FILED
2025 Aug-15 PM 02:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

_____

|  |  |  |
|---|---|---|
| WILLIE BURGESS, JR., | ) | |
| | ) | |
| *Petitioner* | ) | |
| | ) | Case No. 5:24-cv-1751-LCB |
| v. | ) | |
| | ) | |
| TERRY RAYBON, | ) | **CAPITAL CASE** |
| Warden of William C. Holman | ) | |
| Correctional Facility, | ) | |
| | ) | |
| *Respondent.* | ) | |

_____

**FIRST AMENDED PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY UNDER A DEATH SENTENCE**

Petitioner Willie Burgess, Jr., through counsel, respectfully petitions this Court for a writ of habeas corpus under 28 U.S.C. Section 2254 vacating his conviction and sentence of death, which an Alabama court imposed in violation of the United States Constitution.

Mr. Burgess respectfully submits this first amended petition to comply with this Court's order dated April 17, 2025. (*See* Doc. 13 at 8.) The first amended petition is identical to Mr. Burgess's original petition, which was filed in 2024, except now that Respondent has submitted the state court record, Mr. Burgess has

updated all record citations to comply with the CM/ECF numbering system, (*see* Doc. 13 at 8), deleted the first footnote, and added this introductory paragraph.

## INTRODUCTION

1.     This is a death penalty case in which trial counsel repeatedly informed the trial court they were unprepared for both phases of the trial.  Three weeks before the trial began, counsel sought a continuance, representing that they "[could not] properly prepare the case for trial" because one of them was in the middle of a campaign for a judgeship and the other was in the process of moving his office. (Doc. 19-1 at 164.)  The court denied the continuance.  On the day trial was set to begin, one of Mr. Burgess's lawyers again pleaded for a continuance, stating that in his twenty years of practice, he did not "ever remember asking for a continuance in a criminal case because I wasn't prepared, but in this case, it's just, it's been impossible." (Doc. 19-4 at 90–91.)  The guilt phase of the trial nevertheless began that same day, (Doc. 19-4 at 103), and Mr. Burgess's lawyers presented no evidence in his defense.

2.     Immediately after the jury returned its guilty verdict, counsel again moved for a continuance because they had not interviewed any potential mitigation witnesses. (Doc. 19-12 at 102–03.)  The court denied the motion at 3:50 p.m. and gave counsel until 9:00 a.m. the next day to prepare for the penalty phase. (Doc. 19-12 at 104.)  After a brief penalty phase presentation the very next day,

(Doc. 19-12 at 123–202), the jury returned an 11–1 verdict for death.  (Doc 19-2 at 12.)

3.      This was not a case in which defense counsel had nothing to work with.  Mr. Burgess was convicted of capital murder for shooting Louise Crow in the course of a store robbery in Decatur, Alabama.  He was 18 years old at the time.  At trial, counsel argued—consistent with what Mr. Burgess has maintained since the day he was arrested—that the gun fired unintentionally.  Indeed, as the firearms community was aware at the time, the Titan .25 semi-automatic pistol used in the shooting had a design defect making it prone to unintentional discharge.  But at trial, counsel failed to present a firearms expert to explain the design defect to the jury.  Counsel also failed to present other readily available expert testimony that would have directly supported their defense theory.  Counsel presented no evidence whatsoever.

4.      At the penalty phase of the trial, because Mr. Burgess's counsel did not conduct a mitigation investigation, the jury that recommended a death sentence never heard the truth about Mr. Burgess's life, and did not hear any of the compelling mitigating evidence that counsel could easily have obtained.  As a result, the prosecutor was able to argue that Mr. Burgess had "a significantly small amount of mitigating circumstances . . . . We don't see the child being abused.  We don't see the terrible circumstances."  (Doc. 19-13 at 28.)  In fact, Mr. Burgess's

childhood was defined by persistent violence, emotional neglect and abandonment, and ultimately, homelessness.

5.      This is also not a case in which the state postconviction court heard evidence of trial counsel's ineffectiveness and denied relief because it did not find the petitioner's witnesses credible or the evidence sufficient to prove the claims alleged.  Although the postconviction case was pending in the state trial court for almost two decades, the court never granted Mr. Burgess the right to present the facts at an evidentiary hearing.  Although Mr. Burgess's pleadings named lay and expert witnesses and detailed the testimony he expected them to offer, the state court concluded that his claims of ineffective assistance were insufficiently pleaded to even warrant a hearing.

6.      The state court summarily denied Mr. Burgess's claims on the merits, but without hearing a single witness testify.  *See Borden v. Allen*, 646 F.3d 785, 813 (11th Cir. 2011) (holding that state court denial for lack of specificity constitutes denial on the merits).  The state court's ruling was tantamount to a determination that, even if the facts Mr. Burgess alleged in his petition were "assumed to be true," he would not have established a claim of ineffective assistance of counsel.  *Daniel v. Comm'r, Ala. Dept. of Corr.*, 822 F.3d 1248, 1261 (11th Cir. 2016).  That ruling, and the state court's other rulings on Mr. Burgess's constitutional claims, was contrary to, and involved an unreasonable application of,

4

clearly established federal law, and it also represented an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Under *de novo* review, and after affording Mr. Burgess the opportunity to present evidence that the state court denied him, this Court should order a new trial.

## STATEMENT OF FACTS

7.     Willie Burgess, Jr. has been on Death Row since 1994. He was convicted of capital murder for fatally shooting Louise Crow during the course of a robbery of her store when he was eighteen years old. (Doc. 19-1 at 48, 53.) Immediately following his arrest, Mr. Burgess admitted to shooting Mrs. Crow, but maintained (as he has to this day) that it was unintentional. (*See, e.g.*, Doc. 19-1 at 17–19; Doc. 19-9 at 197, Doc. 19-10 at 4–5, Doc. 19-11 at 65, Doc. 19-11 at 68–70.)

8.     The trial court appointed Wesley Lavender and Gregory Biggs to represent Mr. Burgess on July 28, 1993, after relieving his initial trial counsel, who had never handled a murder case. (Doc. 19-3 at 27.) The court authorized $1,000 for investigative expenses, as well as $1,000 for mental and/or physical examinations. (Doc. 19-3 at 46.)

9.     Trial counsel did not spend any of those funds. (Doc. 19-26 at 155.) Their investigator did not even submit a bill. (Doc. 19-26 at 155.) They did not interview any of the State's experts and did not retain any experts of their own to

examine the evidence.  (Doc. 19-26 at 152.)  They interviewed only one potential guilt phase witness, a State's witness whose testimony was so tangential that trial counsel did not contest it at trial.  (Doc. 19-26 at 156.)  They failed to obtain discoverable evidence.  (Doc. 19-26 at 153.)  They did not interview Mr. Burgess about the circumstances of the crime or his defense.  (Doc. 19-26 at 153.)

10.    Once they learned the case might be set for trial in June 1994, counsel repeatedly informed the court that they were unprepared.  They filed two motions to continue, asserting that Mr. Burgess would be denied due process because of their lack of preparation if the case was tried as scheduled.  (Doc. 19-1 at 164–67.) The court denied both motions.  (Doc. 19-1 at 42; Doc. 19-4 at 99–100.)  At a hearing on the second motion on June 20, 1994, Mr. Lavender stated that, in his twenty years of practice, he had never asked for a continuance due to lack of preparation but that he had found it "impossible" to adequately prepare for Mr. Burgess's case in the time the court allotted.  (Doc. 19-4 at 90–91.)  The case went to trial that same day.  (Doc. 19-4 at 103.)

11.    The prosecutor, who had a history of striking women from capital juries, used all his cause challenges and eleven of his fifteen peremptory challenges to remove women from the twelve-person jury, for a strike rate of 73 percent, compared to just under 27 percent for men.  (*See* Doc. 19-27 at 106, 108–10, 119–20.)  He excluded women from the twelve-person jury in a ratio significantly

6

higher than men, *i.e.*, 52.4 percent, as compared to 20 percent.  (Doc. 19-27 at 106, 110.)

12.    At trial, the prosecution sought to prove the killing was intentional by asserting that Mr. Burgess shot Mrs. Crow "between the eyes at point blank range," (Doc. 19-8 at 33, Doc. 19-12 at 35), and that Mrs. Crow was seated on the toilet in the bathroom when she was shot.  (Doc. 19-12 at 23, 26—28.)  The prosecution called police investigators and forensics experts as witnesses. (Doc. 19-8 at 53–108, Doc. 19-10 at 90–184, Doc. 19-10 at 198—Doc. 19-11 at 124, Doc. 19-11 at 141–43.)  Because trial counsel failed to investigate the State's evidence, they were unable to cross-examine the State's witnesses to challenge the State's theory.  (Doc. 19-26 at 148–92.)  They asked almost no questions of the State's law enforcement or forensic witnesses.  (*See, e.g.*, Doc. 19-26 at 163, 181–201.)

13.    Based solely on Mr. Burgess's post-arrest statements, defense counsel argued Mr. Burgess was not guilty of capital murder because the killing was unintentional.  (*See, e.g.*, Doc. 19-12 at 3–5, 18–19.)  Counsel did not present any evidence to support this defense.  (Doc. 19-11 at 144.)  During their deliberations, a juror asked the court for the aid of a firearms expert to provide additional testimony because one juror had "no knowledge of firearms whatsoever." (Doc. 19-12 at 91.)  The court responded that there would be no additional

testimony.  (Doc. 19-12 at 91–92.)  During the subsequent deliberations, individual jurors provided extrinsic knowledge and opinions about the operation of the .25 Titan semi-automatic pistol the State introduced as evidence and about firearms in general.  One juror conducted an experiment with the .25 Titan to show how it operated.  After the experiment, the jury unanimously voted to convict Mr. Burgess of capital murder.  (Doc. 19-12 at 96–97, 99.)

14.    Trial counsel were not prepared to try the penalty phase.  Immediately after the jury returned its verdict on June 27, 1994, they again moved for a continuance because they had not interviewed any witnesses.  (Doc. 19-12 at 102–03.)  The court denied the motion at 3:50 p.m. on June 27, 1994.  (Doc. 19-12 at 104.)  As of 3:50 p.m., trial counsel had yet to conduct a mitigation investigation. (Doc. 19-26 at 197–200.)  They had not located any potential witnesses.  (Doc. 19-26 at 200.)  They had not obtained documentary evidence of Mr. Burgess's life history, except for a few school and hospital records.  (Doc. 19-26 at 201.)  The court gave counsel until 9:00 a.m. the next day to prepare for the penalty phase case.  (Doc. 19-12 at 104.)  At the penalty phase the next day, counsel called only four unprepared witnesses who gave brief, incomplete, and inaccurate testimony. (*See* Doc. 19-12 at 122–64.)

15.    Because the jury never heard the truth about Mr. Burgess's young life, the State was able to argue that the teenager had "a significantly small amount of

mitigating circumstances." (Doc. 19-13 at 28.)  The prosecutor reminded the jury that they had not heard testimony about "the child being abused" and that "[w]e don't see the terrible circumstances" in Mr. Burgess's life.  (Doc. 19-13 at 28.)  In fact, the prosecutor argued, "[h]e is not in the dire circumstances that most of the defendants we deal with in these kinds of cases come through."  (Doc. 19-10 at 28.)

16.    On June 28, 1994, the jury returned a non-unanimous 11–1 verdict recommending death.  (Doc. 19-2 at 12.)  At sentencing on August 24, 1994, the court noted the lack of mitigation Mr. Burgess's counsel presented and sentenced him to death.  (Doc. 19-1 at 55–56.)

17.    Because his counsel did not conduct a mitigation investigation, the jury that recommended a death sentence and the trial judge who sentenced him never heard the truth about his life, and did not hear any of the compelling mitigating evidence that counsel could easily have obtained, and that undersigned counsel alleged in state postconviction proceedings.  They never heard that his father physically and verbally abused him and his siblings, (Doc. 19-27 at 19, 21); his father sexually molested both Mr. Burgess's disabled sister, Michelle, and his sister Barbara, (Doc. 19-27 at 20–21, 23); his mother was mentally ill and suffered from cognitive disabilities, (Doc. 19-27 at 23–25); she emotionally abandoned and beat her children, (Doc. 19-27 at 22–24); and she separated from Mr. Burgess's

9

father because he was violent towards her, and on one occasion threatened to cut her throat.  (Doc. 19-27 at 22.)

18.     The jury and judge never heard that Mr. Burgess grew up in extreme poverty, (Doc. 19-27 at 26–27), and had a history of chronic, severe headaches, (Doc. 19-27 at 41); he suffered head trauma on multiple occasions, including two separate incidents in which he was stabbed in the head, (Doc. 19-27 at 41–42); he became homeless at the age of fifteen, (Doc. 19-27 at 37–38), when there were no local resources for homeless teenagers, (Doc. 19-27 at 38); medical and social work staff at the emergency room where he occasionally sought treatment were concerned about his emotional and physical well-being, but were unable to obtain assistance for him through the Department of Human Resources, (Doc. 19-27 at 44–47); during this period, he was profoundly depressed and had attempted suicide, (Doc. 19-27 at 48, 50, 52–54); and near the time of his arrest, he believed he was dying of brain cancer or a brain tumor.  (Doc. 19-27 at 54.)

## PROCEDURAL HISTORY

19.     This is a capital case with an unusual procedural history.

20.     Mr. Burgess was charged with capital murder (murder during the course of a first-degree robbery) in violation of Ala. Code section 13A-5-40(a)(2).  (Doc. 19-1 at 46, 63.)  He entered a plea of not guilty.  (Doc. 19-1 at 43.)  At

arraignment and at his preliminary hearing, Polly Chatham (appointed) and

Norman Roby (pro bono assisting attorney) represented Mr. Burgess.

21.    Mr. Burgess was tried by a jury that returned a verdict of guilty on the

charge of capital murder and rendered an advisory verdict of 11–1 in favor of a

sentence of death.  (Doc. 19-2 at 11–12.)  Morgan County Circuit Judge Bennett

McRae sentenced him to death on August 24, 1994.  (Doc. 19-1 at 55–56.)

Mr. Burgess did not testify at trial, although he had testified at a hearing on a mid-

trial motion to suppress his post-arrest statements.  (Doc. 19-9 at 177—Doc. 19-10

at 13.)  Wesley M. Lavender and Gregory M. Biggs represented Mr. Burgess at

trial and sentencing.

22.    Counsel for Mr. Burgess filed a post-trial motion for a new trial,

motion in arrest of judgment, and motion for judgment of acquittal.  (Doc. 19-15 at

24–37.)  No evidence was presented at the hearing on these motions, although the

court heard some argument, (Doc. 19-15 at 121–44), and the Clerk of the Jury

Commission was asked to secure records.  (Doc. 19-15 at 113–21.)  The court

denied the post-trial motions on December 9, 1994.  (Doc. 19-15 at 7.)

Mr. Burgess then appealed his conviction and death sentence.

23.    In his post-trial motions and direct appeal, he was represented by

Thomas DiGiulian, William L. Middleton, Catherine Roberts (Halbrooks), and

Laura Francis Owens. The Alabama Court of Criminal Appeals and the Alabama

Supreme Court affirmed Mr. Burgess's conviction and death sentence.  *Burgess v. State*, 827 So. 2d 134 (Ala. Crim. App. 1998), *reh'g denied* (Feb. 5, 1999); *Ex parte Burgess*, 827 So. 2d 193 (Ala. 2000), *reh'g denied* (Feb. 8, 2002).

24.     The United States Supreme Court denied certiorari.  *Burgess v. Alabama*, 537 U.S. 976 (2002).  Elisabeth Semel and Charles D. Weisselberg represented Mr. Burgess in the Supreme Court.

25.     On July 29, 2003, Mr. Burgess filed a timely Rule 32 petition in Morgan County Circuit Court.  (Doc 19-23 at 10—Doc. 19-24 at 138.)  He was represented by Elisabeth Semel, Charles D. Weisselberg, and Jake Watson.  His petition detailed the numerous constitutional deficiencies of his trial counsel and other constitutional violations.  (Doc. 19-23 at 10—Doc. 19-24 at 138.)  Because Judge McRae had retired, the petition was assigned to a judge who had not presided over any previous proceedings in the case, the Honorable Steven Haddock.

26.     On September 24, 2003, Mr. Burgess filed a motion for discovery, which Judge Haddock denied as "premature."  (Doc. 19-33 at 22—75; Doc. 19-25 at 138–39.)

27.     At a September 2005 status hearing, Judge Haddock told the parties this was the first Rule 32 proceeding in which he had not presided over the trial, and he no longer had a law clerk assisting him.  (Doc. 19–4 at 68.)  In May 2007,

12

the court permitted Mr. Burgess to make a limited amendment to one claim in his petition.  (Doc. 19-26 at 100.)

28.     For the next nine years (May 2007 to September 2016), the circuit court took no action in the case.

29.     During this time, however, Mr. Burgess continued to seek to vindicate his constitutional rights.  In 2008, he moved the court for leave to amend his petition and concurrently filed his First Amended Petition, which consisted of 287 pages and provided additional facts in response to the State's argument that the initial petition was not sufficiently specific.  (Doc. 19-26 at 121–27; Doc. 19-34 at 20—Doc. 19-35 at 108.)  In presenting the claims of trial counsel's deficient performance in the investigation, preparation, and presentation of both phases of Mr. Burgess's capital trial, the petition detailed the evidence trial counsel unreasonably failed to develop through consultation with expert witnesses.  (*See, e.g.*, Doc. 19-34 at 46–52, 105–11, 118–21, 124–29, 130–43, Doc. 19-35 at 4–18.)  At this time, Elisabeth Semel, Ty Alper, and Jake Watson represented Mr. Burgess.

30.     The court never ruled on the motion for leave to amend.  The State took nearly a year to request additional time to respond to the First Amended Petition.  (Doc. 19-26 at 128–30.)  The court did not rule on the State's request, and the State filed nothing in response.

31.     On September 19, 2016, the court issued its first order in the case in almost a decade.  The court set a schedule for the filing of additional pleadings. (Doc. 19-26 at 135–36.)  On November 17, 2016, Mr. Burgess filed his Second Amended Petition.  (Doc. 19-26 at 137—Doc. 19-28 at 36.)  The petition provided further specific facts to support his claims, including detailed allegations regarding ineffective assistance of trial counsel for failure to consult with experts who would have provided testimony that corroborated Mr. Burgess's defense that the shooting was unintentional.  The petition alleged the specific facts and opinions to which these experts would have been able to testify at trial.  (*See, e.g.*, Doc. 19-26 at 160–76.)  Mr. Burgess simultaneously moved again for discovery.  (Doc. 19-33 at 90–123; Doc. 19-36 at 33–100.)

32.     In February 2017, the circuit court denied Mr. Burgess's motion for discovery, ruling that it would consider discovery requests once it had delineated the claims appropriate for an evidentiary hearing.  (Doc. 19-28 at 47–48.)

33.     In June 2017, the State filed an Answer to the Second Amended Petition, arguing that Mr. Burgess's petition was not specific enough because it did not include the names of experts Mr. Burgess alleged should have been called at trial.  (*See, e.g.*, Doc. 19-28 at 76–77, 79–80, 82, 86.)  In response, Mr. Burgess moved to amend his petition to provide the names of the experts, and he provided

the names in his proffered amendment.  (Doc. 19-5 at 13; Doc. 19-29 at 95–106.)
The circuit court denied the motion to amend.  (Doc. 19-29 at 93.)

34.    In February 2018, the circuit court acknowledged that "it ha[d] not completed" its ruling on which claims, if any, would proceed to an evidentiary hearing.  (Doc. 19-29 at 144.)  In January 2019, Judge Haddock retired.  Although he had presided over the Rule 32 proceedings for almost 16 years, he had not ruled on any of the claims in Mr. Burgess's petition.  Nonetheless, he remained on the case because the Presiding Circuit Judge temporarily appointed him through July 22, 2019.  (Doc. 19-29 at 147.)  When the court did not rule by that date, the presiding judge extended Judge Haddock's appointment for another year. (Doc. 19-29 at 149.)

35.    On July 19, 2020, four days before the appointment was to expire, the court summarily denied the petition.  (Doc. 19-29 at 150—Doc. 19-30 at 126.) Mr. Burgess filed a motion for reconsideration, (Doc. 19-30 at 127–85), which was denied by operation of law because the court failed to rule before its jurisdiction expired.  (Doc. 19-31 at 28.)

36.    Mr. Burgess appealed, represented by Elisabeth Semel and Ty Alper. The Alabama Court of Criminal Appeals affirmed the denial of relief in an opinion dated June 23, 2023.  *Burgess v. State*, No. CR-19-1040, 2023 WL 4146021, at *58 (Ala. Crim. App. June 23, 2023)*.  In its ruling, the Court of Criminal Appeals held

that the primary justification for the circuit court's summary dismissal of Mr. Burgess's ineffective assistance of counsel claims—that the claims were not pleaded specifically enough—was proper. *See, e.g., Burgess*, 2023 WL 4146021, at *6.

37.    Mr. Burgess filed an application for rehearing on September 5, 2023, which the Court of Criminal Appeals denied on March 15, 2024.  Mr. Burgess filed a petition for certiorari in the Alabama Supreme Court on March 29, 2024.  That court denied certiorari on September 27, 2024.

## JURISDICTION

38.    This Court has subject matter jurisdiction under 28 U.S.C. Section 2241(a).  This Court has personal jurisdiction under 28 U.S.C. Section 2241(a) because Mr. Burgess was convicted and sentenced in the Circuit Court of Morgan County, Alabama.

## GROUNDS FOR RELIEF

**I.    THE PROSECUTION USED ITS PEREMPTORY CHALLENGES IN A MANNER THAT DISCRIMINATED ON THE BASIS OF GENDER IN VIOLATION OF *J.E.B. v. ALABAMA*.**

39.    The prosecutor in Mr. Burgess's case exercised all his cause challenges against women.[1]  After the completion of cause challenges, forty-one jurors remained in Mr. Burgess's jury venire.  (Doc. 19-1 at 195–96; Doc. 19-16 at 18–19.)  Of this group, twenty-one were women and twenty were men.  (Doc. 19-1 at 195–96; Doc. 19-16 at 16–19.)  The trial judge allotted fifteen peremptory strikes to the prosecution and fourteen to the defense.  (Doc. 19-7 at 171.)

40.    District Attorney Robert Burrell then used eleven of his fifteen peremptory challenges to strike eleven out of the twenty-one qualified women from Mr. Burgess's venire, which represents a strike rate of seventy-three percent in the selection of the twelve-person jury.  (Doc. 19-1 at 195–96; Doc. 19-7 at 173–78.)[2]

---

[1] The female jurors struck for cause on the State's motion were Geraldine Couch (24), (Doc. 19-5 at 47); Gilla Brazelton (47), (Doc. 19-5 at 178–80); and Bertha Fuqua (53), (Doc. 19-7 at 49).

[2] The State exercised peremptory strikes against the following eleven female jurors: Peggy Lasater (44); Shirley Gullatt (36); Debra Hyatt (8); Debra Proctor (27); Jane Demonia (12); Bonnie Chancellor (31); Sandra Kent (10); Pearl Haga (29); Annette Byrd (17); Patricia Robinson (33); and Linda Long (50). (Doc. 19-7 at 173–78; Doc. 19-1 at 195–96.)  Ultimately, only four of the twelve jurors on Mr. Burgess's jury were women: Ladonna McWhorter, Karen Owens, Sheri Buckelew, and Robbie Garmon.  (Doc. 19-1 at 195–96; Doc. 19-7 at 180.)

41.    Mr. Burgess was thus tried by a jury that was only 33 percent women, in contrast to the venire, which was 51.2 percent women.  (Doc. 19-27 at 106.)  In striking down to the twelve-person jury, the prosecutor excluded 52.4 percent of the female venire members, but only 20 percent of the male venire members.  (*See* Doc. 19-27 at 106.)  The odds of the prosecution striking a female juror in selecting the twelve-person jury were 2.62 times those of a male juror.  (*See* Doc. 19-1 at 195–96, Doc. 19-7 at 173–78.)  These disparities are not the result of "happenstance."  *See Miller-El v. Cockrell*, 537 U.S. 322, 342 (2003) (*Miller-El I*).  Both the prosecutor's cause and peremptory challenges demonstrate his consistent effort to remove women from Mr. Burgess's jury.

42.    Mr. Burgess was entitled to a jury selection process untainted by purposeful discrimination.  *See Batson v. Kentucky*, 476 U.S. 79, 85–86 (1986).  In *Batson*, the United States Supreme Court reaffirmed its holding that "[p]urposeful racial discrimination in the selection of the [petit jury] violate a defendant's right equal to protection."  476 U.S. at 86 (citing *Swain v. Alabama*, 380 U.S. 202 (1965); *Strauder v. West Virginia*, 100 U.S. 303 (1880)).  The Court, declaring that the evidentiary burden had heretofore been "crippling," announced a three-step inquiry to determine whether a defendant has made the necessary showing of

---

The eight seated male jurors were: Lawrence Brown, Jr., Edward Sims, Jimmy Cross, Larry Chapman, Barry Ziegler, Monty McCulloch, Johnnie Shipley, and John Pearce.  (Doc. 19-1 at 195–96.)

intentional discrimination.  *Id*. at 92, 96–98.  Prior to the commencement of Mr. Burgess's trial, the Court extended *Batson*'s protections to peremptory challenges based on gender.  *J.E.B. v. Alabama*, 511 U.S. 127, 129 (1994).

43.     Under *Batson* and *J.E.B.*, a defendant establishes a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose."  *Batson*, 476 U.S. at 94; *J.E.B.*, 511 U.S. at 144–45.  A defendant may make out a prima facie case of discrimination based solely on facts gleaned from his trial, and the inference of discrimination can be based on a single strike against one juror.  *See Batson*, 476 U.S. at 95–96; *J.E.B.*, 511 U.S. at 142 n.13.  *Batson* offered two evidentiary examples, noting they were "merely illustrative," that may give rise to an inference of discrimination: a "pattern" of strikes and "the prosecutor's questions and statements" during jury selection.  *Id*. at 97.  The Court held that a defendant may make the necessary showing based on "any . . . relevant circumstances" and that the trial judge "shall consider all relevant circumstances."  *Id*. at 96; *id*. (stating that an inference may be raised based on "a combination of factors"); *id*. at 94 (stating that the defendant may make out prima facie case based on "the totality of the relevant facts").

44.     The Alabama Court of Criminal Appeals reviewed Mr. Burgess's *J.E.B.* claim on direct appeal and denied it on the merits.  *Burgess*, 827 So. 2d at 150. The entirety of the court's analysis was as follows:

> We do not find sufficient evidence that the female veniremembers who were struck shared only the characteristics of gender. Nor do we find anything in the type and manner of the prosecutor's statements or questions during the extensive voir dire examination that indicated an intent to discriminate against female jurors. We do not find a lack of meaningful voir dire directed at the female jurors or that female jurors and male jurors were treated differently. There is no evidence that the prosecutor had a history of misusing peremptory challenges so as to discriminate against women. We find only that the prosecutor used many of his strikes to remove women from the venire.

*Id.*

45.    The state court's ruling was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d); *J.E.B.*, 511 U.S. at 129. Under a proper step one analysis, the "totality of the relevant facts" surrounding the prosecutor's strikes of eleven qualified women in the selection of Mr. Burgess's jury made out a prima facie showing of discrimination. *See Batson*, 476 U.S. at 93–94. In addition to the prosecution's exercise of all its cause challenges against women and the number of his strikes, the relevant facts encompass the sequence of strikes; the side-by-side comparisons between struck prospective women jurors and seated male jurors; the heterogeneity of the struck prospective women jurors; and the manner of the prosecutor's voir dire:

46.    ***The sequence of the prosecutor's strikes against women in Mr. Burgess's venire.*** The prosecutor used seven of his first eight strikes to

remove women from the venire.[3]  (Doc. 19-1 at 195–96; Doc. 19-7 at 173–76.)  He used four of his last five strikes against women, reserving his fifteenth strike for a man the prosecutor knew would serve as the first alternate juror.[4]  (Doc. 19-1 at 195–96; Doc. 19-7 at 176–78; *see* Ala. R. Crim. P. 18.4.)  Striking this male juror posed no risk to the prosecutor's intention of keeping as many women off the seated jury as possible.  (Doc. 19-1 at 195–96.)  The timing of the prosecution's decision to strike or refrain from striking a juror may support an inference of purposeful discrimination.  *See Miller-El v. Dretke*, 545 U.S. 231, 250 (2005) (*Miller-El II*) (commenting on the prosecution's decision, toward the end of jury selection, when it had only a few strikes remaining, to allow one Black juror to be seated).  In addition to the sheer numbers, this sequence was part of the prosecution's "pattern" of strikes in the selection of the seated jury.  *See Batson*, 476 U.S. at 97.

47.    ***The "side-by-side comparisons" of "[s]imilarly situated" women whom the prosecutor struck and men who were seated on the jury.***  *Miller-El II*, 545 U.S. at 241.  During the selection of Mr. Burgess's jury, the prosecutor struck several women, each of whom was similarly situated to at least one seated male

---

[3] The prosecutor struck Bonnie Chancellor, Linda Long, Debra Proctor, Peggy Lasater, Jane Demonia, Debra Hyatt, and Annette Byrd.  (Doc. 19-7 at 173–76; Doc. 19-1 at 195–96.)

[4] The prosecutor struck Patricia Robinson, Pearl Haga, Shirley Gullatt, and Sandra Kent.  (Doc. 19-7 at 176–178; Doc. 19-1 at 195–96.)

juror.  *Id.* at 247 n.6 (explaining that jurors need not be "identical in all respects" to be "similarly situated" because "potential jurors are not products of a set of cookie cutters").  Several sets of struck female jurors and seated male jurors provided similar answers to the parties' questions and were thus similarly situated:[5]

> (1)    Sandra Kent, who was struck by the prosecution, and Barry Ziegler, who served on the jury, were both middle-aged. (Doc. 19-1 at 196.)  Neither had a personal relationship with any member of the defense team.  (Doc. 19-5 at 201–02, Doc. 19-6 at 99.)  Neither had ever served on a jury.  (Doc. 19-5 at 202, Doc. 19-6 at 99–103.)  Neither worked in law enforcement, nor did their family members or close friends.  (Doc. 19-6 at 3–4, 104–05.)  Neither had been the victim of a crime, nor had their family members or close friends.  (Doc. 19-6 at 9–10, 106–11.) Both had previously heard about the case, and both agreed that they could disregard what they had heard to decide the case based solely on the evidence presented at trial and the judge's instructions.  (Doc. 19-6 at 18–21, 51–52, 57–58, 70, 115–16, 119–20, 151–54.)  Both agreed to require the defense to prove that Mr. Burgess was insane at the time of the offense.  (Doc. 19-6 at 25–26, 122–23.)  Neither had personal or religious objections to the death penalty.  (Doc. 19-6 at 27, 124.)  Both could impose the death penalty for murder during a robbery, could impose the death penalty despite Mr. Burgess's young age, would be able to

---

[5] The trial court divided the venire into five panels. (Doc. 19-4 at 138.)  The prosecutor questioned each panel about the same topics: familiarity with the defendant and his family, (Doc. 19-4 at 188–89); familiarity with the defense investigator and attorneys, (Doc. 19-4 at 190-93); prior jury service, (Doc. 19-4 at 194–95); experience with the criminal justice system, (Doc. 19-4 at 196–200); knowledge of the case, (Doc. 19-4 at 200–01, 205); familiarity with anyone also called for jury duty that week, (Doc. 19-4 at 207); feelings about the prosecution's and defense's burdens of proof for conviction and an insanity defense, (Doc. 19-5 at 3–4, 6–7); and views about the death penalty.  (Doc. 19-5 at 8–9, 15–23.)  For purposes of illustration, the preceding record citations refer to Panel One. The comparative analyses include citations to some jurors' answers to defense questions on these subjects.

personally announce their death recommendation to the judge, and viewed the death penalty as a deterrent. (Doc. 19-6 at 27, 34–36, 39–40, 77, 124–26, 128–29, 172.)

(2)     Debra Hyatt, who was struck by the prosecution, and Johnnie Shipley, who served on the jury, were in their late thirties. (Doc. 19-1 at 195–96.) Neither had a personal relationship with any member of the defense team. (Doc. 19-5 at 65–66, Doc. 19-6 at 97–99.) Neither had ever served on a jury. (Doc. 19-5 at 67–69, Doc. 19-6 at 99–105.) Neither they nor their family members or close friends worked in law enforcement. (Doc. 19-5 at 69–70, Doc. 19-6 at 105.) Both of their homes had been burglarized. (Doc. 19-5 at 77–78, Doc. 19-6 at 106.) Both had heard about Mr. Burgess's case prior to the trial. (Doc. 19-5 at 97–98, Doc. 19-6 at 115–16.) While Mr. Shipley said that he could give Mr. Burgess a fair trial despite what he had heard about the case, Ms. Hyatt did not address this issue because she was not asked. (Doc. 19-5 at 98, 101–02, Doc. 19-6 at 115, 119.) Both agreed to require the defense to prove Mr. Burgess's insanity. (Doc. 19-5 at 103–05, Doc. 19-6 at 123.) Neither had personal or religious objections to the death penalty. (Doc. 19-5 at 107, Doc. 19-6 at 124.) Both could impose the death penalty for murder during a robbery, could impose the death penalty in a case in which the defendant was 18 at the time of the crime and 20 at the time of trial, and would be able to personally announce their death recommendation to the judge. (Doc. 19-5 at 107–11, 118–19, Doc. 19-6 at 124–29, 134–35.) Neither viewed the death penalty as a deterrent. (Doc. 19-5 at 161, Doc. 19-6 at 172.)

(3)     Jane Demonia, who was struck by the prosecution, and Lawrence Brown, who served on the jury, were both middle-aged. (Doc. 19-1 at 195.) Neither had a relationship with any member of the defense team. (Doc. 19-4 at 190, Doc. 19-5 at 62–67.) Neither had served on a jury in a criminal trial. (Doc. 19-4 at 194–95, Doc. 19-5 at 68–69.) Neither they nor their family members or close friends worked in law enforcement. (Doc. 19-4 at 196, Doc. 19-5 at 69–71.) Neither they nor their family members had been the victims of crime. (Doc. 19-4 at 198–99, Doc. 19-5 at 71–82.) Both had heard about the case prior to trial but stated that they could give Mr. Burgess a fair trial. (Doc. 19-

4 at 201–03, Doc. 19-5 at 84–88.)  Both would require the defense to prove that Mr. Burgess was insane at the time of the offense. (Doc. 19-5 at 6–7, 103–05.)  Neither had personal or religious objections to the death penalty. (Doc. 19-5 at 9, 107.)  Both could impose the death penalty for murder during a robbery, could impose the death penalty against defendant despite his young age, and would be able to personally announce their death recommendation to the judge. (Doc. 19-5 at 9, 16–18, 23, 106–08, 110–11, 117–19.)

(4)    Shirley Gullatt and Pearl Haga, both of whom were struck by the prosecution, and Lonnie McCulloch, who served on the jury, were all middle-aged.  (Doc. 19-1 at 195–96.)  None had a relationship with the defense attorneys or defense investigator. (Doc. 19-4 at 190–93, Doc. 19-6 at 97–99.)  None had served on a jury in a criminal trial.  (Doc. 19-4 at 194–95, Doc. 19-6 at 99–103.)  Neither they nor their family members or close friends worked in law enforcement.  (Doc. 19-4 at 196–98, Doc. 19-6 at 104–05.)  Neither they nor their family members or close friends had been crime victims.  (Doc. 19-4 at 197–98, Doc. 19-6 at 115–19.)  All three had heard about the case but said that they could give Mr. Burgess a fair trial in which they would base their verdicts on the evidence presented and the judge's instructions. (Doc. 19-4 at 201–07, Doc. 19-6 at 115–19.)  All three would require the defense to prove that Mr. Burgess was insane at the time of the offense.  (Doc. 19-5 at 6–7, Doc. 19-6 at 121–23.) None had personal or religious objections to the death penalty. (Doc. 19-5 at 9, Doc. 19-6 at 124.)  All three could impose the death penalty for murder during a robbery, could impose the death penalty against Mr. Burgess despite his young age, and would be able to personally announce their death recommendation to the judge.  (Doc. 19-5 at 17–18, 22–25, Doc. 19-6 at 124–29, 134–35.)

48.    In the selection of Mr. Burgess's jury, five of the struck women—

Shirley Gullatt, Debra Hyatt, Jane Demonia, Sandra Kent, and Pearl Haga—and all

the seated male jurors gave similar answers and were thus similarly situated:

(1)    Neither these five struck women nor the eight seated male jurors had been the victims of violent crime.  (Doc. 19-4 at 198–99, Doc. 19-5 at 71–78, Doc. 19-6 at 9–10, 106–11.)  Four of these struck prospective female jurors and four of the seated male jurors had never been victims of crime, nor had any of their family members or close friends.    (Doc. 19-4 at 196–97.) (Shirley Gullatt and Lawrence Brown), (Doc. 19-5 at 71–77) (Jane Demonia), (Doc. 19-6 at 9–10) (Sandra Kent and William Chapman), (Doc. 19-6 at 106–11) (Pearl Haga, Barry Ziegler, and Lonnie McCulloch).  Of those who had been crime victims, all had been the victims of burglary.  One struck woman and two seated male jurors had been burglary victims decades before Mr. Burgess's trial.    (Doc. 19-5 at 77–78) (Debra Hyatt), (Doc. 19-6 at 11–12) (Edward Sims), (Doc, 19-6 at 110) (John Pearce).

(2)    Four of the five struck prospective female jurors and six of the eight seated male jurors saw or read pretrial publicity about the case but said that they could give Mr. Burgess a fair trial despite this exposure.    (Doc. 19-4 at 200-07) (Shirley Gullatt and Lawrence Brown), (Doc. 19-5 at 84–88) (Jane Demonia), (Doc. 19-5 at 18–21) (Edward Sims and Jimmy Cross), (Doc. 19-6 at 51–70) (Sandra Kent), (Doc. 19-6 at 115–19) (Pearl Haga, Barry Ziegler, Lonnie McCulloch, and Johnny Shipley).

(3)    The five struck prospective female jurors and all the seated male jurors agreed that they would require the defense to prove that Mr. Burgess was insane at the time of the offense.  (Doc. 19-5 at 5-7) (Shirley Gullatt), (Doc. 19-5 at 103-05) (Debra Hyatt and Jane Demonia), (Doc. 19-6 at 25–26) (Sandra Kent, William Chapman, Edward Sims, and Jimmie Cross), (Doc. 19-6 at 123) (Pearl Haga, Barry Ziegler, Lonnie McCulloch, Johnnie Shipley, and John Pearce).

(4)    The five struck prospective female jurors and all the seated male jurors had no personal or religious objections to the death penalty, could recommend the death penalty for murder during a robbery, could impose the death penalty despite Mr. Burgess's young age, and could tell the judge that he or she had voted for the death penalty.  (Doc. 19-5 at 8–9, 16–18, 22–25) (Shirley

25

Gullatt and Lawrence Brown), (Doc. 19-5 at 106–108, 110–111, 118–119) (Debra Hyatt and Jane Demonia), (Doc. 19-56 at 27, 33–36, 39–41) (Sandra Kent, William Chapman, Edward Simms, and Jimmie Cross), (Doc. 19-6 at 124–129, 134–136) (Pearl Haga, Barry Ziegler, Lonnie McCulloch, Johnnie Shipley, John Pearce).

49.     ***The heterogeneity of the eleven women whom the prosecutor struck from Mr. Burgess's venire.***  The struck prospective female jurors ranged in age, lived in different parts of the county, had varying experiences with the criminal justice system, and held differing views on the death penalty.  Their only shared characteristic was gender.

(1)     The eleven women excluded by the prosecution ranged in age: two women—Debra Hyatt and Debra Procter—were in their thirties; six women—Sandra Kent, Shirley Gullatt, Jane Demonia, Patricia Robinson, Peggy Lasater, and Linda Long—were in their forties; and three women—Pearl Haga, Annette Byrd, and Bonnie Chancellor—were in their fifties.  (Doc. 19-1 at 195–96.)

(2)     The eleven women resided throughout Morgan County.  Two women—Peggy Lasater and Shirley Gullatt—lived in Lacey's Spring, a rural area in eastern Morgan County.  (Doc. 19-1 at 195–96.)  Six women—Debra Hyatt, Debra Procter, Bonnie Chancellor, Sandra Kent, Patricia Robinson, and Linda Long—lived in Decatur, the county seat.  (Doc. 19-1 at 195–96.)  Two others—Jane Demonia and Annette Byrd—lived in Hartselle, a less-populated area in southern Morgan County.  (Doc. 19-1 at 195–96.)  The eleventh woman—Pearl Haga—lived in Valhermoso Springs, a sparsely populated area east of Decatur. (Doc. 19-1 at 196.)

(3)     The struck women also had varying experiences with the criminal justice system.  One woman—Bonnie Chancellor—was a distant relative of the victim by marriage.  (Doc. 19-4 at 154.)  Two women—Bonnie Chancellor and Patricia Robinson—had been

26

crime victims. (Doc. 19-5 at 72–73, Doc. 19-6 at 107.) Three women—Debra Hyatt, Bonnie Chancellor, and Annette Byrd—had a family member who had been the victim of a crime. (Doc. 19-5 at 77–79, Doc. 19-6 at 111.) One woman—Linda Long—was related to a law enforcement officer who had investigated Mr. Burgess's case. (Doc. 19-6 at 195.) The Morgan County District Attorney was prosecuting Patricia Robinson's incarcerated son. (Doc. 19-6 at 174.) Two women—Jane Demonia and Annette Byrd—had previously served on a jury, though in civil cases. (Doc. 19-5 at 68–69, Doc. 19-6 at 101–112.) One of these women—Annette Byrd—also served as an alternate juror in a criminal case. (Doc. 19-6 at 103–04.)

(4)  Finally, the struck women's views on the death penalty varied. Five women—Peggy Lasater, Bonnie Chancellor, Debra Procter, Annette Byrd, and Linda Long—expressed reservations about imposing the death penalty. (Doc. 19-5 at 25–27, 107–108, 112–13, 120–21, Doc. 19-6 at 137, Doc. 19-7 at 16–17.) However, six struck women—Shirley Gullatt, Debra Hyatt, Jane Demonia, Sandra Kent, Pearl Haga, and Patricia Robinson—fully supported the death penalty. (Doc. 19-5 at 24–25, 118–19, Doc. 19-6 at 39–40, 135–36.)

50.  ***The prosecutor's manner of voir dire.*** *See Batson*, 476 U.S. at 97.

(1)  Prior to Mr. Burgess's trial, the prosecutor successfully opposed defense counsel's request for individual sequestered voir dire. (Doc. 19-3 at 38–41.)

(2)  The prosecutor's voir dire consisted of posing questions to each panel as a whole and engaging with individuals only after one or more potential jurors raised a hand. This manner of questioning put the onus on each individual juror to reveal a personal detail or signal that he or she might not be able to follow the law. The prosecutor asked, for example, "Are there any of you who have personal or religious objections to the death penalty?" (Doc. 19-5 at 107; *see also* Doc. 19-5 at 9, Doc. 19-6 at 27, 124.) He asked, "Are there any of you who . . . feel that [capital punishment is] too serious a penalty for a murder during the course of a robbery?" (Doc. 19-5 at 17; *see also* Doc. 19-5 at 110–11, Doc.

> 19-6 at 35, 126.)  He also asked, "Are there any of you who feel like . . . the death penalty . . . [is] too harsh for somebody who is eighteen, twenty years old?"  (Doc. 19-5 at 18; *see also* Doc. 19-5 at 111, Doc. 19-6 at 36, 128.)

(3)    Only one-third of the prosecutor's questions elicited a response by one or more of the prospective jurors.  (Doc. 19-4 at 188—Doc. 19-5 at 27, Doc. 19-5 at 60–122, Doc. 19-5 at 339—Doc. 19-6 at 41, 96–137, Doc. 19-6 at 185—Doc. 19-7 at 20.)

51.    The prosecutor's manner of questioning made the voir dire a pro forma exercise.  It indicates that the prosecutor was not interested in information that might provide lawful grounds for exercising peremptory strikes, and further supports the inference that he based his strikes on gender.  *See Batson*, 476 U.S. at 97 (explaining that a prosecutor's questions during voir dire may support a prima facie showing).

52.    The prosecution's peremptory challenges of female prospective jurors based on their gender deprived Mr. Burgess of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and all other applicable federal law.

53.    This Court should find that Mr. Burgess established a prima facie case of gender discrimination with respect to the State's peremptory challenges, which requires a hearing on steps two and three of the *Batson*/*J.E.B.* analysis.  *See Madison v. Comm'r, Ala. Dept. of Corr.*, 677 F.3d 1333, 1339 (11th Cir. 2012) ("[W]e reverse the district court's order and remand the case for the district court

28

to complete the final two steps of the *Batson* proceeding."); *Johnson v. California*, 545 U.S. 162, 170, 173 (2005) (observing that the Court "remanded [*Batson*] for further proceedings because the trial court failed to demand an explanation from the prosecutor–*i.e.*, to proceed to *Batson*'s second step–despite the fact that the petitioner's evidence supported *an inference* of discrimination" and remanding *Johnson* to the state court after holding that the petitioner had established a prima facie showing).[6]

54.    Because the facts outlined above establish a prima facie showing of purposeful gender discrimination, Mr. Burgess is now entitled to an evidentiary hearing to complete the *Batson/J.E.B.* inquiry.  Specifically, this Court should hold a hearing at which the trial prosecutors must provide gender-neutral reasons for their strikes of the female prospective jurors.  *See Batson*, 476 U.S. at 97–98.  The Court then must determine whether Mr. Burgess has established purposeful discrimination based on all relevant circumstances.  *See id.* at 98.[7]

---

[6] In the past two decades, the Supreme Court has issued several opinions elucidating its opinion in *Batson*.  The Court has been explicit, however, that these decisions did not announce new law.  *See, e.g.*, *Flowers*, 588 U.S. at 316 (explaining that, in granting relief, the Court "simply enforce[d] and reinforce[d] *Batson*").

[7] Additionally, this Court is not required to accord deference to the decision of the Alabama Court of Criminal Appeals on this issue for the reasons articulated in paragraphs 136–38 below, which are incorporated by reference herein.  *See Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024).

## II.  TRIAL COUNSEL FOR MR. BURGESS WERE CONSTITUTIONALLY INEFFECTIVE.

55.  To establish ineffective assistance of counsel, a petitioner must demonstrate that (1) his counsel performed deficiently, and (2) their deficient performance resulted in prejudice. *Strickland v. Washington*, 466 U.S. 668, 692 (1984). The deficient performance inquiry turns on whether counsel's acts and omissions were unreasonable "under prevailing professional norms." *Id.* at 688. As for prejudice, the standard is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Here, Mr. Burgess's counsel performed inadequately at every stage of the trial. Counsel did not have a strategic reason for their deficient actions and omissions. Their deficient performance resulted in prejudice.

56.  The Supreme Court has held that a court conducting an ineffective-assistance-of-counsel inquiry must evaluate the reasonableness of counsel's performance as a whole. In *Strickland*, the Court stated, "[T]he performance inquiry must be whether counsel's assistance was reasonable *considering all the circumstances*." 466 U.S. at 688 (emphasis added). The task is not to examine each moment of the representation in isolation, but instead to examine whether counsel performed reasonably. The same principle applies to the prejudice inquiry. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional *errors*, the result of the

30

proceeding would have been different." *Strickland*, 466 U.S. at 694 (emphasis added); *see also id.* at 696 ("[A] court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors."). The Eleventh Circuit, when applying section 2254(d), has recognized that a cumulative approach under *Strickland* is required as a matter of clearly established federal law. For example, in *Daniel*, the court held, under section 2254(d), that the Alabama Court of Criminal Appeals had unreasonably "broke[n] up [petitioner's] penalty phase ineffective assistance of counsel claim into different subparts, then analyzed them separately." 822 F.3d at 1278. As a result, the state court "unreasonably failed to consider the prejudicial effect of trial counsel's deficient performance based on the 'totality of available mitigating evidence,' as established Supreme Court precedent clearly requires" (quoting *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)).

57.    Here, in the state postconviction proceedings, Mr. Burgess alleged that his trial attorneys performed deficiently at both the guilt and penalty phases of the trial, as well as in pretrial litigation, and that their deficient performance prejudiced Mr. Burgess. (Doc. 19-26 at 144.) In support of his claim, Mr. Burgess included more than 200 pages of factual allegations regarding his attorneys' errors and the ways in which they adversely affected the outcome. (*See, e.g.*, Doc. 19-26 at 144—Doc. 19-27 at 184.) Although he utilized subheadings for organizational

purposes, he stated that he did not intend for each section, paragraph, or sentence to be evaluated individually.  (Doc. 19-26 at 144.)  Mr. Burgess also confirmed that he did not intend for any of the subdivisions in his petition to narrow the scope of his claims: "While he points to particular paragraphs for the assistance of the Court and opposing counsel, he does not intend to exclude any other portion of facts alleged here in support of his grounds for relief."  (Doc. 19-26 at 144.)

58.     Nevertheless, the state court divided Mr. Burgess's claim of ineffective assistance of counsel into numerous sub-claims, evaluated each one in isolation, and then explicitly refused to consider the totality of the evidence of Mr. Burgess's ineffectiveness claim.  *Burgess*, 2023 WL 4146021, at *58. Throughout the state postconviction process, Mr. Burgess repeatedly argued that he was entitled to a hearing on all his ineffective-assistance-of-counsel claims individually and cumulatively.  (*See, e.g.*, Doc. 19-16 at 98, Doc. 19-24 at 136, 190–92, Doc. 19-25 at 68–136, Doc. 19-26 at 119, 144, Doc. 19-28 at 36, Doc. 19-29 at 132–35, Doc. 19-30 at 127–85; Doc. 19-33 at 22–27; Doc. 19-34 at 25–26, 105.)  Throughout the proceedings, he continuously requested a full and fair opportunity to present evidence in support of his entire claim under *Strickland*.  *Id*. Throughout the proceedings, he also repeatedly sought discovery to effectuate his ability to present on his ineffective-assistance-of-counsel claims at an evidentiary hearing.  (*See, e.g.*, Doc. 19-24 at 190–92, Doc. 19-25 at 68–136, 168–77, 190–92,

Doc. 19-28 at 165—Doc. 19-29 at 34, 132–35; Doc. 19-36 at 33–100.)  Despite

those efforts, neither the circuit court nor the state appellate court ever conducted

any analysis of Mr. Burgess's claims regarding counsel's performance as a whole,

as controlling U.S. Supreme Court law requires.  *Daniel*, 822 F.3d at 1277–78.

59.     The state courts further refused to allow Mr. Burgess to present any

evidence in support of his extensive and detailed allegations of ineffective

assistance of counsel because they claimed he did not allege sufficient facts to

warrant relief under *Strickland*, *even if those facts were proved true at a hearing.*

(Doc. 19-30 at 126.)  The circuit court prohibited Mr. Burgess from amending his

petition to include the names of experts he claimed counsel should have called at

trial.  (Doc. 19-29 at 93.)  On appeal, the Court of Criminal Appeals held that any

error by the circuit court in failing to allow the amendment was harmless because,

even as amended, Mr. Burgess's petition was insufficiently specific and thus

subject to summary dismissal under Rule 32.7(d).  *Burgess*, 2023 WL 4146021, at

*7.  Specifically, the Court of Criminal Appeals held that Mr. Burgess's amended

petition did not satisfy the pleading requirements of Rule 32 because "Burgess [did

not] provide[] the names of . . . the experts he alleged that his trial counsel should

have used for [his] 1994 trial."  *Id.* at *6.  This is flat wrong.  Mr. Burgess *did*

plead this specific information, as detailed below.  (Doc. 19-29 at 101–06.)

Accordingly, the state court's basis for denying relief on Mr. Burgess's federal

constitutional claims was unreasonable. *See Daniel*, 822 F.3d at 1261. The state court should have allowed him the opportunity to prove his *Strickland* claim.[8]

60.    The Court of Criminal Appeals' ruling on Mr. Burgess's ineffectiveness claim was contrary to, and involved an unreasonable application of *Strickland*, *Williams*, *Wiggins*, and the Supreme Court's precedent addressing the right to effective assistance of counsel. *See, e.g., Wiggins*, 539 U.S. at 524–25; *Williams v. Taylor*, 529 U.S. 362, 396 (2000). The court's failure to consider the totality of the circumstances, and to allow Mr. Burgess an evidentiary hearing, was unreasonable under both section 2254(d)(1) and section 2254(d)(2). *See, e.g.*, *Daniel*, 822 F.3d at 1277 (holding that the state court unreasonably applied *Strickland* because it failed to consider the "totality" of the evidence); *id.* at 1263 (holding that the Rule 32 petition "pleaded more than sufficient specific facts about trial counsel's acts and omissions to show their penalty phase investigation 'fell below an objective standard of reasonableness'") (citing *Strickland*, 466 U.S. at 688).

---

[8] Mr. Burgess's extensive and detailed allegations were sufficient to warrant a hearing on his ineffective-assistance-of counsel claims even absent the inclusion of the names of expert witnesses. *See Daniel*, 822 F.3d at 1270, 1275 (holding that contrary to the state court's ruling, Daniel, who had not named the witnesses he alleged should have been interviewed and presented, had pleaded sufficient facts that, if true, demonstrated counsel's deficient performance and prejudice under *Strickland*).

61.   Mr. Burgess presents his claim of ineffective assistance of counsel below.  The individual and cumulative effect of counsel's deficient performance denied Mr. Burgess his right to effective assistance of counsel in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (Doc. 19-26 at 144–45.)

### A.   TRIAL COUNSEL'S DEFICIENT INVESTIGATION OF THE CRIME PREJUDICED MR. BURGESS AT BOTH PHASES OF THE TRIAL.

62.   Mr. Burgess was charged with one count of murder in the course of a robbery for fatally shooting Louise Crow, an owner of the Decatur Bait and Tackle Shop, inside the store's commode area.  The State claimed that the shooting was intentional and thus charged Mr. Burgess with capital murder.  Although Mr. Burgess admitted to the police and the press that he robbed Mrs. Crow, he repeatedly stated that the shooting was unintentional and that he did not intend to kill her.  (*See, e.g.*, Doc. 19-11 at 65, 68–70, Doc. 19-13 at 140–42; State's Exhibit 101) (played for the jury but not transcribed in the record).  In a videotaped statement, Mr. Burgess explained that the unintentional shooting occurred when Mrs. Crow "hit the gun, [and] the gun went off."  State's Exhibit 101.  Ample evidence was available to trial counsel that would have corroborated Mr. Burgess's account of the shooting. The jury, however, never heard this evidence because trial counsel did nothing to investigate the circumstances of the shooting.

63.     From the outset of the trial, there was no doubt the defense theory was

that the shooting was unintentional.  The only theory of defense about which trial

counsel questioned the prospective jurors was the requirement that capital murder

be the result of an intentional killing committed during the course of an

enumerated felony.  (*See, e.g*., Doc. 19-5 at 143–44, Doc. 19-6 at 74–76.)  Trial

counsel's theory of defense at the guilt phase was that Mr. Burgess was guilty of

felony, not capital, murder, because the shooting was unintentional.  (*See, e.g*.,

Doc. 19-12 at 3–5, 18–19.)

64.     Despite trial counsel's asserted theory of defense, they presented no

evidence to support it.  (Doc. 19-11 at 144.)  Mr. Burgess's lawyers were unable to

subject the State's case to reasonably competent adversarial testing, much less

present affirmative evidence in support of the defense of unintentional shooting,

because they conducted no investigation into the circumstances of the shooting.

They failed to obtain the discovery to which they were entitled, including law

enforcement's videotape and photographs of the crime scene.  They neither

consulted nor retained any experts to evaluate the State's forensic evidence, which

was central to the State's theory that Mr. Burgess intentionally killed Mrs. Crow.

65.     Counsel's failure to investigate the circumstances of the shooting

prejudiced Mr. Burgess in the guilt phase of the trial.  As a result of their deficient

investigation, trial counsel were unable to effectively challenge the State's capital

murder case or to present reasonably available evidence of a meritorious defense of unintentional murder. As a result of their deficient investigation, trial counsel failed to elicit available, favorable testimony from the State's witnesses, conducted inadequate cross-examination, and did not present a single witness or introduce a single exhibit at the guilt phase of the trial. Their performance at trial was not the result of informed strategic decisions. Had counsel investigated the crime, there is a reasonable probability that the jury would have had a reasonable doubt that the shooting was intentional, and Mr. Burgess would not have been convicted of capital murder.

66. Counsel's failure to investigate the shooting also prejudiced Mr. Burgess in the penalty phase of the trial. Had counsel conducted an investigation, they would have presented mitigating evidence demonstrating that—contrary to the State's assertion in its closing argument, (Doc. 19-12 at 166, 183, 185–89)—Mrs. Crow did not suffer after she was shot. Rather, she was instantaneously unconscious. Had trial counsel investigated the shooting, there is also a reasonable probability that counsel would have presented significant evidence in the guilt phase from which to argue, in the penalty and sentencing phases, that the jury and court should have residual doubt about whether the shooting was intentional. Had the jury heard this evidence, there is a reasonable

likelihood that it would not have recommended Mr. Burgess be sentenced to death and the trial judge would not have imposed the death penalty.

**1.  Trial Counsel Performed Deficiently by Unreasonably Failing to Investigate the Crime.**

67.  Trial counsel unreasonably failed to conduct an adequate investigation of the crime.  Counsel in a capital case have an ethical, legal, and constitutional duty under the Sixth and Fourteenth Amendments to the U.S. Constitution to conduct a thorough inquiry into all aspects of the case.  *Hinton v. Alabama*, 571 U.S. 263, 274 (2014) (quoting *Strickland*, 466 U.S. at 690–91) ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.").

68.  To prepare for the guilt phase of a capital case, reasonably competent counsel must explore all potential avenues of defense concerning the nature and circumstances of the charged offense.  Investigation must include, at a minimum, obtaining all discovery such as reports, rough notes, photographs, video and audiotapes; conducting a thorough and independent examination of the State's evidence; exploring the conduct of the police and the State's forensic witnesses; interviewing lay witnesses; interviewing the State's expert witnesses; viewing the crime scene; and obtaining the expert assistance necessary to understand the prosecution's case, cross-examine the State's experts, and present the defense.  *See Hinton*, 571 U.S. at 274; *Alabama Capital Defense Trial Manual* (2d ed. 1992) at

38

*e.g.*, 1–2, 27, 83–103, 121–27; ABA Guidelines (1989 ed.), Guideline 8.1

(Supporting Services) cmt. (directing that "[a]n adequate defense also requires the

services of expert witnesses to testify on behalf of the client and to prepare defense

counsel to effectively cross-examine the states experts"); *see also* Equal Justice

Initiative of Alabama, *Alabama Capital Defense Trial Manual* (4th ed. 2005) at

56–68, 92–143, 158–211; ABA Guidelines (2003 ed.), Guideline 10.7

(Investigation).

69.     Polly Chatham was appointed to represent Mr. Burgess after his first

court appearance.  (Doc. 19-1 at 11.)  Ms. Chatham was initially the sole attorney

appointed to represent Mr. Burgess in his capital murder case.  Prior to her

appointment, Ms. Chatham had never handled a murder case, much less a capital

murder case.  Ms. Chatham asked attorney Norman Roby to assist her.  Mr. Roby

provided some limited pro bono assistance, but he was not appointed to represent

Mr. Burgess.  On May 18, 1993, the Alabama Supreme Court entered an order

suspending Mr. Roby from the practice of law for a period of three years, effective

July 1, 1993.  The court relieved Ms. Chatham as counsel for Mr. Burgess on

July 28, 1993.  Mr. Roby had never been appointed and therefore could not be

"relieved," though the court noted that he was no longer practicing and could no

longer represent Mr. Burgess.  (Doc. 19-3 at 26.)

70.     The trial court then appointed new attorneys, Wesley Lavender and Gregory Biggs, to represent Mr. Burgess.  (Doc. 19-1 at 83–86; Doc. 19-3 at 24–28.)  Neither Mr. Lavender nor Mr. Biggs obtained the case file from Ms. Chatham or Mr. Roby, nor did they obtain from previous counsel any other information that would have assisted them in investigating and preparing for this capital trial.  As of July 28, 1993, the date Mr. Lavender and Mr. Biggs were appointed, no lawyer had conducted any investigation relevant to either phase of the trial, even though five months had elapsed from the time of Mr. Burgess's arrest.

71.     Trial counsel were on notice that unintentional murder was a potentially meritorious theory of defense, because, in his post-arrest statements, Mr. Burgess had repeatedly said he had fired the gun unintentionally.  (Doc. 19-12 at 3–5, 18–19.)  They also knew that the State's theory of intentional murder depended heavily on forensic evidence and that such evidence would require an investigation.  Mr. Biggs represented to the court that "[t]here is a lot of forensic evidence in this case and a lot of witnesses in this case," and that "[t]here is a lot of leg work that [Mr. Lavender] and I can't do."  (Doc. 19-3 at 36–37; *see also* Doc. 19-1 at 35.)

72.     Despite their recognition of the need for forensic investigation, trial counsel did not speak with any of the State's experts or move to take their depositions prior to trial.  *See Alabama Capital Defense Trial Manual* (2d ed.

40

1992) at 200–04 (providing a sample motion and order for the deposition of a State's expert and production of documents).  Trial counsel did not seek the assistance of independent forensic experts or seek to have items of physical evidence, such as the firearm, released to independent forensic experts for examination.  *See Alabama Capital Defense Trial Manual* (2d ed. 1992) at 193–99 (providing a sample motion and order for inspection, examination, and testing of all physical evidence by defense experts).  Trial counsel never consulted any experts concerning the other physical evidence, such as the autopsy results and the condition of the crime scene—including the blood stains, the shattered toilet, and the decedent's position at the scene—despite the fact that witnesses with expertise in these subjects were readily available to defense counsel in Alabama in 1993 and 1994.  *See Alabama Capital Defense Trial Manua*l (2d ed. 1992) at 117 (in a sample ex parte motion for funds for investigative assistance, citing state and federal precedents imposing upon trial counsel the duty to investigate "'all avenues leading to facts relevant to guilt and degree of penalty'") (internal citation omitted); *id*. at 121–27 (providing a sample ex parte motion for funds to retain expert forensic serologist).

73.    Trial counsel obtained a sufficient number of the police reports prior to trial to put them on notice that law enforcement officers had acted incompetently and unprofessionally at the arrest and crime scenes, including that the police had

destroyed the integrity of the physical evidence, and, along with civilians, had

contaminated the crime scene.  Although trial counsel made some efforts to obtain

discovery from the prosecution, (Doc. 19-1 at 67–72, 89–101, 138–41), they

unreasonably failed to obtain all discovery relevant to the mishandling of the crime

scene and the physical evidence.  *See Alabama Capital Defense Trial Manual* (2d

ed. 1992) at 207–210 (providing a sample motion for production of law

enforcement's autopsy and crime scene photographs).

74.    Trial counsel also failed to speak with Mr. Burgess about the

circumstances of the shooting or the defense.  *See Alabama Capital Defense Trial

Manual* (2d ed. 1992) at 29 (emphasizing the "imperative" of "establish[ing] a

working relationship" with the client and being "responsive to [the] client's

questions and needs" as integral to the investigation of a capital case).  In the six

months prior to the trial, counsel met with Mr. Burgess on only three occasions,

April 25, 1994, June 3, 1994, and June 17, 1994, and did not respond to

Mr. Burgess's written requests that they meet with him.  On January 6, 1994, the

court informed counsel that it was tentatively setting a trial date of March 7, 1994,

and, if that proved unfeasible, trial would take place the following month.

(Doc. 19-3 at 55.)  When asked by the court, Mr. Burgess told the court that his

lawyers had not yet begun getting ready for trial.  (Doc. 19-3 at 58–59.)

Mr. Lavender agreed that they had not yet begun preparing for trial.  (Doc. 19-3 at

58–59.)  In the months that followed, Mr. Burgess repeatedly notified the court that he was unable to communicate with his attorneys about preparations for the trial. (Doc. 19-1 at 145–50, 153–63.)

75.     Mr. Lavender billed a total of one hour and six minutes of out-of-court time between December 28, 1993 and May 31, 1994.  Mr. Biggs billed a total of one hour and eighteen minutes of out-of-court time between January 5, 1994 and May 27, 1994.  On June 3, 1994, Mr. Burgess wrote to the judge a fourth time, stating that he wanted the court to appoint him two new lawyers "on the grounds of insufficient council [sic]."  (Doc. 19-1 at 160.)

76.     At the time Mr. Burgess was prosecuted, the State of Alabama paid appointed counsel in capital cases $20 per hour for the lawyer's out-of-court time, up to a maximum of $1,000.  Because of the $1,000 limitation on compensation for out-of-court time, Mr. Burgess's lead counsel, Mr. Lavender, determined that it was not financially possible to prepare a capital case for trial before the case was docketed for trial; thus, it was Mr. Lavender's practice to prepare for trial in the time between the publication of the trial docket and the commencement of trial. Consistent with this practice, counsel had not yet begun preparing Mr. Burgess's case for trial when defense counsel learned, on May 23, 1994, that the case would be docketed for trial just weeks later, on June 20, 1994.  (Doc. 19-1 at 164, 166.) According to local judicial practice, this was extremely short notice.  Defense

counsel usually received notice of the docketing of a capital case at least sixty days prior to trial.

77.    Trial counsel's decision to postpone trial preparation until the case was docketed for trial was unreasonable under well-defined professional norms. *See* ABA Guidelines (1989 ed.), Guideline 11.4.1.A (Investigation) (stating that guilt and mitigation investigations "should begin immediately upon counsel's entry into the case and should be pursued expeditiously"); *Alabama Capital Trial Manual* (2d ed. 1992) at 27 (directing that because "capital cases are unique and require a special effort from the defense attorney," counsel must start preparing the defense effort as soon as they are appointed); *see also* ABA Guidelines (2003 ed.), Guideline 1.1 (Objective and Scope of Guidelines) cmt. ("Investigation and planning for both phases must begin immediately upon counsel's entry into the case, even before the prosecution has affirmatively indicated that it will seek the death penalty").

78.    Mr. Biggs told the court, "We would like to do [the investigation] but it is not proper for us to do it and we would like to have an investigator to go out and do it." (Doc. 19-3 at 37.)  The trial court approved $1,000 for the services of an investigator.  Trial counsel never spent any of the funds.  Although trial counsel instructed an investigator, Keith Russell, on February 21, 1994, to perform a few

assignments, such as serving subpoenas, Mr. Russell did so little work that he did not even submit a bill in Mr. Burgess's case.

79.    Neither counsel nor any defense investigator interviewed any potential guilt phase witnesses prior to trial except for one, Patricia Wallace.  A State witness, Ms. Wallace claimed to have seen a Black man outside the Decatur Bait and Tackle Shop before the shooting.  (Doc. 19-2 at 26.)  Since Ms. Wallace did not claim to observe any events that occurred inside the store, and Mr. Burgess's presence at the crime scene was never in doubt, her testimony was tangential both to the State and to the defense.

80,    After trial counsel learned that the case might be set for trial on June 20, 1994, they repeatedly informed the court that they were not prepared.  On May 25, 1994, Mr. Lavender requested the case not be set on that date.  (*See* Doc. 19-1 at 164.)

81.    On June 7, 1994, Mr. Lavender and Mr. Biggs filed a motion, seeking a continuance of the trial date of June 20, 1994.  (*See* Doc. 19-1 at 164–65.)  Counsel advised the court that Mr. Biggs was campaigning for circuit judge and Mr. Lavender was relocating his office and would likely be in the process of moving on that date.  (Doc. 19-1 at 164.)  The motion stated that counsel could not properly prepare the case for trial by June 20, 1994, and that Mr. Burgess would be

denied due process if the trial went forward.  (Doc. 19-1 at 164.)  The court denied the motion in an order filed on June 10, 1994.  (Doc. 19-1 at 42.)

82.    When the case was called for trial on June 20, 1994, Mr. Lavender and Mr. Biggs filed another continuance motion, (Doc. 19-1 at 166–67), and orally moved to continue the trial.  In the written motion, counsel asserted that they "ha[d] tried diligently to properly prepare this case on less than thirty days' notice of the trial setting and ha[d] been unable to do so."  (Doc. 19-1 at 166.)  In the oral motion, counsel argued that there had not been "adequate time in which to prepare a capital murder case, regardless of how long the attorneys ha[d] been in the case." (Doc. 19-4 at 90.)  Mr. Lavender further explained that he was not comfortable proceeding with the guilt phase and that defense counsel had not yet located witnesses for the penalty phase.  (Doc. 19-4 at 92.)  Even though the prosecutor did not object to a continuance, (Doc. 19-4 at 93), the trial court denied the motion to continue.  (Doc. 19-4 at 97–100.)  Counsel was forced to go to trial completely unprepared, and admittedly so.

83.    Trial counsel's failure to investigate was objectively unreasonable. Their failure to obtain adequate discovery, interview any of the State's expert witnesses, and retain forensic experts fell below the standard of care for capital defense attorneys practicing in Alabama in 1993–1994.  None of these failures were the result of strategic decisions.

2. **Trial Counsel's Unreasonable Failure to Investigate the Crime Prejudiced Mr. Burgess at the Guilt Phase of the Trial.**

84.   The State's case for intentional murder was almost entirely circumstantial.  The State sought to prove that Mr. Burgess had intentionally killed Mrs. Crow by asserting that Mr. Burgess shot Mrs. Crow "between the eyes at point blank range," (Doc. 19-8 at 33, Doc. 19-12 at 35), while she was seated on the toilet in the commode area of the Decatur Bait and Tackle Shop.  (Doc. 19-12 at 27–28, 35.)  The prosecution argued that the physical evidence gathered in the course of the investigation proved that the shooting was intentional.  (*See, e.g.*, Doc. 19-12 at 20–25, 27–32.)  Persuading the jury that Mrs. Crow had been seated when she was shot was particularly important to the prosecution's case because it contradicted Mr. Burgess's account that Mrs. Crow struck the handgun, causing it to discharge unintentionally.  During the guilt phase, the prosecutor repeatedly asserted that Mrs. Crow was seated, in order to portray her as incapable of striking either the firearm or Mr. Burgess and thereby causing an unintentional discharge. (Doc. 19-12 at 23, 26–28.)

85.   Because trial counsel had conducted no investigation of the crime, they could neither confront the State's evidence nor present any evidence in support of the defense that the killing had been unintentional.  They argued the case solely based upon Mr. Burgess's statements, in which he said that Mrs. Crow

had struck the firearm or his hand, causing it to discharge unintentionally.  State's Exhibit 2 (Signed Statement), Exhibit 101 (Video tape of statement to local media).  During his closing argument, trial counsel argued that these statements were credible because, at the time Mr. Burgess was questioned by police and the media, he did not know that intent to kill was an element of capital murder.  (Doc. 19-12 at 17–19.)  This fact was not in evidence, however, as Mr. Burgess did not testify.  This sole argument, based on a fact not in evidence, represented the full extent of trial counsel's efforts to raise a reasonable doubt about whether the shooting was intentional.

86.    An investigation of the crime, including consultation with readily available, qualified expert witnesses, would have allowed defense counsel to present evidence both directly and through cross-examination, that the killing was unintentional.  Through presentation of the testimony of reasonably available experts and effective cross-examination of the State's witnesses, as detailed below, the jury would have heard that the physical evidence supported the conclusion that the firearm was defective and prone to unintentional discharge; that the trajectory of the bullet and the injury Mrs. Crow suffered were consistent with Mr. Burgess's account of an unintentional killing and inconsistent with the prosecution's theory; that the condition of the crime scene, including the shattered toilet, refuted the State's contention that Mrs. Crow was shot at "point blank range" while seated on

the toilet and supported the conclusion that she was standing when shot; and that law enforcement's incompetent handling of the firearm and crime scene destroyed evidence that likely supported the defense of unintentional shooting. There is a reasonable likelihood that, individually and collectively, the affirmative evidence and cross-examination would have raised a reasonable doubt about whether the killing was intentional. Consequently, there is a reasonable probability that Mr. Burgess would not have been convicted of capital murder.

87. ***Had trial counsel investigated the firearms evidence, they would have presented evidence of the Titan .25's design defect.*** Had trial counsel performed an adequate investigation of the physical evidence by consulting a firearms expert, such as Kelly Fite, and obtaining access to the firearm for independent testing and analysis, trial counsel would have learned that the weapon with which Mrs. Crow was shot, a Titan .25 caliber semi-automatic pistol, had a design defect that made it prone to unintentional discharge. Trial counsel would have then presented evidence about this defect, both directly and through cross-examination of the State's witnesses. In 1993-94, firearms experts were regularly consulted and retained by defense counsel in capital cases. *See Alabama Capital Trial Manual* (2d ed. 1992) at 84 ("Experts in ballistics, firearms, toolmarks . . . may be necessary to provide adequate representation"). A qualified firearms

expert would have testified to the following reasonably available facts in support
of the defense that the killing was unintentional:

(1)    Exhibit 72 has the potential for accidental discharge due to the
fact that it was manufactured with a defective firing pin by reason
of its design.

(2)    The defective firing pin would have been detected by a qualified
firearms expert during a properly conducted inspection of State's
Exhibit 72.

(3)    The defect is such that if the hammer is not cocked, the nose end
of the firing pin protrudes through the breech face.

(4)    As a result of this defect, if an object strikes the hammer with
sufficient force when it is in the uncocked position and the safety
is not engaged, there is a high probability that the pistol will
discharge unintentionally even if the trigger is not pulled.

(5)    If the Titan .25 semi-automatic pistol discharged unintentionally
as a result of the design defect, evidence that the hammer struck
a wall or other structural object may have been found in the
commode area.   Close-up photographs of the area, if such
photographs were taken by law enforcement, may reveal a mark
on the wall or other structural object, supporting the conclusion
that the Titan .25 semi-automatic discharged as a result of its
design defect.

(Doc. 19-26 at 160–61.)

88.    The prejudice resulting from counsel's failure to consult with and

present the testimony of a firearms expert is apparent from the jury's explicit

request for such an expert.  During deliberations, one juror asked the Court:

If we were to have a person in our group that has no knowledge
of firearms whatsoever, they do not know the state of a gun ready
to fire or not or the steps necessary to make a gun fire and et

50

> cetera, et cetera, et cetera, just totally, you know, confused as to whether a gun is in a state of fire ability or not then is there a chance we might could get a gun expert to come in here and tell us these – educate someone on firearms?

(Doc. 19-12 at 91.)  The trial judge responded that there would be no additional testimony by a firearms expert or anyone else.  (Doc. 19-12 at 92.)  The jury then returned to deliberate.  (Doc. 19-12 at 94.)  In the presence of all twelve jurors, a discussion took place in which individual jurors provided extrinsic knowledge and opinions about the operation of the .25 Titan semi-automatic and pistols in general. After the judge denied the jury's request for a "gun expert," Juror 12 conducted a demonstration with the .25 Titan semi-automatic, State's Exhibit 72, for the eleven other jurors. Following this demonstration and not more than twenty minutes after the jurors returned to deliberate, the jury voted to convict.

89.     The expert testimony that the jurors sought but counsel failed to present would have explained to the jury that the specific design defect in the Titan .25 semi-automatic is such that unintentional discharges are highly likely when the hammer is bumped.  Had this testimony been presented to the jury, there is a reasonable probability that it would have raised a reasonable doubt as to whether the shooting was intentional.  Thus, had counsel conducted an adequate investigation, there is a reasonable probability that Mr. Burgess would not have been convicted of capital murder.

90.     ***Had trial counsel investigated the autopsy, they would have***
***presented evidence that corroborated Mr. Burgess's account of an unintentional***
***shooting.***  Had trial counsel conducted an adequate investigation of the autopsy by
consulting and retaining an independent forensic pathologist, such as Bruce Levy,
M.D., they would have presented evidence both through cross-examination and
through the testimony of an independent pathologist that the autopsy findings
supported an unintentional shooting.

91.     The autopsy was performed by pathologist Dr. Joseph Embry.  The
prosecutor limited his direct examination of Dr. Embry to elicit answers supportive
of the State's theory that Mr. Burgess intentionally killed Mrs. Crow and that she
suffered an agonizing death.  Dr. Embry testified that the cause of death was a
gunshot wound to the head.  (Doc. 19-11 at 26.)  Dr. Embry had recovered a bullet
from the victim's head.  (Doc. 19-11 at 42–43.)  The wound track "went through
the base of the skull and the brain, and the bullet was retrieved at the end of the
gunshot wound track.  The direction of the gunshot wound track was from her from
her [sic] front to her back, from her left to her right, twenty degrees . . . and slightly
downward, two degrees downward."  (Doc. 19-11 at 26.)  The prosecutor asked
Dr. Embry to review State's Exhibits 42, 43, 45, and 49, "note the blood and the
quantity of that," and opine how long Mrs. Crow survived after the shooting.
(Doc. 19-11 at 42.)  Dr. Embry answered, "Death wasn't instantaneous but she

died within a few minutes." (Doc. 19-11 at 42.)  Having done no investigation of

the autopsy findings, defense counsel did not cross-examine Dr. Embry.  (Doc. 19-

11 at 47.)

92.    In closing argument at the guilt phase, the prosecutor told the jury,

"There's not a way in the world that that woman knocked that gun off and that

bullet hit where it did and tracked the way it did." (Doc. 19-12 at 28–29.)  This

argument was based on a false and misleading reconstruction of the events that

reasonably competent counsel would have refuted through cross-examination of

Dr. Embry and the testimony of an independent pathologist.  As a result of trial

counsel's failure to do so, the State's case was neither challenged nor contradicted,

and Mr. Burgess was prejudiced, as detailed below.

93.    Had defense counsel investigated the autopsy evidence, they would

have presented the testimony of a forensic pathologist.  A forensic pathologist who

would have testified as described herein was readily available in Alabama in 1993-

94. *See Alabama Capital Trial Manual* (2d ed. 1992) at 84 ("Experts in . . .

pathology . . . may be necessary to provide adequate representation.").  Based on

forensic principles that were well known in the field during this time frame, a

forensic pathologist would have testified to the following facts in support of the

defense that Mr. Burgess shot Mrs. Crow unintentionally:

(1)    According to the autopsy report, the bullet passed close to the
brain stem where all of the basic centers of respiration and

53

heartbeat are located. According to Dr. Embry's testimony, the path of the bullet was through the base of the skull, where the internal carotid arteries and cavernous sinus are, and through the brain. (Doc. 19-11 at 26, 42.) The injuries sustained along the path of the bullet support the conclusion, to a high degree of medical certainty, that the bullet rendered Mrs. Crow instantly unconscious as soon as she was shot.

(2) Because Mrs. Crow was rendered immediately unconscious by the bullet, she could not act to break her fall. Her body weight in motion had greater force than if she had any awareness or ability to control her movements. The autopsy findings, the photographs, and the other physical evidence support the conclusion, to a high degree of medical certainty, that Mrs. Crow's survival time was in the range of 30 seconds to a minute. The autopsy findings, crime scene and autopsy photographs, and other physical evidence, including the broken toilet tank; the dimensions of the scene in which the shooting occurred; the victim's position after the shooting; and the path of the bullet, support the opinion, to a high degree of medical certainty, that Mrs. Crow was standing when she was shot.

(3) The trajectory of the bullet wound is consistent with Mrs. Crow striking the pistol or Mr. Burgess's hand or arm, causing his wrist to rotate. Had his wrist rotated as a result of Mrs. Crow's action, the bullet would have entered Mrs. Crow's head at an angle consistent with the wound track, which went "from her front to her back, from her left to her right, twenty degrees . . . and slightly downward, two degrees downward." (Doc. 19-11 at 26; State's Exhibit 1.) The autopsy findings, including the path of the bullet and the location of the entry wound, as well as the physical evidence, also support the opinion, to a high degree of medical certainty, that Mr. Burgess's account of the shooting is consistent with the physical evidence. Based on the physical evidence, a pathologist could not rule out an unintentional shooting in this case.

(4) The wound sustained by Mrs. Crow was not a contact or near-contact wound. "Point blank range," the term the State repeatedly used to describe the shooting, (Doc. 19-8 at 33, Doc.

19-12 at 35) is not a term that is accepted by forensic pathologists
as one that conveys accurate and reliable information about the
distance of the muzzle to the entry wound, and it carries the risk
that the fact-finder will erroneously draw inferences about the
question of intent from this measurement alone.

(Doc. 19-26 at 164–65.)

94.    In the prosecutor's guilt phase opening statement, he asserted that the

evidence would show that Mrs. Crow was shot in a "point blank" manner.  (Doc.

19-8 at 33.)  Popular conceptions of the term "point blank" imply an intentional,

execution-style shooting with a firearm.  The prosecutor persisted in his guilt phase

closing argument in describing the shooting as "point blank."  He said, "I don't

pretend to be an expert on firearms, but to me, somebody got one of these things

no more than two feet from my face, that's pretty point blank."  (Doc. 19-12 at 23.)

The prosecutor relied on this depiction of the shooting in his closing argument at

the guilt phase to bolster his theory that Mrs. Crow's death was an execution-style,

intentional killing and to inflame the passions of the jury to convict Mr. Burgess of

capital murder.  (Doc. 19-12 at 23–30.)  Had counsel presented the testimony of an

independent pathologist, counsel would have been able to contradict the

prosecution's depiction of the shooting as an intentional "point blank" shooting.

95.    There is a reasonable probability that an independent pathologist's

testimony would have raised a reasonable doubt about whether the shooting was

intentional.  Absent trial counsel's deficient performance, there is a reasonable likelihood that Mr. Burgess would not have been convicted of capital murder.

96.     Had trial counsel investigated the autopsy findings by consulting and retaining a forensic pathologist, he or she would also have helped counsel prepare for cross-examination of the State's witnesses.  Through cross-examination, reasonably competent counsel could have shown the jury that Dr. Embry's findings, to which he testified on direct examination, were consistent with the defense of unintentional shooting, as follows:

(1)    The trajectory of the bullet from front to back, "slightly downward, two degrees downward," (Doc. 19-11 at 26), is consistent with Mrs. Crow having been in a standing position at the time she was shot.

(2)    The twenty-degree angle of the gunshot wound from left to right, (Doc. 19-11 at 26), is consistent with Mr. Burgess's hand having rotated after Mrs. Crow struck the handgun or Mr. Burgess's hand or arm.

(3)    Although death was not instantaneous, (Doc. 19-11 at 42), the bullet rendered Mrs. Crow immediately unconscious and unable to break her fall or otherwise control her movement.

(Doc. 19-26 at 166.)

97.     Had trial counsel elicited the testimony above from Dr. Embry, there is a reasonable likelihood that the cross-examination of the State's own witness would have raised a reasonable doubt that the shooting was intentional.

56

Consequently, there is a reasonable probability that Mr. Burgess would not have been convicted of capital murder.

98.    ***Had trial counsel investigated the crime scene, they would have presented evidence that, contrary to the State's assertion, Mrs. Crow was standing when she was shot.***  Persuading the jury that Mrs. Crow was seated when she was shot was particularly important to the prosecution's case against Mr. Burgess.  During both phases of the trial, the prosecution repeatedly asserted that Mrs. Crow was seated in order to portray her in a particularly vulnerable position from which she was either unlikely to or incapable of striking the firearm or Mr. Burgess.  (Doc. 19-12 at 23, 26, 186, 188.)

99.    Photographs of the crime scene depicted Mrs. Crow's body lying against the toilet in the commode area of the Decatur Bait and Tackle Shop. (State's Exhibits 40–49 at Doc. 19-13 at 117–36.)  The toilet tank was noticeably broken.  (Doc. 19-13 at 131–36.)  Police reports about the crime scene also described the broken toilet tank.

100.   Had trial counsel investigated the crime scene by consulting with a plumbing engineer, such as Julius Ballanco, P.E., about the broken toilet, they would have learned and therefore would have presented evidence that the condition of the broken toilet supported the theory that Mrs. Crow was standing when she

was shot and that was consistent with the defense theory of an unintentional shooting.

101.    A plumbing engineer was readily available to defense counsel in 1993-94, and, based upon well-established scientific principles, would have testified to the following facts in support of Mr. Burgess's contention that Mrs. Crow was standing at the time of the shooting:

(1)    Based on a review of the physical evidence, including but not limited to photographs of the scene depicting Mrs. Crow's body; the broken toilet and surrounding area (State's Exhibits 10–12, and 40–49); the autopsy report of Joseph Embry, M.D. (which included Mrs. Crow's weight and height) (State's Exhibit 1), CR. 16–23; the velocity of the bullet recovered from Mrs. Crow's head; and a comparison of the force of her weight from a standing or seated position, it can be said with a high degree of scientific certainty that Mrs. Crow was standing at the time she was shot.

(2)    The American National Standards Institute ("ANSI") prescribes specific standards for toilet construction. Although these standards are not mandatory, all mass produced toilets conform to these standards. Toilet manufacturers intentionally build the tank and toilet bowl to withstand significant weight, well beyond that which is expected from normal use. As a result, a standard design toilet bowl and tank are capable of supporting thousands of pounds of weight.

(3)    Based on the standard design of the toilet and a review of the evidence introduced at trial, it can be said with a high degree of scientific certainty that the toilet on which Mrs. Crow's body was found was made of vitreous china, which was of a thickness and strength that conformed to ANSI standards. Vitreous china is a highly resilient material, which is able to hold large amounts of weight without breaking. However, vitreous china is a brittle

58

material, and may break as a result of a high impact collision with a hard object.

(4)    According to the autopsy report (State's Exhibit 1) of the State's pathologist, Dr. Joseph Embry, the bullet that killed Mrs. Crow was recovered from her head. Therefore, it can be said with a high degree of scientific certainty that the bullet did not cause the toilet tank to shatter.

(5)    No object, other than the body of Mrs. Crow, was located in, on or near the toilet that can be identified as the cause of the broken toilet tank. If the toilet tank had been cracked prior to the shooting, the crack would have caused the toilet to leak a significant amount of water, which would have been noticeable.

(6)    For purposes of determining the cause of the broken toilet, the locations of the breaks are significant. A toilet tank typically breaks at the "throat" area of the toilet where the toilet meets the tank. When a toilet breaks due to the force of a person seated on the bowl falling or pressing backwards against the tank, it typically breaks at the throat area. This result would be expected even if the tank had been improperly installed.

(7)    State's Exhibits 40 and 47 show that the toilet broke along the corners where the front and sides of the tank meet, not at the throat area as would be expected if the break had been caused by excessive weight having been pressed backwards against the tank in a seated position.

(8)    Using a structural load analysis, the force of Mrs. Crow's body falling backwards from both a seated and standing position can be calculated to a high degree of scientific certainty. According to the autopsy report, Mrs. Crow weighed approximately 272 pounds at the time of her death. The bullet, as fired from the Titan .25 semi-automatic, would have had a force of between sixty to eighty pounds per foot. The position of the body in State's Exhibit 47 illustrates how the toilet bowl was supporting the majority of Mrs. Crow's weight.

(9)     Had Mrs. Crow been seated when she was shot, her body and the tank would have been only inches apart from each other. After the bullet hit her, there would have been no opportunity for her body to accelerate towards the tank, and the resulting force would have been insufficient to create enough linear impact with the tank to cause it to break.

(10)    Given that most of Mrs. Crow's weight would have been supported by the toilet bowl, and that there would have been only a short distance between her body and the toilet bowl in a seated position, the maximum force that could be generated from her falling backwards against the toilet bowl from a seated position is approximately 192 pounds of force. Using a more realistic estimate of her weight distribution and distance, the force was actually likely to be in the range of seventy to one hundred pounds.

(11)    It can be said to a high degree of scientific certainty that 192 pounds of force would have been insufficient to have broken the toilet tank in the manner shown in State's Exhibits 40 and 47. Given Mrs. Crow's height and weight distribution in a standing position, the weight of her upper body would have fallen at least three feet from her standing position to the tank of the toilet.

(12)    Given that Mrs. Crow's upper body fell at least three feet diagonally to hit the toilet tank, and that her body accelerated linearly, the force of Mrs. Crow's body would have been at least 578 pounds. It can be said to a high degree of scientific certainty that had Mrs. Crow been standing when she was shot, the force of her body falling back onto the toilet would have caused the tank to break along the corners of the tank, as depicted in State's Exhibits 40, 42, and 47–49.

(13)    Therefore, it can be said, to a high degree of scientific certainty, that Mrs. Crow was standing at the time she was shot.

(Doc. 19-26 at 168–171.)

102.   This expert testimony would have significantly corroborated a critical part of Mr. Burgess's account of the shooting: Mrs. Crow was standing when the gun was fired.  This evidence would have supported the defense theory that the shooting was unintentional, and thus there is a reasonable likelihood it would have raised a reasonable doubt that the shooting was intentional.  Had counsel investigated the crime scene, there is a reasonable probability that Mr. Burgess would not have been convicted of capital murder.

103.   Had the jury heard the testimony set forth above, the prosecutor would have been unable to mislead the jury during closing argument as follows: "I think the reasonable thing to assume . . . is that she was sitting on the toilet."  (Doc. 19-12 at 26.)  Trial counsel's failure to present evidence that Mrs. Crow was standing when she was shot also allowed the prosecution to improperly inflame the emotions of the jurors during the guilt phase of the trial.  The prosecutor argued that Mrs. Crow was seated at the time she was shot, presenting a false but vivid image of Mrs. Crow in a position from which she was unlikely or even unable to strike at the firearm or Mr. Burgess.  (Doc. 19-12 at 26–29, 35.)

104.   Had trial counsel investigated the crime scene by consulting with a plumbing engineer, in addition to giving the testimony described above, he also would have assisted counsel in preparing for cross-examination of the State's witnesses.  Such cross-examination would have elicited evidence undermining the

credibility of the State's argument that Mrs. Crow was seated at the time she was shot. Specifically, defense counsel would have elicited from the State's lead investigator, Gary Walker, that his own report describing the crime scene contradicted the State's theory. Walker's February 3, 1993 report states on page 8: "It appears to me that from the wound track she was standing up when she was shot. This would account for the busted commode because Mrs. Crow weighed 274 lbs. when she was weighed at B'ham." The jury never heard Investigator Walker's opinion about Mrs. Crow's position because of counsel's failure to investigate. Had the jury heard the evidence that Mrs. Crow was standing at the time she was shot, there is a reasonable likelihood that this evidence would have raised a reasonable doubt that the shooting was intentional. Consequently, had counsel investigated the crime scene, there is a reasonable probability that Mr. Burgess would not have been convicted of capital murder.

105. ***Had trial counsel investigated the gunshot wound, they would have presented evidence that the distance from the muzzle to the entry wound was consistent with Mr. Burgess's account of an unintentional shooting.*** In the prosecutor's guilt phase opening statement, he asserted that the evidence would show that Mrs. Crow was shot in a "point blank" manner. (Doc. 19-8 at 33.) The prosecutor relied on this false and misleading depiction in his closing argument at the guilt phase to bolster his theory that Mrs. Crow's death was an execution-style,

intentional killing and to inflame the passions of the jury to convict Mr. Burgess of capital murder.  (Doc. 19-12 at 23–30.)

106.   Had trial counsel investigated the gunshot wound, they would have presented evidence that contradicted the prosecutor's assertions.  A firearms expert, such as Kelly Fite, and/or forensic pathologist, such as Bruce Levy, M.D., would have testified to the following facts in support of the defense that Mr. Burgess shot Mrs. Crow unintentionally:

> The wound sustained by Mrs. Crow was not a contact or near-contact wound.  The stippling and an abrasion collar around the entry wound are consistent with the muzzle being no more than two feet away from the entry wound. A reliable determination of the distance from the muzzle of the pistol to the entry wound requires testing that the State failed to conduct.  This estimated distance of two feet or less from the muzzle to the entry wound is consistent with Mr. Burgess's account of an unintentional shooting.

(Doc. 19-26 at 173.)

107.   This testimony would have shown that a shot to the face from a distance of two feet or less was consistent with Mr. Burgess's account that Mrs. Crow struck the pistol or him, thus raising a reasonable doubt that the shooting was an intentional killing.  Had the jury heard this testimony, there is a reasonable likelihood it would have raised a reasonable doubt about whether the shooting was intentional.  Consequently, had counsel investigated the gunshot wound, there is a reasonable probability that Mr. Burgess would not have been convicted of capital murder.

108.   ***Had trial counsel investigated Mr. Burgess's account of the shooting, they would have presented evidence that his reflexive reaction was consistent with an unintentional use of lethal force.***   Had trial counsel investigated Mr. Burgess's account of the shooting by consulting with an expert who, based on training and experience, was qualified to analyze the various factors involved in lethal force encounters, trial counsel would have presented evidence that Mr. Burgess's account was consistent with an unintentional shooting.  A lethal force expert qualified to analyze the factors involved in lethal force encounters, including the psychological, physiological, and biomechanical responses of the participants, could have rendered an opinion as to whether the circumstances of the shooting were or were not consistent with an unintentional discharge of the firearm.  The research that would have formed the basis of the expert's testimony was known within the relevant professional community in 1993 and 1994. Individuals who had training and expertise in the analysis of lethal force encounters were available to and did consult and testify during those years in legal matters involving whether a shooting was intentional or unintentional.

109.   Based on a review of the discovery and other available evidence, a qualified lethal force expert, such as William Lewinski, Ph.D., would have testified that, in his opinion, to a high degree of scientific certainty, the circumstances of the shooting were consistent with an unintentional discharge of the firearm and the

emotional and physical components that undergird this phenomenon. A qualified

expert would have testified further that, in addition to his review of the discovery

and relevant evidence and his training and experience, he based his opinion on the

following information, which is grounded in research that he and other

professionals in the field have conducted:

(1)    When a firearm held in the hand is struck, or the hand or forearm of the person holding the firearm is struck, the person holding the firearm tends to reflexively clutch the firearm to retain control of it. If the firearm is clutched, it remains in the hand of the person, but frequently the result of the clutching response is an unintended trigger pull. The reflexive clutching action results in the fingers squeezing the firearm, including the index finger squeezing the trigger.

(2)    The reflexive trigger squeeze has a very high probability of occurring if the index finger is already inside the trigger guard.

(3)    The discovery and other evidence in this case are consistent with Mr. Burgess's finger being inside or close to the trigger guard when Mrs. Crow intentionally or inadvertently struck his hand, arm, or the handgun. This conclusion is supported by the results of the autopsy, which concluded that the trajectory of the bullet was twenty degrees left to right. Had Mr. Burgess's index finger been in another location farther from the trigger guard, it is reasonably likely that the trajectory of the bullet would have been greater than twenty degrees left to right or that the shot would have missed entirely.

(4)    The unintentional or intentional striking of a firearm by a person at whom a firearm is pointed occurs for one of two reasons: first, a flight or fight response by the person at whom the firearm is pointed; second, the inadvertent striking of the firearm can occur because one of the two individuals is engaged in behavior that occurs for another reason, such as loss of balance.

(5)    With regard to the first reason, the autonomic *flight* response leads to an unintentional discharge when a hand or arm is thrust in a defensive action to block or deflect the firearm to protect oneself or facilitate escape.  The hand strikes the firearm, hand, or forearm of the person holding the firearm, leading to instability of the firearm in the hand, and a clutching motion to re-establish control, leading to an unintentional discharge.  The autonomic *fight* response leads to an unintentional discharge when the person at whom the firearm is pointed strikes the firearm, hand, or forearm in an offensive action designed to gain control of the firearm or the person holding the firearm.  The strike then dislodges the gun, leading to a clutching action, or the person actually strikes the fingers, leading to compression on the trigger and a direct, unintentional discharge.

(6)    With regard to the second reason, an unintentional discharge can occur when one or the other subject is engaged in behavior that occurs for another reason, such as loss of balance.  If the person holding the firearm even stumbles slightly, in an attempt to regain balance, he or she will engage in a clutching action, leading to an unintentional discharge.  If the person at whom the firearm is pointed loses his or her balance, the inadvertent hand or arm motion accompanies the attempt to regain balance.  The inadvertent motion strikes the firearm, hand or arm and results in an unintentional discharge.

(Doc. 19-26 at 174–76.)

110.   Had the jury heard the evidence that the circumstances of the shooting were consistent with an unintentional discharge of the handgun, there is a reasonable likelihood it would have raised a reasonable doubt that the murder was intentional.  Consequently, had counsel conducted an adequate investigation of the crime, there is a reasonable probability that Mr. Burgess would not have been convicted of capital murder.

111.   ***Had trial counsel investigated the police department's mishandling of the firearms evidence, they would have presented evidence of failure to follow proper procedures and contamination that would have raised a reasonable doubt about the State's theory of an intentional shooting.***  Because trial counsel conducted no investigation into police conduct at the arrest scene, they failed to follow up on leads, readily discernable from the discovery in their possession, indicating that law enforcement had mishandled the firearms evidence and had engaged in conduct that compromised its integrity.  Consequently, the State was able to present an unchallenged picture of a competent and thorough investigation by law enforcement in order to bolster its theory that the shooting was intentional.

112.   The State relied on the unimpeached testimony of law enforcement officers to create the false impression that the firearms evidence seized at the arrest scene had been properly handled and preserved.  (*See, e.g.*, Doc. 19-10 at 94–96, 105–06, 109–10, 146–48, 166–67, 182–83, Doc, 19-11 at 5–6, 49–50) (direct testimony of law enforcement officers regarding the chain of custody of the pistol after it was removed from Mrs. Crow's vehicle through the time it was received by Alabama Department of Forensics fingerprint examiner John Kilbourn); (Doc. 19-11 at 99–107, 117–18) (direct testimony of Alabama Department of Forensics firearms examiner Brent Wheeler regarding his ballistics comparison).

113.    The State's case depended on leading the jury to believe that the firearms evidence seized at the arrest and crime scenes was properly handled and preserved.  The prosecution's contention that Mr. Burgess intentionally shot Mrs. Crow was based, in substantial part, on its undisputed testimony concerning the physical evidence, including testimony about the Titan .25 semi-automatic pistol and the casing recovered from the crime scene.  Trial counsel's inability to challenge the State's firearms evidence permitted the prosecution to argue that the only inference the jurors could draw from the physical evidence was that the shooting was intentional.  (*See* Doc. 19-12 at 28–29) (prosecution arguing that "[t]here's not a way in the world that that woman knocked that gun off and that bullet hit where it did and tracked the way it did").

114.    The condition of the Titan .25 semi-automatic pistol was critical to a determination of whether the firearm had discharged unintentionally due to a design defect or as a result of other events that occurred during the confrontation between Mr. Burgess and Mrs. Crow.  In addition, evidence of Mrs. Crow's fingerprints or DNA on the firearm would have supported the defense theory that she struck the firearm, which caused the pistol's unintentional discharge.

115.    Had trial counsel performed an adequate investigation by consulting a firearms expert, such as Kelly Fite, and a crime scene investigator, such as Michael Grissom, they would have presented evidence that law enforcement mishandled the

firearms evidence, thus raising a reasonable doubt about the State's theory of an intentional shooting. Through cross-examination and affirmative testimony, trial counsel would have shown that law enforcement failed to document the condition of the firearms evidence when it was initially recovered at the arrest scene and throughout the chain of custody. They also would have shown that law enforcement destroyed trace evidence, such as the decedent's fingerprints or DNA, as the firearm, magazine, and unexpended cartridges were handled by a series of officers from the time they were recovered until they were received for examination by the Alabama Department of Forensic Sciences ("ADFS"). Further, as detailed below, through cross-examination and affirmative testimony, trial counsel would have both shown that law enforcement contaminated the crime scene and mishandled evidence, including the .25 casing, and discredited the testimony of a State's witness that the location of the .25 casing supported its theory that the shooting was intentional.

116. In 1993 and 1994, experts such as crime scene investigators were regularly retained by the defense in capital cases. *See Alabama Capital Trial Manual* (2d ed. 1992) at 84. Further, the police practices described below were well-established during this time frame. A qualified crime scene investigator would have testified to the following facts in support of the defense's theory that Mr. Burgess shot Mrs. Crow unintentionally:

(1)    As of 1993, well-established law enforcement practices and procedures required that a suspect weapon be handled with extreme care to preserve the firearm in the condition in which it was seized, in order to not disturb, contaminate, or destroy trace evidence, such as blood, DNA, or fingerprints. The manner in which law enforcement in this case handled the Titan .25 semi-automatic pistol (State's Exhibit 72), magazine (State's Exhibit 72), and unexpended rounds (State's Exhibits 97 and 98) was improper, made it impossible to determine the condition of the firearm when it was seized, and would likely have destroyed any trace evidence.[9]

(2)    As of 1993, well-established law enforcement practices and procedures required that a suspect weapon be photographed in the position and location in which the weapon was found. Police officers failed to photograph the Titan .25 semi-automatic pistol in the condition in which it was found in the vehicle. The manner in which the officers handled the Titan .25 semi-automatic pistol contaminated the firearm from the moment it was removed from the vehicle. (Doc. 19-10 at 146–48.) At least one member of the Madison Police Department and three members of the Decatur Police Department handled the firearm before it reached the Alabama Department of Forensic Sciences (ADFS) where it was examined for the presence of latent fingerprints and where ballistics testing was conducted. (Doc. 19-9 at 36–37; Doc. 19-10 at 95–96; Doc. 19-10 at 105–06; Doc. 19-10 at 109–110; Doc. 19-10 at 146–47.) Except for noting that the safety was off, Madison Police Lieutenant Danny Moore made no record of the firearm's condition when he recovered it, (January 26, 1993 Report of Lieutenant Danny Moore at 2), and, as detailed below, the firearm was repeatedly handled in an unprofessional manner that destroyed any trace evidence, such as latent fingerprints and DNA.

(3)    As of 1993, well-established law enforcement practices and procedures required that a suspect firearm be processed for trace evidence, including DNA and latent prints that may have been

---

[9] State's Exhibit 72 contained the magazine but not the seven unexpended rounds, which were not admitted into evidence.

deposited by the victim. The processing of the firearm is reliable only if the integrity of the evidence has been adequately preserved. In this case, the integrity of the firearms evidence had been destroyed before it was processed.

(4)    Decatur Police Department Investigator Sheila Moore's opinion at trial, (Doc. 19-10 at 158), that the casing was found where she would have expected it to be based upon the manner in which a shell casing is ejected from an automatic weapon was false, misleading, and unreliable. Her testimony did not take into account the following facts, among others: the physical dimensions of the room in which the Titan .25 semi-automatic pistol was fired; the objects in the room where the pistol was fired; the nature of the flooring in the room; and the discovery of the casing after the scene had been altered, disrupted, and contaminated by the actions of law enforcement officers, including the Decatur Coroner, Decatur Fire Department personnel, representatives of the ADFS, and civilians. Additionally, while most semi-automatic firearms eject to the right, experimentation with the actual firearm is required to determine the ejection pattern of a particular pistol. Similarly, Investigator Moore's sketch of the location of the shell casing she found in the commode area the day after the homicide (State's Exhibit 81) did not reveal anything probative about the actual location of the shell casing immediately after it was ejected from the Titan .25 semi-automatic pistol or about the location of Mrs. Crow or Mr. Burgess at the time of the shooting.

(Doc. 19-26 at 179–81.)

117. Mr. Burgess was prejudiced by trial counsel's failure to investigate the State's contamination of the firearms evidence and by trial counsel's failure to present the testimony of a crime scene investigator. Because of their omissions, trial counsel could not argue to the jury that law enforcement's mishandling of the firearms evidence undermined the credibility of the State's case. Had the jury

71

heard this evidence, there is a reasonable likelihood it would have raised a reasonable doubt about whether the shooting was intentional. Consequently, had counsel conducted an adequate investigation of the crime, there is a reasonable probability that Mr. Burgess would not have been convicted of capital murder.

118.    In addition, had counsel investigated law enforcement's mishandling of the firearms evidence, they would have had the information necessary to cross-examine the police officers who handled the firearms evidence to show that they had acted unprofessionally and incompetently from the time the evidence was seized, leading to the destruction of the integrity of this evidence. This would have undermined the credibility of the State's case and thereby provided additional evidentiary support for the defense that the shooting was unintentional. Had trial counsel adequately investigated the firearms evidence by consulting and retaining a firearms expert and a crime scene investigator, they would have cross-examined the following witnesses in the following ways:

(1)    Defense counsel asked no questions of Madison Police Lieutenant Danny Moore concerning the firearm or any items of evidence recovered at the arrest scene. (Doc. 19-10 at 110.) Had they investigated the firearms evidence, reasonably competent trial counsel would have cross-examined Lieutenant Moore about law enforcement's failure to photograph the firearm in its original condition, exactly as it appeared in the vehicle before being removed by law enforcement.

(2)    Reasonably competent trial counsel would have also cross-examined Lieutenant Moore about the manner in which Lieutenant Moore altered the condition of the firearms evidence

when he recovered the weapon with his bare hands, placed it in his patrol car, and then put it in his pants pocket before turning it over to Decatur police officers. (Doc. 19-10 at 105–06, 109–110) (testimony of Lieutenant Moore describing seizure of pistol); (Doc. 19-10 at 146–47) (testimony of Decatur Police Sergeant Jep Tallent describing transfer of custody of the pistol after placing it in his pocket).

(3)    Trial counsel asked no questions of Decatur police officers regarding the circumstances under which State's Exhibit 72 was unloaded at the arrest scene, further compromising the integrity of the firearm and destroying any trace evidence before it was given to Gary Walker, who was the lead investigator. R. 1308. (*See also, e.g.*, Doc. 19-10 at 146–47) (testimony of Sergeant Tallent describing how the pistol was passed from Lieutenant Moore to Sergeant Long to Sergeant Tallent); (*id.* at Doc. 19-10 at 147–50) (testimony of Sergeant Tallent that he carried the Titan .25 semi-automatic pistol in his pocket, that he did nothing "to alter the condition of the pistol other than maybe unload it while it was in [his] possession" and that he placed the firearm in his locker until he turned it over to Investigator Walker).

(4)    Trial counsel asked no questions of Investigator Gary Walker concerning State's Exhibit 72 or the unexpended rounds that Walker or another member of the Decatur Police Department reloaded before sending State's Exhibit 72 to the ADFS, again compromising the integrity of the firearms evidence. (Doc. 19-10 at 182–83; *see* Doc. 19-11 at 5) (testimony of John Kilbourn of the ADFS explaining that he received State's Exhibit 72 and the "magazine . . . that came out of it" from Investigator Walker).

(5)    Defense counsel's only question of Mr. Kilbourn was an inquiry about whether there had been "fingerprint matches" regarding any of the evidence turned over to the ADFS, to which he replied that he had no knowledge about "any comparisons." (Doc. 19-11 at 6.) The question demonstrated that counsel unreasonably failed to investigate the ADFS fingerprint examination of the Titan .25 semi-automatic pistol. Mr. Kilbourn testified on direct examination that though he had processed evidence for latent prints, the ADFS lab did not conduct fingerprint identification or

comparison. (Doc. 19-11 at 3.) Counsel's question also showed that he unreasonably failed to review Mr. Kilbourn's March 9, 1993 correspondence and Fingerprint Examination Report, which had been provided in discovery. The letter advised that the ADFS "does not perform fingerprint comparisons."

(6)    As a result of their failure to investigate, defense counsel did not competently cross-examine Mr. Kilbourn. (Doc. 19-11 at 6.) Had defense counsel done so, the jury would have learned through cross-examination that, had Mrs. Crow left any useable latent prints on the firearm, the prints would have been destroyed by law enforcement officers' repeated mishandling of the evidence.

(7)    Mr. Wheeler testified, based on his ballistics comparison, that State's Exhibit 72 had been used to fire the fatal bullet. (Doc. 19-11 at 106–07.) Mr. Wheeler did not conduct any other examination or testing of the firearm. (Doc. 19-11 at 117.) Defense counsel asked no questions of Mr. Wheeler concerning State's Exhibit 72. (Doc. 19-11 at 118–22.) Had defense counsel investigated the firearms evidence, they would have cross-examined Mr. Wheeler on that point, and the jury would have heard that he did not conduct a complete examination of the firearm, and that had he done so, he would have identified the defective firing pin.

(Doc. 19-26 at 181–84.)

119.    Based on their cross-examination and the presentation of their own expert witnesses, reasonably competent counsel would have then argued that the mishandling of this key evidence, the inadequate examination of the firearm, and the misleading testimony about the location of the .25 casing undermined the credibility of the State's theory that the shooting was intentional, thus raising a

reasonable doubt about whether Mr. Burgess was guilty of capital murder. Trial counsel's failure to do so was not the result of informed strategic decisions.

120. ***Had trial counsel investigated the police department's mishandling of the crime scene, they would have presented evidence of the failure to follow proper procedures and of contamination that would have raised a reasonable doubt about the State's theory of an intentional shooting.*** Had trial counsel conducted an investigation of the crime scene by consulting a crime scene investigator, such as Michael Grissom, trial counsel would have presented the following expert testimony showing that Decatur police officers failed to handle the crime scene in a manner consistent with death scene practices and procedures that were well-established as of 1993, and explaining to the jury which inferences could reliably be drawn from the crime scene and which could not:

   (1)   Decatur police officers failed to conduct a walk-through of the scene to assess boundaries, establish a path of entry and exit, identify and preserve evidence, and systematically document and collect such evidence.

   (2)   Decatur police officers failed to prepare and maintain a crime scene log to document anyone entering or leaving the scene, including the identities and assignments of officers who entered and left the scene, as well as their arrival and departure times, and their individual assignments.

   (3)   Decatur police officers failed to exclude all non-essential personnel from the crime scene and failed to identify and document contamination at the scene from the presence of citizens and police officers, including civilians and officers who

walked through the scene and touched the body, structures, and physical evidence at the scene.

(4)    Decatur police officers failed to obtain elimination fingerprints from civilians and police officers who touched structures, the body, and physical evidence at the scene.  They also failed to photograph the shoeprint impressions at the scene and to obtain shoeprint impressions from civilians and officers who entered the scene for elimination and identification purposes.

(5)    Decatur police officers failed to complete and compile supplemental reports from each officer at the scene that documented the searches they conducted outside the scene, the areas in the scene in which they worked, the items of physical evidence that they handled, and possible contamination caused by their actions.

(6)    Decatur police officers failed to adequately preserve the crime scene for further investigation.  The crime scene investigation was completed within three hours and twenty-one minutes, but the crime scene was not sealed.  As a result, officers could not return to a secure scene for further investigation after Mr. Burgess had been arrested.  (Report of Investigator Gary Walker stating that the first officers arrived at 11:19 a.m. and the last officer cleared at 2:38 p.m.; Witness Statement of Lieutenant F.W. DeButy stating that after the decedent's body was removed, he cleaned the walls and floor of the bathroom).

(7)    Decatur police failed to prepare a complete, contemporaneous written description of the crime scene and the physical evidence, and a complete, contemporaneous diagram of the crime scene. Measurements are the most important components of crime scene diagrams for future investigation and possible reconstruction.  They record the actual size and distance relationships between the crime scene and the physical evidence. Crime scene diagrams correlate with and supplement photographs of the scene and the physical evidence.  The sketch prepared at this death scene contains no measurements of the location of Mrs. Crow's body inside the commode area or of

various items of physical evidence located at and/or collected from the scene.

(8)   Decatur police officers failed to adequately and accurately photograph the crime scene. Systematic and progressive photography of the crime scene is necessary to ensure that the photographs record an accurate and reliable appearance of the scene and the physical evidence, which is necessary for subsequent investigation and analysis and for use in court. For example, Decatur police officers failed to take overall views and mid-range and close-up views of the scene and items of evidence found at the scene. To the limited extent that they took mid-range and close-up photographs, officers failed to utilize measuring devices to establish the relationship between Mrs. Crow's body, structures, and individual items of evidence such as the blood stains.

(9)   Decatur police officers failed to record the photography of the crime scene in a log and to do so in a manner necessary to ensure that the photographs would reliably and accurately record the crime scene. For example, police officers did not document the chronology of the photographs, image numbers, type of photograph taken (overall, midrange, or close-up), and did not include a brief description of each photograph.

(10)   Decatur police officers failed to adequately and accurately document the condition of Mrs. Crow's body, which is the most important piece of evidence in a death scene investigation. For example, they failed to document which individuals had touched the victim's body, in what manner and when, and whether and how Mrs. Crow's position had been altered before Sergeant John Boyd photographed her body and before it was removed from the commode area. The circumstances under which officers removed Mrs. Crow's body from the scene—including the time, manner of removal, items of physical evidence disturbed or altered in order to remove Mrs. Crow's body, and the identities of all those who assisted—were not properly documented. Officers removed Mrs. Crow's body before the scene had been thoroughly examined and properly documented.

(11)  Decatur police officers were aware no later than 12:45 p.m. that a Titan .25 semi-automatic pistol had been located in Mrs. Crow's vehicle.   (Report of Investigator Gary Walker describing the identification of the pistol in the vehicle.)  Decatur police officers failed to search for shell casings prior to the removal of Mrs. Crow's body or their departure from the crime scene.  If shell casings could not be located prior to the removal of the body, a search should have been conducted immediately thereafter.   Decatur police officers failed to examine and photograph the crime scene after removing Mrs. Crow's body in order to document the condition of the scene and any disruption of the scene as a result of the removal of the body.

(12)  On January 27, 1993, the day after the shooting, when a police officer first searched for and located the shell casing, the integrity of the scene had been destroyed in several respects.   First, Mrs. Crow's body had been removed.   Second, the circumstances under which her body was removed and the condition of the scene after her Mrs. Crow's removal had not been properly documented.   Third, the crime scene had been cleaned by a Decatur police officer, which was a clear violation of well-established police practices at that time.   Other than a notation in the officer's report that he cleaned the walls and floor of the crime scene, there is no record of the manner in which his actions altered the condition or integrity of the crime scene.

(13)  Decatur Police Department Investigator Sheila Moore's opinion at trial, (Doc. 19-10 at 158–59), that the casing was found where she would have expected it to be based upon the manner in which a shell casing is ejected from an automatic weapon was false, misleading, and unreliable.  Her testimony did not take into account the following facts, among others: the physical dimensions of the room in which the Titan .25 semi-automatic pistol was fired; the objects in the room where the pistol was fired; the nature of the flooring in the room; and the discovery of the casing after the scene had been altered, disrupted, and contaminated by the actions of law enforcement officers, including the Decatur Coroner, Decatur Fire Department personnel, representatives of the ADFS, and civilians.  Additionally, while most semi-automatic firearms eject to the

78

right, experimentation with the actual firearm is required to determine the ejection pattern of a particular pistol. Similarly, Investigator Moore's sketch of the location of the shell casing she found in the commode area the day after the homicide (State's Exhibit 81) did not reveal anything probative about the actual location of the shell casing immediately after it was ejected from the Titan .25 semi-automatic pistol or about the location of Mrs. Crow or Mr. Burgess at the time of the shooting.

(14)    Decatur police officers failed to take measurements of blood stain evidence at the crime scene, which are routinely obtained to assist investigate events at the scene. For example, police officers failed to take measurements of the blood stains on the walls and floor of the commode area.

(Doc. 19-26 at 185–201.)

121.    Notwithstanding the multiple ways in which police officers failed to adhere to well-established crime scene practices and procedures, a crime scene investigator would have testified that, in his opinion, Mrs. Crow was standing at the time she was shot and that there is no reliable physical evidence to refute this conclusion. In support of this opinion, a crime scene investigator would have testified to the following:

(1)    The blood stains depicted in State's Exhibits 40 through 49 were deposited after Mrs. Crow was in the position in which her body was discovered, that is, lying on the broken toilet. The blood was expelled through Mrs. Crow's nose and mouth and depicts downward drainage. The stains on the adjacent walls are consistent with involuntary movement of Mrs. Crow's head after she was shot and lying on the toilet. All of the blood stain evidence supports the conclusion that Mrs. Crow was standing when she shot.

(2)    The force of the low caliber bullet fired from the Titan .25 semi-automatic would not have caused the toilet to break had Mrs. Crow been seated when she was shot.  Mrs. Crow's weight (272 pounds at autopsy), which would have increased in force as her body fell, would have been sufficient to cause the toilet to break.

(Doc. 19-26 at 189.)

122.    The prosecution relied on the credibility of the State's witnesses to establish the integrity and reliability of the physical evidence that, it argued, led only to the conclusion that the killing was intentional.  (Doc. 19-12 at 28–29.) With the above expert testimony, the defense would have been able to counter the State's theory of an intentional shooting by illustrating that this conclusion was the product of an incompetent investigation.

123.    Had trial counsel conducted an investigation of the crime scene by consulting a crime scene investigator, they could have shown through cross-examination of the State's witnesses that the police investigation compromised the crime scene in the following ways:

(1)    Decatur Police Officer George "Mike" Woods, along with Officer Michael Durbin, were the first officers to arrive at the scene at 11:19 a.m. on January 26, 1993.  (Doc. 19-8 at 53–55.) Officer Woods testified that both Hoover Blackwood and Billy Ryans were outside the bait shop when he and Officer Durbin arrived.  (Doc. 19-8 at 55.)  He stated that when he and Officer Durbin entered the shop, "Mr. Blackwood followed us in there and we advised him to step outside until we could secure the store because at that particular time we didn't know what we had." (Doc. 19-8 at 55.)  Woods testified that he instructed other

80

officers, who arrived soon thereafter, to tape off the crime scene. (Doc. 19-8 at 58–59.)

(2)     Reasonably competent cross-examination of Officer Woods would have shown the jury that the crime scene was contaminated by the two civilian witnesses who were inside the crime scene when Woods arrived.  Mr. Ryans entered the crime scene at least twice, and Mr. Blackwood entered the crime scene at least once, walked around the counter where Mrs. Crow had been standing, and occupied the scene, unsupervised by police for at least fifteen minutes.  (Doc. 19-8 at 40–44.)

(3)     Counsel also failed to adequately cross-examine Lieutenant Frank DeButy, who described the layout of the Decatur Bait and Tackle Shop based upon measurements he had taken and a diagram he had prepared on or about June 20, 1994, more than a year after the homicide.  (Doc. 19-10 at 126, 134–40.)

(4)     Trial counsel asked no questions of Lieutenant DeButy concerning his observations at the crime scene or his documentation of the crime scene on January 26, 1993.  (Doc. 19-10 at 141.)    Had counsel adequately cross-examined Lieutenant DeButy, the jury would have heard evidence that the crime scene was neither secured nor preserved in accordance with fundamental law enforcement practices and procedures. The jury would have heard that Lieutenant DeButy arrived at the scene at 11:24 a.m. and discovered a news reporter standing with his hands pressed against an exterior window of the shop.  (Doc. 19-10 at 113.)  The jury also would have heard that hours after Mrs. Crow's death, Lieutenant DeButy washed and cleaned the walls of the bathroom where Mrs. Crow was shot.  Reasonably competent counsel would therefore have shown that the testimony of Investigator Sheila Moore—that the bathroom was in substantially the same condition the next day—was untrue. (Doc. 19-10 at 159.)

(5)     In addition to refuting the false testimony regarding the significance of the shell casing's location, reasonably competent defense counsel would have been able to raise a reasonable doubt about the State's argument that the crime scene was secure.  The

prosecutor introduced Mr. Burgess's statement that he had been carrying mace and had intended to use the mace, not a firearm, during the robbery. In closing argument at the guilt phase, the prosecutor argued to the jury: "[W]here is the mace? Where is it? He tells you when he gets up intentionally, the first time, that he goes out and look [sic] for somebody to rob, he gets his pistol and his mace. That's the last mention of the mace . . . ." (Doc. 19-12 at 31.) The prosecutor misled the jury to believe that, had the mace been left at the scene, the police would have found it because their handling of the crime scene was thorough and professional. Trial counsel unreasonably failed to present evidence and argument that, in fact, the "missing" mace was a result of negligent police work.

(Doc. 19-26 at 190–92.)

124. Trial counsel's inadequate cross-examination of the aforementioned witnesses and police officers allowed the prosecution to mislead the jury. Had trial counsel cross-examined the State's witnesses based upon their consultation with a crime scene investigator and firearms expert and presented expert testimony, they would have revealed significant inconsistencies and deficiencies in the crime scene investigation, which together would have raised a reasonable doubt that the shooting was intentional. Had they done so, it is reasonably probable that Mr. Burgess would not have been convicted of capital murder.

### 3. Trial Counsel's Unreasonable Failure to Investigate the Crime Prejudiced Mr. Burgess at the Penalty Phase of the Trial.

125. Trial counsel's unreasonable failure to investigate the crime also prejudiced Mr. Burgess in the penalty phase. Much of the information that an

investigation would have uncovered was mitigating, contradicting the State's portrayal of a cold-blooded, execution-style shooting that resulted in an agonizing death for the victim.

126.   During its penalty phase argument, the State repeatedly relied on false information to present an aggravated account of Mrs. Crow's death.  First, the prosecutor told the jury that Mr. Burgess "carries her back to the bathroom and sits her on the toilet and shoots her in the head."  (Doc. 19-12 at 186.)  Second, as in the guilt phase, the prosecutor relied on a misleading depiction of the shooting as "point blank" in his closing argument in the penalty phase to bolster his theory that Mr. Burgess deserved death because Mrs. Crow's death was an intentional, execution-style killing.  (Doc. 19-12 at 188.)  Finally, the prosecutor argued that Mrs. Crow suffered an agonizing death: "And then the shot comes. And she sits in there long enough—and you saw the pictures.  What must go through her mind there before her life finally runs out.  He didn't shoot her but one time?  If somebody is going to shoot me, I think I'd just assume [sic] they be sure about it." (Doc. 19-12 at 188–89; *see also* Doc. 19-12 at 166, 185–89.)  These arguments were based on a false and misleading revision of the events that reasonably competent counsel would have refuted had they investigated the crime by retaining and consulting the independent forensic experts described above.  Because trial

counsel failed to do so, they were unable to challenge or contradict this picture of aggravated, intentional murder.

127.    Urging the jury that Mrs. Crow suffered an agonizing, intentional, execution-style murder significantly increased the probability that the jury would sentence Mr. Burgess to death.  Had trial counsel consulted with a forensic pathologist, the jury would have heard his expert opinion that, contrary to the prosecution's assertions, the bullet rendered Mrs. Crow immediately unconscious, and, therefore, unable to experience any sensations such as pain.  Had trial counsel consulted with a crime scene investigator, the jury would have heard his expert opinion that the crime scene evidence supported the conclusion that Mrs. Crow was standing when she was shot.  Had trial counsel consulted with a plumbing expert, the jury would have heard his expert opinion that, based upon well-established scientific principles, Mrs. Crow was standing when she was shot. Had trial counsel presented the testimony of Investigator Gary Walker, the jury would have heard that, based upon his examination of the crime scene, in his opinion, Mrs. Crow was standing when she was shot.  Had trial counsel elicited this testimony, the jury would have heard that Mrs. Crow did not suffer, and it is reasonably probable that Mr. Burgess would not have been sentenced to death.

128.    Finally, had trial counsel investigated the shooting, including the firearms evidence, the gunshot wound, the autopsy findings, the crime scene, and

the police handling of the physical evidence, there is also a reasonable probability that the penalty and sentencing phases would have been different, because counsel would have presented significant evidence in the guilt phase from which to argue (in the penalty and sentencing phases) that the jury and court should have residual doubt about Mr. Burgess's guilt on the charge of capital murder.

### 4. The State Court Unreasonably Held That Mr. Burgess Had Not Sufficiently Pleaded a Prima Facie Claim Under *Strickland*.

129. The state appellate court reviewed Mr. Burgess's extensive allegations regarding counsel's ineffective investigation of the crime, and concluded, in just a few sentences, that "summary dismissal of those claims was proper." *Burgess*, 2023 WL 4146021, at *10. The state court correctly noted that the claims in this section of the petition involve "allegations that his counsel should have consulted or presented testimony from experts." *Id.* Yet the court held that the claims were insufficiently pleaded because Mr. Burgess "did not plead the name of a single expert that trial counsel should have consulted or used at trial." *Id.*

130. In fact, Mr. Burgess pleaded the names of experts he alleged trial counsel should have used for his 1994 trial, just as he did in the allegations above. Mr. Burgess's proffered amended petition alleged, with respect to each expert claim, the following: 1) the substance of the expert testimony that should have been presented, 2) the specific allegation as to why that testimony would have

mattered, 3) the specific allegation that such testimony was available at the time of trial, and 4) the names of specific experts who were available to provide such testimony at Mr. Burgess's trial in 1994.  (Doc. 19-29 at 101–06; *see also, e.g.*, Doc. 19-26 at 145–95.)  Nothing more is required to establish a prima facie case under *Strickland*.  *See Daniel*, 822 F.3d at 1261.

131.   Although the circuit court denied Mr. Burgess's motion to amend his petition, the opinion of the Alabama Court of Criminal Appeals makes clear that "even with the facts as alleged in the proposed amendment," the claims in Mr. Burgess's petition "do not meet the specificity and full-factual-pleading requirements" of Alabama law.  *Burgess*, 2023 WL 4146021, at *7.  The court held that "any error in the circuit court's refusal to grant Burgess leave to amend his petition was harmless."  *Id.*  In short, the state court held that the dismissal of this entire portion of Mr. Burgess's ineffectiveness claim was proper because Mr. Burgess did not include the names of experts that he did in fact include.

132.   The state court's ruling was contrary to and an unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).

133.   First, the court was simply mistaken in its assertion that Mr. Burgess's amended petition did not plead the names of experts counsel could have called at trial in support of the allegations made in the petition.  The petition did so, and it

made detailed allegations that, if proven true, would establish a Sixth Amendment violation under clearly established U.S. Supreme Court law.[10]  *See, e.g., Hinton*, 571 U.S. at 274 (quoting *Strickland*, 466 U.S. at 690–91) ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.").  As the Eleventh Circuit has explained, facts that a petitioner alleges in a Rule 32 petition are "assumed to be true under Alabama law." *Daniel*, 822 F.3d at 1261.  Thus, where the facts alleged, if proved true, establish a violation under *Strickland*, it is unreasonable for the state court to deny petitioner an opportunity to prove his claims.  *See Daniel*, 822 F.3d at 1280 (requiring *de novo* federal court review where the Alabama Court of Criminal Appeals' adjudication of the merits of petitioner's ineffectiveness claim was unreasonable).

134.   Second, as noted above, Mr. Burgess's extensive and detailed allegations were sufficient to warrant a hearing on his ineffective-assistance-of-counsel claims even absent the inclusion of the names of expert witnesses.

---

[10] Citing to seven different pages of the circuit court's ruling dismissing Mr. Burgess's petition, the Court of Criminal Appeals also noted in one sentence that "the circuit court also held that much of the evidence Burgess alleged his counsel should have presented would have been inadmissible at trial." *Burgess*, 2023 WL 4146021, at *10.  The court did not delineate which portions of the allegations it believed related to inadmissible evidence, nor did it explain why Mr. Burgess would not have been entitled to a hearing at least on the claims that the court agreed related to admissible evidence.

Mr. Burgess's claims were pleaded with far more specificity than the pleading that the Eleventh Circuit found sufficient in *Daniel*. See *id*. at 1270, 1275.

135.   The state court should have allowed Mr. Burgess the opportunity to prove his *Strickland* claim.  The failure to do so was unreasonable.  This Court must now review the claim *de novo*.  Because Mr. Burgess diligently requested one but "has never been afforded an opportunity to develop [his claimed] factual basis in the crucible of an evidentiary hearing," this Court must conduct such a hearing now.  *See Daniel*, 822 F.3d at 1280 (quoting *Pope v. Sec'y for Dept. of Corr.*, 680 F.3d 1271, 1294 (11th Cir. 2012)).

### 5.    Alternatively, this Court is Not Required to Accord Any Deference to the Alabama Court of Criminal Appeals.

136.   In the alternative, this Court is not required to accord deference to the decision of the Alabama Court of Criminal Appeals on this issue.  Instead, the Court should decide the merits of petitioner's claims *de novo*.  It is true that Justice O'Connor's opinion in *Williams* construed 28 U.S.C. Section 2254(d) as requiring federal habeas courts to defer to reasonable state-court decisions.  *See* 529 U.S. at 362.  However, the Supreme Court has now implicitly overruled that construction.  *See Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024).  In the wake of *Loper Bright*, the deference requirement Justice O'Connor read into Section 2254(d) must be held to violate the Supremacy Clause (Article VI,

clause 2) and Article III of the Constitution.  *See* Anthony G. Amsterdam & James S. Liebman, Loper Bright *and the Great Writ*, Colum. Hum. Rts. L. Rev. (forthcoming Feb. 2025), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=499 1093.

137.   The United State Supreme Court has never ruled on the constitutionality of the deference requirement.  Consequently, this Court is at liberty to invalidate it.  Subsequent to the filing of this habeas petition, petitioner is filing the notice of constitutional question required by Federal Rule of Civil Procedure 5.1 and is serving the Attorney General of the United States with that notice.

138.   This Court may avoid the necessity for adjudicating the constitutionality of section 2254(d)'s deference requirement by construing the statute in the manner prescribed by Justice Stevens's opinion in *Williams*, 529 U.S. at 386: "Section 2254(d) requires us to give state courts' opinions a respectful reading, and to listen carefully to their conclusions, but when the state court addresses a legal question, it is the law 'as determined by the Supreme Court of the United States' that prevails."  This approach is advised by the canon of constitutional avoidance.  *See*, *e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) ("'[I]t is a cardinal principle' of statutory interpretation . . . that when an Act of Congress raises 'a serious doubt' as to its constitutionality, 'this Court will first

ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'"); *INS v. St. Cyr*, 533 U.S. 289, 299–300 (2001) ("[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' . . . we are obligated to construe the statute to avoid such problems."); *see also, e.g., United States v. Hansen*, 599 U.S. 762, 781 (2023); *McKesson v. Doe*, 592 U.S. 1, 6 (2020) (per curiam); *Skilling v. United States*, 561 U.S. 358, 403–08 (2010).[11]

### B. TRIAL COUNSEL'S DEFICIENT MITIGATION INVESTIGATION PREJUDICED MR. BURGESS AT THE PENALTY PHASE OF HIS TRIAL.

139.    Defense counsel has a duty to investigate all possible avenues leading to the discovery of mitigating evidence*. Porter v. McCollum*, 558 U.S. 30, 39 (2009) (per curiam); *Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005) (citing ABA Guidelines, 1989 ed.); *Wiggins*, 539 U.S. at 524–25 (citing ABA Guidelines, 1989 ed.); *Williams*, 529 U.S. at 396 (citing the ABA Standards for Criminal Justice 4-4.1, commentary, at 4–55 (2d ed. 1980)).  Counsel must conduct an adequate mitigation investigation in order to perform effectively; failing to conduct an adequate mitigation investigation is *per se* deficient performance.  *See Wiggins*,

---

[11] Mr. Burgess will brief the issues raised by paragraphs 136–38 together with other legal issues, after the Court has set a schedule for further briefing.

539 U.S. at 523–24; *see also Porter*, 558 U.S. at 39 (holding that, with regard to a 1988 capital trial, "[i]t is unquestioned that under the prevailing professional norms at the time of Porter's trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background'") (quoting *Williams*, 529 U.S. at 396)).

140.   Counsel for Mr. Burgess performed deficiently by unreasonably failing to conduct a mitigation investigation.  Counsel's deficient performance prejudiced Mr. Burgess at the penalty phase of his trial.  *Strickland*, 466 U.S. at 692.

### 1.   Trial Counsel Performed Deficiently by Unreasonably Failing to Conduct a Mitigation Investigation.

141.   Counsel for Mr. Burgess failed to pursue all reasonably available avenues to obtain complete and accurate information relevant to Mr. Burgess's social history.[12]  They failed to interview Mr. Burgess's family members and other life history witnesses such as neighbors, physicians, teachers, friends, and social workers, and failed to obtain life history records from courts, medical providers, schools, governmental agencies, and employers of Mr. Burgess and of his family members.  *See* ABA Guidelines Guideline 11.4.1 (Investigation, Penalty) (1989 ed.) (detailing defense counsel's duty to investigate mitigating evidence, and

---

[12] The terms "social history," "psycho-social history," and "life history" are used interchangeably throughout this petition.

providing a list of mitigating factors to consider, individuals to interview, and records to collect); *Alabama Capital Defense Trial Manual* (2d ed. 1992) at 30–39 (same); *id.* at 56–81 (providing a list of questions for counsel to ask the client to obtain necessary background information); ABA Guidelines (1989 ed.), Guideline 11.8.3 (Preparation for the Sentencing Phase (also explaining that it is defense counsel's duty to investigate mitigating evidence, and providing a list of mitigating factors to consider, individuals to interview, and records to collect)); *see also Alabama Capital Defense Trial Manual* (4th ed. 2005) at 72–80. In *Wiggins*, the Supreme Court discussed capital counsel's duties in a trial that occurred in 1989, five years before Mr. Burgess's trial. 539 U.S. at 522–527. Describing the 1989 ABA Guidelines as "well-defined norms," the Court emphasized counsel's responsibility to discover all reasonably available mitigating evidence, including all aspects of the client's social history. *Id.* at 524–25.

142.   On January 6, 1994, trial counsel informed the court that funds were needed for an independent physical and mental health evaluation of Mr. Burgess based, in part, upon information furnished to law enforcement as early as the date of his arrest that he might be suffering from a brain tumor or brain cancer. (Doc. 19-3 at 33–35.) The court approved $1,000, with the opportunity to seek additional funding based upon a further showing of need. (Doc. 19-3 at 38.) However, trial counsel did not expend any of those funds, and did not retain the

mental health or medical professionals, such as Bekh Bradley, Ph.D., Kelly Skelton, M.D., Ph.D., and Dale Watson, Ph.D., whose assistance was necessary to present a constitutionally adequate defense at the guilt, penalty, and sentencing phases.

143.   When the trial began, none of Mr. Burgess's lawyers had conducted any investigation in preparation for the penalty phase.  But for two sets of records, they had no information about Mr. Burgess or his family regarding any aspect of his life history.  The only records in trial counsel's possession on June 20, 1994 were Mr. Burgess's Decatur City School records, which had been subpoenaed and were produced to counsel on June 20, 1994 (the first day of trial) and Mr. Burgess's Decatur General Hospital records, which had been obtained about a week prior to trial.

144.   The minimal records counsel did obtain on the eve of trial contained mitigating evidence and leads to other mitigating facts and witnesses, yet trial counsel failed to pursue them.  *See Wiggins*, 539 U.S. at 526–27 (observing that a court assesses "the reasonableness" of a mitigation investigation not only by what counsel knew, "but also whether the known evidence would lead a reasonable attorney to investigate further," and concluding that a "halfhearted" investigative effort is constitutionally insufficient).  The school records identify teachers who were available and willing to provide mitigating information about Mr. Burgess,

and further identify and provide leads to events in his life that were the basis of mitigating evidence.  The medical records include reports and notes detailing specific injuries, medical emergencies, and other events that also pertain to Mr. Burgess's living conditions and chronic stressors during the more than two years that he was homeless prior to the robbery and killing.  Trial counsel did not pursue the information contained in either set of records, and, aside from obtaining the records, did no preparation for the penalty phase.  Thus, as of June 20, 1994, the first day of Mr. Burgess's capital murder trial, (Doc. 19-4 at 57), counsel had no mitigating evidence—either documentary or testimonial—to present.

145.   The jury returned its guilt phase verdict seven days later, on the afternoon of June 27, 1994.  (Doc. 19-12 at 96–97.)  At the conclusion of the guilt phase of the trial, little had changed regarding counsel's lack of preparation for the penalty phase.  While counsel apparently had taken the preliminary step of locating some potential penalty phase witnesses, counsel had not interviewed the witnesses whom they had located and thus did not know which witnesses they would call or what testimony the witnesses had to offer.  Lead counsel, Mr. Lavender, explained to the court at the conclusion of the guilt phase of the trial that he had "been unable personally to talk to all of them or really any of them because I've been involved in getting ready for the trial."  (Doc. 19-12 at 102.)

146.   Trial counsel had told the court repeatedly that they were unprepared for trial.  On June 7, 1994, Mr. Lavender advised the court that he was in the process of moving his office, and that it would be impossible for him to prepare for this capital trial and move his office at the same time.  (Doc. 19-1 at 164–65.) Again, on July 7, 1994, defense counsel filed a written motion to continue Mr. Burgess's trial, explaining that Mr. Lavender was relocating his office and that Mr. Biggs was campaigning for circuit judge.  (Doc. 19-1 at 164.)  The motion stated that counsel could not properly prepare the case for trial by June 20, 1994, and that Mr. Burgess would be denied due process if the trial went forward. (Doc. 19-1 at 164.)  The motion to continue was denied in an order filed on June 10, 1994.  (Doc. 19-1 at 42.)  When the case was called for trial on June 20, 1994, Mr. Lavender and Mr. Biggs filed yet another continuance motion, (Doc. 19-1 at 166–67), and orally moved to continue the trial.  In the written motion, counsel asserted that they "ha[d] tried diligently to properly prepare this cause on less than thirty days' notice of the trial setting and ha[d] been unable to do so."  (Doc. 19-1 at 166.)  In the oral motion, they argued that there had not been "adequate time in which to prepare a capital murder case, regardless of how long the attorneys ha[d] been in the case."  (Doc. 19-4 at 90.)  Mr. Lavender further explained that defense counsel had not yet located witnesses for the penalty phase.  (Doc. 19-4 at 92.) The prosecutor did not object to a continuance.  (Doc. 19-4 at 93.)  The trial court

denied the motion to continue without conducting any inquiry into whether counsel was prepared to go to trial, or whether Mr. Burgess would be prejudiced by forcing him to trial with two unprepared attorneys.  (Doc. 19-4 at 97–100.)

147.   After the jury returned the guilty verdict, defense counsel moved for another continuance, reminding the court that they had previously said that they were unprepared.  (Doc. 19-12 at 102–03.)  At 3:50 p.m., on June 27, 1994, the court denied counsel's motion and gave them until 9:00 a.m. the next morning to prepare for the penalty trial.  (Doc. 19-12 at 104.)  At that point, counsel had yet to conduct a mitigation investigation, had failed to gather life history documents, had failed to locate and interview potential penalty phase witnesses, had failed to prepare a penalty phase trial strategy, had failed to prepare penalty phase witnesses to testify, and had failed to prepare the defense's opening and closing arguments. Between the court recess and trial the next day, Mr. Lavender billed 2.8 hours for "[p]repar[ing] for penalty phase."

148.   Counsel was unreasonable in waiting until trial to begin their mitigation investigation.  *See Williams*, 529 U.S. at 395 (finding counsel's penalty phase preparation ineffective, and noting that "[t]he record establishes that counsel did not begin to prepare for [the penalty] phase of the proceeding until a week before the trial"); *see also Alabama Capital Defense Trial Manual* (2d ed. 1992) at 27 (stating that it is imperative counsel "start preparing the defense effort as soon

96

as [counsel is] brought into the case"); ABA Guidelines (1989 ed.), Guideline

11.4.1 (Investigation) (directing that counsel's mitigation investigation "should

begin immediately upon counsel's entry into the case and should be pursued

expeditiously"); *id*. Guideline 11.8.3 (Preparation for the Sentencing Phase)

(same).

149.   Counsel also unreasonably failed to assemble a constitutionally

adequate defense team.  The ABA Guidelines specify that the "defense team

should consist of no fewer than two attorneys, . . . an investigator, and a mitigation

specialist."  ABA Guidelines, Guideline 4.1 (2003 ed.); *see* Definitional Notes for

Guideline 1.1, note 1 (2003 ed.) (explaining that the word "should," which is

employed throughout the ABA Guidelines, "is used as a mandatory term").

Guideline 4.1 also mandates that "[t]he defense team should contain at least one

member qualified by training and experience to screen individuals for the presence

of mental or psychological disorders or impairments."  ABA Guidelines, Guideline

4.1 (2003 ed.); *see also* ABA Guidelines (1989 ed.), Guideline 11.4.1(D)(7)

(Investigation) (stating that as part of the investigation, counsel "should secure the

assistance of experts where it is necessary or appropriate" for the "preparation of

the defense," an "adequate understanding of the prosecution's case," and " rebuttal

of any portion of the prosecutor's case"); *see also Alabama Capital Defense Trial

Manual* (2d ed. 1992) at 121–24 (providing a sample ex parte motion for funds for

the assistance of an expert serologist). Counsel did not have a mitigation specialist, an investigator, or anyone qualified to screen for mental or psychological disorders.[13]

150.   Although lead counsel's practice in general was not to use an investigator, Mr. Burgess's attorney requested funds for investigative assistance, and the court appointed Keith Russell to serve as an investigator. (Doc. 19-3 at 38, 81–82.) However, Mr. Russell did so little work on the case that he never submitted a bill. He merely retrieved some of Mr. Burgess's school records from the school district office located directly across the street from the police station.

151.   With no investigator or mitigation specialist to investigate Mr. Burgess's social history, preparation for the penalty phase fell to Mr. Lavender alone. Even though the penalty phase of the trial was entirely his responsibility, Mr. Lavender's only preparation took place the evening before the guilt phase concluded and the following evening, that is, the night before the penalty phase, when he spent 2.8 hours.

152.   Although counsel were on notice of both the existence and relevance of reasonably available documents, they made no effort to obtain them and

---

[13] The Alabama Court of Criminal Appeals denied this aspect of Mr. Burgess's ineffectiveness claim on the merits. *See Burgess*, 2023 WL 4146021, at *18. The state court's ruling was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d).

conducted no investigation based on documents they did obtain.  Counsel did not

seek Mr. Burgess's medical records from the family physician, Dr. Moody Jacobs,

even though counsel said at a hearing on January 6, 1994 that they would do so.

(Doc. 19-3 at 33–34.)  Counsel did not request records from social service

agencies, even though the Decatur General Hospital records they had in their

possession show that hospital social workers made neglect referrals to the Morgan

County Department of Human Resources regarding Mr. Burgess within two years

of his arrest.  Furthermore, counsel did not interview the social workers and

physicians, identified in these same Decatur General Hospital records, who noted

that Mr. Burgess was homeless and experienced several medical emergencies

during this period.

153.   Mr. Burgess was born and raised locally in Decatur, Alabama.  Going

back several generations, almost all of Mr. Burgess's maternal and paternal family

were born and lived in Morgan, Madison, or Lawrence Counties.  Family history

information—documents and witnesses—was therefore reasonably accessible to

trial counsel.

154.   Counsel never visited the home of Maggie Burgess, Mr. Burgess's

mother, which was located less than two miles from their offices.  They never

visited the residences of any of Mr. Burgess's immediate or extended family,

almost all of whom lived in Decatur or nearby.  They spoke with none of his relatives and none of his neighbors.

155.    Counsel briefly spoke with Mr. Burgess's parents, one teacher, and a woman with whom he had a brief relationship.  They did not speak with any other family members or teachers, and spoke with no friends, community members, medical professionals, social workers, employers, or probation officers.  The following are individuals who knew Mr. Burgess and who were readily available and willing to testify, yet trial counsel did not speak to a single one of them:

> ***Members of Mr. Burgess's immediate and extended family***: John Birdsong, Geneice Birdsong, Magdalene Birdsong, Barbara Burgess, Kim Burgess, Nathan Burgess, Lola Lockett Clancy, Linda Climon, Edward Gladney, Adam Gregory, Leavon Hampton, Kate Climon Jones, Isaac Lockett, Jr., Teresa Milam, Vickey Milam, Bobby Redus, and others;

> ***Decatur community members***: Suraya Cannon, Dorothy Gordon, Betty Jackson, Sonny Jackson, Henry Jackson, Lorenzo Jackson, and others;

> ***Neighbors, friends, and their parents***: Doris Baker, Brock Butler, Willie Bynum, Reba Davenport, Shirley Davis, Martha Douglas, Carlos Emerson, Emma Higgins, Thomas Higgins, LaShana Hill, Faye Jackson, Felissa James, Brenda Jones, Lawrence Jones, Sr., Yolanda Wallace, Derrick Watkins, Edith Watkins, Roderick Watkins, Charles Young, Francis Young, Stacey Young, and others;

> ***Decatur educators***: Curtis Biffle, Sonny Jackson, Eloise Locke, William Gilchrist, Kim Gann, Benford Masterson, Pokey Mose, Edward Orum, Doris Outlaw, Gladys Smith, Nancy Stevens, Jada Winton, and others;

> ***Medical care, social workers, and other service providers***: Nathan Collier, Steve Collier, Alyce Beasley, Brian Hill, Teresa Payne-Sykes, David Petty, and others;

**Probation officer**: Sam Rice;

**Job Corps representative**: Marion Davis.

(Doc. 19-27 at 2–3.)

156.   As detailed below, trial counsel also unreasonably failed to have Mr. Burgess evaluated by independent medical and mental health professionals. Counsel also did not retain a mitigation specialist, such as Nancy Smith, M.S.W., to assist other qualified professionals in evaluating the social history documents and witness statements – because no documents or witness statements had been obtained nor had counsel retained any qualified professionals.

### 2.   Trial Counsel's Unreasonable Failure to Investigate and Present Mitigating Evidence at the Penalty Phase Prejudiced Mr. Burgess.

157.   Counsel's failure to investigate and prepare for the penalty phase prejudiced Mr. Burgess in two ways.  First, their failure to conduct a mitigation presentation left them with little evidence to present at the penalty phase; the evidence they did present was superficial, largely false and misleading, lacking in mitigating value, and, ultimately, damaging to their client.  Second, had they assembled an adequate defense team and conducted an adequate mitigation investigation, they would have presented compelling, detailed evidence of Mr. Burgess's life history, which from birth until his arrest was one of economic and emotional deprivation as well as physical and psychological trauma, and included

years of homelessness during which Mr. Burgess, a teenager, struggled to find

safety, food, and shelter.  Had the jury heard this mitigation case, there is a

reasonable likelihood that Mr. Burgess would not have been sentenced to death.

> ### a.    *Counsel's inadequate, inaccurate, and damaging penalty phase presentation.*

158.    Because trial counsel failed to conduct any mitigation investigation,

the jury heard inadequate, false, and misleading information about Mr. Burgess

during trial counsel's cursory penalty phase presentation.  Trial counsel's lack of

preparation for the penalty phase was evident in their opening statement.  (Doc. 19-

12 at 119–22.)  Trial counsel never mentioned Mr. Burgess, never told the jury that

they would present evidence in mitigation or what that evidence would be, and

never told the jury that they would be seeking a life verdict.

159.    The defense called four unprepared witnesses at the penalty phase:

Mr. Burgess's parents, Maggie and Bill Burgess, (Doc. 19-12 at 123–36; 148–59);

Mr. Burgess's third-grade teacher, Maxine Ellison, (Doc. 19-12 at 137–47); and a

young woman with whom Mr. Burgess had a brief relationship, Danyelle Douglas.

(Doc. 19-12 at 160–63.)  Counsel spoke to these witnesses about their testimony

for the first time either late on the afternoon of June 27 or early on the morning of

June 28, just before court reconvened.  Because counsel unreasonably failed to

conduct a social history investigation, they had no basis upon which to make a

reasoned decision as to which witnesses to call in mitigation, much less what

questions to ask them.  Their testimony, combined, comprises just forty transcript pages.  (Doc. 19-12 at 123–63.)

160.   Counsel knew nothing about the backgrounds of Mr. Burgess's parents or about the violence and emotional trauma they had inflicted on him.  To the extent that counsel spoke with Maggie or Bill Burgess just prior to calling them as witnesses, their brief discussions were insufficient to learn even the most basic information about their life histories and relationships with each other and Mr. Burgess, much less to determine what information they had to offer in mitigation in a capital case.

161.   As a result of counsel's deficient performance, the court and jury heard false, misleading, and incomplete testimony from Mr. Burgess's parents. The testimony was in fact damaging to Mr. Burgess because it not only conveyed the impression that even his own parents did not care whether he was given a sentence of life or death, but it was affirmatively misleading regarding the true facts of Mr. Burgess's life.  The sum and substance of Mrs. Burgess's testimony was that her son was a "good child," (Doc. 19-12 at 125); that she did not know whether Mr. Burgess might have felt neglected by his father, (Doc. 19-12 at 126–27); and that she believed that Bill Burgess did not do as much for Mr. Burgess as he did for his other children.  (Doc. 19-12 at 135–36.)

162.   Maggie Burgess was asked about the fact that Bill Burgess was absent much of the time that Mr. Burgess was growing up.  Mrs. Burgess testified that her husband was present at some point when Mr. Burgess was a child but could not recall when.  (Doc. 19-12 at 124–25.)  She could not recall how old Mr. Burgess was when Bill Burgess left the family and went to Texas, (Doc. 19-12 at 124–25), or how long he remained there.  (Doc. 19-12 at 127.)

163.   Trial counsel initially told the court that he had no further questions, but there was a short recess, and he recalled Mrs. Burgess.  (Doc. 19-12 at 128.)  Almost immediately, counsel asked Maggie Burgess why she had separated from Bill Burgess.  (Doc. 19-12 at 129.)  She turned to the judge and wanted to know whether she had to answer; the court instructed her to answer.  (Doc. 19-12 at 129–30.)  The judge asked whether counsel wished to exclude witnesses from the courtroom, but counsel unreasonably declined to exclude Bill Burgess from the courtroom.  (Doc. 19-12 at 130.)

164.   Bill Burgess was sitting in the courtroom, watching his wife testify about their relationship.  In his presence, Mrs. Burgess answered the question inaccurately, simply stating that the couple separated because she was young and they could not get along.  (Doc. 19-12 at 131.)  Mrs. Burgess denied that Bill Burgess was abusive to the children, (Doc. 19-12 at 131), and she incorrectly agreed that Bill Burgess still supported the family after he left them.  (Doc. 19-12

at 133–35.)  Counsel ended the short direct examination by attempting to impeach his own witness—Mr. Burgess's mother—about whether Bill Burgess cared for Mr. Burgess as much as for the other children.  (Doc. 19-12 at 135–36.)

165.   Because counsel had not conducted a social history investigation, they could not present, through witnesses and documents, reasonably available mitigating evidence about the facts of Bill Burgess's violence towards his wife and children and the facts about Bill Burgess's abandonment of his family, as well as the consequences of these events in the developmental history of their client.  As a result of trial counsel's deficient performance, Maggie Burgess's testimony was harmful to the defense case.  The prosecutor was able to argue that the defense had presented no "horror stories" about Mr. Burgess's childhood and no evidence of abuse or deprivation that might explain Mr. Burgess's murder of Mrs. Crow. (Doc. 19-12 at 182.)

166.   The defense then called Bill Burgess and asked him how many children he had.  (Doc. 19-12 at 148.)  Bill Burgess inaccurately claimed to have seventeen.  (Doc. 19-12 at 148.)  He testified that he and Maggie Burgess had separated when Mr. Burgess was about four years old, (Doc. 19-12 at 151), but then falsely claimed that he had supported his children during his absence and had given them a good home when he returned from Texas.  (Doc. 19-12 at 153–54.)

He also testified that he and Mrs. Burgess had divorced, which was untrue. (Doc. 19-12 at 151.)

167.   Because counsel had not conducted a social history investigation, they could not impeach Bill Burgess. Nor could they present, through witnesses and documents, reasonably available mitigating evidence about the facts of Bill Burgess's violence towards his wife and children and the facts about his abandonment of the family. As a result of trial counsel's deficient performance, Bill Burgess's testimony was harmful to the defense case.

168.   Counsel then called Danyelle Douglas, who testified that she had dated Mr. Burgess for about four months sometime prior to January 1993, that he was not violent, that he was a nice person, and that she did not want him to die. (Doc. 19-12 at 162–63.)

169.   Mr. Burgess was prejudiced by trial counsel's presentation of Danyelle Douglas. Counsel knew nothing about Ms. Douglas, except that she and Mr. Burgess had dated at some point in time. Counsel failed to obtain even the most basic information about her knowledge of or relationship with Mr. Burgess, much less determine whether she had mitigating evidence to offer the jury, and, if so, what that evidence was. Counsel had no rational basis for presenting this witness. Ms. Douglas's testimony permitted the prosecutor to ask, rhetorically,

what weight the fact that "some girl he dated for six months said he wasn't mean to her" carried against a life taken during a robbery.  (Doc. 19-12 at 180.)

170.    The final defense witness was Maxine Ellison, who had taught Mr. Burgess in third grade and had kept in touch with him.  (Doc. 19-12 at 139–40.)  Because, as with every other witness, counsel spent only a few minutes with Mrs. Ellison prior to calling her to the stand, they had obtained no information about Mrs. Ellison's experience as an educator or her relationship with Mr. Burgess.

171.    Mrs. Ellison described Mr. Burgess as not aggressive, very quiet, eager to please, and non-violent.  (Doc. 19-12 at 140, 141, 144–45.)  She did not know if there was abuse in the home, but Mr. Burgess was always quiet and "[w]hen children don't talk, there's something wrong."  (Doc. 19-12 at 143.)  Mrs. Ellison confirmed that the family was poor, and that Mr. Burgess qualified for a free school lunch.  (Doc. 19-12 at 142.)  However, as a result of counsel's omissions, Ms. Ellison's testimony stood alone and was wholly uncorroborated by the wealth of available, mitigating documentary and testimonial evidence detailed below.  The prosecutor was able to ask the jury rhetorically what weight the fact that Mr. Burgess "had a teacher . . . that liked him, . . . [a]nd he was on the free lunch program" carried against "somebody . . . who was killed in the course of a robbery?"  (Doc. 19-12 at 180.)

172.    At the conclusion of the defense penalty testimony, the prosecutor argued that "[w]hat you've heard this morning is insufficient to counterbalance the aggravating circumstances of the nature of this case."  (Doc. 19-12 at 166.) Further, "I don't believe that anything you will hear here today will be enough mitigation to counterbalance what you've heard in aggravation."  (Doc. 19-12 at 166.)

173.    Defense counsel argued principally that Mr. Burgess had no significant history of prior criminal activity, (Doc. 19-12 at 167); that he was remorseful, (Doc. 19-12 at 168); that Mrs. Crow was shot only one time, (Doc. 19-12 at 172); and that this was not the type of crime that deserved the death penalty. (Doc. 19-12 at 174.)

174.    The prosecution returned to the theme that the mitigation evidence was minimal, noting that Mr. Burgess did not have a very significant father figure, had a teacher who liked him, "[a]nd he was on the free lunch program.  And some girl he dated for six months said he wasn't mean to her."  (Doc. 19-12 at 180.) "Now," continued the prosecutor, "what does that weigh up against a human life? What does that way [sic] up against somebody whose life—who was killed in the course of a robbery?"  (Doc. 19-12 at 180.)  He said sarcastically, "If it's a mitigating circumstance, murder during the course of a robbery by someone that doesn't have a father figure, on the free lunch program, I think we'd all better—

108

everybody better get them a gun.  There's a world of folks come up without father figures.  Come up in single parent homes."  (Doc. 19-12 at 182.)

175.   As the prosecutor pointed out, the jury heard no evidence of sexual or physical abuse or deprivation:

> There are horror stories in this world about how children are brought up.  How they're sexually and physically abused and deprived and beaten and things of that nature.  That's the kind of thing I think you're talking about when you're talking about when you're talking about – people sometimes get raised up where they got no choice other than just to be virtually just animals.  Did you hear anything like that in this case?

(Doc. 19-12 at 182.)

176.   Had counsel conducted a social history investigation, they would have been able to make reasoned decisions about what mitigation evidence to present and would, through documents and the testimony of lay and expert witnesses, have presented the evidence detailed below.  The prosecutor would not have been able to argue that the jury heard no evidence that Mr. Burgess had been the victim of abuse or that Mr. Burgess was merely a child on the free lunch program with no significant father figure.

177.   Further, in a case like this one, involving only one aggravating factor, trial counsel's deficient performance was especially prejudicial.  Even with no evidence of the persistent physical violence and emotional abandonment that defined Mr. Burgess's childhood and adolescence and the homelessness that defined his teenage years, one juror remained unconvinced that Mr. Burgess's

crime merited the death penalty. The jury returned an 11–1 verdict in favor of death. Under Alabama law, only two more votes were necessary for a recommendation of a life sentence. "Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale," there is a reasonable probability that they would not have recommended a death sentence, and that Mr. Burgess would not have been sentenced to death. *Wiggins*, 539 U.S. at 537.

> **b.    *The penalty phase case in mitigation that a reasonably competent investigation would have uncovered.***

178.    Had counsel conducted a reasonably competent social history investigation, they would have been able to present compelling and accurate mitigating evidence at the penalty phase of the trial. A reasonably competent investigation would have uncovered the information detailed in the following paragraphs, all of which was reasonably available to trial counsel through social and community history documents, including medical records; school records; vital statistics records; employment records; civil, juvenile, and adult court records; property records; jail records; burial records; local archival records; records of local charitable organizations; juvenile and adult probation department records; Department of Human Resources records; Decatur Housing Authority records; Job Corps Records; census records; and published local histories, as well as from the witness accounts from family members, teachers, medical professionals, social

workers, friends and other individuals who were readily available and willing to testify on Mr. Burgess's behalf, including the individuals identified above, as well as from thorough and complete interviews with Bill Burgess, Maggie Burgess, Danyelle Douglas, and Maxine Ellison.

179.   Had trial counsel presented this evidence to the jury, there is a reasonable probability that it would not have recommended a death sentence, and the court would not have sentenced Mr. Burgess to death.  The following paragraphs detail the specific facts and evidence that was reasonably available to trial counsel through the testimony of the identified witnesses and documents:

### Mr. Burgess's Maternal Family

180.   The family histories of Mr. Burgess's parents are demonstrative of the consequences of extreme poverty and the devastating effects of segregation.  They provide evidence of cognitive limitations, alcohol abuse, physical violence, and emotional instability, all of which profoundly shaped Mr. Burgess's upbringing.

181.   Mr. Burgess's maternal great-grandparents, Mahalia and Robert Heard, were sharecroppers in Athens, Alabama.  Mahalia and Robert had four children, including Mr. Burgess's grandmother, Rosetta ("Rose").  As a youngster, Rose worked as a domestic worker to help support the family.  Segregation and its attendant deprivations were dominant features in the life of Mr. Burgess's maternal

family.  Intellectual disability is also a multi-generational feature of the Heard family.

182.    Before Rose Heard gave birth to Mr. Burgess's mother, Maggie, she had a son, Bobby Redus, who was born in 1938.  However, Rose never married or lived with her son's father.  In 1944, Rose left her son in Athens and moved to Decatur to work.  Her son was raised by his grandparents and had little contact with his mother.  In his late twenties, Rose's son threatened to commit suicide. Family members found Bobby on the front porch with a gun to his head, screaming that he was going to kill himself because nobody loved him.

183.    Rose Heard married James Albert Reynolds, who was from Pulaski, Tennessee.  She gave birth to Mr. Burgess's mother, Maggie Lee Reynolds, in Decatur on December 1, 1949.

184.    James Albert Reynolds, Mr. Burgess's maternal grandfather, had a history of seizures and died at age fifty-six, just about the time that Maggie entered elementary school.  James and his brothers were alcoholics and heavy gamblers, as was Maggie's half-brother, James E. Reynolds.  Maggie does not remember her father, and Rose did not talk about him.

185.    When Maggie was a child, Rose was employed as a domestic worker in private homes.  Though she was hard-working, she was emotionally detached from her daughter and, at times, physically violent.  Maggie's life with Rose was

112

very structured and disciplined, and disobedience was met with severe corporal punishment.  Rose was never affectionate with Maggie; she did not tell her daughter that she loved her, and she never hugged her.

186.    Rose lived a life of extreme social isolation and enforced the same isolation on her daughter, who was almost never allowed to leave the house to be with other children and rarely allowed visitors in their home.  Social isolation was a dominant feature of Maggie Burgess's upbringing, and it became a dominant feature in the lives of her own children.

187.    From an early age, Maggie exhibited signs of mental illness and cognitive disabilities that have been life-long challenges.  Both peers and adults viewed her as different, strange, and eccentric.  As a child, Maggie walked everywhere in a pair of knee-high boots, even in the hottest days of summer.  She introduced herself to a neighbor, who sometimes walked her to Sunday school, as "Whitey."  The neighbor did not discover that this was not Maggie's real name until years later.  Maggie had trouble carrying on conversations, as did her mother Rose.  Both began conversations speaking intelligibly but, before long, they became impossible to understand.

188.    Rose Reynolds never attended church but believed in "Hoodoo." "Hoodoo" is a form of traditional folk magic, which originated in West African coastal cultures and migrated to the United States during the slave trade.  It is

believed to allow people access to supernatural forces that will influence their daily lives.  Maggie grew up believing that Rose could put a "Hoodoo" spell on anything or anyone and, before and during Mr. Burgess's upbringing, she believed that significant life events occurred because of her mother's spells.

189.    At age six and a half, Maggie Reynolds was enrolled at Carver Elementary School, which was segregated.  Although she attended regularly, Maggie had difficulty learning from the first grade forward.  She could not hear well, appeared not to understand, was unable to plan, and her vision was poor.  Even when Maggie was described as making progress, she was not keeping up with her classmates.  Throughout elementary school, she consistently scored below grade level on achievement tests.

190.    Maggie continued attending the segregated program for African-American students at Carver through junior high school and high school.  She always kept to herself and never spoke unless spoken to.  From grades seven through eleven she received Cs, Ds, and Fs in all her classes except for Physical Education.  In tenth grade, in 1966, Maggie took the California Mental Maturity Test, a type of IQ test.  She scored in the fifteenth percentile nationally, which is indicative of significant deficits.  Maggie dropped out of high school after completing eleventh grade in 1967, when she became pregnant with her first child.

191.   Maggie gave birth to her first child, Robert Reynolds, in 1967. His father was someone she knew from the neighborhood and high school. After Robert was born, Maggie continued to live at home with her mother. Robert's father left Decatur when Robert was a young child and did not financially support him. Maggie's first son changed his name to Adam Gregory when he was eighteen years of age. He is referred to hereafter as Adam, the name by which he is known.

192.   The neighbors were shocked when they found out that Maggie was pregnant with her first child because Rose had kept Maggie so confined. Rose would not allow Adam's aunts, who were Maggie's age and older, to visit their nephew unless Rose was present or they were accompanied by their parents. Rose also rarely allowed Maggie to take Adam outside. Maggie kept Adam's hair in long braids and dressed him in girl's clothing. Occasionally, Maggie was permitted to visit the father's family home with the baby. Rose, Maggie, and Adam held hands and walked the mile to and from their home, never accepting a ride. They always brought their own food.

193.   Maggie's second child, Barbara Reynolds, was born in her mother's house on December 13, 1968. Maggie was nineteen years old. Barbara does not know the identity of her biological father, whom her mother has never discussed with her.

### *Mr. Burgess's Paternal Family*

194.   Bill Burgess, Mr. Burgess's father, was born in the late 1920s and raised in extreme poverty in segregated, rural Alabama.  Bill Burgess's date of birth cannot be established reliably.  It varies, by self-report and records, from 1926 to 1929.  Segregation and its attendant profound harms, including poverty and the constant threat of violence from the White community, were the defining realities of Bill Burgess's childhood and many of his adult years.

195.   Bill Burgess's paternal grandmother was named Nora.  She was born and died in Moulton, Alabama.  Census records for Nora use the code "MU," for "mulatto."  Nora married Robert "Bob" Burgess, Sr., who was born in Alabama in May of 1876 and was a farmer.  Bill Burgess's paternal grandparents had about thirteen children.  One of their children was Robert Joe Burgess, Jr., Bill Burgess's father.

196.   Bill Burgess's maternal grandmother was Arlena Scott, and his maternal grandfather was Robert Scott.  Both worked at a slaughter pit in Decatur.  The couple lived in a house on Fifth Street and had about thirteen children.  One of their daughters was Queen Esther Scott, Bill Burgess's mother.  Alcohol abuse was common among the Scott siblings.

197.   Queen Esther Scott and Robert Joe Burgess, Jr. married on April 12, 1925, in Lawrence County, Alabama.  They had at least five children, including

116

Bill, and at least one child died in infancy.  In 1933, at age twenty-four, Bill

Burgess's father was shot and killed.  Bill was approximately five years of age.

Thereafter, his mother moved with the children from Lawrence County to Decatur,

where she became involved with another man with whom she later had two

children.

198.   Bill Burgess's family lived in extreme poverty.  Their home was on

Twelfth Street in an area called West Town, which was just shacks.  Bill Burgess

had to work to help the family survive, and his death certificate confirms that he

had no more than a third grade education.  The family had no running water or

electricity.  Bill worked in the fields picking and chopping cotton and other crops,

as these were the only jobs available to most African-American children.

199.   Bill Burgess left home to find work when he was about twelve years

old, not long after he was "called" to preach.  Little can be said with certainty

about the next twenty-five years of his life, from the late 1930s until the early

1960s.  As well as spending time in Decatur, Bill claimed to have lived in

California, Tennessee, Texas, New York, Michigan, and Illinois, and claimed to

have worked at General Motors for more than nineteen years, boxed

professionally, sung the blues, and played a host of instruments.  He claimed to

have served for at least nine years in all three branches of the military in World

War II, to have served in Japan, Germany, and Korea, and to have been wounded

in Korea.  Some of his travel to obtain employment in Texas and Michigan can be verified.  No one who knew him in Decatur recalls that Bill was in the armed services, and there is no verification of his military service.

200.   Beginning in the early 1960s through the early 1970s, Bill Burgess had on-and-off relationships with several women who lived in Decatur, including Vinette Broadway, Magdalene Birdsong, Teresa Milam, and Elza Hampton.  These relationships and others overlapped with his marriage to Mr. Burgess's mother, Maggie Lee Reynolds.  Bill Burgess fathered numerous children with these women and with several women outside of Decatur.  As a result, Mr. Burgess has literally dozens of half-brothers and half-sisters, a number of whom are close to him in age, and many of whom he never knew.  Many of Bill Burgess's children found out about one another in school, from friends, or on the streets.

201.   Complaints and contempt orders on file in the Morgan County Juvenile Court against Bill Burgess establish that he was ordered to pay child support for a number of his children.  He was cited, arrested, and sentenced to jail for failure to provide court-ordered support for some of his children.

202.   Bill Burgess's relationships with the numerous women in his life led to confusion and inconsistent accounts of how many children he had and to whom he was married at any given time.  At Mr. Burgess's trial, Bill Burgess testified that he had seventeen children, including five with Maggie.  According to other

statements, he had approximately thirty-four children.  Of the five women in

Decatur with whom he had children, he was married to two or three of them.  He

was still married to Teresa Milam when he married Mr. Burgess's mother.  Maggie

found out about Bill Burgess's marriage to Teresa Milam from her, not from Bill.

203.   Bill Burgess's relationship with Magdalene Birdsong was typical of

his relationships with women.  He fathered several children with Magdalene

Birdsong, but did not live with the family.  Instead, he stopped by once in a while

to bring food or if he wanted a favor from her.  He talked about marrying

Magdalene Birdsong, even as he was married to Maggie Burgess and Teresa

Milam, with whom he also fathered children.  The children learned not to believe

much of what Bill said, and not to believe that he would stay and become a real

father to them.  They endured the teasing from schoolmates about how many

children Bill Burgess had.

204.   Bill Burgess's children also feared his violence.  Bill regularly beat

both Magdalene Birdsong and Teresa Milam, and he beat the children with

extension cords and whatever else he could find around the house.

205.   Within the Decatur African-American community, before his

marriage to Maggie Burgess and through the time of Mr. Burgess's trial, Bill

Burgess held himself out as a preacher.  However, his reputation in the community

was that of someone who lived a life that contradicted everything he preached.  At

the time of Mr. Burgess's trial, his father's reputation as a drinker, storyteller, womanizer, and "baby-maker" was well-known in the community, as was his absence from the lives of the more than two dozen children he fathered, and his severe mistreatment of many of them during the brief periods he was present. Bill Burgess was a source of confusion and humiliation for Mr. Burgess as he was growing up.

### Maggie Reynolds, Bill Burgess and Their Children

206.    Maggie Reynolds and Bill Burgess met in church. They married on May 17, 1969. Maggie was nineteen years old and was employed as a domestic worker. Bill was forty. After their marriage, Maggie moved out of her mother's home with her two children, Adam and Barbara. In 1969, housing in Decatur was segregated. Maggie and Bill moved into Bill's house, which was located two blocks away from Vine Street in Northwest Decatur, a historically African-American section of town. Following the Civil War, many former slaves settled in the Vine Street area because Whites already owned most of the residential property east of the railroad tracks in what is now Old Decatur.

207.    Maggie and Bill Burgess's first child, Michelle Denise Burgess, was born at home on May 25, 1970. Michelle has been diagnosed with cerebral palsy, "mental retardation," and possible hearing loss. For a period of time, Maggie did not realize that there was anything wrong with Michelle. Family and friends

recount different versions of the cause of Michelle's disability, though all believe her disability was the result of an event that occurred after her birth. Maggie has always maintained that Michelle's condition is the result of an incident that occurred when gopher rats pushed Michelle off the bed when she was a baby. Maggie's fixation with gopher rats was not limited to her belief that they were responsible for Michelle's disability; she also gave them as the reason for the family's frequent moves.

208.   Michelle is totally disabled. She cannot talk, walk unassisted, or care for herself in any respect. To a significant extent, Michelle became the focus of Maggie's life to the exclusion of all the other children. The challenges of caring for a profoundly disabled child, especially those faced by a mother who had cognitive disabilities and psychological limitations, were significant, compromising Maggie Burgess's ability to nurture and care for Mr. Burgess and his siblings and adversely affecting Mr. Burgess's psychosocial development.

209.   Bill Burgess refused to care for Michelle. When he was in the house, his reaction to her condition was to yell at her.

210.   Bill also took advantage of Michelle's condition and sexually molested her.

211.   In August 1973, Bill Burgess purchased a home in Decatur on Grant Street, SE. The home was in a predominantly White part of town. When Adam

began school that year, he was the only African-American student in his class at Somerville Road Elementary School.

212.    Maggie and Bill Burgess's second child, Willie Burgess, Jr., was born on April 17, 1974, at Decatur General Hospital.  According to Maggie, Mr. Burgess was born breech after a long labor.  Out of all of Maggie's deliveries, his was the most difficult.

213.    Just over a year later, on June 9, 1975, Maggie's and Bill's third child, Nathan Tyrone Burgess, was born at home.  On December 3, 1977, Maggie gave birth to Kim Denise Burgess at Decatur General Hospital.  Maggie's last child, Christie Burgess, was born on November 24, 1985, also at Decatur General Hospital.

214.    Throughout their marriage, even during the many years when he was absent, Bill dominated Maggie.  The children and neighbors knew that she was afraid of Bill.  If they were in a room together, Maggie would not answer a question until after Bill had replied.  At times, Bill refused to let the children eat and beat Maggie if she tried to feed them.  When the family lived on Grant Street, Maggie put a lock on the refrigerator so that Bill could not take the food.  During periods of separation, including between 1978 and 1991, Maggie allowed Bill to come by whenever he wanted, even though he was violent towards her and the children.

215.   Bill was violent with all Maggie's children, including those he did not father.  He beat Maggie's oldest child, Adam, with cords and told him that he was not worth a dime and made Bill sick.  Bill also sexually molested Barbara during the time the family lived on Grant Street.  When Barbara was between four and nine years old, Bill often came into her room at night and rubbed himself all over her.  She took to sleeping in her clothes to avoid his assaults, which in turn resulted in beatings from Maggie.

216.   Even before Maggie and Bill separated, Bill was absent from the home more than he was present.  The children recall waiting up at night for him to return, but he usually did not.  Often, the only reason Maggie was able to put food on the table was because a local store owner extended her credit.

217.   Maggie Burgess was emotionally detached from her children, including Mr. Burgess.  She displayed no affection, in either what she said or how she behaved.  This treatment stood in stark contrast to the closeness and warmth the children observed between their friends and their own parents.

218.   Like Bill, Maggie's profound emotional neglect of the children was coupled with serious physical violence.  She frequently made the children go outside and pick the switches she used to beat them.  Then, she braided the switches together and hit the children on their legs, arms, and back, sometimes leaving scars and drawing blood.  She also beat her children with a broom,

123

extension cord, belt, or whatever was at hand, and often required the children to strip naked before she beat them.  When, as described further below, Maggie and the children lived in the projects, family and neighbors remember Maggie beating the children and hearing the children screaming. This form of punishment began when the children were pre-school age and continued until each child left home.

219.   When the family lived on Grant Street, Maggie and Bill beat Adam and Barbara more severely and more frequently than their younger siblings.  This differential treatment caused tension between the siblings to the point that Adam and Barbara became physically aggressive toward the younger children.

220.   Maggie and Bill separated in 1978.  The separation was precipitated by a fight during which Bill beat Maggie and threatened to cut her throat.  The children, who were ages three to ten, tried to intervene, grabbing at Bill to get him to stop.  They were frightened and crying, but Bill yelled at them to shut up.  As she packed up, Maggie hid the family's belongings under the beds so Bill would not discover that she was planning to move.  One day, when Bill was at work, she and the children moved to the East Acres Housing Project in Decatur.  Maggie believes the separation was caused by a spell cast by her mother.

221.   After the separation, Maggie and the children were completely on their own.  In about 1980, Bill traveled to different states, including Texas, with one of his children from another relationship.  How much time he spent in Decatur

during the next eighteen years is unclear.  He was convicted of drunk driving in 1984 in Morgan County.  Bill also made an appearance in juvenile court in Morgan County in 1986 because of a child support complaint regarding one of his sons.

222.   From the time Mr. Burgess was four or five years old until after he was homeless, Bill did not live with Maggie and his children, and did not act as a parental figure to Mr. Burgess or any of his children with Maggie Burgess.  After the separation, Bill dropped by periodically to see Maggie, but did not spend any time with Mr. Burgess or his siblings.  During these unpredictable visits, he continued to sexually molest Mr. Burgess's oldest sister, Barbara, and later sexually abused his younger sisters.  Bill also drank frequently, and the children could smell the liquor on him.  They were also aware of his many children, all around town.  Though they initially laughed about their father's infidelities and multiple families, as they got older, these circumstances began to affect them more.  Mr. Burgess always called his father "Bill," never "Dad."

### Maggie Burgess's Mental Illness and Cognitive Deficiencies

223.   Maggie Burgess has suffered from mental illness and cognitive disabilities her entire life.  Often, these problems manifested themselves in bizarre behaviors.  Maggie walked everywhere, sometimes with the children in a row, and refused to accept rides.  She carried a switch with her, and when the children misbehaved, she struck them.  The only time neighbors spoke with Maggie was

125

when she was walking or shopping because she would rarely let visitors—adults or children—into the home. Even in the heat of summer, Maggie kept her apartment shuttered.

224.    Maggie did not allow the children to go to other children's houses, nor did she allow children to come to her house to visit her children. Mr. Burgess's middle school classmates who lived in the neighborhood heard Michelle yelling from inside the house. The curtains were so dark that they could not see in, and a washing machine was pushed up against the back door so that no one could get in or go out. Even when they were very young, living on Grant Street, the children had to sneak out to play with friends. Maggie also prohibited her children from participating in extracurricular activities at school. For all intents and purposes, the children were shut in.

225.    When they lived in East Acres, people saw Maggie walk up and down the street in her housecoat and rock in her chair on the porch, muttering to herself for hours at a time. Women from the neighborhood remember that Maggie was obsessed with buying canned food and other items. According to Maggie and some of the children, at least once, a relative reported to a social services agency that Maggie was neglecting the children. Maggie bought lots of canned foods because she wanted to be sure that when the Department of Human Resources came to inspect, she would be able to demonstrate that she had plenty of food to

feed the family.  Maggie stored the cans under the beds, in the cupboards, and in the closets.

226.   Maggie's cognitive limitations were coupled with a delusional belief system.  At some point in her adulthood, Maggie developed a belief that Rose was not her biological mother. She also believed that she had certain God-given powers, including the capacity to visualize events before they happened.

227.   The Burgess family's dysfunctional state was such that some administrators at Mr. Burgess's school were aware that there were problems at home.  They dealt with Maggie Burgess on a number of occasions.  They were never certain that she understood what was being said to her.  They had the impression that she was mentally ill and intellectually disabled.

### Life in the Toxic, Segregated Environment of the East Acres Public Housing Community

228.   Mr. Burgess lived in East Acres from 1978 until his arrest in January 1993.  During these years, East Acres was an impoverished, predominantly African-American community, which lacked the educational, medical, social, and psychological resources to identify, assist, and protect the many at-risk children and adolescents who lived there.

229.   There was significant pollution in the area surrounding Decatur during Mr. Burgess's developmental years.  Pollution from industrial operations contributed to noise, smoke, and dust.  The U.S. Army Redstone Arsenal located in

Huntsville, approximately twenty miles from Decatur, disposed of its wastewater, contaminated with DDT, into surrounding creeks.  DDT accumulated in the sediment until eventually thousands of tons were spread over a 2.3-mile area of Huntsville Spring Branch-Indian Creek, a tributary of the Tennessee River.  A 1979 report documented the extensive pollution in the Triana area.  The Tennessee River suffered from record-high DDT levels, centered in Triana, Alabama, some fifteen miles downstream from Decatur.  Clean-up of the Redstone Arsenal did not begin until the end of 1982 as part of a settlement with Olin Corporation, which leased Redstone Arsenal from the U.S. Army for approximately twenty-three years.  In fact, in the early 1990s, Triana was considered the unhealthiest town in the United States because of DDT and PCB pollution.

230.   The neighborhood in which Mr. Burgess grew up suffered from an infestation of drugs—predominately crack cocaine—and violent crime.  In 1990, East Acres fell well below the national average in categories such as high school graduation rates, unemployment rates, percentages of two-parent families, and average household income.

231.   Public housing constructed before 1978 contained lead-based paint. Older homes in the East Acres community often contained layers of lead paint on the walls, ceilings, and woodwork.  Furthermore, the lead paint and primers were

outdoors on places such as the walls, fences, and porches.  Ingestion of lead can lead to such problems as brain damage, intellectual disability, and even death.

232.   At the time Mr. Burgess was growing up, the population of Morgan County was approximately ninety percent White.  The other ten percent was predominately Black.  Decatur city schools were not desegregated until 1969.  It was not until 1986 that an African American served on the Decatur City Council. It was not until 1996 that Decatur saw its first African-American grand jury foreperson.  At the time of Mr. Burgess's trial, there were no African-American lawyers or judges in Morgan County.

233.   During Mr. Burgess's developmental years, the accumulated wealth of Decatur's Black community was less than one percent of the White community's. The income gap was greatest at younger ages, particularly for males.  In 1980, the average income for African Americans in Decatur was forty-five percent of the White average income.  Thirty-three percent of African Americans, as compared to 8.8 percent of Whites, lived in poverty.  When Mr. Burgess was a teenager, the unemployment rate in Decatur for African Americans over the age of sixteen was twelve percent; the rate for Whites was 4.7 percent.

234.   In 1990, poverty levels in Morgan County and the State of Alabama were about four times as high for African Americans as they were for Whites. Poverty among children under the age of eighteen was higher in Decatur than in

Morgan County at large. Nonwhite residents experienced higher unemployment rates than White residents, and these rates were higher overall in Decatur than for persons living in other parts of Alabama.

### *Burgess Family Poverty*

235.   Everyone in the East Acres Housing Project was poor. However, Mr. Burgess's family had less than most. They were, according to neighbors, "dirt poor." The few times that Mr. Burgess's friends were allowed inside the house, they noticed that there was very little furniture. Maggie bought the children clothes at yard sales. They also went to the Salvation Army to find clothes, and Mr. Burgess brought home food baskets from churches. When Mr. Burgess was in middle school, one friend regularly bought Mr. Burgess and one of his siblings dinner because they did not get any dinner at home. Because the family was so poor, teachers at Michelle's school took up collections to pay for her clothing and diapers.

236.   Before Maggie's youngest child was born in 1985, Maggie worked for a time as a janitor at Somerville Road Elementary School and at Decatur General Hospital. In high school, Maggie's oldest children worked and contributed their earnings to the family. For the most part, however, Maggie and her seven children relied on food stamps, social security benefits, and welfare payments, which was a bare subsistence level. In 1986, the family's annual income was $4,032. That

same year, Maggie and the children began receiving assistance from the Committee on Church Cooperation ("CCC"), which helped poor individuals obtain medication, food, and clothes. After 1986, they continued to depend upon the assistance of the CCC to meet their needs. Although he was supposed to be paying child support regularly, Bill did not do so.

237.    Maggie and the children also moved frequently within East Acres, trading one small apartment for another, often for no apparent reason. Sometimes, the moves were precipitated by neighbors' complaints about—and disapproval of—Maggie's physical abuse of the children. Other times, Maggie believed there were gopher rats in her home, and moved to avoid them. Other families moved far less often, and typically moved out of East Acres, rather than moving within the project.

### *Mr. Burgess's Elementary School Years*

238.    All the Reynolds and Burgess children, except Michelle, attended Somerville Road Elementary School. School teachers recall that Maggie Burgess appeared to be not only slow but likely learning disabled and was someone who had difficulty understanding what was being said to her. She was struggling to provide the basics and did not have the ability to help the children with their

schoolwork.  Although Mr. Burgess did not speak to his elementary school teachers about his home life, they knew that his father was absent.

239.   When Maggie Burgess talked about her husband, she always called him "Reverend Burgess."  When Mr. Burgess was attending Somerville Road Elementary School, Maggie came to school with a broomstick and told one of the administrators that Reverend Burgess had a girlfriend who would be coming up to school and, when that happened, Maggie planned to beat her up.  The administrator told Maggie that she could not do anything like that at the school.

240.   From kindergarten through third grade, Mr. Burgess was an average or below average student.  His grades began to fall in the fourth and fifth grades, although the change was not precipitous until he entered middle school. Mr. Burgess's teachers recall that he was sweet, quiet, and shy.  He was a follower and never a troublemaker, and he got along with everybody.  At age nine or ten, when teachers often see the beginning of disciplinary problems in children, Mr. Burgess was well-behaved.

241.   Mr. Burgess's younger brother, Nathan, was described as more intelligent.  He was identified as a gifted student and sent to a magnet school in second grade.  However, as one of the few African-American students in the school, he was isolated and alienated.  Nathan transferred back to Somerville Road

in third grade.  He was the opposite of Mr. Burgess in terms of behavior.  He was a leader who instigated fights with the other children.

242.   Other students teased Mr. Burgess because of his clothes, and he learned at an early age to deflect the teasing by joking.  He did not respond by starting fights.  In elementary school, Mr. Burgess associated with other students, but Nathan was his only friend.

243.   In 1978, around the time that Maggie and the children moved to the East Acres Housing Project, Barbara was tracked in school as "Educable Mentally Retarded" ("EMR").  She was in EMR classes throughout middle and high school. In Alabama, the EMR classification was for students who could function in mainstream schools but required substantial help to do so.

244.   When Mr. Burgess was in elementary school at Somerville, Michelle began attending the Carver Program, a school for students with severe mental, physical, and sensory disabilities.  Teachers recall that Michelle could not stand, walk, or feed herself.  She could not speak and was aggressive, grabbing people when she was hungry, and screaming and biting to voice her feelings.  They also noticed that Maggie was severely limited in her ability to reinforce what was being taught in school or process her conversations with school administrators.

245.   Maxine Ellison (then Maxine Priest) is the teacher who has best known Mr. Burgess and others in his family since the children attended Somerville

Road Elementary School.  Mrs. Ellison testified briefly at the penalty phase of Mr. Burgess's trial.  (Doc. 19-12 at 137–47.)  At the time of Mr. Burgess's trial, she had been a teacher for twenty-three years.  (Doc. 19-12 at 139.)  She had served as the Parenting Coordinator for the Decatur City Schools.  (Doc. 19-12 at 137.)  After her retirement in 1998, Mrs. Ellison founded the Decatur Youth Enrichment Program, which serves to expand cultural and educational opportunities for local low-income students ages three through ten.  Mrs. Ellison's knowledge of Mr. Burgess and his family included the following facts, which were not presented at trial:

(1)    Because she taught several of the Burgess children, Mrs. Ellison had a number of opportunities to observe their mother.  She was also familiar with the differences in the children's intellectual abilities and personalities.  Her knowledge was enhanced by the fact that Mr. Burgess continued to visit her, at least a couple of times a year, until the time of his arrest.

(2)    Mrs. Ellison was acquainted with Bill Burgess, whom she met in approximately 1968.  In addition to the fact that he was absent from Mr. Burgess's life, Mrs. Ellison knew of Bill Burgess's alcohol abuse and his reputation as a father who did not provide for his children.  She had also observed that Bill had a completely dominating influence on Maggie's behavior.

(3)    Maggie Burgess provided just the basics for her children in terms of neat and clean clothes.  However, Maggie did not have the mental capacity to help the children with their homework.  Unlike other single mothers, Maggie Burgess lacked the ability to provide the necessary guidance to her children.

(4)    Mr. Burgess was more withdrawn and more sensitive than his siblings.  He was particularly quiet in relation to most third

134

graders, who are normally very social and active. Mrs. Ellison had sufficient training to recognize that Mr. Burgess's quiet and reserved behavior in third grade was an indication of serious problems, almost certainly at home. Mrs. Ellison had to make a special effort to engage him in activities.

### Middle School Years

246.    Oak Park Middle School, where Mr. Burgess was next a student, was unusual for a Decatur school. It was composed of middle-class White children and poor Black children from the projects, though there was also a small group of poor White children. The students from the projects were clearly disadvantaged at Oak Park, although there were a few teachers who took an interest in them. There was a stigma attached to the students from East Acres and an attitude among many teachers that those children simply were not worth educating. The affluent students were bused to Oak Park, but buses did not go to the projects. Teachers were aware that some of the parents of the poor children were simply too embarrassed to visit the school.

247.    The transition from Somerville Road Elementary to Oak Park was extremely difficult. Students who had attended Somerville Road were accustomed to a classroom in which a single teacher was responsible for all the students. At Oak Park, students were assigned to "pods" of 150. Five teachers taught simultaneously in a large, open semicircle with wooden dividers between them.

Because of the distractions, only those motivated students who entered Oak Park with well-developed learning skills were successful.

248.   The students were also separated by "tracking," which worked to the educational disadvantage of the students from East Acres.  For example, it was not uncommon for teachers to spend class time grading the papers of the upper-level students while the lower-level students copied from textbooks.  This systemic disinterest in the disadvantaged students was also evidenced by the fact that those who did poorly were rarely held back.  The school purported to provide "Academic Enrichment" classes to disadvantaged students, but these were merely study halls with no support for students who could not afford to participate in the school's extracurricular activities.  African-American students were acutely aware of the disparate treatment.

249.   This disparate treatment extended beyond the indignity of tracked educational opportunities for students of different races.  Poor Black children who came to school without having taken a bath were forced to sit outside the classroom door because they were told that they smelled.  By contrast, the White children who came to school dirty were given a shower and told to bathe at home in the future.

250.   In 1985, before Mr. Burgess entered sixth grade, his brother, Adam, graduated from high school and moved in with his maternal grandmother, Rose,

where he lived for several years. From this point forward, except for sporadic contact with Barbara, Adam was completely detached from his mother and siblings.  In 1987, at age nineteen, he legally changed his name from Robert Reynolds to Adam Gregory to further dissociate himself from his family.

251.    Soon after Mr. Burgess entered sixth grade at Oak Park, several life-altering events occurred.

252.    On November 24, 1985, Maggie Burgess gave birth to Christie, her seventh child.  Although Bill Burgess is listed as her father on Christie's birth certificate, Maggie had been involved for some time with another man.  Neighbors remember him arriving at Maggie's house late at night.  The Burgess children believe that this man is Christie's father.  Not long after Christie was born, Mr. Burgess and Barbara assumed a significant role in caring for her.

253.    On December 5, 1985, Mr. Burgess and some of his siblings found their mother on the floor having convulsions.  They were terrified by what they saw: Maggie's stomach was extremely distended, she was foaming at the mouth, and Christie was lying beside her on the floor.  An ambulance was called, and Maggie was admitted to the Emergency Room at Decatur General Hospital in an unresponsive condition.  She was then transferred to the Intensive Care Unit at Humana Hospital in Huntsville.  Maggie was diagnosed with "post partal

endometritis," a form of postpartum infection, and a "generalized seizure disorder."

254.    Maggie was due to be discharged from the hospital on December 10, 1985, but the nurses were unable to reach the family to notify them of Maggie's discharge because the home phone was disconnected.  Maggie did not leave the hospital until December 12.  During the eight days that Maggie was at Humana Hospital, Mr. Burgess's grandmother Rose, and one or two neighbors occasionally checked on the children and helped with the cooking.  For the most part, however, the children were left to fend for themselves.

255.    After her seizures, Maggie could not remember any of her children except for Christie.  Though her memory later returned, it took her months to fully recover.  After her discharge, Barbara, who had just turned seventeen, and Mr. Burgess, age eleven, took turns staying out of school to care for Maggie, Christie, and Michelle.  Christie was less than two weeks old, and Michelle needed constant care.  Mr. Burgess and Barbara got the food stamps, cashed their mother's checks, bought groceries, and did the cooking.  The siblings understood that they had to take care of everything so that no one from the Department of Human Resources ("DHR") would come to the house.

256.    In April 1986, Michelle was admitted to the Crippled Children's Clinic to have corrective foot surgery for "severe pes planal valgus feet secondary

to cerebral palsy." The physician recommended that Maggie be provided with home assistance to take care of Michelle and her other children, due to her own medical problems. It does not appear that Maggie obtained such assistance.

257.   Mr. Burgess was often absent during sixth grade because he had to help care for his disabled sister, Michelle, and for his youngest sister, Christie. When his teachers inquired about his absence, this was the reason given. He never complained about his situation. Occasionally, Mr. Burgess would ask his teachers questions about caring for Michelle, such as how to feed her when she could not keep her food down. Maggie Burgess responded neither to the home progress reports she received, nor to the notes sent home from teachers.

258.   As a result of Mr. Burgess's absences, he began performing poorly in school. During his first semester of sixth grade, he failed two classes and received two D grades. During his second semester, he failed five classes. Mr. Burgess was held back and required to repeat sixth grade. That year, his oldest sister, Barbara, was in tenth grade. She failed three classes in her first semester, five classes in her second semester, and was also required to repeat tenth grade.

259.   In 1986-87, both Mr. Burgess and his brother Nathan were in the sixth grade at Oak Park Middle School. Mr. Burgess's repeated absences continued, as did his mother's lack of response to inquiries from teachers, and the failure of the educational system or any other public agency to intervene.

260.    Throughout middle school, Mr. Burgess's teachers described him as consistently polite and gentle, but as a child with many hardships who was also fearful of physical affection.  He wanted to please, and when he finished his work, Mr. Burgess would come show it to his teacher.  Mr. Burgess needed to feel that a teacher was interested in him in order to perform, and he was acutely aware when a teacher was not interested.  For example, Mr. Burgess would stay in class with one teacher during recess to work because he knew that she cared about him.  He asked questions and gave good answers to his teacher's questions.  He did well in math and even stayed late to finish his work.  However, he was "tracked" in the lowest group, which got the least attention from most of the teachers.

261.    Some of Mr. Burgess's classmates also knew about the hardships he faced. Though he tried to keep his chin up at school, it was apparent that something was wrong at home.  His fellow students were aware that children in Mr. Burgess's situation often "covered" for their parents to avoid another visit from the DHR.

262.    Other classmates bullied Mr. Burgess about his mother, whom they described as slow.  They also made fun of her for having no teeth, often referring to her as "Toothless Maggie."  Kim Burgess was also teased in school because of her clothes and appearance.  When this happened, Mr. Burgess and Nathan protected her from the taunting.

263.    During the fall semester of her twelfth-grade year, Maggie's oldest daughter, Barbara, dropped out of high school and moved to Huntsville to live with the young man who became the father of her first child.  She no longer wanted to care for Michelle and Christie, and she did not tell her mother where she was going.  Mr. Burgess, then age fourteen, became the eldest child in the Burgess home and shouldered even greater responsibilities.

264.    Throughout middle school—two years in sixth grade, a year in seventh, and one in eighth—Mr. Burgess's grades and test scores continued to drop, as did his attendance, which had been excellent during elementary school.  Mr. Burgess became increasingly accustomed to missing school because of his responsibilities at home.

265.    In 1988-89, Mr. Burgess and Nathan were both in eighth grade at Oak Park Middle School.  During this time, teachers took note of the fact that Mr. Burgess continued to have a quiet, kind personality, in contrast to his brother, whom teachers recall was often disruptive and in frequent need of discipline.

266.    Teachers also took note of how poor Mr. Burgess and his brother were.  They were among the poorest children at Oak Park Middle School, often eating from house to house and borrowing clothes from other children.  Nathan and Mr. Burgess shared a single bicycle, which they rode to school with one of them in the seat and the other on the handlebars.  One afternoon when the brothers were

fishing, one of them fell into the water near the Hudson Bridge. That child came to school the next day wearing wet shoes, because he did not have a spare pair. The children also did not have coats suitable for the cold weather.

267.   While Mr. Burgess was in middle school, his friends and his siblings' friends from the neighborhood were still not allowed inside the Burgess house. Friends were afraid to knock on the door because the house was always dark and the windows were closed, even during the summer. When friends tried to stop by to visit Mr. Burgess and his brother, Maggie told them that the boys were "on punishment" and could not come out. Mr. Burgess and Nathan sometimes climbed out of their windows to escape.

268.   Maggie remained socially isolated. Some of the neighbors did not know that Michelle existed until several years after they moved onto the block.

269.   Maggie also continued to beat Mr. Burgess and his siblings throughout their adolescence and mid-teens. Neighbors believed that Maggie focused some of the beatings on Mr. Burgess because she simply did not like him. Mr. Burgess and Nathan started running away to friends' homes to escape the violence.

270.   In spite of his hardships, during his middle school years, many of Mr. Burgess's interactions with his peers were focused on trying to make them laugh. However, his close friends understood that his light-hearted demeanor

masked a great deal of pain and suffering. When anything negative was brought up, Mr. Burgess changed the subject. When friends tried to talk to Mr. Burgess about his problems, he would say that nobody was there for him but would not provide any details. It was apparent that Mr. Burgess had no support system.

271.   In seventh and eighth grades, Mr. Burgess's small circle of friends and their parents noticed that he was becoming increasingly isolated and that he appeared to be depressed. While other children were playing, Mr. Burgess would sit alone on the curb, away from the rest of the children. At school, he often ate lunch by himself, at a table with students who were not his regular friends. He walked, ran, or rode his bicycle late into the night for hours on end, even when everyone else was in bed. He was constantly on the move. Mr. Burgess appeared on neighbors' porches at six o'clock in the morning, laughing and talking to himself. Sometimes, friends found him sleeping in Delano Park.

### *High School and Homelessness*

272.   Mr. Burgess began ninth grade at Decatur High School in September 1989, when he was living with his mother and siblings in the East Acres Housing Project. Around that time, Maggie Burgess became involved with a man named Charles Orr, who subsequently moved in with her and the children. Mr. Orr's relationship with Mr. Burgess and Nathan was initially positive. However, as his presence in the home increased, the relationship deteriorated. The boys were

unaccustomed to the presence of an adult male figure, let alone someone like Mr. Orr who asserted his authority over Nathan and Mr. Burgess. When he was around the house, Maggie told Mr. Burgess and Nathan to leave. As Mr. Orr took on the role of head of the household, intense friction developed between him, the boys, and Maggie. Invariably, Maggie sided with him against the children. On at least one occasion, a physical fight occurred between Nathan and Mr. Orr. Though Mr. Burgess never had physical altercations with Mr. Orr, he did get into verbal conflicts with him. Mr. Orr's presence in the home led Mr. Burgess to feel increasingly isolated and rejected. When the conflict in his home became intolerable, Mr. Burgess left for days at a time, staying with friends, extended family, or on the streets.

273.    In late 1989 or early 1990, Maggie told both Mr. Burgess and Nathan that she was kicking them out of her home, and that they could no longer live there. Mr. Burgess left his mother's home in the East Acres Housing Project. From that day forward, Maggie did not keep track of where he was living, nor did she allow him to return. Willie Burgess was homeless at the age of fifteen.

274.    Mr. Burgess lived on the streets in Decatur, Alabama at a time when there were no services for homeless teenagers. Organizations such as the Decatur Salvation Army, the CCC, and Tennessee Valley Outreach had basic charity services, but none offered help for unaccompanied, homeless minors. The

144

Salvation Army and Tennessee Valley Outreach did not accept individuals who were under the age of eighteen. The Alabama Baptist Children's Home, a foster care center where, as described below, Mr. Burgess went for help, did not allow any boys over the age of twelve in their shelter. Operation Home, a foster home and shelter for homeless youth, had only six beds available at any given time. Moreover, a child would not have found out about the shelter's existence without being referred there by the DHR or the Decatur Police Department. This was true of all youth support services in Decatur at this time: homeless children could not secure a place to stay by themselves.

275.    The DHR was the only agency in Decatur with any responsibility for children in Mr. Burgess's situation, but it failed to provide any assistance to Mr. Burgess. The agency was dysfunctional and the subject of public scrutiny for failing to properly investigate and follow-up on neglect and abuse claims. In short, between 1990 and 1993, there were simply no resources in Decatur for homeless youth in Mr. Burgess's position.

276.    With intermittent exceptions, from the time that Mr. Burgess's mother forced him out until his arrest, Mr. Burgess's "home" was the streets of Decatur. Mr. Burgess slept for brief periods at the homes of relatives, parents of his friends, and various girlfriends. Most often, he slept outside in parks, abandoned warehouses, vacant apartments, and empty cars. His few personal belongings were

scattered at different locations.  He stopped by one place or another for a change of clothes.  He often walked by himself, all night long, all around town.

277.    One of the places where Mr. Burgess took shelter when he was homeless was an abandoned warehouse in Northwest Decatur.  The warehouse, which had a filthy concrete floor, was infested with rats.  To avoid the rats, Mr. Burgess slept on a pile of wooden crates.  Mr. Burgess also spent nights in the waiting room at Decatur General Hospital, pretending he was a visitor.  He walked the halls and slept in chairs or in the bathroom that was across from the snack area. Mr. Burgess also stayed in empty apartments in the East Acres Housing Project. For a time, Mr. Burgess slept in one such apartment that had been gutted by a fire. He also slept in a box underneath the Gordon Avenue Bridge, at Point Mallard, and in Delano Park.

278.    While homeless, Mr. Burgess often visited the families with whom he was acquainted.  Even though Mr. Burgess stopped by frequently, he did not talk much during these visits.  He was very quiet and reserved when others were engaged in normal conversation.  At times he cried, but typically withdrew if asked what was bothering him.  The only information that Mr. Burgess imparted was that he could not return to where his mother or father were staying.  Based on his depressed behavior, people believed that Mr. Burgess was going through an emotional crisis.

279.   Mr. Burgess's pattern was to stay with friends for a couple of days at a time, and then return to the streets.  He did not stay anywhere long enough to get comfortable, as he did not want to be perceived as a burden.  In fact, Mr. Burgess often did chores to make himself welcome: cleaning the dishes, mopping the floors, taking out the trash, and baby-sitting.  Mr. Burgess was repeatedly described by friends, neighbors, and acquaintances as a young man who found shelter wherever he could lay his head down.

280.   When Mr. Burgess was homeless, and not staying with friends and acquaintances who fed him, he sometimes went days without anything to eat or drink except chocolate.  He loaded up on chocolate, which he sometimes stole, because it temporarily suppressed his hunger.

281.   Mr. Burgess did chores, such as sweeping and taking out the trash, for two local shopkeepers in exchange for lunch money, food, or clothing.  For several months, Mr. Burgess stopped by one of these stores every day, often looking tired.

282.   While on the streets, friends and acquaintances noticed Mr. Burgess's pattern of walking long distances by himself.  Mr. Burgess's constant walking was both a product of his having nowhere to go and a reflection of his fear that he would be kicked out of a friend or acquaintance's house.  Rather than suffer this rejection again, Mr. Burgess kept moving.

283.   Mr. Burgess's pattern of walking and traveling long distances was not only physically and psychologically arduous, but also dangerous.  While he was homeless, Mr. Burgess stayed temporarily with his sister Barbara in Huntsville.  He got to Huntsville by walking on the freeway.  When Mr. Burgess was staying with Barbara he walked the streets at night, often walking through a dangerous area behind Barbara's apartment complex.

284.   Despite being homeless, Mr. Burgess struggled to stay clean.  He walked all over Decatur at night to wash his clothes at various locations.  If he stayed with his friends and their parents, his clothes either got washed with theirs, or he left the clothes he was wearing and exchanged them for clean clothes.

285.   Mr. Burgess carried around some of his possessions in a backpack or plastic bag.  He also left some of his belongings at various people's homes, and left blankets in different locations, such as warehouses or empty apartments, since he rarely knew where he would be spending the night.

### Mr. Burgess's Head Trauma, Headaches, Apparent Seizures, and Blackout Episodes

286.   Mr. Burgess sustained a series of concussive injuries beginning in infancy through adolescence, suffered from apparent seizures and/or blackouts.  He

also has a history of chronic, severe headaches.  These injuries and head traumas

are described in more detail as follows:

(1)    When he was an infant, his mother fell as she walked with Mr. Burgess in her arms.  His head struck the pavement.  He did not receive any medical treatment.

(2)    Between the ages of about three and seven, Mr. Burgess suffered what appeared to be seizures or blackouts.  His eyeballs rolled back and his arms and legs flailed about.  The episodes lasted several minutes.

(3)    At age five or six, Mr. Burgess fell while playing outside.  His head was bleeding, and it is uncertain whether he received medical treatment.

(4)    Mr. Burgess's headaches began at about age five.  His mother was aware of them, but he did not receive any medical attention with the possible exception of some X-rays when he was in elementary school.

(5)    When he was in elementary school, Mr. Burgess was hit in the head with a bat.  Maggie shaved his head and packed the wound with grease.  He did not receive any medical treatment.

(6)    When Mr. Burgess was in elementary school, he also fell on his head while playing basketball.  One of his friends carried him home.  Mr. Burgess's head was bleeding.  Maggie went through the same process of shaving his head and packing the wound with grease.  He did not receive any medical treatment.

(7)    As discussed below, Mr. Burgess's younger brother Nathan was aggressive and dominant in their relationship from a young age. He frequently started physical fights with Mr. Burgess and did not stop until Mr. Burgess gave up.  Nathan beat Mr. Burgess as hard as he could and, on at least one occasion, slammed his head into the concrete repeatedly.

(8)    During one of the seizure or blackout episodes, Mr. Burgess fell down the stairs inside the family's apartment on Beech Street.

(9)    When he was approximately seventeen years of age, Mr. Burgess was stabbed in the head twice. The first time, his brother Nathan stabbed him with a railroad spike. As more fully set forth below, Mr. Burgess did not obtain medical treatment, and his headaches worsened after this event. The second stabbing occurred when his girlfriend stabbed Mr. Burgess in the head with a barbecue fork. Mr. Burgess did not seek medical treatment and has a scar from the incident.

(10)    For several months prior to his arrest, Mr. Burgess was experiencing severe headaches almost daily. He banged his head against the wall because the pain was unbearable. As discussed below, within weeks of January 26, 1993, he attempted suicide.

287.    Mr. Burgess also believed, prior to and at the time of his arrest, that he was dying of brain cancer or a brain tumor.

### Dropping Out of School, Decatur General Hospital Emergency Room Visits, and Morgan County DHR

288.    Mr. Burgess received little medical care when he was homeless, but he went on several occasions to the Decatur General Hospital Emergency Room. On October 4, 1989, Mr. Burgess was seen in the Emergency Room at Decatur General Hospital, complaining that he had experienced pain in both knees for several years. A physician, who worked in the Decatur General Hospital Emergency Room during this period and who later treated Mr. Burgess at the hospital, concluded that Mr. Burgess's symptoms were consistent with Osgood Schlatter's disease, a condition that affects boys in early to mid-adolescence and is

150

caused by calcification on the tibia just below the knee. Osgood Schlatter's disease can also be caused by too much walking.

289.   Once Mr. Burgess was homeless, he rarely went to school. As he became increasingly absent from Decatur High School in the second semester of ninth grade, Mr. Burgess was also failing almost every class. On days that he went to school, Mr. Burgess had to walk there from wherever he had slept the night before.

290.   When Mr. Burgess was homeless and still in ninth grade, he went to seek shelter at a foster care center, the Alabama Baptist Children's Home ("ABCH"). He was told that ABCH could not help him.

291.   In April 1990, Mr. Burgess, then a few days shy of his sixteenth birthday, was arrested for the first time. The charge was "out of control." The case was dismissed. (Doc. 19-2 at 28.)

292.   On April 17, 1990, Mr. Burgess turned sixteen and withdrew from Decatur High School before completing ninth grade. Educational authorities made no effort to investigate, much less address, the reasons for his withdrawal. Mr. Burgess did not want to go back to school while homeless because he was afraid that school officials would ask why he was not living with his mother. Mr. Burgess's friends noticed that once he dropped out of school, he kept increasingly to himself.

293.    During the summer and fall of 1990, Mr. Burgess stayed on and off in Courtland, Alabama with his father, Bill, and his brother, Nathan.  His father always worked late and was rarely around when Mr. Burgess stayed with him. Mr. Burgess did most of the cooking and cleaned up after himself, his brother, and father.  However, Mr. Burgess did not stay at his father's house for long because of their troubled relationship.  At night, Mr. Burgess often walked by himself the twenty-two miles of railroad tracks that ran between Courtland and Decatur.

294.    During the period that Mr. Burgess traveled back and forth between Courtland and Decatur, he sometimes stayed on Decatur's streets at night.  On October 15, 1990, at 11:20 p.m., Mr. Burgess went to the Decatur General Hospital Emergency Room.  He had a quarter-inch hole in his right lower leg.  Mr. Burgess reported that there had been a shooting in East Acres where he was walking the night before.  Mr. Burgess, who had been drinking, thought that he might have been shot.  The examining physician diagnosed the hole as a probable spider bite and secondary infection and prescribed a strong steroid, consistent with the severity of the bite.

295.    The following day, the social services department at Decatur General Hospital received a referral from the treating physician because Maggie Burgess made her son return the medication after he had charged it to her account.  The infection had worsened, and the hospital notes stated that Mr. Burgess might

152

require surgery.  It was very rare for emergency room doctors to inquire into their patients' home lives or to make referrals to the hospital's social services department.  However, the treating physician was so concerned that Mr. Burgess's mother had made him return his medication that he made a referral, nonetheless.  In his interactions with the physician, Mr. Burgess was quiet, reluctant to talk, and seemed sad.  Unfortunately, the emergency medicine department did not allow for psychiatric referrals unless individuals were overtly psychotic at the time of arrival, or unless they manifested clear signs of serious drug or alcohol abuse.

296.   The social worker who met with Mr. Burgess that day as a result of the physician's referral, arranged for the purchase of his medication.  She also made a neglect referral to the Morgan County DHR.  She described Mr. Burgess as a child who had been kicked out of his home by his mother earlier in the year, did not have a guardian or a place to live, and was rearing himself.  The social worker noted that Mr. Burgess had walked, unaccompanied by an adult, to the hospital at night.  She reported that he "walks where ever he needs to go" and "insisted" on walking to whatever his destination was upon discharge.  Despite the neglect referral made by the hospital social worker, the DHR did not assist Mr. Burgess in finding a safe or stable living environment or ensure that he was in school.

297.   Mr. Burgess continued to shift between Courtland and Decatur on foot or bicycle.  From time to time, he stayed with a friend's family in Courtland.

Mr. Burgess slept at their house for a few nights and then disappeared. Several members of this family knew that Mr. Burgess had suffered abuse at home and that he was experiencing extreme headaches.

298.   In January 1991, Mr. Burgess's case was transferred to another Decatur General Hospital social worker. The referral concerned assistance with payment for Mr. Burgess's algebra textbook so that he could re-enroll in Decatur High School. The social worker was aware that Mr. Burgess had been going back and forth between the streets and the homes of friends. Mr. Burgess's readmission to school was blocked not only because he lacked the money for a textbook, but because he had no permanent address or stable guardian, and his mother would not let him return home. Mr. Burgess said that he wanted to become a ward of the State or be placed in a children's home so that he could have a decent place to live and get some help. For several months, the social worker and his supervisor made unsuccessful efforts to prevail upon DHR to intervene.

299.   Mr. Burgess enrolled in Courtland High School for a very brief period in January 1991. At the time, Mr. Burgess had been out of school since he dropped out of Decatur High School in April 1990. After one week, he withdrew from Courtland High. He told the Decatur General Hospital social worker that he had tried staying with his father, but once again had to leave because they could not get along.

154

300.    The Decatur General Hospital social worker tried to facilitate a living arrangement for Mr. Burgess with his father's ex-wife, Teresa Milam.  However, there were several difficulties, including the lack of a legal familial relationship, obstacles imposed by the Decatur Housing Authority and other agencies such as the DHR, and the lack of responsiveness from Mr. Burgess's mother.  The social worker reported that on January 22, 1991, Ms. Milam agreed to allow Mr. Burgess to stay with her.  On January 24, 1991, Mr. Burgess transferred back to Decatur High School.

301.    Although Mr. Burgess was ostensibly living with Ms. Milam during this time, his situation was unstable.  He was profoundly depressed.  Sometimes he had food; sometimes he did not.  He stayed with Ms. Milam for a few months, but typically only for a day or two at a time.  He did not engage in conversation. "Little Willie," as Teresa Milam called him, was always sad, but would not open up to Ms. Milam about his problems.  When he stayed with Ms. Milam, Mr. Burgess also persisted in his pattern of walking the streets.

302.    On February 25, 1991, Mr. Burgess went to the Decatur General Hospital Emergency Room by himself.  According to the ER nurse's report, Mr. Burgess stated that he had been "worried a lot lately."  The physician who examined him reported: "This is a 16-year-old, black male complaining of burning epigastric pain, often postprandial and a multitude of stressors including school

and being kicked out of one home to the next, to the next, while looking for work."

According to the physician, he had never written a note like this before, nor has he

written one since.  The physician was also concerned because, in his experience,

sixteen-year-olds do not usually complain of indigestion or persistent upper or

middle abdominal pain, which can be indicative of a pre-ulcerous condition.  It

appeared to the doctor that Mr. Burgess's symptoms were likely the physical

manifestation of his emotional condition.

303.   Mr. Burgess rarely attended school during the beginning of his second

semester of ninth grade at Decatur High, between January and March 1991.

During this time, his attendance records show numerous unexcused absences, with

more than thirty-five entries of calls to the home of Ms. Milam, where Mr. Burgess

stayed periodically.  Comments include: "knee/student;" "home/mother;" "don't

know;" "no answer;" "sick/mother;" "probably truant;" and "truant/Ms. Miland."

He received a numerical grade average in only one class out of six.  There is a

notation in his school records that Mr. Burgess was living with "Ms. Miland," a

probable reference to Teresa Milam.  On April 8, 1991, Mr. Burgess again

withdrew from Decatur High School.  Despite Mr. Burgess's chronic absence from

school, educational and other public authorities failed to intervene.

304.   During the time that Mr. Burgess was homeless and absent from

school, two VISTA volunteers who worked at the Decatur Housing Authority saw

him wandering around during school hours.  They were concerned that he was not in school and not living with his family.  They decided to try to help him return to his mother's home, so they went to see Maggie on several occasions.  Each time, Maggie refused to allow Mr. Burgess to return, indicating that there was nothing she could do for him.  According to the VISTA volunteers, Maggie did not understand that she was responsible for Mr. Burgess's wellbeing, and did not care that he was living on the streets.

305.   On March 27, 1991, shortly before he withdrew from Decatur High School, Mr. Burgess applied to enroll in Job Corps, a federally-funded job training program for youth.  Mr. Burgess told the hospital social worker that he had dropped out of school and signed up for Job Corps.

306.   On April 30, several days after his seventeenth birthday, Mr. Burgess arrived by bus at a Job Corps center in Mammoth Cave, Kentucky.  He was placed in the bricklayer helper trainer program.  While he was in the program, Mr. Burgess reported to work on time, completed his assignments, and demonstrated that he could become a valuable employee.

307.   On May 28, Charles Orr, Maggie Burgess's male companion, died of a heart attack.  When Mr. Burgess learned this, he realized that his mother had no one to support her.  Mr. Burgess thought about killing himself so that his mother could collect the life insurance policy she had taken out on him.  He climbed up the

water tower at the Job Corps Center and came close to jumping off. One of the staff coaxed him down. On June 25, Mr. Burgess resigned from Job Corps in lieu of disciplinary action and was sent back to Decatur by bus. It was not uncommon, during this time, for enrollees to be summarily dismissed from the program due to disciplinary problems. Rather than attempt to investigate the reasons for troubling behavior such as Mr. Burgess's, staff members often sent children back home.

308.   In June, when the hospital social worker tried to follow up on Mr. Burgess's situation with his "stepmother," he learned that Teresa Milam's telephone had been disconnected, and he closed his file on Mr. Burgess.

### After Job Corps

309.   Within months of the death of Charles Orr, Bill Burgess moved back in with Maggie. Kim and Christie, the two youngest children, were still at home, as was Michelle, their disabled sister.

310.   When Bill came back to live with Maggie and the children, he beat Kim severely, was verbally abusive to her, and attempted to sexually assault her. Maggie did not protect Kim from her father. Kim often ran away to friends' and neighbors' homes to escape. As discussed below, Mr. Burgess became aware that Kim was the victim of their father's physical abuse. During the period that Mr. Burgess was homeless, Bill also repeatedly sexually assaulted Christie, Mr. Burgess's youngest sibling, who was between the ages of six and eight.

311.   Mr. Burgess returned from Job Corps to the streets of the East Acres, sleeping wherever he could.  As before, he stayed briefly with friends and relatives, in parks, in warehouses and abandoned buildings, and kept his clothes at different locations.

312.   Mr. Burgess also remained largely isolated from his family.  Rather than support each other, he and his brother Nathan fended for themselves, except for a brief period when they lived with their father in Courtland.  While Mr. Burgess left Courtland after only a short time, Nathan stayed for another seven months, during which time he lost contact with Mr. Burgess.

313.   When they did see each other, Nathan was often physically abusive toward his brother.  When Mr. Burgess was seventeen years old, Nathan stabbed him in the back of the head with a railroad spike.  The spike stuck in his head, and Mr. Burgess pulled it out himself. Although the wound caused a great deal of bleeding, Mr. Burgess did not receive medical treatment.  After this injury, Mr. Burgess began complaining more often that his head hurt.

314.   Nathan Burgess was arrested on September 25, 1991 for robbery and for assaulting the store clerk whom he had robbed.  At age sixteen, he was convicted and sentenced to prison for twenty years.

315.   Between October 1991 and March 1992, Mr. Burgess was arrested four times as a juvenile.  The offenses were theft, trespassing, breaking and

entering a vehicle, and unauthorized use of a vehicle.  In each instance, he was placed on juvenile probation.  In each instance, the juvenile authorities failed to provide any assistance to Mr. Burgess.  The juvenile probation officer assigned to Mr. Burgess's case failed to conduct any home visits.  He spoke briefly to Maggie, whom he described as developmentally slow and mentally unstable.  He did not know that Mr. Burgess was homeless, though he occasionally saw him on the streets.

316.   Mr. Burgess's mother, Maggie, told him on several occasions that he would die before the age of eighteen.  On April 17, 1992, Mr. Burgess turned eighteen years old and was still living on the streets.

317.   Mr. Burgess had been in an on-again-off-again relationship with Coretta Powell for about a year.  In June of 1992, Ms. Powell found out that she was pregnant with Mr. Burgess's child.  Once Mr. Burgess learned about the pregnancy, he became obsessed with the prospect of becoming a father and finding work.  However, Ms. Powell, who was seventeen years old, broke up with him before the baby was born because she was not ready emotionally for both a child and a relationship.

318.   On September 22, 1992, Mr. Burgess's first child, Tevin Powell, was born.  Mr. Burgess wanted to be a father to his son, but all he knew about being a parent was what not to do, and he was homeless and jobless.  His girlfriend's

rejection, and the restrictions she placed on Mr. Burgess's ability to see his child, caused him great frustration and depression.

319. Mr. Burgess tried hard to work in 1992 despite his homelessness, but it was difficult, and he succeeded at it for only brief periods of time. Mr. Burgess worked in September 1992 at Wayne Farms, a chicken processing plant in Decatur, but that job lasted only a few weeks. He also worked for short periods of time at McDonald's and as a dishwasher at the Iron Gate Restaurant. The jobs required him to walk for miles to get to work, and he was so hungry that he ate on the job when he could.

320. In 1992, for several months, Mr. Burgess had a relationship with Danyelle Douglas, a young woman who lived with her mother and siblings in East Acres. Danyelle's mother allowed Mr. Burgess and his fourteen-year-old sister, Kim, to frequent her home when they needed a place to go. During this time, Kim was repeatedly running away from home to escape Bill Burgess's physical abuse. She would often show up at the door in the middle of the night, beaten up and vowing never to return to her family home. Mr. Burgess's girlfriend's mother sometimes hid Kim in her house when Bill or Maggie came looking for Kim. She took Kim in and fed her, as she did with Mr. Burgess. When Mr. Burgess visited, all he had with him were the clothes on his back.

### *The Months Leading to Mr. Burgess's Arrest*

321.   In the latter months of 1992, Mr. Burgess developed a relationship with Yolanda Wallace, then age nineteen.  Ms. Wallace was living in an apartment in East Acres with her young children.  Eventually, Mr. Burgess began staying with her.  Mr. Burgess cooked, cleaned the house, and looked after her children. They both spent a lot of time unsuccessfully looking for work.  Among the places they applied for jobs was the Lurlene B. Wallace Center, where Ms. Wallace's mother was employed.

322.   During the period that Mr. Burgess stayed with Yolanda Wallace, his sister Kim continued to run away from home because Bill Burgess was assaulting her.  Often, when she came over to Ms. Wallace's house, Kim was upset and crying.  Sometimes, she got up very early and just sat in Ms. Wallace's house all day.  Mr. Burgess did not know what to do about his sister and wanted Kim to stay with him and Ms. Wallace.  However, Ms. Wallace knew that Kim was a minor, and that they needed her mother's permission before she could stay there permanently.  Eventually, Kim disappeared, and neither Mr. Burgess nor Ms. Wallace could find her.

323.   In late 1992, Mr. Burgess's behavior grew more peculiar, and he was increasingly isolated and depressed.  Mr. Burgess had periods of depression when he would fall into a zombie-like state.

162

324.    While Mr. Burgess had headaches for years before he was homeless, they intensified during the last year before his arrest.  During the fall of 1992, Mr. Burgess had severe headaches almost daily.  When they were particularly painful, he banged his head against the wall and rocked and cried while holding his head.  He sometimes slept for a long time to try to get rid of them.  His friends and Ms. Wallace knew that he had frequent, painful headaches.

325.    After Thanksgiving of 1992, Mr. Burgess's depression worsened.  He stopped smiling, he stopped talking, he stopped eating, and he stopped sleeping. He became extremely thin and appeared physically and emotionally drained.  He also began to have hallucinatory thoughts, such as believing that the television was talking to him.

326.    Mr. Burgess also believed that he was losing his mind.  He barely talked to his friends and stopped going to the locations where they used to hang out.  He often appeared out of touch.  He did not talk to others, including his girlfriend, about his depression and peculiar behavior.  In December, his isolation worsened.  Increasingly, he did not want to leave Ms. Wallace's house.

327.    On December 21, 1992, a complaint was filed seeking child support from Mr. Burgess for his son.  He was served with the complaint on December 29, 1992.

328.   In the winter of 1992, Mr. Burgess stole a Christmas tree, lights, and some other items to give as gifts to Ms. Wallace and her children.  He cooked dinner for his girlfriend that night, but she did not come home, which exacerbated Mr. Burgess's depression.  His anxiety was compounded by other pressures and fears: He thought he was not good enough to be with his child.  He did not have a job.  Though he had experienced other periods of sadness, this time was different in that he could not pull himself out of his depression.

329.   On several occasions, Mr. Burgess contemplated taking his own life and told Ms. Wallace that he wanted to kill himself.  Mr. Burgess said over and over again that no one knew what he was going through.  On one occasion, Mr. Burgess ingested two boxes of Nyquil gel caps in an apparent attempt to commit suicide.  He told Ms. Wallace that his headaches were so bad that he wanted to die.  He did not see a doctor after this incident.  On another occasion, Ms. Wallace's mother observed Mr. Burgess on a bed with a gun, saying that he was going to kill himself.

330.   During the time that Mr. Burgess stayed with Ms. Wallace, a group of young men in the neighborhood, who were the same age as Mr. Burgess or a little older, were constantly picking fights with him.  They taunted him and threw objects at his girlfriend's house.

164

331.   The attacks escalated.  In late 1992, Mr. Burgess got a Titan .25 semi-automatic to protect himself from the young men in the neighborhood who were increasingly bullying and threatening him.  The gun had a defect, and it would go off if it was bumped or dropped.

332.   In late 1992, Mr. Burgess got into a fight with one of the young men in the neighborhood who had been after him.  This young man was suspected to carry a gun.  After getting away from the fight unharmed, Mr. Burgess went to his mother's house.  Mr. Burgess's mother told him that, given the way he was living, he would get killed, but it did not make any difference because he was dying anyway.  She told Mr. Burgess that he had cancer in his head.  Mr. Burgess believed his mother when she told him that he had brain cancer, because of his bad headaches.  Since he was a little boy, his mother had always implied that something was wrong with his head.  Later, Maggie confirmed with the pre-sentence investigator at Mr. Burgess's trial that "he was in good physical and mental health as far as she knew.  She stated that he had a head injury some years ago and thought he might have cancer."  (Doc. 19-2 at 29.)

333.   In the latter part of 1992, Mr. Burgess frequently told his friends and girlfriend that he had brain cancer or a brain tumor.  Friends joked with him about it, but Mr. Burgess truly believed that he was not well.  As discussed below, when questioned by the police after his arrest, Mr. Burgess told the officers that it did not

165

make any difference who his lawyer was because he was dying of brain cancer anyway. The officers' reports and testimony at the preliminary hearing, suppression hearing, and at trial include Mr. Burgess's statements that he believed he was dying of brain cancer.

334.    On January 26, 1993, the day that Mr. Burgess was arrested for the murder of Louise Crow, Ms. Wallace was three months pregnant with their child. Neither she nor Mr. Burgess knew that she was pregnant. Shortly after his arrest, Ms. Wallace learned that Mr. Burgess had been accepted for a job at the Wallace Center.

### The Arrest and Interrogation

335.    Within hours of his arrest, Mr. Burgess was taken into custody and held in an interrogation room at the Morgan County Police Station. During questioning by Decatur police investigators Dawson Long and Jep Tiallent, Mr. Burgess spoke of losing a girlfriend's baby through miscarriage, (Doc. 19-9 at 150), and said that he had no reason to live. (Doc. 19-9 at 136, Doc. 19–14 at 22, *see also* 35, 85, 86.) Mr. Burgess also said that he thought he had brain cancer. (Doc. 19-9 at 113.) Sergeant Tallent testified that Mr. Burgess said that "he just knew he had a brain tumor and it was cancerous." (Doc. 19-9 at 113.) Tallent described Mr. Burgess's emotional state as depressed. (Doc. 19-9 at 113–14.) Mr. Burgess also said something about being treated at Decatur General Hospital, but

166

Tallent could not recall any details.  (Doc. 19-4 at 86.)  After Tallent left the room, Mr. Burgess also told Long that he had been "struck in the head" and was treated at Decatur General Hospital.  (Doc. 19-14 at 40.)

336.   Mr. Burgess's application for appointed counsel on January 28, 1993, states: "Defendant is 'transient'; no income, sleeps from 'place to place.'" (Doc. 19-1 at 10–11.)

### *Summary*

337.   The jury did not hear this compelling mitigation case.

338.   All the evidence set forth above was obtained from witnesses and records, which were reasonably available to trial counsel in 1993 and 1994. Counsel's failure to investigate was "not [based on] reasoned strategic judgment." *Wiggins*, 539 U.S. at 526.  Counsel unreasonably failed to present this extensive and compelling mitigation evidence at the penalty phase of the trial, including the August 24, 1994 sentencing.

339.   Had this evidence been gathered and presented, the jury would have known that Mr. Burgess's development was shaped by physical violence, emotional neglect, abandonment, poverty, homelessness, and mental illness.  The prosecutor would not have been able to argue that the jury heard no evidence of Mr. Burgess's abuse or that Mr. Burgess was merely a kid on the free lunch

program with no father figure.  He could not have argued that this was a case

involving few mitigating circumstances:

> [I]f [defense counsel] wants to talk about comparing him to what you usually see in these cases, he's got a significantly small amount of mitigating circumstances, too.  We don't see the child being abused. We don't see the terrible circumstances.  We don't see the borderline retardation.  There is a man that could have made something of himself if he wanted to.  He is not in the dire circumstances that most of the defendants that we deal with in these kind of cases come through.

(Doc. 19-13 at 28.)

340.   Had the jury and court heard the truth about Mr. Burgess's social

history, there is a reasonable probability that the result of the penalty and

sentencing phases would have been different.

### 3.    Trial Counsel Unreasonably Failed to Retain and Present Any Expert Witnesses in Support of the Case in Mitigation.

341.   Trial counsel's deficient performance included their unreasonable

failure to consult with and present the testimony of qualified experts who would

have explained the impact of Mr. Burgess's life history on his psychosocial

development.  Although the court approved trial counsel's request for $1,000 for

independent medical and mental health evaluations and granted them the

opportunity to seek additional funding based upon a further showing of need,

(Doc. 19-3 at 38), trial counsel did not expend any of those funds and did not retain

the qualified mental health professionals whose assistance was necessary to present

a constitutionally adequate penalty phase. *See, e.g.*, *Alabama Capital Defense Trial Manual* (2d ed. 1992) at 83–87, 105–110 (stating that the use of experts is "critical" to preparing and defending a capital case and providing guidance to obtain and maximize expert assistance); ABA Guidelines (1989 ed.), Guideline 11.4.7 (Investigation) (directing counsel to obtain expert assistance "where it is necessary or appropriate for preparation of the defense; adequate understanding of the prosecution's case; [or] . . . presentation of mitigation); *see also Alabama Capital Defense Trial Manual* (4th ed. 2005) at 80 (discussing the prevalence of "trauma and mental illness" among capital defendants and explaining that "few attorneys have a background sufficient to detect [these conditions] without expert assistance"); *see also Porter*, 558 U.S. at 40 (finding ineffective assistance of counsel at a 1988 capital trial where counsel "failed to uncover and present any evidence of Porter's mental health or mental impairment, his family background, or his military service"); *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985) (reaffirming, in the context of a capital case in which the defendant had been denied the services of an independent psychiatrist, that the federal Constitution entitles an indigent defendant to "the raw materials integral to the building of an effective defense").

342.    Despite Mr. Burgess's repeated exposure in childhood and adolescence to a number of dangerous and harmful developmental environments and stressful, abusive, and traumatic experiences, including violence, neglect, and

emotional abandonment, trial counsel failed to consult with and present the

testimony of a sociologist, such as Kevin Fitzpatrick, Ph.D., and qualified mental

health professionals, such as Bekh Bradley, Ph.D., Kelly Skelton, M.D., Ph.D., and

Dale Watson, Ph.D., who would have relied upon the existing social science

research and utilized the multi-generational social history investigation that should

have been conducted to offer expert testimony to assist the jury and the trial court

in understanding the compelling mitigating circumstances in Mr. Burgess's case.

*See, e.g.*, ABA Guidelines (2003 ed.), Guideline 10.4 (The Defense Team)

(requiring that the defense team include "at least one mitigation specialist" and "at

least one person qualified by training and experience" to "screen" the client for the

presence of mental illness); *id.* Guideline 10.11 cmt. (The Defense Case

Concerning Penalty) (explaining the importance of selecting experts who can assist

the jury in understanding the client's social history).

### 4. Trial Counsel's Unreasonable Failure to Consult with Experts and Present Expert Testimony Prejudiced Mr. Burgess.

343. Trial counsel's failure to consult with experts and present their

testimony prejudiced Mr. Burgess. The "risk-factors" model of understanding the

effects of past experience on subsequent development and adult behavior applies a

basic psychological framework that was widely employed by the community of

mental health professionals generally, and, specifically, by mental health

professionals who were engaged in the development and presentation of social histories for defendants in capital trials in 1993-94. Likewise, the "risk factors" model of understanding the relationship between the exposure to violence and other adverse social contexts and the development of mental health disorders among adolescents was employed by sociologists generally, and by those who were engaged in the development and presentation of social histories for defendants in capital trials in 1993-94. Had qualified mental health professionals and sociologists been presented with the facts of Mr. Burgess's life history detailed above, they would have testified that Mr. Burgess was exposed throughout his life to persistent dangerous and inadequate environments and underwent a number of stressful and traumatic experiences, including physical and emotional abuse and parental neglect and abandonment, which put him at significant psychosocial risk to develop mental health disorders.

344. The risk factors that defined Mr. Burgess's childhood, adolescence, and teenage years were known in 1993-94 to predispose children to the development of mental health problems and delinquent behavior. These risk factors fall into several broad categories: childhood and family environment; family history of mental illness and alcohol abuse; social, neighborhood, and community environment; adolescent homelessness; and head injuries. Within each broad category, Mr. Burgess was exposed to numerous risk factors:

345.   *Childhood and Family Environment*: Mr. Burgess experienced multiple instances of physical abuse by both parents; witnessed multiple instances of physical abuse by his parents of his siblings; witnessed violence and verbal abuse directed at his mother by his father; was aware of multiple instances of sexual abuse by his father of at least one of his sisters; experienced emotional abandonment and neglect by his mother, who had both cognitive limitations and symptoms of mental disorders; experienced parental abandonment by his father; and, from a young age, experienced the stress of caring for a severely disabled sibling.

346.   *Family History of Mental Illness and Alcohol Abuse*: Mr. Burgess was raised by a mother with a demonstrated family history of intellectual disability and mental illness; and his father had a demonstrated family history of alcohol abuse.

347.   *Social, Neighborhood, and Community Environment*: Mr. Burgess was raised in extreme poverty; attended schools where poverty and race were defining features and where teachers were unwilling or unable to address Mr. Burgess's educational and psychosocial needs; was negatively impacted by public social services agencies' failure to address risk factors in the home; and resided in a neighborhood where criminal conduct—especially drug abuse and violence— were epidemic, particularly during the years that Mr. Burgess was homeless.

348.   *Adolescent Homelessness*: Mr. Burgess was forced by his mother to leave home at age fifteen; was homeless for more than two years prior to the crime; found shelter in abandoned warehouses, empty apartments, vehicles and, for very short periods, with friends; sought medical care from a local hospital emergency room where, at age sixteen, a physician described his homelessness and "exposure to multiple stressors"; and was failed by public institutions that did not take action to address the serious needs of this minor.

349.   *Head Injuries:* Mr. Burgess sustained repeated, severe head injuries beginning in childhood through his teenage years but received no evaluation or treatment following these injuries.

350.   The dangerous and inadequate developmental environments to which Mr. Burgess was exposed in childhood and adolescence, the childhood abuse that he experienced, and the other traumatic experiences spanning his life prior to his arrest constitute significant psychosocial risk for the development of mental health problems.  These mental health problems include learning and/or school-related problems; difficulty forming stable relationships; symptoms of depression and disordered thinking; suicidal thoughts and behaviors; posttraumatic stress disorder; delinquent behavior as a juvenile; problematic alcohol and/or substance use; and homelessness.

351.    A dose-response relationship exists such that when someone is exposed to either more frequent or more severe levels of a) dangerous and inadequate developmental environments, b) childhood abuse, and c) other traumatic life experiences that occur in very early childhood and continue across the course of childhood and adolescent development, the likelihood of negative outcomes, including those set forth above, increases.  Such exposure also leads to particularly high levels of risk for the problems identified above because these exposures interrupt and interfere with the development of key cognitive, social, and emotional capacities.  Exposure to these risk factors also leads to increased risk and vulnerability for negative outcomes when the individual is exposed to additional traumatic events as an adult.  For example, children who are abused or neglected are less likely to develop secure attachments with caregivers or parents and are more likely to become homeless as adolescents.  Homeless adolescents who have not formed secure relationships with parents or caregivers are more likely to have behavioral and emotional problems than homeless adolescents who have formed secure relationships.

352.    At minimum, Mr. Burgess displayed overt signs and symptoms of several mental illnesses for months prior to the crime.  These included a severely depressed mood marked by repeated thoughts of suicide and a suicide attempt by overdose.

353.    Mr. Burgess's social history provides very clear evidence of these risk factors at work.  At the time of Mr. Burgess's trial, there was widespread consensus among mental health professionals that early experiences play an extremely important formative role in shaping the course of subsequent psychological development and behavior.  Mr. Burgess experienced very traumatic events and forms of childhood maltreatment that are destructive of normal development and that place children seriously at risk for emotional illness and delinquent behavior.  In his adolescent years, Mr. Burgess began to suffer from many of the problems that the risk factors literature indicates will emerge as a result of earlier trauma exposure.  Lacking any consistent, supportive presence in his life, Mr. Burgess was denied the experience of being psychologically buffered or protected from the pain of this mistreatment and the destructive, corrosive effect it would have on his self-esteem.  His social history illustrates the ways in which these risk factors interact and accumulate over the developmental years and eventually produce a range of emotional and behavioral problems, including poor school performance, truancy, delinquency, and adult criminality.

354.    Each child in a family experiences the effects of parental maltreatment, instability, and trauma differently depending upon a host of factors, including, for example, when the events occur and how they are understood by the child and others in the family.  Although from outside appearances, all siblings

175

may grow up in the same disadvantaged and abusive environment, their life courses can take dramatically divergent paths. These differences cannot be explained without thorough examination and assessment of each family member's life course.

355.    Numerous studies, well-known to mental health professionals and sociologists at the time of Mr. Burgess's trial, showed that poverty has significant, direct effects on early childhood development, including lowered levels of self-esteem, high levels of frustration, poor self-regulation, and problematic academic performance and achievement in school. In addition to the direct effects of poverty, research available at the time of Mr. Burgess's trial demonstrated that parents' low socioeconomic status and lack of education also serve as social and psychological stressors that influence the likelihood that they will engage in child abuse.

356.    Like everyone exposed to a wide range of significant risk factors over the course of his life, Mr. Burgess was affected by the accumulation of traumatic events and physical and psychic harm that he experienced. These risk factors interacted with one another and compounded each other's effects in the following ways:

(1)    Bill Burgess abandoned the Burgess children when Mr. Burgess was between four and five years old. Mr. Burgess's father provided no emotional or monetary support to the family, though they lived in extreme poverty. Research available to mental

176

health professionals at the time of Mr. Burgess's trial showed that children who have been abandoned by parents are at high risk for developing psychological disturbances later in life. Parental abandonment is a particularly significant form of trauma, creating devastating feelings of pain and grief from which it is difficult to recover. Parental abandonment is one of the major causes of adolescent depression as well as subsequent "acting out" behavior.

(2)    Before Bill Burgess abandoned Mr. Burgess's family and when he reappeared intermittently, unpredictably, briefly, and opportunistically, Bill Burgess physically and/or verbally abused Maggie, Mr. Burgess, and his siblings. Mr. Burgess was not only aware of his father's reputation as a "womanizer" and the father of dozens of children, but he was also teased relentlessly about his father's conduct. Mr. Burgess was "at risk" because of paternal abandonment and the absence of a father figure, but also because of the dominance of his father's negative image among his peers and in the community.

(3)    While Maggie Burgess managed to provide her children with basic, physical necessities such as shelter, clothes, and food, she was unable to and did not nurture or care for her children in any other respect. As a result of Maggie Burgess's intellectual and psychological disabilities, including paranoid and disordered thinking, and her own family history, Mr. Burgess experienced what researchers and clinicians call "psychologically unavailable caregiving," a particularly destructive form of childhood maltreatment. This risk factor is recognized by experts to be rooted in an environment of emotional neglect, rather than an isolated incident. Maggie Burgess lacked the capacity to develop an emotional attachment to Mr. Burgess, to nurture him, or to provide him with the necessary parental support and guidance. Emotionally neglected children suffer long-term harm, including low self-esteem and poor self-regulation.

(4)    Maggie Burgess's relationship with Mr. Burgess was also abusive. Maggie beat Mr. Burgess and his siblings with electric cords, switches, broom handles, and belts. Beatings occurred frequently, as often as several times per week. The beatings were

unpredictable and occurred throughout Mr. Burgess's childhood and adolescence. At the time of Mr. Burgess's trial, this kind of violence was widely understood to be psychologically destructive. It significantly undermines normal social and emotional development, and certainly when the abuse is experienced in the ways it was experienced by Mr. Burgess, it creates lifelong psychological problems, deep insecurities, diagnosable psychological disorders, and an increased potential for delinquency and criminality. Extensive research available at the time of Mr. Burgess's trial documented the ways in which, for many children, these problems persist as they mature into adulthood.

357.   The mechanisms by which these destructive effects are produced have been well understood for many years. Physically abused children come to view the world as a dangerous and threatening place, one in which their psychological and physical survival are regularly placed at risk. They find it difficult to form trusting relationships with people, for fear that they will be vulnerable to further abuse and pain. They suffer chronic problems with low self-esteem because they frequently begin to think of themselves as unworthy, somehow deserving of the abuse to which they have been subjected. Physical, emotional, and sexual abuse robs children of the capacity to feel real joy and happiness, often leads to forms of depression, and has consequences that are profound and enduring.

358.   Social science and other research that was available to mental health professionals at the time of Mr. Burgess's trial showed that a parent's own childhood socialization, including models of physical force and isolation, are often determinative of what form of adaptation a parent will use in dealing with family

178

stress.  Maggie Burgess was raised in extreme emotional and social isolation and continued that pattern with her children.  Until they reached an age when Maggie's ability to control her children's conduct by physical punishment diminished, the children were rarely permitted outside.  If they violated the rule, they were beaten. Likewise, with rare exceptions, visitors were not allowed in the home.  Maggie Burgess's need for social isolation may be explained as one of her coping mechanisms.  However, the imposition of this isolation on her children was both a constant stressor and a developmental risk factor for Mr. Burgess.

359.  Mr. Burgess's sister Michelle has an illness and lifelong disability that placed extreme and lasting stress—economic and emotional—on Maggie Burgess and on the other children in the family.  These stressors were exacerbated by the family's extreme poverty, the absence of two parents in the home, and Maggie Burgess's emotional and intellectual deficits, as well as her delusional and paranoid thinking.  The responsibility for raising a child who is profoundly disabled can be overwhelming even in financially stable, two-parent homes. However, in the context of this family's circumstances, and particularly given Maggie's cognitive disabilities, emotional deficits, and paranoid beliefs, Michelle's presence was a daily and chronic stressor.  At an early age, Mr. Burgess was forced to assume care-taking responsibilities for his younger siblings and for Michelle, responsibilities that a child is unprepared to handle.  When, in Mr. Burgess's first

semester of sixth grade, his mother was hospitalized for a seizure disorder, the
enormity of these care-taking responsibilities became overwhelming, and marked
the end of Mr. Burgess's regular attendance at school. The downward spiral
continued until he left school in ninth grade. Educational authorities made no
effort to investigate, much less address, the cause of his difficulties.

360.   Institutional failure was another important factor in Mr. Burgess's
social history that helps to explain the course of his life. This institutional failure
took several different forms, beginning early in life and continuing until the time of
his arrest.

361.   There were many opportunities for institutional intervention during
Mr. Burgess's developmental years, but none occurred. Mr. Burgess's family was
chronically poor and almost entirely dependent upon government assistance,
including financial aid from public agencies. However, social services failed to
address the stressors in the family constellation or those particular to Mr. Burgess.
The risk factors in Mr. Burgess's life increased as he moved from elementary to
middle school. The predominant educational environment in middle school was, at
best, wholly unsupportive of African-American students from the projects and, at
worst, hostile to them.

362.   Middle school years are especially crucial years for adolescent boys to
begin to develop and assert their emerging social identities. Given Mr. Burgess's

history of childhood maltreatment, including parental abandonment, emotional neglect, physical and emotional abuse, and a series of traumatic events, coupled with the absence of any intervention—fortuitous or otherwise—inadequate protective factors were in place to decrease the likelihood that he would develop adaptive behaviors to cope with and survive these risk factors.  Children subjected to maltreatment and rejection, like Mr. Burgess, often become emotionally distant, leading to further disconnection from others.  Adolescents who have experienced persistent deprivation, neglect, and abuse often develop adaptive behaviors that are socially unacceptable and involve breaking rules.  Significantly, however, teachers and childhood friends continued to describe Mr. Burgess as an unusually kind, generous, thoughtful, and non-aggressive person.  In addition, Mr. Burgess apparently resisted the influence of the most severe criminogenic forces that surrounded him throughout his childhood and adolescent years.  Despite living in crime-ridden areas of Decatur's public housing developments, Mr. Burgess had no juvenile record until he was sixteen years old.

363.   Throughout his life prior to his arrest, Mr. Burgess received inadequate healthcare.  He was rarely taken to a doctor, even when he suffered head injuries.  By the time Mr. Burgess was five or six years old, he began to have severe headaches and experienced what observers described as seizures, during which his eyes rolled back and his arms and legs flailed.

364.   Among other circumstances relevant to his development, Mr. Burgess's history of suspected concussive injuries and repeated traumatic exposures raises a reasonable probability that he had impaired psychiatric, neuropsychological, and/or psychological functioning over the long term and at the time of the offense.

365.   For reasons that can be explained by her own psychosocial circumstances, Mr. Burgess's mother consistently put the men in her life over the wellbeing of her children.  This included her continuing, albeit sporadic, involvement with Mr. Burgess's father and her relationship with two other men during Mr. Burgess's adolescence.  This behavior caused confusion, undermined the children's tenuous sense of stability and, ultimately, destroyed the already-fragile relationship between Mr. Burgess and his mother.  The friction that developed between the Burgess boys and their mother's companion was a highly predictable response—especially among adolescent boys—to the sudden and unexpected presence of a new male authority figure in their lives.  Maggie Burgess's intellectual and emotional disabilities also contributed to her decision to force Mr. Burgess out of the house when he was fifteen years old, after her male companion moved into her home.

366.   Studies conducted by social scientists such as sociologists during the period 1983–93, and relied on by mental health professionals at the time of

182

Mr. Burgess's trial, distinguished between homeless children who are "throwaways" and those who are "runaways." The former are defined as having left home because they were abandoned by their parents, asked to leave by a parent, or subjected to extreme abuse or neglect. Mr. Burgess fits into the former category of homeless children.

367.   The scientific literature published during this period includes both quantitative and qualitative studies, as well as general reviews of previously-available literature published for practical application and for policy purposes. There was a substantial focus on homeless adolescents who were either "throwaways" or "runaways." These scientific studies identified types of behaviors and circumstances that put individuals at risk for adolescent homelessness. Some of these risk factors included but were not limited to: physical and sexual abuse; family conflict; substance abuse in the family (parents/siblings); difficulty in school; chronic moving from one residence to another; mental health problems in the family; and poverty. The majority of studies found that some form of abuse—generally experienced during childhood—was a critical risk factor for becoming homeless, particularly among youth identified as "throwaways" or "runaways."

368.   The studies also identified a number of factors that had important consequences for youth who experienced homelessness during this critical period

of adolescent development. Some of these consequential factors included, but were not limited to: an increase in violent victimization; an increase in illegal activity; an increase in mental health problems; an increase in hunger or food insecurity; and a decrease in physical and sexual health. A majority of the studies found that mental health problems and illegal activity were common thematic experiences among youth who experienced homelessness. The existing literature also demonstrated how difficult these circumstances were to manage for homeless adults, let alone adolescents.

369. Mr. Burgess's homelessness at age fifteen went all but unnoticed by local authorities. Until his arrest, Mr. Burgess lived on the streets of Decatur, finding shelter wherever he was able, with friends, in abandoned buildings, and in local parks. He sought assistance from social workers at a local hospital who attempted unsuccessfully to provoke action by the Morgan County Department of Human Resources. However, the DHR did nothing to place this homeless teenager in a safe and stable living environment. Mr. Burgess was arrested several times as a juvenile and was on probation during the time that he was homeless. Neither his probation officer nor anyone in the juvenile court system took action to address his psychosocial needs.

370. While he was living on the streets, consistent with the behavior of many homeless individuals, Mr. Burgess depended upon a hospital emergency

room for medical care for the types of conditions that were indicative of his status as a homeless youth, *e.g.*, insect bites, knee pain, stomach pain, and sexually transmitted disease. Reports from that treatment document his degree of emotional instability, lack of parental care, and the multitude of stressors with which he was attempting to cope. Studies relied upon by mental health professionals at the time of Mr. Burgess's trial established that homelessness is itself a risk factor for emotional disorder. Homelessness creates psychological stressors including fear for personal safety, fear for the future, depression, diminished self-worth, and suicidal ideation. Studies also showed that rates of mental health problems, including formally defined mental disorders, were several times higher for homeless than non-homeless youth.

371.   In addition to the traumatic exposure to violence and the threat of violence, homelessness exposed Mr. Burgess to numerous negative role models. He was exposed to people who were involved with criminal activity and was exposed to promiscuity and violence. Extensive empirical research on childhood risk factors that was available to mental health professionals at the time of Mr. Burgess's trial established that the presence of negative role models like these can have a damaging effect on childhood socialization and result in adult behavior that is skewed toward delinquency and crime. During the two and a half years that Mr. Burgess was homeless, he experienced severe psychological and physical

deprivation.  While living on the streets, Mr. Burgess experienced a range of

mental health problems including depression, suicidal ideation, and disordered

thinking.  Studies available to mental health professionals at the time of

Mr. Burgess's trial established that the traumatic effects of an abusive home

environment and homelessness may compound each other to produce even greater

psychological damage.

372.   For most of the time that he was homeless, Mr. Burgess did not know

where he would sleep the next night or when he would eat again.  Studies available

at the time of Mr. Burgess's trial demonstrated that the absence of control in the

lives of homeless youth like Mr. Burgess frequently leads them to lose faith in their

ability to care for themselves and in the willingness of others to assist them.  This

can both exacerbate depression and lead to a profound distrust of others.  It is

therefore notable that, under the circumstances in which Mr. Burgess was

homeless, he exercised some problem-solving initiative through his interactions

with social workers at Decatur General Hospital, his enrollment in Jobs Corps, and

even his intermittent employment.

373.   Mr. Burgess's pattern of staying only briefly with friends and

avoiding dependency, even on those families who offered help, was typical of a

depressed homeless youth.  After years of familial rejection, homeless youth often

become distrustful of close relationships and terrified of allowing themselves to

rely on others. As Mr. Burgess frequently did, homeless adolescents often reject offered help, especially from those who know them, so as to avoid being rejected themselves.

374. While homeless, Mr. Burgess consistently displayed psychologically dysfunctional behaviors. For example, he rarely disclosed the fact that he was living on the streets—even to close friends—and often appeared depressed and withdrawn. He held his head in his hands and rocked back and forth when he experienced headaches. Inattentiveness, marginal communication ability, depression, anxiety, withdrawal, and persistent excessive and repetitive behaviors are all indicators of the stress that the child is experiencing. These indicators were known to mental health professionals at the time of Mr. Burgess's trial.

375. Mr. Burgess's psychological dysfunction was further evidenced by suicidal ideation and at least one suicide attempt during the period after he was homeless.

376. During the time Mr. Burgess was homeless between the ages of fifteen and eighteen, there were no homeless services in Decatur for a minor in Mr. Burgess's circumstances. Agencies such as the schools, the DHR, and the juvenile probation department had the ability to intervene, but they did not. Moreover, these institutional failures took a physical and psychological toll on Mr. Burgess. Mr. Burgess's state of severe social and psychological deprivation

required access to formal support systems.  However, Mr. Burgess was denied

access to such critical support services.  At the time of Mr. Burgess's trial,

significant social science research regarding the risks and consequences of youth

homelessness—including in Alabama—was readily available, as were experts such

as sociologists who could describe the significance of those findings to

Mr. Burgess's jury.

377.   Mr. Burgess's post-arrest statements to the police and the media

demonstrate the unraveling of this teenager's life at the time of the offense.

Decatur Police Detectives Richard Dawson Long and Jep Tallent, who interrogated

Mr. Burgess after his arrest for Mrs. Crow's murder, testified at Mr. Burgess's

preliminary hearing and during his trial to Mr. Burgess's depression and

Mr. Burgess's belief that he was dying of brain cancer or a brain tumor.

378.   By age fifteen, Mr. Burgess had already experienced severe physical

and psychological trauma.  More than two years of homelessness prior to the

crime, with its attendant negative life events, further pushed Mr. Burgess along a

trajectory of increasing risk regarding his emotional stability and potential criminal

conduct.  Shortly before the crime, Mr. Burgess felt that he had failed as a parent,

believed that his girlfriend had suffered a miscarriage, was being harassed and

assaulted by people in the neighborhood, was experiencing severe headaches, and

believed that he was dying of brain cancer. His depression led him to make at least one suicide attempt just weeks prior to the offense.

379. Trial counsel's failure to consult with mental health experts included their failure to consult with mental health professionals regarding Mr. Burgess's mother, Maggie Burgess. Mr. Burgess's mother suffered from both cognitive limitations and mental illness, both of which dramatically affected her ability to nurture and care for her children and explained her physically and emotionally abusive conduct toward Mr. Burgess. Since childhood, she had difficulty carrying on intelligible conversations and appeared to suffer from intellectual disability. Raised in social and emotional isolation, she imposed these conditions on her children as well, keeping them inside the house and away from others. She hoarded food and kept the family's apartment shuttered. She lacked the capacity to develop an emotional attachment to her children, to nurture Mr. Burgess, or to provide him with the necessary parental support and guidance. As detailed above, this mitigating evidence was reasonably available through social history documents and witnesses who knew Maggie Burgess throughout her life. At the time of Mr. Burgess's trial, mental health professionals were well-versed in the near- and long-term psychosocial risks faced by children whose parents suffer from cognitive impairments and mental illness, and were available to explain to the jury how

Mr. Burgess's life course was impacted by these formative and traumatic experiences.

380.    As a result of counsel's failure to investigate and present Mr. Burgess's social history, accompanied by the expert testimony of qualified mental health professionals and sociologists, the jury never heard the powerful mitigating evidence that existed in this case.  Had counsel presented the testimony of qualified mental health professionals and sociologists, as detailed above, the prosecutor would not have been able to argue that Mr. Burgess was merely a kid on the free lunch program with no father figure, and that this was a case with minimal mitigation.  The prosecution conceded at Mr. Burgess's trial that it had established only one aggravating circumstance.  (Doc. 19-12 at 117.)  Even without the presentation of the reasonably available mitigating evidence, one juror remained unconvinced that Mr. Burgess's crime merited the death penalty; the jury returned an 11–1 verdict in favor of death.  Under Alabama law, only two more votes were necessary for a recommendation of a life sentence.  In light of these circumstances, had counsel consulted with appropriate experts and presented their testimony, there is a reasonable probability that the jury would not have recommended a death sentence and Mr. Burgess would not have been sentenced to death.

**5.   The state court's ruling that Mr. Burgess had not pleaded an ineffectiveness claim sufficiently to warrant a hearing was unreasonable.**

381.   The Alabama Court of Criminal Appeals ("CCA") was the last state court to review and adjudicate Mr. Burgess's claim that trial counsel were ineffective for failing to investigate, prepare, and present available, compelling mitigating evidence at the penalty phase of his trial. *Burgess*, 2023 WL 4146021, at *11–16, *18. The CCA affirmed the trial court's summary dismissal of this claim, unreasonably characterizing it as Mr. Burgess's "allegation that his counsel should have called more witnesses at the penalty phase." *Id.* at *12. The CCA's primary reason for affirming the summary denial of Mr. Burgess's claim was that Mr. Burgess's detailed allegations did not delineate exactly what each named mitigation witness would have said if called to testify, thus supporting the inference that such testimony would have been merely "cumulative" of the brief testimony that was in fact presented. *Id.* at *12–13 (citing *Daniel v. State*, 86 So. 3d 405, 422 (Ala. Crim. 2011)).

382.   As detailed above, Mr. Burgess's claim is not that he should have called "more witnesses"; it is that his trial counsel unreasonably failed to investigate and present an available and compelling mitigation case, and their failure allowed the prosecutor to mock the meager, false, and misleading testimony they did present. The CCA's ruling that Mr. Burgess's petition, despite the

extensive, specific detail it included, did not sufficiently plead a *Strickland* claim to warrant an evidentiary hearing was both contrary to and an unreasonable application of U.S. Supreme Court law, as well as an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d)(1), (2).

383.    As noted above, when evaluating a state court's dismissal of a *Strickland* claim for failure to comply with Rule 32.6(b)'s specificity requirements, the facts alleged in the state postconviction petition are "assumed to be true." *Daniel*, 822 F.3d at 1261; *see also Frazier v. Bouchard*, 661 F.3d 519, 531 (11th Cir. 2011) ("If Frazier's allegations concerning counsel's performance are true—*an assumption we must indulge because the state trial judge conducted no evidentiary hearing to evaluate the strength of Frazier's claims*—there is support for Frazier's argument that his attorneys failed to satisfy *Strickland's* performance prong.") (emphasis added).  The question for this Court is then "whether the [state court's] determination that [the] relevant ineffective assistance of counsel claims were due to be dismissed for failure to state a claim with sufficient specificity under Rule 32.6(b) was 'contrary to, or involved an unreasonable application of, clearly established Federal law.'"  *Borden v. Allen*, 646 F.3d 785, 817–18 (11th Cir. 2011) (citing 28 U.S.C. § 2254(d)(1)); *see also Powell v. Allen*, 602 F.3d

1263, 1273 (11th Cir. 2010) (per curiam) (evaluating whether allegations in

petitioner's Rule 32 petition sufficiently state a claim for ineffective assistance).[14]

384.    Mr. Burgess's case is on all fours with *Daniel,* 822 F. 3d at 1280.  In

*Daniel*, the petitioner filed a Rule 32 petition in the Alabama state court alleging,

among other things, ineffective assistance of trial counsel for failure to investigate

and present admissible compelling mitigating evidence.  *Id*. 1257.  The petitioner

presented allegations of specific compelling mitigating information that trial

counsel would have discovered if they had "conducted even a cursory investigation

of his background."  *Id*.  The trial court summarily dismissed the petition without

an evidentiary hearing, reasoning that petitioner's claims were insufficiently

pleaded.  *Id.* at 1258.  The CCA affirmed, holding, as it did in Mr. Burgess's case,

*Burgess*, 2023 WL 4146021, at *8, *13, that Daniel had failed to comply with

Alabama's pleading requirements because he had failed "to identify the names of

the witnesses he alleged should have been interviewed, to plead with specificity

what admissible information those witnesses would have provided, and to allege

how the result of the proceedings would have been affected by the additional

testimony." *Daniel v. State*, 86 So. 3d at 430 (citation omitted).

---

[14] Where the state court ruling also involves factual determinations, the question is also whether those factual determination are unreasonable.  28 U.S.C. § 2254(d)(2).

385.    In federal habeas proceedings, the Eleventh Circuit held, contrary to the state court's ruling, that Daniel's petition pleaded sufficient facts that, if true, demonstrated counsel's deficient performance and prejudice under *Strickland*. *Daniel*, 822 F. 3d at 1270, 1275.  The court reviewed the allegations that trial counsel's failure to conduct a thorough mitigation investigation was prejudicial in a case where effective counsel would have uncovered an "excruciating life history." *Id*. at 1257, 1264 (quoting *Wiggins*, 539 U.S. at 537).  The Court found that the allegations, if true, warranted relief under *Strickland* and its progeny. *Daniel*, 822 F. 3d at 1275–76 (holding that "any fair reading" of the Rule 32 allegations "includes many details about [petitioner's] background and character that were not discovered by trial counsel").  The Court also found the state court's decision to analyze Daniel's claims individually was unreasonable because this analysis prevented the court from considering the prejudicial effect of trial counsel's deficient performance based on the "totality of available mitigating evidence." *Id*. at 1277–78 (citing *Wiggins*, 539 U.S. at 534).

386.    Concluding the CCA had unreasonably adjudicated petitioner's claims under Section 2254, the Eleventh Circuit reversed.  *Daniel*, 822 F. 3d at 1280. Though it found petitioner's allegations compelling, the Court refrained from conducting a *de novo* review, reasoning that the petitioner's factual allegations "remain[ed] untested" in "the crucible of an [adversarial] evidentiary hearing." *Id*.

194

at 1280 (citing *Pope v. Sec. for Dept. of Corr.*, 680 F.3d 1271, 1294 (11th Cir.
2012)).  Instead, it remanded *Daniel* to the District Court for an evidentiary hearing
to be followed by *de novo* review.  *Id.* at 1280–81.

387.   As in *Daniel*, "any fair reading" of the allegations in Mr. Burgess's
Second Amended Rule 32 petition would conclude that he alleged ineffective
assistance of trial counsel sufficiently to merit an evidentiary hearing under
*Strickland* and its progeny.  If anything, the extensive mitigation case Mr. Burgess
detailed in his Rule 32 petition, (Doc. 19-27 at 11–57), dwarfed that of the
allegations Daniel made in his Rule 32 petition.  *See Daniel v. State*, 86 So. 3d at
430 (noting that one sentence in the Rule 32 petition "was the extent of Daniel's
pleadings" related to the key claim that he had been sexually abused by his
stepfather).  Moreover, in Mr. Burgess's case, the CCA held that the circuit court
was "correct" in concluding that he had failed to plead specific facts that would
have been revealed had trial counsel obtained social history records.  *Burgess*,
2023 WL 4146021, at *14.  This conclusion was unreasonable in light of the
specific allegations in Mr. Burgess's petition.  For example, Mr. Burgess alleged
the specific categories of social history records his counsel could readily have
obtained, (*see, e.g.*, Doc. 19-27 at 11–12), where those records could be found,
(*see, e.g.*, Doc. 19-26 at 201), and specifically what beneficial information the
records contained.  (*See, e.g.*, Doc. 19-27 at 46–47) (quoting Emergency Room

physician note in a medical record that Mr. Burgess faced "a multitude of stressors including . . . being kicked out of one home to the next, to the next, while looking for work").[15]

388.   As in *Daniel*, an evidentiary hearing is needed to allow Mr. Burgess to prove—and the State to test—his allegations.  For example, Mr. Burgess alleged his trial counsel failed to conduct a mitigation investigation, leading to a penalty phase presentation to the jury that, like the one presented in *Daniel*, was "woefully incomplete."  822 F.3d at 1274.  The CCA, however, affirmed the trial court's ruling that Mr. Burgess's trial counsel had engaged in a timely and adequate preparation for the penalty phase, *Burgess*, 2023 WL 4146021, at *11, a conclusion the trial court reached without the benefit of hearing any testimony or considering any evidence, and one that is plainly contradicted by the detailed allegations in Mr. Burgess's petition.  (Doc. 19-26 at 195—Doc.19-27 at 4.)

389.   Despite the fact that Mr. Burgess pleaded detailed allegations with respect to both deficient performance and prejudice, the state court nevertheless found that the petition did not sufficiently allege a *Strickland* claim to even warrant a hearing.  *Burgess*, 2023 WL 4146021, at *14.  The CCA's ruling was contrary to and an unreasonable application of federal law, as well as an unreasonable

---

[15] In addition, while the CCA asserted that Mr. Burgess had not named experts he contended trial counsel could have called to testify at the penalty phase, *Burgess*, 2023 WL 4146021, at *13.  He did in fact do so.  (Doc. 19-29 at 104–06.)

determination of the facts in light of the state court record. As in *Daniel*, this

Court must now allow him an opportunity to prove his claim in an evidentiary

hearing. *Daniel*, 822 F. 3d at 1280.

390.   In the alternative, this Court should decide the merits of petitioner's

claim *de novo* for the reasons articulated in paragraphs 136–38 above, which are

incorporated by reference herein. *See Loper Bright*, 144 S. Ct. at 2244.

## C.   TRIAL COUNSEL WERE INEFFECTIVE IN THEIR PRETRIAL PREPARATION AND LITIGATION.

### 1.   Trial Counsel Unreasonably Failed to Withdraw Mr. Burgess's Plea of Not Guilty by Reason of Mental Disease or Defect Prior to the Commencement of Jury Selection.

391.   At his arraignment, Mr. Burgess entered pleas of not guilty and not

guilty by reason of mental disease or defect. (Doc. 19-3 at 22.) Although the dual

pleas were entered, by the time of trial, his attorneys had decided not to present a

defense based upon mental state. The court-ordered psychological evaluation Dr.

Lawrence Maier conducted in July 1993 did not support the presentation of a

mental state defense, (Doc. 19-4 at 34–36), and counsel failed to conduct any

investigation into Mr. Burgess's history of mental illness or retain a qualified

mental health professional to determine whether such a defense would be viable.

Therefore, they were in no position to present a mental state defense, and, indeed,

had decided not to do so before jury selection commenced.

392.    Although counsel decided not to present a mental state defense, they unreasonably failed, prior to jury selection, to withdraw Mr. Burgess's plea of not guilty by reason of mental disease or defect.  Counsel's failure to withdraw the plea was not strategic and constituted deficient performance.

393.    Counsel's failure prejudiced Mr. Burgess.  Because the plea was not withdrawn prior to voir dire, the venire was told repeatedly that Mr. Burgess had pleaded both not guilty *and* not guilty by reason of mental disease or defect. During voir dire, the prosecutor extensively discussed both pleas, making clear that it was Mr. Burgess's burden to prove a defense based on his mental state.  (Doc. 19-5 at 5–7, 104–05, Doc. 19-6 at 25–26, 122–24, 207–09.)  The seated jurors therefore expected Mr. Burgess to prove a mental state defense.  By not withdrawing the plea in a timely manner, counsel left the jury with the impression that Mr. Burgess would concede all the elements of the offense of capital murder and rely upon an affirmative defense to the charge based on his mental state.  After closing arguments and instructions from the court, a juror asked a bailiff, "[W]hen will they go into the mental stage?"  (Doc. 19-12 at 63.)  The judge then brought the jury out and instructed them, without objection, that Mr. Burgess had withdrawn his plea of not guilty by reason of mental disease or defect and that the withdrawal of the defense should not be held against Mr. Burgess.  (Doc. 19-12 at 65–67.)

198

394.    Because the failure to withdraw the plea in a timely manner undermined Mr. Burgess's actual defense theory, he was prejudiced.  Had the plea been withdrawn in a timely manner, there is a reasonable probability that the results of the guilt, penalty, and sentencing phases would have been different.

395.    The Alabama Court of Criminal Appeals denied this aspect of Mr. Burgess's ineffectiveness claim on the merits.  *See Burgess*, 2023 WL 4146021, at *18–19.  The state court's ruling was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).  In the alternative, this Court should decide the merits of petitioner's claim *de novo* for the reasons articulated in paragraphs 136–38 above, which are incorporated by reference herein.  *See Loper Bright*, 144 S. Ct. at 2244.

## 2.    Trial Counsel Unreasonably Failed to Investigate, Prepare and Litigate the Change of Motion.

396.    In light of the highly prejudicial publicity in this case, Mr. Burgess had a constitutional right to a change of venue.  Trial counsel filed a change of venue motion and conducted minimal investigation to support this motion.  However, trial counsel failed to gather and present reasonably available evidence to show that Mr. Burgess could not receive a fair trial in Morgan County.  Trial counsel's deficient performance prejudiced Mr. Burgess.  For the reasons detailed below, had the change of venue motion been adequately investigated, prepared and

199

litigated, it would have been granted, and there is a reasonable probability that the result of the guilt, penalty, and sentencing phases would have been different.

397. ***Trial counsel unreasonably failed to present reasonably available and overwhelming evidence that Mr. Burgess could not receive a fair trial in Morgan County.***

398. On December 22, 1993, trial counsel filed a two-page Motion for Change of Place of Trial. (Doc. 19-1 at 120–22.) The written motion, submitted approximately two months before the hearing on the application for change of venue, (Doc. 19-1 at 38–39; Doc 19-3 at 60—Doc. 19-4 at 25), and four months prior to the court's order denying the motion, (Doc. 19-1 at 40–41), was the only pleading trial counsel filed with respect to venue. The motion cited no facts or legal authority. Between the date it was filed, December 22, 1993, (Doc. 19-1 at 120–22), and the court's ruling on the motion, April 14, 1994, counsel had ample opportunity to provide the court with an analysis of the evidence and the applicable law. The hearing on the motion took place on February 21 and 25, 1994. (Doc. 19-1 at 38–39; Doc. 19-3 at 60—Doc. 19-4 at 25.)

399. At the February 21, 1994 hearing, counsel made a limited showing based solely on some of the media coverage during the period between January 26, 1993, and January 31, 1994, the date originally set for the hearing on the motion. Defense counsel introduced a collection of newspaper articles regarding the case,

transcripts from television and radio stations, videotapes of some of the television broadcasts, and affidavits and testimony describing newspaper circulation and television and radio audiences. (Doc. 19-1 at 61, 117; Doc. 19-3 at 62–80, 122—Doc. 19-4 at 3.) They had subpoenaed pretrial publicity from local media outlets from January 26, 1993, through approximately January 31, 1994, the date originally set for the hearing on the motion. (Doc. 19-1 at 37.) At the end of the February 21, 1994 hearing, the prosecutor stated that he did not intend to call any witnesses at the change of venue hearing. (Doc. 19-3 at 82.)

400. On February 25, 1994, trial counsel announced that they intended to call individuals who had signed affidavits at the behest of the State. (Doc. 19-3 at 84.) This is the first mention in the record of the fact that on February 17, 1994, the prosecutor had sent two Decatur police investigators to gather affidavits from members of the community, attesting to their opinion that Mr. Burgess could receive a fair trial in Morgan County. (Doc. 19-2 at 69–76; Doc. 19-3 at 85–86, Doc. 19-4 at 9–10.) Although the affidavits included sections for affiants to fill in demographic information, the critical language, *i.e.*, the affiants' personal opinions, were pre-printed on the form: "[I]t is my opinion . . . that the conclusion of the defendant that he cannot get a fair and impartial trial in this county at this time is not a correct conclusion, and it is . . . my firm opinion that defendant can and will

receive a fair and impartial trial before a judge and jury in this county at this time."
(Doc. 19-2 at 69–76.)

401.   While trial counsel presented some documentation of media coverage
in support of their change of venue motion, they failed to obtain and present
relevant and reasonably available pretrial publicity for the period between the
charged offense and the date of the hearing.

402.   In fact, there was overwhelming evidence that Mr. Burgess could not
receive a fair trial in Morgan County.  Counsel's deficient performance in not
marshalling and presenting this evidence prejudiced Mr. Burgess.  Specifically, the
evidence that counsel could have reasonably discovered and presented in a motion
for change of venue is as follows:

403.   The media coverage of Mrs. Crow's death was extensive.  News
cameras and reporters immediately flooded the scene of Mr. Burgess's arrest,
which occurred within about two hours of the robbery and killing.  Mr. Burgess
had been stopped by police while driving from Decatur to Huntsville in the
victim's car.  Mr. Burgess's girlfriend and her daughter were also in the vehicle.
Mr. Burgess was found with about $100 in cash and a gun holster was in his belt.
A .25 semiautomatic pistol was located under the front seat of the car.
Mr. Burgess's arrest and subsequent statements to members of the press were

videotaped, broadcast on television and radio, and published in the newspapers

repeatedly over the months leading up to and during the trial.

404.    After his arrest and interrogation, Decatur police officers paraded

Mr. Burgess, who was handcuffed and dressed in jail clothes, through a crowd of

reporters as he was marched from the Decatur City Hall to the Morgan County Jail.

Reporters surrounded Mr. Burgess, waved cameras and microphones in his face,

and peppered him with questions.  Mr. Burgess's pace and route were directed by

the officers who surrounded him.

405.    Reporters questioned Mr. Burgess extensively about the robbery and

killing and other criminal activity.  The media videotaped the entire custodial walk

from city hall to the county jail.  It was broadcast in whole and in part on news

stations in Morgan and Madison Counties.  Mr. Burgess's photograph and excerpts

of his statements were in the headlines and newspaper articles during the months

leading up to and during the trial.  Among other questions, reporters asked Mr.

Burgess, "Why'd you do it?," "Was it worth it?," "How much did you get away

with the first time you did it?," "How much did you get today?," "What do you

have to say to the victim's family?," "You took her life for $100?," and "You

gonna sleep tonight?"

406.    In response to this barrage of questions, Mr. Burgess said, "I did the

crime and it's time for me to pay for the crime."  Mr. Burgess said that he needed

money for a job interview, explaining, "The way I was dressed, it didn't feel good to me. I needed more clothes and I needed money and I didn't have no money, no income." He told reporters that he did not intend to kill Mrs. Crow, but that she went for the firearm and the "gun went off." He said, "I refuse to have life in prison, I want the chair because I feel if I took a lady's life, then my life should be taken. And that's what I want . . . I want the electric chair, plain and simple."

407.   What became widely publicized as Mr. Burgess's "confession" contained prejudicial, racially inflammatory, and wholly inadmissible statements. In addition to insisting that he wanted the electric chair, the eighteen-year-old also responded to questions from reporters about his prior criminal activity. Mr. Burgess admitted to a recent robbery of the Decatur Holiday Inn and that he was nearly killed selling cocaine, which caused him to turn to a "life of robbery."

408.   In 1993-94, Morgan County had about 100,000 residents. The robbery and killing of Louise Crow were headline news in the local and regional media for many days. Typical of the coverage was a radio broadcast on January 27, 1993, that began: "A stunning admission of capital murder and a plea to die in the electric chair top the headlines this morning." The reports in the days following the homicide were increasingly more detailed and inflammatory, including lengthy excerpts of Mr. Burgess's statements; photographs of

Mr. Burgess in custody surrounded by officers; photographs of the victim; and interviews with Mrs. Crow's family, friends, and customers.

409.   The press coverage conveyed the community's shock and outrage about the crime and focused on Mr. Burgess's statements to the press, which from January 26, 1993 forward were consistently and almost exclusively labeled his "confession," and on his plea for the electric chair.  Coverage described the robbery and shooting as a "brutal slaying" and emphasized that "his confession shocked the police and the media."

410.   Public interest in the story was so great that, on January 30, 1993, one television station aired the entire footage of Mr. Burgess's statement as he was led, in custody, from the city hall to the jail.  State's Exhibit 100.  The anchor introduced the video by telling viewers that "the confession caught on camera surprised police as much as it did the rest of us," adding that "all of us here in the Tennessee Valley were shocked by the murder of a Morgan County woman gunned down at her Decatur store."

411.   In addition to details about Mr. Burgess's statements and plea for the electric chair, the media focused on Mrs. Crow's outstanding reputation and the pain of family and friends in the aftermath of her killing.  One article described a large gathering of patrons at the Decatur Bait and Tackle Shop to comfort her family, which conveyed the value of the business to the town and Mrs. Crow's

position of respect in the community.  James Crow spoke of his wife as "a kind and gentle person."  The local paper published an announcement from the Crow family thanking police officers for their speed in apprehending Mr. Burgess and expressing appreciation to friends and customers of the bait shop for "all of the cards, flowers, and letters of encouragement," and to the "neighborhood kids that Mama looked forward to seeing each day."  To commemorate Mrs. Crow's birthday in June 1993, the newspaper published a memorial from her family, which read, "It's your birthday today Mama.  What used to be a happy time is so sad for us now.  We miss you more and more as the days go by."

412.    Willie Burgess, on the other hand, was the target of public hostility and outrage.  Tammy Crow, Mrs. Crow's daughter, told the media that she would "make sure" Mr. Burgess got his "wish" to die in the electric chair.  It was reported that he "gunned down Louise Crow for a mere one-hundred dollars out of the register."  The police called it "an execution-style murder," and Mr. Burgess's statements were characterized in the media as "open" and "matter of fact."  The newspapers referred to Mr. Burgess as "the eerie siren of the street," characterizing him as "eerily detached" and "remarkably rational in recounting irrational behavior."  The media also publicized several other crimes that Mr. Burgess allegedly had committed.

413.    Coverage presumed Mr. Burgess's guilt and insinuated that legal proceedings were a mere formality.  For example, Morgan County District Attorney Bob Burrell commented, "Even though he confessed, Burgess still will have to be indicted by a grand jury."  The press emphasized the effect of the crime on the entire community of Morgan County.  An editorial declared that Mr. Burgess "didn't know the value of life" and that Mrs. Crow's family had a "right to be angry over what happened . . . It cannot be justified.  His apology means nothing."

414.    Throughout 1993 and early 1994, Mr. Burgess was mentioned in news stories about the rise in crime in Morgan County.  A television broadcast at the end of January 1993, which referred to the murder of Mrs. Crow, reported that the year was already "dangerous and deadly" in the county.  It included the following observation: "What has police and many residents in the county worried is the lack of a common motive for all these crimes. . . . You can be a victim just as much as the person sitting next to you."  The newspapers published articles such as "Kids Who Kill," which began with an account of the robbery-murder of Louise Crow and Mr. Burgess's statements.  In the 1993 year-end reports, the murder rate in Decatur trumped all other national and local news as the top story.  Mr. Burgess's name appeared prominently in such articles, which revisited community reaction to the killing and his public statement made while in police custody.

207

415.   The press reported every development in the legal proceedings
leading up to the trial.  Thus, Mr. Burgess's name remained prominent in the news
from the date of his arrest to the date of his sentencing.

416.   The pretrial publicity was so extensive that any of Mr. Burgess's
conduct or alleged activities prior to trial drew media attention.  For example, the
media covered Mr. Burgess's indictment for arson based upon a fire in his jail cell.
Mr. Burgess's photo, taken at the time of his arrest for the capital offense,
accompanied one of the articles about the arson case.  A Morgan County Sheriff's
Department spokesperson was quoted as saying, "[Mr. Burgess] has been in there a
long time and has continued to break rules since he's been confined."

417.   In August 1993, Mr. Burgess's paternal cousin, Roy Burgess, Jr., was
arrested for killing a former high school classmate, Kevin Gardner.  He was
charged with capital murder.  The news coverage surrounding the capital murder
prosecution of Roy Burgess, Jr. overlapped with Willie Burgess's prosecution and
trial.  The coverage added an unusual and highly significant dimension to the
prejudicial effect of pretrial publicity in Willie Burgess's case.  According to the
media reports, both defendants were Black male teenagers who had dropped out of
high school.  The victims in both cases were White.  Both defendants used a .25
handgun, shot the victim in the head during a robbery, and stole the victim's car.
Both confessed and both reportedly had prior criminal records.  Both were held

without bond.  Both were denied Youthful Offender Status by Judge McRae, and both faced the death penalty.  Both cases had racial overtones that were made explicit in the news stories.  Coverage of the Roy Burgess, Jr. case made reference to his cousin, Willie Burgess.  Publicity in Roy Burgess, Jr.'s case also focused on the stellar reputation of the victim and the damage done to the community by the murder.  Both young men were sometimes referred to in headlines simply as "Burgess."  The simultaneous media coverage of the two cases compounded the amount of negative public attention focused on Willie Burgess and created a more hostile atmosphere in Decatur towards him.

418.    Counsel were aware that news reports about Mr. Burgess's case were ongoing.  For example, on January 6, 1994, in arguing that the court should permit individual sequestered voir dire, lead counsel said, "I'm sure the Court is aware of all the publicity in this case.  It has been on the radio and television again this week." (Doc. 19-3 at 39.)  Later, during the same proceeding, a colloquy occurred concerning counsel's need to produce all the coverage that had been disseminated.  Mr. Biggs told the court that the media "ran [the story] two weeks ago when I was home watching television.  They ran it a couple of days ago.  I think each time they run the news story, it prejudices our client's chances to have a fair trial and a fair jury in North Alabama." (Doc. 19-3 at 46.)  During voir dire, a number of

prospective jurors said that they had seen publicity about the case within the past few days. (Doc. 19-5 at 147, Doc. 19-7 at 35–36.)

419.    Despite their knowledge of the continuing and prejudicial publicity, and the fact that the publicity was reasonably available, counsel unreasonably failed to investigate and present all the coverage concerning Mr. Burgess's case during the relevant period, *i.e.*, from January 26, 1993 through trial, including the news reports described above, all of which was inflammatory and prejudicial to Mr. Burgess.

420.    Counsel's unreasonable failure to investigate, prepare and litigate the motion for change of venue prejudiced Mr. Burgess. Had counsel done so, they would have presented to the court the information detailed above. Because counsel unreasonably failed to conduct a full investigation, present all the relevant evidence, and submit appropriate arguments, the court was unable to make an informed decision regarding the change of venue motion. As a result, the court engaged in a highly prejudicial sample jury proceeding, described below, and ultimately denied the change of venue motion. Had trial counsel investigated and presented the full extent and significance of the reasonably available pretrial publicity and community saturation, the court would have granted a change of venue. Had venue been changed, there is a reasonable probability that the results of the guilt, penalty, and sentencing phases would have been different because the

210

jury sitting in judgment of Mr. Burgess would not have been tainted by the prejudicial pretrial publicity that had saturated Morgan County.

421.    ***Trial counsel unreasonably failed to retain and consult with a social science expert who would have presented a content analysis of the pretrial publicity in support of the motion for change of venue.***

422.    Counsel unreasonably failed to retain a social scientist with training and experience in the analysis of pretrial publicity and its effects on juror bias to analyze the content of the pretrial publicity and conduct a public opinion survey. However, at the time of Mr. Burgess's capital prosecution, defense counsel and prosecutors in other capital cases were utilizing social scientists to undertake the necessary analysis and were presenting their expert testimony.  Qualified professionals, at educational institutions and in private practice, were available and experienced in conducting surveys concerning the effects of pretrial publicity, particularly in capital cases.

423.    Counsel's failure to retain and consult with a social scientist prejudiced Mr. Burgess.  An expert retained by reasonably competent counsel would have utilized and based his or her analysis, polling, and testimony on methods and social science standards, which are the product of a substantial body of research.  Courts have accepted these methods and standards as a reliable, scientific means of analyzing pretrial publicity, assessing the prejudicial nature of

the publicity and the impact of the publicity on the potential jury pool, for purposes of determining whether a change of venue is required.

424.   Had counsel retained and consulted with a social scientist, such as Edward J. Bronson, Ph.D., that expert would have testified to the following facts, in addition to those discussed above:

425.   Individually and collectively, an analysis of factors such as the nature and extent of the publicity, the nature and gravity of the crime, the status of the victim in the community, the status of the defendant in the community, and the size and nature of the community demonstrated that Mr. Burgess could not receive a fair trial in Morgan County.

426.   The coverage of this case raised serious concerns about Mr. Burgess's fair trial rights as guaranteed by Alabama statutory law and Alabama and federal constitutional law.  The degree of prejudice was sufficient to meet the test of presumptive or inherent prejudice.

427.   The overriding issue in the media coverage was Mr. Burgess's statement to reporters as the police were taking him to jail.  Not only did Mr. Burgess admit to killing Mrs. Crow, but he also insisted on receiving the death penalty for his actions.  In addition to the fact that newspaper reports of his statement appeared extensively for the duration of the case in the trial court, his

statement was also shown repeatedly on television.  Televising a confession can be prejudicial per se.  *Rideau v. Louisiana*, 373 U.S. 723, 726–27 (1963).

428.   More than half of the stories about Mr. Burgess's case were printed on the front page or the front page of the interior section of the Decatur Daily or the Huntsville Times.  The case was also the subject of newspaper editorials, which are highly indicative of an event's significance in a given community.  One such editorial was headlined, "Teen didn't know value of life."  While there were more stories directly related to Mr. Burgess's case in 1993 than 1994, the pattern of publicity did not decline in a manner that reduced its overwhelmingly prejudicial nature.

429.   The circumstances of Mr. Burgess's statement and plea for execution during his custodial walk—including the fact that it was videotaped in its entirety, broadcast repeatedly on television and radio, and graphically described in the print media—were powerful and prejudicial.

430.   The pretrial publicity was inflammatory, included information that would have been inadmissible at trial, and created a strong presumption of guilt.  Among the inflammatory words and themes that characterized coverage of Mr. Burgess's case were his so-called "confession" to the murder and descriptions of Mr. Burgess as someone who "confessed" to murder.

431.   The nature of the offense also supported a change of venue.  The coverage was inflammatory, and the media used emotive and powerful terms to characterize the crime in this case: "execution-style killing," "shot in the head," "shot in the face," "brutal slaying," "shot at close range in the mouth," "gunned down," and "senseless crime."  Rarely, if ever, was the offense simply called a killing, homicide, shooting, or even a murder.

432.   The gravity of the crime supported a change of venue.  The offense was described in more than 100 news articles as a death penalty or capital murder case.  There were over thirty references in the print media alone to the electric chair, including headlines such as "'I Want Electric Chair,'" "Teen Says He Wants Death After Fatal Decatur Robbery," and "Victim's Daughter Says She'll 'Make Sure' Suspect Gets His Wish to Die."

433.   The small size of Morgan County and its relatively homogeneous racial make-up, *i.e.*, approximately ninety percent of the population at the time was White, also supported a change of venue.  Mr. Burgess's case received banner-head coverage and was featured among the top stories of the year.  The murder of Mrs. Crow was portrayed as injurious to the entire community, provoking both anger and fear among residents.  In this small, predominantly White county, misinformation about Mr. Burgess's case spread through word of mouth among a majority community with shared values.

434.    Publicity about Mrs. Crow's killing had at least three significant components, each of which demonstrated that Mr. Burgess could not receive a fair trial in Morgan County.  The first concerned the reaction of the community.  The stories describing the effect of the robbery-murder on family, friends, and customers were consistent with Decatur's self-image as a small town where everyone knows one another, especially long-time and well-liked merchants such as Mrs. Crow.  The media described Louise Crow as a grandmother who had been gunned down, a person liked by "everyone," and a storeowner who always gave candy to the "neighborhood kids."  The devastating effect of her killing on the Crow family, friends, and customers was highly publicized, and, importantly, so was the desire of close relatives to see Mr. Burgess executed in the electric chair.  By contract, Mr. Burgess was consistently portrayed in hostile terms as a "confessed murderer," who killed coldly and for person gain and who "never learned the value of human life."  A majority of the jurors were acquainted with the victim, members of her family, and the State's witnesses, further demonstrating that Mr. Burgess could not receive a fair trial in the county.  Second, the media coverage placed Mrs. Crow's killing in the context of a surging pattern of murder in Decatur.  Third, the increased number of murders was not simply reported as a statistical fact.  Rather, there were repeated stories—again referring to Mr. Burgess and Mrs. Crow—discussing the community's state of alarm and fear.  These

reports included articles about the number of residents who were so frightened that they were arming themselves and the fact that firearm sales were soaring in the wake of recent killings.

435.   Had counsel consulted with a social science expert, who would have presented a content analysis of the pretrial publicity as detailed above, it is reasonably probable that the court would have granted the change of venue motion. Had the court granted a change of venue, there is a reasonable probability that the results of the guilt, penalty, and sentencing phases would have been different because the jury sitting in judgment of Mr. Burgess would not have been tainted by the prejudicial pretrial publicity detailed above.

436.   ***Trial counsel unreasonably failed to conduct a public opinion poll or survey to assess the impact of the pretrial publicity on whether Mr. Burgess could receive a fair trial in Morgan County.***

437.   Counsel also unreasonably failed to conduct a public opinion poll or survey to assess the impact of the publicity on whether Mr. Burgess could receive a fair trial in Morgan County.

438.   Public opinion surveys and polls were used by prosecutors and defense counsel in high-publicity criminal trials in 1993-94 with sufficient frequency that trial counsel's failure to do so fell below prevailing professional standards.  Counsel trying a capital case in 1993-94 reasonably would have been

familiar with the case law and with the literature—widely disseminated within the criminal defense community—that discussed using opinion polls and surveys to assess the extent and impact of pretrial publicity.  Counsel unreasonably failed to conduct such a survey.

439.   Counsel's failure to conduct a poll or survey of public opinion and present that evidence at trial prejudiced Mr. Burgess.  A poll or survey of public opinion would have revealed that publicity related to Mr. Burgess's case had saturated Morgan County, causing residents to form the opinion that Mr. Burgess was guilty of capital murder.  The prejudice was compounded by the fact that the prosecutor conducted his own survey, albeit one that was biased and statistically unsound.  On February 17, 1994, the prosecutor sent Decatur Police Investigators Dwight Hale and Sheila Moore to gather affidavits from members of the community, attesting to their opinion that Mr. Burgess could receive a fair trial in Morgan County.[16]  (Doc. 19-4 at 5–6.)  Investigator Hale told everyone whom he approached that he was with the police department and was soliciting opinions about whether Mr. Burgess could get a fair trial in the community.  (Doc. 19-4 at 5–6.)  Although the affidavits had some sections for affiants to fill in demographic

---

[16] Sheila Moore was involved in the Decatur Police Department's investigation of the crime.  She went to the crime scene the day after the murder and located a shell casing, testified erroneously that the scene was in substantially the same condition as the previous day when, if fact, a Decatur Police Department lieutenant had washed it down.  (Doc. 19-10 at 158–59.)

information, the critical language, *i.e.*, the affiants' personal opinions, were printed on the form. (Doc. 19-2 at 69–76.) The affiants knew that the individuals soliciting their signatures were law enforcement officers. (Doc. 19-3 at 85–86, 107–08, 119.) Hale estimated that there were some thirty affidavits in what was marked, but not received, as State's Exhibit 1. (Doc. 19-4 at 9.) He also estimated that he had approached about fifty people, did not obtain affidavits from those who believed Mr. Burgess could not get a fair trial in Morgan County, and did not keep a list of the identities of those who declined to sign an affidavit. (Doc. 19-4 at 9–10.) Investigator Hale also testified that he asked a woman who had called him on a "personal matter" whether she would sign an affidavit. He then drove to her home and obtained her signed affidavit. (Doc. 19-4 at 8–9.) Because the court never heard the true extent to which pretrial publicity saturated the community, it denied the change of venue motion. Had the court granted a change of venue, there is a reasonable probability that the results of the guilt, penalty, and sentencing phases would have been different because the jury sitting in judgment of Mr. Burgess would not have been tainted by the prejudicial pretrial publicity detailed above.

440. ***Counsel were ineffective with regard to the sample jury proceeding in unreasonably failing to participate in the proceeding and show how the outcome supported Mr. Burgess's motion for change of venue.***

441.   At the conclusion of the hearing on February 25, 1994, the court announced that it was considering selecting twelve or twenty-four jurors "at random" from a venire that would be assembled in March.  (Doc. 19-4 at 24–25.) The judge stated that he would "just bring them in for this case and let you attorneys, just in a limited fashion, voir dire and I may have some limited questions myself of those prospective jurors because they would be the same type of jurors that we would select from . . . whenever this case is tried."  (Doc. 19-4 at 24.)  The judge also stated that he wanted to "make sure [that he had] a comfortable legal basis for doing something of that nature."  (Doc. 19-4 at 24.)  Neither party objected nor commented on the proposal.  Counsel filed no pleadings regarding the court's plan.

442.   Court reconvened on March 9, 1994, at which time the trial judge announced that he had assembled "twelve people [who] are a representative sample of prospective jurors that were drawn and called in Morgan County to serve on the jury."  (Doc. 19-4 at 27.)  The court docket indicates that the twelve individuals were selected "randomly" from among jurors "summoned for jury duty this week." (Doc. 19-1 at 39.)  Counsel did not request an explanation as to how that "random" selection had occurred.  (Doc. 19-4 at 26–55.)  Counsel were present, but did not participate in the proceeding, which was conducted entirely by the court.  (Doc. 19-4 at 26–55.)

443.    The sample jurors were placed under oath and examined by the court. They were identified in the transcript only by number.  (Doc. 19-4 at 27–28.) Nothing about their identities, race, occupation, or other demographic information appears in the record.  (Doc. 19-4 at 26–55.)

444.    Two of the twelve sample jurors knew Louise Crow.  (Doc. 19-4 at 28.)  All twelve members of the sample jury had heard about Mr. Burgess's case from some source—media, friends, or general conversation.  (Doc. 19-4 at 41.) Five of the twelve members of the sample jury, who had read about the case in the newspapers, recalled Mr. Burgess making "some type of confession" to the murder of Mrs. Crow.  (Doc. 19-4 at 32.)  Nine individuals recalled seeing a report about the "confession" on television. (Doc. 19-4 at 39.)  Eight sample jurors remembered the statements were made by Mr. Burgess "himself."  (Doc. 19-4 at 39–40.)

445.    The trial court asked if any of the sample jurors remembered where and under what circumstances Mr. Burgess confessed.  Seven sample jurors responded affirmatively.  (Doc. 19-4 at 48.)  Sample Juror Six volunteered that he saw Mr. Burgess being escorted in police custody from city hall to the county jail. (Doc. 19-4 at 49.)  All seven other sample jurors responded affirmatively when asked by the trial court if this was their recollection as well.  (Doc. 19-4 at 48.) Sample Juror Six told the court that Mr. Burgess said, "'Yes, I did it, uh huh, I did

it.'" (Doc. 19-4 at 49.)  He also recalled that Mr. Burgess had admitted committing

a robbery at the Holiday Inn.  (Doc. 19-4 at 49.)

446.   In addition to confirming the extent to which media coverage had

saturated the community, the sample jurors also expressed fixed opinions about

Mr. Burgess's guilt.  When asked if anyone was "reasonably certain" of Mr.

Burgess's innocence, there was not a single affirmative response.  (Doc. 19-4 at

42.)  However, when asked if anyone was "reasonably certain" of Mr. Burgess's

guilt, five answered affirmatively.  (Doc. 19-4 at 42–43.)

447.   Counsel asked no questions of the sample jurors, offered no comment,

and made no argument concerning the sample jury.  On April 14, 1994, without

further hearing or any briefing, the trial court entered an order denying the change

of venue motion.  (Doc. 19-1 at 40–41.)  The court stated that Mr. Burgess had

failed to meet his burden of showing that a fair trial could not be had.  (Doc. 19-1

at 40.)  In reaching its decision, the court stated that it considered the substance,

scope, and breadth of media coverage, the effect of the passage of time, the

responses given by sample jurors, and other testimony presented by both parties.

(Doc. 19-1 at 40.)

448.   Counsel's deficient performance prejudiced Mr. Burgess.  Based on

the case law and literature alone, reasonably competent counsel would have made

informed decisions about the manner in which the sample jury proceeding should

be conducted to ensure that the questions were fair and the answers reliable.  Based on that research, reasonably competent lawyers would have filed motions addressing the manner in which the sample jury should be drawn, admonished, and questioned and would have participated themselves in voir dire of the sample jury.

449.   Counsel should not only have reviewed the available literature but consulted with a qualified expert who would have assisted in making informed decisions about the manner in which the sample jury proceeding should be conducted to ensure that the draw and questions were fair and the answers reliable.  Based on that expert assistance, counsel would have filed motions addressing the manner in which the sample jury should be drawn, admonished, and questioned and would have participated in the voir dire of the sample jury.

450.   Even absent counsel's deficient performance in this proceeding, the results of the sample jury supported the motion for a change of venue.  The sample jury revealed that 100 percent of the jurors had heard about the case from some source.  (Doc. 19-4 at 41.)  Seven of the twelve sample jurors indicated that they had formed an opinion about Mr. Burgess's guilt or innocence.  (Doc. 19-4 at 41–42.)  Five were "reasonably certain" that Mr. Burgess was guilty of the murder of Louise Crow.  (Doc. 19-4 at 42–43.)  Counsel unreasonably failed to provide the trial court with briefing in which they showed how content analysis of the pretrial publicity and the sample jury supported the conclusion that the publicity was

222

inherently prejudicial. Counsel also unreasonably failed to retain and consult with a qualified social science expert, who would have explained the "minimization effect," a process by which respondents, sample jurors, and particularly prospective jurors, largely unconsciously, minimize their recollection of the pretrial publicity and its impact upon their ability to be impartial. The expert would have demonstrated the manner in which the "minimization effect" was manifest in the pretrial process, including the sample jury, all of which would further support the expert's opinion that Mr. Burgess had shown inherent and actual prejudice. Counsel's deficient performance prejudiced Mr. Burgess. The content analysis of the media coverage and the results of the sample jury demonstrated that the publicity was so inflammatory that jurors' claims of impartiality could not be believed.

451. Because trial counsel failed to effectively litigate the issues with respect to the sample jury, the court denied the change of venue motion. Had the court granted the change of venue motion, there is a reasonable probability that the results of the guilt, penalty, and sentencing phases would have been different because the jury sitting in judgment of Mr. Burgess would not have been tainted by the prejudicial pretrial publicity.

452.   ***Trial counsel unreasonably failed to raise "actual prejudice" as a separate ground for change of venue.***

453.   As a separate, additional basis for the motion for change of venue, counsel unreasonably failed to argue that the results of the sample jury showed "actual prejudice" under *Irvin v. Dowd*, 366 U.S. 717, 723–28 (1961).

454.   Counsel's failure prejudiced Mr. Burgess.  The responses of the jury venire showed that they were biased against Mr. Burgess because of the pretrial publicity.  This is most apparent from an incident during voir dire involving a prospective juror, Mr. "O," who told other prospective jurors that, based on the publicity, he knew that Mr. Burgess was guilty.  *See Burgess*, 827 So. 2d at 155–57.  But the effect of the media barrage was also quite clear from the extraordinarily high number of jurors who knew about the case and who had formed opinions about Mr. Burgess's guilt.  (Doc. 19-4 at 41–43; Doc. 19-5 at 134–52, Doc. 19-6 at 21–23, 60–61, 64, 68, 71, 163–64, 169, 203–04, Doc. 19-7 at 37–39.)

455.   In the end, Mr. Burgess was forced to pick a jury from a venire in which at least forty-nine of the fifty-four people composing the venire knew about the case, and many admitted to having extensive discussions about the facts of the case.  (Doc. 19-5 at 37, 85, 97–98, 134–52, Doc. 19-6 at 18–19, 51–52, 57, 116–17, 199–200.)  No fewer than seventeen prospective jurors possessed a fixed

opinion that Mr. Burgess was guilty or stated an inability to be impartial. (Doc. 19-5 at 134–52, Doc. 19-6 at 21, 63–64, 71, 164, 169, Doc. 19-7 at 39.) Thus, the totality of the circumstances supported a showing of "actual prejudice."

456. Had counsel based their motion and/or renewed their motion for change of venue based on a showing of "actual prejudice," it is reasonably probable that the court would have granted the motion for change of venue. Had the court granted a change of venue, there is a reasonable probability that the results of the guilt, penalty, and sentencing phases would have been different because the jury sitting in judgment of Mr. Burgess would not have been tainted by the prejudicial pretrial publicity.

457. ***Trial counsel unreasonably failed to conduct an adequate voir dire regarding the pretrial publicity and to renew the change of venue motion prior to and during jury selection.***

458. Counsel unreasonably failed to renew the motion for change of venue prior to the commencement of jury selection and during the voir dire of prospective jurors. The results of the sample jury provided a basis for renewal of the motion based upon a showing of both "inherent" and "actual" prejudice. Moreover, the responses of the prospective jurors demonstrated "actual prejudice." *Irvin*, 366 U.S. at 723, 727.

459.   Counsel's failure prejudiced Mr. Burgess.  Notably, most of the jurors who had seen the media coverage volunteered that what they recalled was Mr. Burgess's "confession."  (*See e.g.*, Doc. 19-6 at 159.)  To the extent jurors acknowledged that they had read, heard, or seen something about the case, counsel, with a few exceptions, asked no questions regarding the sources of the information, the frequency or recency of their exposure to publicity, or the content of what they had learned, all of which were reasonably necessary to renew the change of venue motion, develop and make meritorious cause challenges, and to the exercise of peremptory strikes in an informed manner.  (*See e.g.*, Doc. 19-6 at 18–19, 23–24, 54–57, 154–160.)

460.   As jury selection proceeded, it was all the more evident that only a handful of members of the venire had not heard of the case through the media coverage.  (Doc. 19-5 at 37, 85, 98, 133, 133–43, Doc. 19-6 at 19, 52, 55–57, 115–18, 199.)  A significant percentage of the jurors had formed an opinion that Mr. Burgess was guilty of the charged capital crime.  (Doc. 19-5 at 134–52, Doc. 19-6 at 21–23, 60–61, 64, 68, 71, 163–64, 169, 203–04, Doc. 19-7 at 37–39.)  When jurors gave answers about the publicity that demanded further inquiry, counsel unreasonably failed to ask questions and unreasonably failed to challenge biased jurors for cause.

461.    For example, two of the ten prospective jurors on Panel One who had heard about the case immediately volunteered that each had formed the opinion that Mr. Burgess was guilty.  (Doc. 19-4 at 203–04, Doc. 19-5 at 37–38.)  At least three of the ten who had heard about the case discussed it with family or friends.  (Doc. 19-4 at 205–06.)  Trial counsel did not question any of the three jurors about the substance of the conversations, even though they did not respond when asked by the prosecutor whether those discussions had caused them to be biased in any way.  (Doc. 19-4 at 206–07.)  One of the three said that based on what they had heard, the juror was "left with the impression that the evidence was there to convict him."  (Doc. 19-5 at 37.)  The prospective juror confirmed that the newspaper articles indicated the "evidence was fairly substantial."  (Doc. 19-5 at 38.)[17]  Trial counsel did not challenge the prospective juror for cause and, instead, exercised a peremptory strike.  (Doc. 19-7 at 173–78.)

462.    Panel Two offers another example.  Ten of the twelve prospective jurors on Panel Two had heard about the case, (Doc. 19-5 at 84–85), and seven of them had discussed it.  (Doc. 19-5 at 95.)  Of the twelve, at least three jurors had formed an opinion that Mr. Burgess was probably guilty.  (Doc. 19-5 at 134–37,

---

[17] Another juror stated that she had formed the same opinion ("what this [juror] says") based on the news coverage.  (Doc. 19-5 at 40.)  This prospective juror was challenged for cause without objection based upon the juror's reservations about the death penalty.  (Doc. 19-5 at 9–14, 47.)

149–52.)  Again, counsel failed to question prospective jurors who were reasonably likely to have been excused for cause.  One member of Panel Two stated that Mr. Burgess was innocent according to the law, but believed Mr. Burgess was guilty.  The defense would have to "overpower" what the juror already knew and put on evidence to prove Mr. Burgess was innocent.  (Doc. 19-5 at 149–50.)  This opinion was based on television coverage of the case.  (Doc. 19-5 at 152.)  The juror later told the prosecutor that she "could put that out of my mind" and decide the case based on the evidence.  (Doc. 19-5 at 172.)  Trial counsel asked no other questions and did not challenge the juror for cause.

463.   Despite counsel's deficient performance in their questioning of prospective jurors, the totality of the circumstances, including the pretrial publicity, the sample jury, and the jury selection itself, demonstrated "actual prejudice." Counsel unreasonably failed to renew the motion for change of venue with each panel of the jury on the additional ground that they had shown "actual prejudice."

464.   Counsel's failures prejudiced Mr. Burgess.  Had counsel renewed the motion during jury selection or conducted an adequate inquiry of prospective jurors regarding the pretrial publicity and renewed the motion during voir dire, it is reasonably probable that the court would have granted a change of venue.  If the court had granted a change of venue, there is a reasonable probability that Mr. Burgess would not have been convicted of capital murder, or, if convicted,

would not have been sentenced to death, because the jury sitting in judgment of

Mr. Burgess would not have been tainted by the prejudicial pretrial publicity.

465.   The Alabama Court of Criminal Appeals denied this aspect of Mr.

Burgess's ineffectiveness claim on the merits.  *See Burgess*, 2023 WL 4146021, at

*19–26.  The state court's ruling was contrary to, and an unreasonable application

of, clearly established federal law, and was based on an unreasonable

determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d);

*Rideau,* 373 U.S. at 723; *Irwin*, 366 U.S. at 717. In the alternative, this Court

should decide the merits of petitioner's claim *de novo* for the reasons articulated in

paragraphs 136–38 above, which are incorporated by reference herein.  *See Loper*

*Bright*, 144 S. Ct. at 2244.

### 3.   Trial Counsel's Performance During Jury Selection was Ineffective.

#### a.   *Trial counsel unreasonably failed to object to the prosecution's unconstitutional discriminatory peremptory challenges against women.*

466.   In Claim I, Mr. Burgess alleged that the prosecution's strikes of

female prospective jurors based on their gender deprived Mr. Burgess of his rights

under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States

Constitution and all other applicable federal law. Mr. Burgess expressly

incorporates by reference herein all of the factual and legal allegations contained in

Claim I.

467.    As detailed in Claim I, the prosecutor in Mr. Burgess's case exercised all his cause challenges against women.  After the completion of cause challenges, forty-one jurors remained in Mr. Burgess's jury venire.  (Doc. 19-1 at 195–96; Doc. 19-16 at 18–19.)  Of this group, twenty-one were women and twenty were men. (Doc. 19-1 at 195–96; Doc. 19-16 at 16–19.)  The trial judge allotted fifteen peremptory strikes to the prosecution and fourteen to the defense.  (Doc. 19-7 at 171.)  District Attorney Robert Burrell then used eleven of his fifteen peremptory challenges to strike eleven out of the twenty-one qualified women from Mr. Burgess's venire, which represents a strike rate of seventy-three percent in the selection of the twelve-person jury.  (Doc. 19-1 at 195–96; Doc. 19-7 at 173–78.)

468.    Notwithstanding this stark pattern and other evidence of purposeful discrimination, Mr. Burgess's trial counsel unreasonably failed to object to the State's strikes.  Trial counsel's failure to object to the prosecutor's discriminatory use of peremptory challenges against women violated Mr. Burgess's rights to the effective assistance of counsel under the Sixth and Fourteenth Amendments of the United States Constitution.

469.    Under *Batson* and *J.E.B.*, a defendant establishes a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose."  *Batson*, 476 U.S. at 94; *J.E.B.*, 511 U.S. at 144–45.  A defendant may establish a prima facie case of discrimination based solely on facts

gleaned from his trial, and the inference of discrimination can be based on a single strike against one juror.  *See Batson*, 476 U.S. at 95–96; *J.E.B.*, 511 U.S. at 142 n.13.  *Batson* offered two evidentiary examples, noting they were "merely illustrative," that may give rise to an inference of discrimination: a "pattern" of strikes against a cognizable group and "the prosecutor's questions and statements" during jury selection.  *Id*. at 97.  The Court held that a defendant may make the necessary showing based on "any . . . relevant circumstances" and that the trial judge "shall consider all relevant circumstances"  *Id*. at 96; *id*. (stating that an inference may be raised based on "a combination of factors"); *id*. at 94 (stating that the defendant may make out prima facie case based on "the totality of the relevant facts").  In *Johnson v. California*, 545 U.S. 162 (2005), the Supreme Court reiterated that defendant's burden at *Batson*'s first step is one that requires only "producing an inference" of purposeful discrimination, which "can be made out by offering a wide variety of evidence."  *Id*. at 169–70.  *See also Flowers v. Mississippi*, 588 U.S. 284, 301–02 (2019) (highlighting the "variety of evidence" a defendant may offer to support his or her showing and offering examples).

470.   The "totality of the relevant facts" surrounding the prosecutor's strikes of eleven qualified women in the selection of Mr. Burgess's jury gave rise to a prima facie showing of discrimination.  *See Batson*, 476 U.S. at 93–94.  In addition to the prosecution's exercise of all its cause challenges against women and

the number of his strikes, the relevant facts supporting a prima facie case encompass the sequence of strikes; the side-by-side comparisons between struck prospective women jurors and seated male jurors; the heterogeneity of the struck prospective women jurors; the manner of the prosecutor's voir dire; and the past conduct of the prosecutor in using peremptory challenges in a discriminatory manner in capital jury selection.

471.    Mr. Burgess's trial counsel unreasonably failed to object under *Batson* and *J.E.B.* based on the relevant facts that were apparent from the record, as detailed in paragraphs 46-51, which are expressly incorporated by reference. Trial counsel also unreasonably failed to object under *Batson* and *J.E.B.* based upon District Attorney Burrell's pattern and practice of striking women from capital juries. *Batson* freed a defendant of the obligation to demonstrate "a consistent pattern of official racial discrimination," holding that the accused could "rely[] solely on the facts concerning [jury] selection *in his case*." 476 U.S. at 96. In *Miller-El v. Dretke*, however, the Supreme Court explained that *Batson*'s term "'all relevant circumstances'" means that a defendant may nonetheless make a prima facie showing based on evidence "beyond the case at hand," including the pattern and practice of discrimination by the prosecution. 545 U.S. 231, 239–40, 263 64 (2005) (quoting *Batson*, 476 U.S. at 96–97).

472.   On direct appeal, the Alabama Court of Criminal Appeals noted, "There is no evidence that the prosecutor had a history of misusing peremptory challenges so as to discriminate against women." *Burgess v. State*, 827 So. 2d 134, 150 (Ala Crim. App. 1998).  Such evidence was, however, available and shows that Morgan County District Attorney Burrell's pattern and practice of discriminating in capital jury selection supports an inference that discriminatory purpose motivated his use of peremptory strikes against women on Mr. Burgess's venire.

473.   At the time of Mr. Burgess's trial, lead trial counsel Wesley Lavender had practiced in Decatur for two decades, and had tried numerous criminal cases, including capital cases.  Mr. Lavender reasonably should have known that Mr. Burrell discriminated in capital jury selection for the following reasons:

(1)    In the six months before Mr. Burgess's trial, at least one *Batson* objection was made against Mr. Burrell in another capital case. *See Pace v. State*, 714 So. 2d 316, 317–18 (Ala. Crim. App. 1995).  Mr. Lavender served for a period of time as trial counsel in this earlier capital case.  Reasonably competent counsel would have been aware of the developments in that case, including Mr. Burrell's discriminatory jury selection practices, which the Court of Criminal Appeals found raised "an inference of discrimination." *Id.* at 318.

(2)    In capital cases prosecuted by Mr. Burrell during the ten-year period preceding Mr. Burgess's trial, the odds of a prospective female juror being struck versus not being struck were 1.53 times

those of a prospective male juror.[18] Information about Mr. Burrell's jury selection in these cases would have been readily available to Mr. Lavender through a review of the Morgan County Circuit Court files.

(3)   At minimum, the information regarding Mr. Burrell's past conduct in discriminating against African Americans and women in the selection of capital juries would have alerted a reasonably competent lawyer to investigate Mr. Burrell and to raise a *J.E.B.* objection at Mr. Burgess's trial.

474.   Given the relevant facts outlined above and in Claim I—which raise an inference of the prosecutor's discriminatory use of peremptory strikes—trial counsel's failure to object under *J.E.B.* was unreasonable under *Strickland*'s deficient performance prong. *Strickland,* 466 U.S. at 688. Trial counsel's failure to object prejudiced Mr. Burgess because, as set out in Claim I and immediately above, there was ample evidence to raise an inference of gender discrimination. Had trial counsel objected, it is reasonably likely that the trial court would have found a prima facie showing, required the prosecution to provide gender-neutral

---

[18] In the ten-year period preceding Mr. Burgess's trial (1984-1994), Mr. Burrell prosecuted seventeen capital cases. Postconviction counsel obtained copies of the files or a portion of the files from the Morgan County Clerk's Office and the Administrative Office of Courts. Eleven of the cases had sufficient documentation to determine the number and gender breakdown of peremptory strikes exercised by Mr. Burrell in each case. The defendants in the cases with sufficient documentation are: Roy Burgess, Jr., Gary Drinkard, Wilson Gurley, William Hagood, and Rick Martin (co-defendants), John Milton Hardy and Ulysses Sneed (co-defendants), Tyrone Harris, Samuel Orr, William Vaughn Owen, Levi Pace, Wendell Scott, and Robin Dion Myers. An analysis of these cases reveals that the odds of a prospective female juror being struck by Mr. Burrell in a capital case versus not being struck were 1.53 times those of a prospective male juror.

reasons, and completed the *Batson* inquiry.  *See Batson*, 476 U.S. at 94; *J.E.B.*, 511 U.S. at 145.

475.   The Alabama Court of Criminal Appeals reviewed Mr. Burgess's *J.E.B.* claim on direct appeal and denied it on the merits, finding that the record did not support an inference of discrimination.  *Burgess*, 827 So. 2d at 150.  Because the facts outlined above, had they been presented at trial and on appeal, would have established a prima facie showing of purposeful gender discrimination, Mr. Burgess was prejudiced by trial counsel's unreasonable failure to object under *Batson* and *J.E.B.* to the prosecutor's discriminatory strikes.  Mr. Burgess is therefore now entitled to an evidentiary hearing to determine whether the prosecutor can provide gender-neutral reasons for his use of peremptory strikes to remove the eleven female jurors.  *See Johnson*, 545 U.S. at 170, 173.

476.   The Alabama Court of Criminal Appeals denied this ineffectiveness claim on the merits.  *See Burgess*, 2023 WL 4146021, at *31–33.  The state court's ruling was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d); *J.E.B.*, 511 U.S. at 127. In the alternative, this Court should decide the merits of petitioner's claim *de novo* for the reasons articulated in paragraphs 136–38 above, which are incorporated by reference herein.  *See Loper Bright*, 144 S. Ct. at 2244.

235

### b. *Trial counsel unreasonably failed to adequately challenge the systematic exclusion of African Americans from Morgan County juries and to preserve the challenge for review.*

477.   African Americans were severely underrepresented on and excluded from the jury rolls of Morgan County, thereby violating Mr. Burgess's right to a jury drawn from a fair cross-section of the community, in violation of the Sixth and Fourteenth Amendments to the United States Constitution.  Trial counsel unreasonably failed to adequately challenge the systematic exclusion of African Americans from Morgan County juries and to properly preserve the challenge for review.

478.   Defense counsel moved to quash the venire, on the grounds that it underrepresented African Americans, but cited no statistics in support of this contention.  (Doc. 19-4 at 180–83.)  The trial court denied the motion, but gave the State leave to call Toy Mitchell, the Clerk of the Morgan County Jury Commission, on the issue.  (Doc. 19-4 at 182–83.)  The trial court also explicitly gave permission for defense counsel to call witnesses.  (Doc. 19-5 at 183.)  Although trial counsel cross-examined Ms. Mitchell, they failed to renew any objection or argument related to the underrepresentation of African Americans.  (Doc. 19-7 at 85–91, 97–98.)

479.   The Court of Criminal Appeals ruled that Mr. Burgess had failed to meet his burden of establishing a prima facie case that African Americans were

underrepresented on the jury venire. *Burgess*, 827 So. 2d at 185. This ruling, however, was based on erroneous testimony about the percentages of African Americans eligible for jury service in Morgan County. *Id.* ("[B]lacks over 19 years of age and eligible for jury service made up only 7.2% of the county population."). Had counsel presented the accurate demographic information below, they would have been able to establish a constitutional violation. In this way, counsel's deficient performance prejudiced Mr. Burgess.

480. The underrepresentation of African Americans in the jury pool was unconstitutional. *See Duren v. Missouri*, 439 U.S. 357, 363–67 (1979). A determination of a cognizable group's representation requires comparing the percentage of the group within the relevant population of jury service eligible persons, and the group's percentage on the master jury lists. Persons nineteen years of age and older are eligible for jury service. Ala. Code § 12-16-60(a)(1). Ms. Mitchell testified at a pretrial hearing that African Americans comprised 7.23 percent of persons on the Morgan County master jury list compiled on October 30, 1992, the list from which Mr. Burgess's jury venire was drawn. (Doc. 19-7 at 87.) She also testified that African Americans made up 7.2 percent of the jury service eligible persons in the county. (Doc. 19-7 at 84.) According to the United States Census Bureau, however, African Americans made up about 10.08 percent of the total population and 9.15 percent of persons who were nineteen years of age or

older in Morgan County in 1994.  The absolute disparity was therefore close to two percent; the comparative disparity (the percentage of African Americans on the master list divided by the percentage of jury-eligible African Americans) was 20.98 percent.  Given the relatively small size of the African American population in Morgan County, comparative disparity is a more appropriate indicator.

481.   Counsel unreasonably failed to collect and present accurate demographic data with respect to the population of African Americans nineteen years and older, and unreasonably failed to cross-examine Ms. Mitchell about the data that she presented.  Counsel also unreasonably failed to seek documents and other evidence relating to the procedures of the Alabama Administrative Office of the Courts in creating the master jury lists for Morgan County in 1993 and 1994, such as documents relating to the method(s) by which jurors were placed on or excluded from the master jury lists during this time frame and any documents and other evidence relating to the procedure by which the Administrative Office of the Courts generated names of prospective jurors for a venire and procedures by which they issued summonses.  Thus, counsel also unreasonably failed to preserve the claim for appellate review.

482.   Counsel's failures prejudiced Mr. Burgess.  Had counsel made the appropriate objections and presented an adequate case, including establishing both that African Americans were underrepresented and systematically excluded from

the jury rolls, the court would have been required to quash the venire pursuant to *Duren* and the Sixth and Fourteenth Amendments to the United States Constitution. With a representative jury drawn from a fair cross-section of the community, there is a reasonable probability that the results of the guilt, penalty, and sentencing phases would have been different. Had trial counsel properly preserved the claim for appellate review, there is a reasonable probability that the outcome on appeal would have been different.

483. The Alabama Court of Criminal Appeals denied this aspect of Mr. Burgess's ineffectiveness claim on the merits. *See Burgess*, 2023 WL 4146021, at *28–29. The state court's ruling was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). *See Strickland*, 466 U.S. at 668. In the alternative, this Court should decide the merits of petitioner's claim *de novo* for the reasons articulated in paragraphs 136–38 above, which are incorporated by reference herein. *See Loper Bright*, 144 S. Ct. at 2244.

### c.    *Trial counsel unreasonably failed to challenge jurors for cause.*

484. Counsel unreasonably failed to challenge Juror "P." for cause. During voir dire, Mr. P. stated that he remembered Mr. Burgess's confession on television. He acknowledged that the confession "would have some effect on my judgment."

239

(Doc. 19-6 at 163.)  He particularly recalled "the way [the confession] was said."

(Doc. 19-6 at 164.)  When counsel asked follow-up questions, Mr. P. confirmed

that he "might not" be able to set aside the influence and that "it possibly could"

play some part in his deliberations.  (Doc. 19-6 at 164–65.)  Trial counsel did not

challenge Mr. P. for cause.  (Doc. 19-6 at 181.)  He served on the jury.  (Doc. 19-7

at 180.)

485.    Counsel also unreasonably failed to challenge Juror "Ch." for cause.

Mr. Ch. said that when the shooting occurred, "everybody formed an opinion"

about the offense.  (Doc. 19-6 at 68.)  Although he denied having an opinion

"today" and said that he could decide the case based upon the evidence, Juror Ch.

agreed that he had formed an opinion about the case.  (Doc. 19-6 at 67–70.)  Trial

counsel did not challenge Mr. Ch. for cause.  He served on the jury.  (Doc. 19-7 at

180.)

486.    Mr. Burgess was prejudiced.  With a fair and representative jury

panel, there is a reasonable probability that Mr. Burgess would not have been

convicted of capital murder or, if convicted, would not have been sentenced to

death.

487.    The Alabama Court of Criminal Appeals denied this aspect of Mr.

Burgess's ineffectiveness claim on the merits.  *See Burgess*, 2023 WL 4146021, at

*29.  The state court's ruling was contrary to, and an unreasonable application of,

clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d); *Strickland*, 466 U.S. at 668. In the alternative, this Court should decide the merits of petitioner's claim *de novo* for the reasons articulated in paragraphs 136–38 above, which are incorporated by reference herein. *See Loper Bright*, 144 S. Ct. at 2244.

> ### d. *Counsel Unreasonably Failed to Move to Quash the Indictment Based on Discrimination in the Selection of Grand Jury Forepersons.*

488. Trial counsel unreasonably failed to move to quash the indictment based on discrimination against African Americans in the selection of grand jury forepersons, in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution. In May 1993, the law was well-established that discrimination in the selection of a grand jury foreperson violates the United States Constitution. *See Rose v. Mitchell*, 443 U.S. 545 (1979); *Johnson v. Puckett*, 929 F.2d 1067, 1071–73 (5th Cir. 1991).

489. Mr. Burgess's grand jury was unlawfully constituted. Counsel's failure to present reasonably available evidence of discrimination and the improper constitution of his grand jury prejudiced Mr. Burgess. Had counsel investigated this claim and presented evidence and argument in support of it, the court would have learned the following:

490.   Mr. Burgess was indicted during the Morgan County Grand Jury's March 1993 Term.  (Doc. 19-1 at 63.)  His indictment was filed in circuit court on April 5, 1993, (Doc. 19-1 at 62), and Mr. Burgess was arraigned on the indictment on May 17, 1993.  (Doc. 19-1 at 30.)

491.   Grand jurors, including grand jury forepersons, are drawn from the same master jury lists as petit jurors.  African Americans were under-represented in the master jury list from which Mr. Burgess's grand jury was drawn.  According to the United States Census Bureau, African Americans made up about 10.08 percent of the total population and 9.15 percent of persons who were nineteen years of age or older in Morgan County in 1994.  The absolute disparity was therefore close to two percent; the comparative disparity (the percentage of African Americans on the master list divided by the percentage of jury-eligible African Americans) was 20.98 percent.  Given the relatively small size of the African-American population in Morgan County, comparative disparity is a more appropriate indicator.

492.   African Americans were historically excluded from serving as forepersons on Morgan County grand juries, including the period during which Mr. Burgess was indicted.  Morgan County's African-American population has ranged from approximately twenty-four percent in 1910 to ten percent in 1990.  For seventy years—from at least 1927 (when records were first kept) until at least

242

August 1996—no African American served as a foreperson of a grand jury in Morgan County. *See Ex parte Drinkard*, 777 So. 2d 295, 304 (Ala. 2000) (stating that as of 1995, no African American had ever served as grand jury foreperson in Morgan County, even though ten percent of the population in Morgan County is Black).

493.    The exclusion of African Americans from service as grand jury forepersons was due to racial discrimination.  For many decades, up until at least October 1993, the grand jury foreperson was selected by the circuit judge, with the advice and consent of the district attorney, from among the members of the grand jury.  This procedure for selecting a grand jury foreperson was not race-neutral and was susceptible to abuse.  Forepersons were selected based upon whether they were known to the district attorney, and whether they met the district attorney's own subjective criteria.  The district attorney is not a neutral court official but is chosen in a partisan election to prosecute crimes.  During the time that Mr. Burrell served as district attorney prior to October 1993, he selected grand jury forepersons.  Although African Americans served on grand juries, Mr. Burrell never selected an African American as a grand jury foreperson.  The Alabama Court of Criminal Appeals determined that "Morgan County engaged in a lengthy history of racial discrimination in selecting grand jury forepersons." *Pace v. State*, 714 So. 2d 332, 336 (Ala. 1997).

243

494.   Mr. Burgess's indictment was returned by the grand jury in April 1993.  The foreperson of his grand jury was selected by this discriminatory process.

495.   The grand jury foreperson has a critical role in Alabama and has a substantial impact upon the grand jury process and the decision whether to return an indictment.  Among other tasks, the foreperson is the leader of the grand jury, presides over the grand jury proceedings, acts as the court's representative by maintaining order, excludes unauthorized persons and persons acting in an unauthorized manner, appoints officers within the grand jury that are necessary for its functioning, swears witnesses, maintains lists of witnesses, and submits a written report of the proceedings to the court.  Ala. R. Crim. Pr. 12.5; Ala. Code § 12-16-199.  The foreperson also presents the indictment to the court.  Ala. Code § 15-8-70.

496.   In light of this systematic discrimination in the selection of the grand jury foreperson, trial counsel should have moved to quash the indictment.  Had trial counsel presented the court with such a motion, based on the above facts and law, it is reasonably probable that the court would have quashed the indictment.

497.   The Alabama Court of Criminal Appeals denied this aspect of Mr. Burgess's ineffectiveness claim on the merits.  *See Burgess*, 2023 WL 4146021, at *33–34.  The state court's ruling was contrary to, and an unreasonable application

244

of, clearly established federal law, and was based on an unreasonable

determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).

In the alternative, this Court should decide the merits of petitioner's claim *de novo*

for the reasons articulated in paragraphs 136–38 above, which are incorporated by

reference herein.  *See Loper Bright*, 144 S. Ct. at 2244.

> ### e.    *Trial Counsel Were Ineffective in Unreasonably Failing to Investigate and Properly Litigate the Motion to Suppress Mr. Burgess's Statements and the Evidence Seized upon his Unlawful Arrest.*

498.   Without undertaking an adequate investigation, trial counsel moved to

suppress Mr. Burgess's statements to police, his statements to the media, and the

physical evidence seized upon Mr. Burgess's arrest.  A suppression hearing was

held out of the presence of the jury on June 23, 1994, after opening statements

were given and during the State's case.  The trial court summarily denied the

motion to suppress.  (Doc. 19-10 at 66–67.)  Mr. Burgess would not have been

convicted of capital murder or sentenced to death had the statements and evidence

derived from his statements to the media been suppressed.  In litigating the motion

to suppress, with respect to Mr. Burgess's statements to law enforcement and to the

media and the evidence seized upon Mr. Burgess's arrest, trial counsel's

performance fell below an objective standard of reasonableness.

499.   ***Trial counsel unreasonably failed to investigate and adequately
litigate the motion to suppress Mr. Burgess's statements to police.*** Trial
counsel's litigation of the motion to suppress Mr. Burgess's statements was
constitutionally deficient.  Trial counsel unreasonably failed to cite legal authority
or raise meritorious arguments to support suppression of Mr. Burgess's statements.
They made no effort to investigate the interrogation practices of the Decatur Police
Department, which would have uncovered facts that supported their legal
argument.  Trial counsel's failures prejudiced Mr. Burgess.

500.   After Mr. Burgess was arrested, Sergeants Tallent and Long brought
Mr. Burgess back to Decatur.  (Doc. 19-9 at 119–20.)  During the drive, Mr.
Burgess expressed concern about Yolanda Wallace—his girlfriend with whom he
had been arrested—and her child.  (Doc. 19-9 at 99.)  When Mr. Burgess arrived in
Decatur, Sergeants Tallent and Long put Mr. Burgess in an interrogation room in
the police department's detective division.  (Doc. 19-9 at 90–91.)  Both officers
were armed.  (Doc. 19-9 at 149.)  Sergeant Dawson advised Mr. Burgess of his
*Miranda* rights at 1:40 p.m.  (Doc. 19-9 at 102–03.)  Mr. Burgess initially indicated
that he understood his rights and waived them.  (Doc. 19-9 at 129–30.)

501.   Mr. Burgess initially said that he had obtained Mrs. Crow's car from a
man named Soda Pop.  (Doc. 19-9 at 94, 105–06.)  Sergeants Tallent and Long
both told Mr. Burgess that they did not believe him.  (Doc. 19-9 at 94, 105–06.)

246

Sergeant Long directly confronted Mr. Burgess, and told him that "if he persisted in lying . . . it wouldn't do any good, that we could put him with the car." (Doc. 19-9 at 133.) At that point, Mr. Burgess asked about Ms. Wallace. *Id*. The officers said that they assumed she was at the police department. *Id*. Mr. Burgess said, "[S]he didn't have anything to do with it" and that he would be glad to explain it to the officers, "but he needed a lawyer at this time." *Id*.

502.   When a suspect in custody invokes the right to counsel, interrogation must cease until an attorney is present, unless the suspect initiates communication with the police. *Miranda v. Arizona*, 384 U.S. 436, 474 (1966); *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981).

503.   Rather than end the interrogation or ensure that Mr. Burgess would be provided counsel at the State's expense, the officers responded by misleading Mr. Burgess about his right to counsel. The officers asked Mr. Burgess if he had an attorney and told him that "if [Mr. Burgess] would name one that [they] would call him one" or would let him call. (Doc. 19-9 at 115.) Neither officer explained at that time that an attorney would be appointed for Mr. Burgess if he could not afford one. (Doc. 19-9 at 115, 153.) Mr. Burgess did not know any lawyers to call. (Doc. 19-9 at 189.) The officers clearly communicated to Mr. Burgess that he had no right to counsel unless he could provide the name of an attorney to call. Mr. Burgess subsequently made statements to the police.

504.   It is undisputed that Mr. Burgess unequivocally invoked his right to counsel and that officers asked Mr. Burgess to provide the name of his lawyer. Although the parties testified to different versions of what occurred next, the court failed to make any credibility determinations or resolve the conflicting facts.  (Doc. 19-10 at 66–69.)  Under the facts presented by Mr. Burgess and the State's witnesses, the statements should have been suppressed.

505.   As Mr. Burgess testified, when he invoked his right to counsel, he was told that he no longer had that right because he had already waived it.  (Doc. 19-9 at 189.)  Sergeant Tallent became angry.  (Doc. 19-9 at 190.)  He stood behind Mr. Burgess and pressed down on Mr. Burgess's shoulders.  *Id*.  When Mr. Burgess again asked for a lawyer, Sergeant Tallent knocked his hat off and told Mr. Burgess that he was no longer in the juvenile system but was in with "the big boys."  *Id*.  Mr. Burgess made a statement in order to get out of the interrogation room.  *Id*.  The continued interrogation of Mr. Burgess after he unequivocally asked for counsel, and the use of force and coercive tactics established that the statements and the evidence derived from them were admitted in violation of *Miranda* and its progeny, as well as the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

506.   According to Sergeant Long, after Mr. Burgess invoked his right to counsel, Sergeant Tallent left the interrogation room.  (Doc. 19-9 at 133–34.)

Sergeant Long remained in the interrogation room with Mr. Burgess for between ten and twenty minutes and engaged in "small talk" to "relieve the boredom." (Doc. 19-9 at 134.)  They discussed Mr. Burgess's girlfriend, Yolanda Wallace, and a child that Mr. Burgess had lost due to the mother's miscarriage.  (Doc. 19-9 at 150–52.)  Long expressed sympathy.  (Doc. 19-9 at 152.)

507.    Sergeant Long claimed that he stepped out to go to the restroom and, upon his return, Mr. Burgess initiated a conversation about the charges.  (Doc. 19-9 at 135–36, 152.)  Sergeant Long characterized the period after the invocation as "small talk" followed by a re-initiation by Mr. Burgess.  (Doc. 19-9 at 150–52.) The trial court found that Mr. Burgess initiated contact with officers.  (Doc. 19-10 at 68.)  The Court of Criminal Appeals affirmed, finding "no evidence in the record to suggest that Long's 'small talk' with Burgess was a psychological ploy." *Burgess*, 827 So. 2d at 175.

508.    Trial counsel's unreasonable failure to investigate and to introduce evidence about interrogation practices prejudiced Mr. Burgess.  Had counsel adequately litigated this motion, they would have been able to establish that Sergeant Long's claimed "small talk" was a planned part of his interrogation strategy and that the Decatur Police Department had a pattern and practice of continuing to question suspects after they invoked their rights.

249

509.    Counsel failed to present reasonably available evidence that engaging suspects in "small talk" is a well-established interrogation technique.  For over fifty years, leading interrogation manuals in the United States have instructed officers that it is essential to establish rapport with suspects in order to conduct a successful interrogation.  *See, e.g.,* Charles E. O'Hara, *Fundamentals of Criminal Investigation* (1st ed. 1956); Fred E. Inbau & John E. Reid, *Criminal Interrogation and Confessions* (2d ed. 1967).  One leading interrogation manual instructs officers to "establish a rapport with the suspect" prior to the interrogation.  Fred E. Inbau, John E. Reid, Joseph P. Buckley & Brian C. Jayne, *Criminal Interrogation and Confessions* 93 (5th ed. 2001).  As the manual notes, "[s]ome investigators are skilled at small talk, where they can discuss sports, news events, or hobbies with almost anyone.  For some suspects, this can be an effective approach to establishing rapport."  *Id*.  When Sergeant Long was engaging in "small talk" with Mr. Burgess, he was actually employing a standard police interrogation strategy, designed to elicit a statement from Mr. Burgess.

510.    Sergeant Long deliberately kept Mr. Burgess in the interrogation room so that he could obtain a statement after Mr. Burgess had invoked his right to counsel.  During the suppression hearing, Decatur Police Investigator Walker testified that he tried to enter the interrogation room a few minutes after Sergeant Tallent left.  (Doc. 19-9 at 163–64.)  Sergeant Long opened the door, looked at

250

Walker, and held up his hand or finger to signal Walker to stay out. (Doc. 19-9 at

164–67.) That indicated to Investigator Walker that "if I came in it would interrupt

whatever [Mr. Burgess] was talking about, and Sergeant Long didn't think that I

needed to come in there at that time and cause an interruption." (Doc. 19-9 at

164.)

511.   There was no legitimate reason for Sergeant Long to keep Mr.

Burgess in the interrogation room after he had asked for counsel. The

interrogation room was located within the detective division of the Decatur Police

Department, in the Decatur City Hall. The same building contains the Decatur

City Jail. It was routine for detectives within the Decatur Police Department to use

the city jail to hold suspects prior to bringing them to the Morgan County Jail. In

fact, after the officers obtained the statement they wanted, they placed Mr. Burgess

for a short time in the city jail.

512.   Officers should have brought Mr. Burgess to the Morgan County Jail

after he invoked the right to counsel. Had officers needed to keep Mr. Burgess

nearby for any reason, officers could have placed Mr. Burgess in the Decatur City

Jail.

513.   If trial counsel had conducted adequate investigation, they would have

uncovered evidence of the Decatur Police Department's pattern and practice of

improper interrogation. If they had prepared for the motion to suppress, they could

have cited the legal authority discussed above to show that both of Mr. Burgess's statements warranted suppression. Had trial counsel adequately litigated the motion to suppress, Mr. Burgess's first statement would not have been admitted as evidence because of the violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights and his second statement, on videotape, would also have been suppressed because it was not sufficiently attenuated from the first statement so "as to dissipate the taint." *Wong Sun v. United States*, 371 U.S. 471, 491 (1963). Had the jury never heard these statements, there is a reasonable probability that the results of the guilt, penalty, and sentencing phases would have been different.

514. ***Trial counsel unreasonably failed to investigate and adequately litigate the motion to suppress Mr. Burgess's statements to the media.*** Counsel also unreasonably failed to investigate and to introduce reasonably available evidence establishing that police officers contacted members of the media and planned to parade Mr. Burgess before them with the intent that he make incriminating statements. Counsel's deficient performance prejudiced Mr. Burgess because the following information was not presented to the court in support of a motion to suppress Mr. Burgess's statements to the media:

515. Officers completed their interrogation of Mr. Burgess in the detective division of the Decatur Police Department by 4:00 p.m. on the afternoon of his arrest. (Doc. 19-13 at 140.) He was then booked. At that point, Mr. Burgess

should have been brought directly to the Morgan County Jail. Instead of taking Mr. Burgess directly to the county jail, officers detained Mr. Burgess at the police department and the Decatur City Jail. Officers notified members of the news media that Mr. Burgess would be brought to the county jail, and officers waited until approximately 5:30 p.m. for members of the media to gather before taking Mr. Burgess to the county jail. Officers knew that Mr. Burgess earlier had requested counsel, and that counsel was not afforded to him. Officers then deliberately paraded Mr. Burgess before the media with the intent that he make incriminating statements without counsel, which would prejudice his subsequent prosecution and trial. Under these circumstances, the members of the media were acting as agents of the State, and the "perp walk" of Mr. Burgess presented circumstances that "the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

516.   Wearing a white jail jumpsuit, Mr. Burgess was marched a lengthy distance under the direct glare of television cameras and confronted by reporters. With officers surrounding Mr. Burgess and holding his arms, he was brought through a glass doorway to the sidewalk alongside Decatur City Hall. He then was paraded before the media along the sidewalk, across Ferry Street, along the front of the Morgan County Courthouse, and to the Morgan County Jail, which is on the

west side of the courthouse.  The distance of the media walk was over 800 feet.

During the entire time, officers deliberately walked Mr. Burgess at a slower than

normal rate of speed, so that Mr. Burgess would make a statement.

517.   The trial court denied the motion to suppress Mr. Burgess's

statements to the media.  (Doc. 19-10 at 69–70.)  The Court of Criminal Appeals

affirmed, finding "no evidence of police complicity with the press or of some

coercion on the part of the police which persuaded Burgess to speak to the press."

*Burgess*, 827 So. 2d at 177.  The Alabama Supreme Court

> searched the record in vain to find any evidence of a route that would
> have been isolated from the news media all the way from the building
> containing the interrogation room to the entrance of the county jail.  For
> aught that appears from the record, any route available to the police
> would have been equally accessible to the news media.

*Ex parte Burgess*, 827 So. 2d at 199.

518.   Counsel, however, unreasonably failed to investigate and to introduce

evidence establishing that there were two other routes by which officers could have

taken Mr. Burgess to the county jail that would not have exposed Mr. Burgess to

members of the media and that would have afforded greater security for the

officers and Mr. Burgess.

519.   Counsel's failure to investigate prejudiced Mr. Burgess.  Had counsel

done so, they would have learned and could have presented evidence that the route

taken by officers was deliberately designed to expose Mr. Burgess to the media so

that he would make a statement and would be shown in custody to the community, *i.e.*, to the potential jury pool.

520.    There were at least two other ways to bring Mr. Burgess to the county jail that would have provided greater security for officers and for Mr. Burgess, and that would not have exposed Mr. Burgess to the media.  There is a secured basement garage under the Decatur Police Department with a ramp leading to Ferry Street in between Decatur City Hall and the Morgan County Courthouse.  First, officers easily could have taken Mr. Burgess to the garage by stairs or elevator, placed Mr. Burgess in a van or patrol vehicle in the secured basement garage, and driven him directly to the jail.  Second, there is a side door to the Morgan County Courthouse across the street from the ramp.  Officers in the Decatur Police Department have a key to the door.  Officers could have taken Mr. Burgess to the secured garage and walked him up the ramp to the street, across Ferry Street, and into the side door of the Morgan County Courthouse, a distance of approximately 129 feet.  Officers could then have taken Mr. Burgess to the third floor of the Morgan County Courthouse, which has a secure passageway leading to the county jail.

521.    Had counsel adequately investigated and litigated the motion to suppress, it is reasonably probable that the court would have granted the motion.  The jury never would have heard that Mr. Burgess claimed that he had committed

the robbery to buy clothes for a job interview, or that he stated, "[T]he way I was dressed, it didn't feel good to me."  State's Exhibit 101.  The prosecutor would have been unable to argue during the penalty phase that Mr. Burgess killed Mrs. Crow because he was "somebody who doesn't like his clothes."  (Doc. 19-12 at 186–87.)  The jury would have never heard the irrelevant information that Mr. Burgess had sold cocaine, or Mr. Burgess's assertion that he wanted the electric chair.  State's Exhibit 101.  Had the jurors not heard these inflammatory and prejudicial statements, there is a reasonable probability that the results of the guilt, penalty and sentencing phases would have been different.  The result on appeal would have been different as well, as the Alabama Supreme Court could not have made the statement that no evidence appears in the record with respect to alternative routes for the police to have taken Mr. Burgess.  *Ex parte Burgess*, 827 So. 2d at 199.

522.    The Alabama Court of Criminal Appeals denied this aspect of Mr. Burgess's ineffectiveness claim on the merits.  *See Burgess*, 2023 WL 4146021, at *34–35.  The state court's ruling was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d). In the alternative, this Court should decide the merits of petitioner's claim *de novo*

for the reasons articulated in paragraphs 136–38 above, which are incorporated by reference herein.  *See Loper Bright*, 144 S. Ct. at 2244.

**f.**     ***Trial Counsel Unreasonably Failed to Challenge Mr. Burgess's Indictment on the Grounds that It Neither Alleged All of the Elements of the Offense nor Provided Fair Notice of the Charge.***

523.    Trial counsel unreasonably failed to challenge Mr. Burgess's indictment even though the indictment did not allege all elements of the capital offense and did not provide Mr. Burgess with fair notice of the capital charge.

524.    Felony prosecutions for capital cases in Alabama must be initiated by a grand jury indictment.  *See* Alabama Constitution, art. 1, § 8.  The Sixth and Fourteenth Amendments to the United States Constitution require that the accused receive fair notice of the criminal charge and potential penalty.  Where the existence of an aggravating circumstance is necessary to make a defendant eligible for a death sentence, that circumstance is properly considered an element of the offense.  Because it is an element of the offense, the Sixth and Fourteenth Amendments require that it be contained within the charging document.

525.    Mr. Burgess's indictment charged him with causing the death of Ms. Crow by shooting her while in the course of committing or attempting to commit a theft, with intent to overcome her physical resistance, "in violation of Section 13A-5-40 of the Code of Alabama."  (Doc. 19-1 at 63.)  Section 13A-5-40 is the statute defining capital murder in Alabama, and it sets forth eighteen separate

capital offenses.  These include "[m]urder by the defendant during a robbery in the first degree or an attempt thereof" Ala. Code§ 13A-5-40(a)(2), as well as the different offense of "[m]urder done for a pecuniary or other valuable consideration or pursuant to a contract or for hire."  § 13A-5-40(a)(7).  The indictment does not refer to any relevant subsection of § 13A-5-40 or contain the word "robbery."  Nor does it state that Mr. Burgess could not be sentenced to death unless aggravating circumstances outweigh any factors in mitigation.  Further, Alabama statutes do not provide for additional written notice of the alleged aggravating circumstances, and no written notice was provided to Mr. Burgess.

526.   A defendant convicted of capital murder is not eligible for the death penalty unless at least one aggravating circumstance is found and unless aggravation outweighs mitigation.  The aggravating circumstance relied upon by the prosecutor at Mr. Burgess's sentencing was that set forth in Alabama Code § 13A-5-49(4), that "[t]he capital offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, . . . robbery."  The jury was instructed at the penalty phase that the alleged aggravating circumstance was that "[t]he capital offense was committed while the defendant was engaged in or was an accomplice in the commission of or an attempt to commit or flight after committing or attempting to commit a robbery."  (Doc. 19-12 at 193.)  But the

258

aggravating circumstances statute and the jury instruction differ from the language of the indictment.  Though the indictment generally describes the elements of robbery, it does not specifically refer to robbery.  Nor does it contain any language about flight, which is in both the aggravating circumstance statute and the jury instruction.

527.   Trial counsel's failure to object to the deficient indictment prejudiced Mr. Burgess.  Had counsel done so, it is reasonably probable that the court would have sustained the objection and dismissed the indictment.

528.   The Alabama Court of Criminal Appeals denied this aspect of Mr. Burgess's ineffectiveness claim on the merits.  *See Burgess*, 2023 WL 4146021, at *36–37.  The state court's ruling was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).  In the alternative, this Court should decide the merits of petitioner's claim *de novo* for the reasons articulated in paragraphs 136–38 above, which are incorporated by reference herein.  *See Loper Bright*, 144 S. Ct. at 2244.

> **g.**    ***Counsel Unreasonably Failed to Challenge Unconstitutional and Improper Race-Based Practices.***

529.   At the time of his arrest for this capital offense, Mr. Burgess was a Black teenager.  Louise Crow, the victim, was a White woman.  The Morgan

County District Attorney's decision to seek the death penalty in this case was unconstitutionally influenced by considerations of race. Had Mr. Burgess been White, or had the victim in this case been Black, it is far less likely Mr. Burgess would now be under a sentence of death. The death penalty is sought, prosecuted, and imposed in Morgan County and the State of Alabama in an arbitrary and capricious fashion and pursuant to a racially discriminatory pattern, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

530. Trial counsel's failure to object and to challenge the use of race-based considerations prejudiced Mr. Burgess. Trial counsel unreasonably failed to move to prohibit the death sentence from being imposed in this case based on several grounds.

531. First, using reasonably available data, trial counsel should have challenged Mr. Burgess's capital prosecution on the ground that the Morgan County District Attorney chose to pursue the death penalty in Mr. Burgess's case based on racial motives.

532. Trial counsel failed to present reasonably available evidence that, in Morgan County, there is a compelling disparity in capital charging decisions, one that is statistically so significant that it can only be explained by the race of the defendant and victim. Robert Burrell was the District Attorney of Morgan Country

from 1987-1993, the year Mr. Burgess was arrested and charged and was responsible for capital charging decisions. Court records from 1987 through 1993 show that 100 percent of murder cases involving a Black defendant and a White victim were charged capitally. By comparison, only 16.66 percent of such cases involving a White defendant and a White victim were charged capitally. Therefore, in those cases in which the victim was White, Black defendant was more than six times as likely to be charged capitally than a White defendant. Only fifteen percent of cases involving Black victims and Black defendants were charged capitally. Therefore, Black defendants charged with the murder of White victims were approximately 6.5 times more likely to face a capital prosecution than Black defendants charged with the murder of Black victims. Black defendants charged with the murder of White victims were over 5.85 times more likely to be capitally charged than any other racial combination. All the Morgan County court records establishing these disparities were reasonably available to counsel.

533. Trial counsel unreasonably failed to consult with a statistical expert, who would have analyzed the data contained in the court records and explained their statistical significance. Specifically, such an expert would have testified that the racial disparities in the Morgan County charging decisions are too great to be the product of chance, and that they are explained by the racial factors in those cases.

261

534.   Reasonably competent counsel would have argued that there was constitutionally impermissible racial bias in the State's decision to seek the death penalty in Mr. Burgess's case.  The compelling disparity in charging decisions in Morgan County, where the defendant is Black and the victim is White compared to any other combination, raises a *prima facie* case of racial bias.  Therefore, under the general jurisprudence of the Equal Protection Clause of the Fourteenth Amendment and the Eighth Amendment's prohibition against cruel and unusual punishment, reasonably competent counsel would have argued that the burden should shift to the State to explain why it chose to pursue the death penalty in this case based on motives other than race.  Had trial counsel adequately challenged the prosecutor's use of race in charging Mr. Burgess by presenting the facts detailed above, there is a reasonable probability that Mr. Burgess would not have been charged with capital murder, and, therefore, would not have been sentenced to death.

535.   Second, Mr. Burgess was prejudiced by trial counsel's unreasonable failure to move to preclude the death penalty in this case on the ground that the State's decision to pursue the death penalty through trial and sentencing, rather than agree to a negotiated disposition, was based on racial motives.  Counsel should have shown, through reasonably available county court records for the period 1987–1993, that racial disparities in the negotiated disposition of capitally

charged cases was not the product of chance and are explained by the racial factors in those cases. Therefore, under the general jurisprudence of the Equal Protection Clause of the Fourteenth Amendment, the Eighth Amendment's prohibition against cruel and unusual punishment, reasonably competent counsel would have argued that the burden should shift to the State to explain why it chose to pursue the death penalty to verdict and sentencing in this case based on motives other than race. Had trial counsel adequately challenged the prosecutor's use of race in the decision to pursue the death penalty for Mr. Burgess through trial and sentencing by presenting the facts detailed above, there is a reasonable probability that Mr. Burgess would, therefore, never have been sentenced to death.

536. Mr. Burgess was also prejudiced by trial counsel's failure to move to preclude the death penalty in this case on the ground that the jury's verdict and the Court's sentence of death were based on racial motives. Counsel should have shown, through reasonably available court records, that racial disparities in the penalty phase verdicts and sentencing in capitally charged cases in Morgan County are not product of chance and are explained by the racial factors in those cases. Had trial counsel adequately challenged the impermissible influence of race in the imposition of the death penalty in Morgan County, there is a reasonable probability that Mr. Burgess would, therefore, never have been sentenced to death.

537.  In addition to a statistical showing, trial counsel failed to present other reasonably available evidence, including the exclusion of African Americans from service as grand jury forepersons, the underrepresentation of African Americans as jurors, judges, lawyers, law enforcement officers and in other professions, and the extent to which the culture of racial discrimination was a significant factor in the administration of the criminal justice system and in the county's political, economic, and social life up to and including the period in which Mr. Burgess was charged with capital murder and sentenced to death.  This evidence would have supported the statistical showing that constitutionally impermissible considerations of race influenced the charging decision, the State's handling of the case through trial and sentencing, the jury's verdict, and the court's imposition of the death penalty.  Had trial counsel adequately challenged racial bias by presenting this evidence, there is a reasonable probability that Mr. Burgess would, therefore, never have been charged with capital murder or would never have been sentenced to death.

538.  Trial counsel also failed to present reasonably available evidence that, in addition to the county-based statistics, up to and including the date of Mr. Burgess's indictment, there are disparities in capital charging, disposition, conviction, and sentencing outcomes in Alabama that showed a compelling disparity where the defendant is Black and the victim White compared to any other

combination. *See, e.g.*, U.S. General Accounting Office, GAO/GGD-90-57 Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities (1990). Reasonably competent counsel would have argued that this disparity raises a prima facie case of racial bias. Therefore, under the general jurisprudence of the Equal Protection Clause of the Fourteenth Amendment, the Eighth Amendment's prohibition against cruel and unusual punishment, reasonably competent counsel would have argued that the burden should shift to the State to explain why it chose to pursue the death penalty in this case and to do so through sentencing based on motives other than race. Had trial counsel adequately challenged the prosecutor's use of race in charging Mr. Burgess and in pursuing his prosecution through sentencing by presenting these additional facts, there is a reasonable probability that Mr. Burgess would have never been charged with capital murder, and, therefore, would never have been sentenced to death. Likewise, had trial counsel challenged the racial disparities in capital sentencing outcomes by presenting this statistical evidence, there is a reasonable probability that Mr. Burgess would, therefore, never have been sentenced to death.

539.    The Alabama Court of Criminal Appeals ruled on the merits of this aspect of Mr. Burgess's ineffectiveness claim. *See Burgess*, 2023 WL 4146021, at *36. The state court's ruling was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of

the facts in light of the evidence presented.  28 U.S.C. § 2254(d).  In the

alternative, this Court should decide the merits of petitioner's claim *de novo* for the

reasons articulated in paragraphs 136–38 above, which are incorporated by

reference herein.  *See Loper Bright*, 144 S. Ct. at 2244.

### D.    TRIAL COUNSEL WERE INEFFECTIVE AT THE GUILT PHASE OF THE TRIAL.

#### 1.    Trial Counsel Unreasonably Failed to Move to Exclude State's Exhibit 101 in its Entirety, to Ensure that Inadmissible Portions Would Not Be Heard by the Jury, to Make an Adequate Record, and to Move for a Mistrial.

540.    After arresting and interrogating Mr. Burgess inside City Hall,

Decatur police officers notified members of the news media that Mr. Burgess

would be brought to the Morgan County Jail.  Officers waited until approximately

5:30 p.m. for members of the media to gather before taking Mr. Burgess to the

county jail.  They then paraded Mr. Burgess before the reporters and camera crews

with the intent that he make incriminating statements.  Mr. Burgess's statements

were captured on videotape and aired on local television in excerpts and in their

entirety.

541.    The trial court denied Mr. Burgess's motion to exclude his videotaped

statement to the media as involuntary and a product of his unlawful arrest.  (Doc.

19-10 at 69–70.)  Defense counsel also moved to exclude portions of the statement

relating to other crimes, particularly an alleged attempt to sell cocaine and an

alleged robbery of the Decatur Holiday Inn, and a reference to a conversation Mr. Burgess had with a prisoner during a visit to the correctional center in Athens. (Doc. 19-8 at 192, Doc. 19-10 at 82–83, 190.)  The trial court ordered the tape edited to remove references to the Holiday Inn but left in the reference to selling cocaine and the visit to the correctional center in Athens.  (Doc. 19-10 at 86, 191.)

542.   The trial record contains two videotapes.  State's Exhibit 100 is a complete recording of Mr. Burgess's statements, obtained by Channel 19, along with the news anchor's commentary on the story.  It was admitted into evidence but was not played for the jury.  (Doc. 19-11 at 137.)  State's Exhibit 101 also contained the news anchor's commentary, a full version of Mr. Burgess's statement, followed by a second recording of the anchor's commentary and an edited version of Mr. Burgess's statement.  Portions of State's Exhibit 101 were played for the jury, but none of what was played was transcribed.  (Doc. 19-11 at 138, 143–44.)

543.   When State's Exhibit 101 was played for the jury, the jurors first heard a portion of the news anchor's comments, although they were instructed subsequently to disregard them.  (Doc. 19-11 at 143.)  The news anchor stated:

> Hello, I'm Karen Tarica.  Earlier this week, all of us here in the Tennessee Valley were shocked by the murder of a Morgan County woman gunned down at her Decatur store.  Police found the body of 48-year-old Mary Louise Crow of Trinity at her bait and tackle shop in Decatur.  Someone shot Crow during the robbery.  A few hours later

267

police spotted the victim's car and arrested the man driving it. 18-year-old Willie Burgess, Jr., of Morgan County faces capital murder charges.

At the time, most of us probably thought that was the end of this tragic story, but as we would soon find out, it was only the beginning. A few hours later as Decatur police transferred their murder suspect from one location to another, he suddenly began talking. 18-year-old Willie Burgess, Jr. confessed the crime to reporters, a startling confession, one that leaves some people feeling sympathy for the murder suspect, and questioning how something like this could happen in our area. In any case, the confession caught on camera surprised police as much as it did the rest of us. Newscenter 19 has aired much of that videotape but now, due to the bizarre circumstances surrounding the crime, the investigation, and the public interest, we've decided to show you the entire tape. We should warn you, the suspect uses several racially charged words you may find offensive. So now unedited and in its entirety is what a Newscenter 19 crew recorded on the night of January 26.

544.   The jury then heard Mr. Burgess's redacted videotaped statement.

The following is the statement, with the redacted portions struck out:

Q: Anything you want to say, Mr. Burgess?

Willie Burgess, Jr.: I did the crime and it's time for me to pay for the crime. There was a man in the correctional center over there in Athens, he told me, he said, "Never do the crime, unless you can pay the time." I could try to run, I could try to run through y'all and drag him and him with me (motioning with head) but uh, it'd be stupid because I'd a get caught in the parking lot with handcuffs behind me. And I'm sorry that I did what I did but I didn't mean to shoot the lady. She just went for the gun and the gun went off. And I panicked and I took her car, and I went to Huntsville to pick up my girlfriend thinking that I wasn't gonna get caught. And Decatur's finest . . . You see where I'm at.

Q: Why'd you do it?

Willie Burgess, Jr.: I needed clothes so I could get me a job. I had passed a test at the Wallace Center. And the way I was dressed, it didn't

feel good to me.  I needed more clothes and I needed money and I had no money, no income.  And selling 'caine, I almost got killed doing that.  So I chose the life of robbery thinking that [edit] (that'll ~~work?).~~ [edit] ~~And I got away with it one time.  I ain't gonna say where. But I got away with it one time.~~

Q:  ~~Was it worth it?~~

~~Willie Burgess, Jr.:  It wasn't worth it.~~

Q:  ~~How much did you get away with when you did it the first time?~~

~~Willie Burgess, Jr.:  A hundred something dollars.~~

Q:  ~~How much did you get today?~~

~~Willie Burgess, Jr.:  A hundred something dollars.~~  I bought a couple clothes and I looked at how many clothes I had and I said, "Damn, what is this?  This ain't . . . I'd be better off robbing a bank."  But umm . . . .

Q:  You going to sleep tonight, you think?

Q:  (inaudible) rob a bank?

Q:  (inaudible) next job?
Willie Burgess, Jr.:  My next job?

Q:  Mm-hm.

Willie Burgess, Jr.:  There won't be a next job.  Capital murder, I can't get out.

Q:  What do you have to say to the victim's family?

Willie Burgess, Jr.:  I'm sorry and I didn't mean to do it like this.  I was just going to mace her with my mace that I lost somewhere down over in there.  And I was going to disappear.  I didn't have plans really to take her car.

Q:  You took her life for $100?

Willie Burgess, Jr.:  I didn't try to take her life for a hundred dollars. It's just when she hit the gun, the gun went off because it was already cocked back.  And a .25 is known for going off without your hand being on it.

Q:  You're, you're 18, what do you have to say to others younger than you or your age about this?"

Q:  Curb, where we going?

Willie Burgess, Jr.:  Anybody 18, that's doing what you're doing, quit it 'cuz uh, you may do it this day, that day, that day, but there's gonna be a day when you can't do it no more.  And my day done came.  And my mama told me once, she said, "Junior, your life is going to end, you visitin' a gravesite."  And I refuse, I refuse to have life in prison, I want the chair, because I feel if I took a lady's life, then my life should be taken.  And that's what I want.  I want life.  Well, I want the electric chair, plain and simple.

Q:  You what?

Willie Burgess, Jr.:  I want the electric chair, plain and simple.

Q:  Why?
Willie Burgess, Jr.:  Because I took somebody else's life and it wasn't right.  And I don't feel that I can sit up here in prison knowing that I done take somebody's life and get away with it.

Q:  How you gonna sleep tonight?

Willie Burgess, Jr.:  I don't plan to sleep.  I plan to stay up and watch my back.  And . . .

Sergeant Walker:  Turn this way, Willie.

Willie Burgess, Jr.:  And just, just be myself.  I know right now I feel like suicide.  I'm not going to kill myself.  I'm gonna wait.  I'm gonna let, I'm gonna let life ~~take my life.  I got a felony case already, second-degree theft.  They say when you do something small, it lead to something too big.  Here it's murder~~ I done.  This long walk.  This is

270

the first time I feel that I'm wanted.  Everybody's here trying to find out who I am, what I am, and what I done.  Before this happened, nobody wanted to know me.  Nobody.  They were just like, "Damn him, he's just another black nigger on the streets."  Well, this time I'm just another black nigger go to jail.  Because I committed murder, stole a car, and robbed a lady all at one time.

All the lady was doing was trying to push me out and, what it seems to me, because when I look back, if I think about it, it was more like she was trying to push the gun and me out the door and shut the door.  'Cuz the door shut after the gun went off.  And I was on the other side of the door.

Q:  Well, but you, you took the lady into the restroom?

Willie Burgess, Jr.:  Yeah, I took her into the restroom.

Q:  Why'd you that?

Willie Burgess, Jr.:  I was going to lock her up in there and try to go for, to run.

Q:   And, and the lady hit the gun?

Willie Burgess, Jr.:  And she hit the gun.

~~Q:  And, it went off?~~

~~Willie Burgess, Jr.:  And it went off.~~

~~Q:  Mr. Burgess, did you rob the Holiday Inn in Decatur?~~

~~Willie Burgess, Jr.:  Yes, I did.  I robbed the Holiday Inn with a empty gun.~~

~~Q:  When was this?~~

~~Willie Burgess, Jr.:  About two, three weeks ago.  I robbed them, seeing that I was trying to get some money.  I got about $400 from them.~~  Then I went and bought me some new shoes, bought me some clothes.  I was

feeling kinda good.  I had got a job interview.  I don't want to say where I got the job interview at 'cuz I don't want them to be hiring criminals without checking on them.

Sergeant Walker:  We got to go in the other door.

Willie Burgess, Jr.:  I robbed the Holiday Inn cuz I needed clothes.

Q:  Why did you (inaudible) take the lady at the Holiday Inn in the back?

Willie Burgess, Jr.:  I took her back there because (inaudible).  I had to run all the way from the Holiday Inn to East Acres.  And when I ran, by the time she got to the phone and Decatur Police had started riding I was on 16th Avenue SE before (inaudible) and she was (inaudible).  And that's it.

Sergeant Walker:  Close the door, Nate.

545.   Exhibit 101 ends with the following commentary by the news anchor,

which the jury heard:

> Well at this hour, 18-year-old Willie Burgess, Jr. remains behind bars charged with capital murder.  Friends and family of murder victim, Mary Louise Crow, grieve.  Police continue their investigation and the rest of us here in the Tennessee Valley have more questions than answers about an 18-year-old whose confession you just saw.  For Newscenter 19, I'm Karen Tarica.  Thank you and goodnight.

546.   The tape was the last evidence heard in the guilt phase of the trial.

Immediately after the tape was played, the prosecution rested.  (Doc. 19-11 at 144.)

The defense then immediately rested without calling any witnesses or introducing

any evidence.  (Doc. 19-11 at 144.)

547.   State's Exhibit 101 shows Mr. Burgess in a white jail jumpsuit, with "MORGAN COUNTY JAIL" printed on the back and down his left pant leg, as he is walked in custody.  Two detectives hold his arms and other armed officers surround him.  Excluding portions in which there is commentary from the news anchor, the redacted version of the tape, State's Exhibit 101, lasts over four minutes.  The jury saw Mr. Burgess in custody, held by officers, for that period of time.

548.   The redacted videotape contained inadmissible and inflammatory statements.  Mr. Burgess spoke about selling cocaine; made obvious references to the proceeds of a prior robbery, even though evidence of that robbery was ordered to be redacted from the tape; said that he wanted the death penalty; referred to a prior visit to a correctional facility in Athens; and referred to himself twice as a "black n******."  (Doc. 19-11 at 144; State's Exhibit 101.)

549.   None of these statements were admissible, as each was irrelevant to the proof of the charged offense.  To the extent that any of the statements had some relevance, their prejudicial effect far outweighed their probative value, and deprived Mr. Burgess of due process under the Sixth and Fourteenth Amendments to the U.S. Constitution, the presumption of innocence, and a reliable determination of penalty under the Eighth and Fourteenth Amendments.  *See*

273

*Estelle v. Williams*, 425 U.S. 501, 517 (1976); *see also Holbrook v. Flynn*, 475 U.S. 560, 568–69 (1986).

550.    The redacted videotape also erroneously excluded an admissible portion of Mr. Burgess's statement that explained his conduct.  Mr. Burgess's defense was that the shooting was accidental.  The editor removed Mr. Burgess's statement that after Mrs. Crow hit the gun, "it went off."  (Doc. 19-11 at 144; State's Exhibit 101.)  Assuming *arguendo* that the State was permitted to introduce part of Mr. Burgess's admissions, he was entitled under the protections of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution to have the jury hear the entire statement.  *See King v. State*, 355 So. 2d 1148, 1151 (Ala. Crim. App. 1978).

551.    The redacted videotape misled the jury about Mr. Burgess and the proceeds of the robbery of the Decatur Bait and Tackle Shop.  During some of the hearings on the admissibility of State's Exhibit 100, all counsel and the court were confused about Mr. Burgess's videotaped statements concerning a "robbery." They were confused about whether he was referring only to the Holiday Inn robbery or to two distinct robberies.  (Doc. 19-8 at 194, Doc. 19-10 at 186–87.) The redacted tape improperly contained references to purchasing clothes following a robbery.  A review of the complete tape, Exhibit 100, makes it clear that Mr. Burgess is referring to purchasing clothing after the Holiday Inn robbery.

274

However, because all references to the Holiday Inn incident were not properly redacted, the jury was left with the grossly misleading and prejudicial impression that Mr. Burgess bought clothes and shoes after the bait shop robbery and that he felt good about doing so.  The jury heard Mr. Burgess describe the robbery and shooting, immediately followed by this comment: "I went and bought me some new shoes, bought me some clothes.  I was feeling kinda good."  (Doc. 19-11 at 144; State's Exhibit 101.)  Because the trial judge had ordered that any reference to the Holiday Inn robbery be redacted from the tape before it was played at trial, when creating State's Exhibit 101, all references to clothing should have been redacted.  Instead, the edited videotape made it appear that Mr. Burgess used the proceeds of the robbery of the Decatur Bait and Tackle Shop to purchase shoes and clothing, and that he felt good and lacked remorse.

552.   Trial counsel's performance was deficient with respect to State's Exhibit 101 for the following reasons:

(1)    Counsel moved to exclude the entire videotaped statement only on the grounds that it was involuntary and a product of his unlawful arrest.  (Doc. 19-10 at 25–29.)  Counsel failed to raise the other meritorious legal and constitutional objections to the introduction of the videotape in its entirety, which are detailed in this claim.

(2)    Counsel failed to move to exclude inadmissible and prejudicial portions of State's Exhibit 101.  In fact, virtually all of State's Exhibit 101 was inadmissible, including but not limited to Mr. Burgess's request for the electric chair, his references to himself as a "black n******," his references to selling cocaine,

the reference to a conversation with an inmate in during a visit to the detention facility at Athens, and the comments about proceeds from the Holiday Inn robbery.

(3)    After the court ruled that some portions of the statement should be redacted, counsel did not monitor the editing to ensure that the editing was faithful to the judge's order and that the redacted tape would not be misleading.    The redacted tape still included references to the proceeds of a prior robbery.    Perhaps most glaringly, the edited tape misled the jury to believe that Mr. Burgess used proceeds from the robbery of the Decatur Bait and Tackle Shop to buy shoes and clothing, and that he felt good about the robbery.    Based on the videotape, the prosecutor argued that Mr. Burgess was cold and unremorseful: "You saw him on video tape . . . He looked at his clothes and he just didn't like the way they looked.    And that meant more to him than Louise Crow's life meant to him."    (Doc. 19-12 at 183.)

(4)    Counsel unreasonably failed to move to exclude the video portion of the tape because it showed Mr. Burgess in readily identifiable jail garb, marching to jail, surrounded by officers. As such, it deprived Mr. Burgess of the presumption of innocence.

(5)    When the tape was played for the jury, the jury heard the news anchor's commentary.    Counsel unreasonably failed not to object or move for a mistrial when the jury heard the tape or inadmissible portions of the tape.

553.    Counsel's failure to make these necessary objections and motions, among others, was unreasonable.    Trial counsel's failures prejudiced Mr. Burgess. As described above, the tape was inadmissible, misleading, and inflammatory.    The tape prejudiced Mr. Burgess at both the guilt and penalty phases of the trial, including at his sentencing hearing before the judge.    Had counsel made the necessary and proper objections and motions, there is a reasonable probability that

Mr. Burgess would not have been convicted of capital murder, or, if convicted, would not have been sentenced to death.

554.    The Alabama Court of Criminal Appeals denied this aspect of Mr. Burgess's ineffectiveness claim on the merits.  *See Burgess*, 2023 WL 4146021, at *37–39.  The state court's ruling was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d); *Strickland*, 466 U.S. at 668. In the alternative, this Court should decide the merits of petitioner's claim *de novo* for the reasons articulated in paragraphs 136–38 above, which are incorporated by reference herein.  *See Loper Bright*, 144 S. Ct. at 2244.

**2.    Trial Counsel Unreasonably Failed to Object to Prosecutorial Misconduct in the Guilt Phase Argument.**

555.    Trial counsel unreasonably failed to object when the prosecutor knowingly, and in bad faith, argued facts not in evidence, gave his personal opinions, and appealed to emotion.  During the guilt phase arguments, the prosecutor engaged in numerous acts of misconduct, as follows:

556.    Based in substantial measure on his personal opinion and facts not in evidence, the prosecutor argued at the close of the guilt phase that Mr. Burgess had intentionally taken Mrs. Crow's life during the commission of the robbery.  The

prosecutor argued that Mr. Burgess shot Mrs. Crow "at point blank range," (Doc. 19-12 at 23), while she was seated on the toilet—a theory that misstated the evidence, misled the jury, and was false. Although there was no testimony from the pathologist or any expert regarding Mrs. Crow's position at the time of the shooting, the prosecutor referred to the pathologist and said, "I think the reasonable thing to assume, *as he testified to*, is that she was sitting on the toilet." (Doc. 19-12 at 26) (emphasis added). This assertion was false, as the pathologist did not testify that Mrs. Crow was sitting on the toilet when the shot was fired. The prosecutor's argument was critical to persuading the jury that the killing was intentional.

557. The prosecutor speculated that had the shooting taken place as Mr. Burgess described, the path of the bullet would have been different. He opined that if a gun is slapped and goes off, "it's going to be moving . . . [and] you're going to jerk your head whichever way you slap at, you're going to jerk your head out of the way. There's not a way in the world that that woman knocked that gun off and that bullet hit where it did and tracked the way it did." (Doc. 19-12 at 28–29.) Neither Dr. Embry nor any of the other witnesses who testified at trial provided any testimony to support this assertion. In fact, as alleged herein, the trajectory of the bullet reasonably could have been explained by another scenario, including that Mrs. Crow had struck the firearm or Mr. Burgess's hand or arm.

558.   The prosecutor repeatedly argued facts not in evidence.  The prosecutor re-read Mr. Burgess's written statement, which said that on the morning of the shooting, Mr. Burgess had picked up the gun, which was already loaded with one bullet in the chamber and seven in the clip.  (Doc. 19-12 at 20–21.)  To imply that the shooting was intentional and introduce extra-record facts about State's Exhibit 72, the prosecutor conducted a demonstration with the .25 semiautomatic pistol.  The prosecutor showed the jury how bullets are put into the clip (magazine), saying, "You mash this thing down and you push that one bullet in there, and he did that."  (Doc. 19-12 at 21.)  The prosecutor continued, describing how each bullet was inserted into the clip, "one by one," putting the magazine into the butt of the pistol, "pull[ing] the slide back and that's what puts one in the chamber," (Doc. 19-12 at 21), then letting the hammer down.  (Doc. 19-12 at 22.)  None of these "facts" were in evidence.  Nor was there any evidence to support the prosecutor's assertion that Mr. Burgess intentionally loaded the weapon immediately before going to the Decatur Bait and Tackle Shop, and that from this demonstration the jury could infer an intent to kill.

559.   The prosecutor improperly appealed to emotion and impugned Mr. Burgess's character.  He said several times that Mr. Burgess had "a chip" on his shoulder, and he even asked the jury—during the guilt phase argument—"to take his life." (Doc. 19-11 at 201, Doc. 19-12 at 32–34.)

560.   The prosecutor misrepresented the expert testimony.  He argued that Mrs. Crow had suffered following the shot, asking "[w]hat must go through [Mrs. Crow's] mind there before her life runs out."  (Doc. 19-12 at 188.)  In fact, Dr. Embry had not testified that Mrs. Crow was conscious after the shot, only that she had survived for several minutes.  This mischaracterization was designed to inflame the emotions of the jury by portraying Mrs. Crow as having suffered anguish and pain following the shot.

561.   The prosecutor repeatedly stressed his own personal beliefs: "I believe the evidence in this case proved the defendant guilty of capital murder," (Doc. 19-11 at 200); "I believe the evidence is reasonable to believe, sitting on the toilet," (Doc. 19-12 at 23); "I don't pretend to be an expert on firearms, but to me . . . that's pretty point blank," (Doc. 19-12 at 23); "[s]ure, I believe that," (Doc. 19-12 at 24); "we don't believe that crap," (Doc. 19-12 at 25); "I think the most likely thing, my belief," (Doc. 19-12 at 28); "I don't know that I've ever seen [a bathroom] that you can lock somebody in," (Doc. 19-12 at 30); "I don't believe that [Mrs. Crow] said that to him," (Doc. 19-12 at 32); "I don't believe that," (Doc. 19-12 at 32); and "I think she looked at him or she said something to him that he took that way, and I think it made him mad." (Doc. 19-12 at 33.)

562.   Trial counsel failed to object to any of the above instances of prosecutorial misconduct and move for a mistrial.  Mr. Burgess was prejudiced.

Had trial counsel made adequate objections, it is reasonably probable that they would have been sustained, and that Mr. Burgess would not have been convicted of capital murder, or, if convicted, would not have been sentenced to death.

563.    Trial counsel also unreasonably failed to object to the prosecutor's misleading statements to the jury about the law:

564.    The prosecutor misstated the law on critical points during the arguments.  For example, during the guilt phase arguments, the prosecutor erroneously described felony murder:

> Felony murder says if you cause someone's death *with no fault on your part* while you're involved in a robbery or certain other offenses . . . then you're guilty of murder.  In other words, if Willie Burgess had had a child dart out in front of him as he was leaving the parking lot in the car, that he couldn't see, couldn't stop, couldn't help it, and killed that child, he would be guilty of felony murder, even though if he wasn't involved in a robbery, *it would have been a complete accident*.  He wouldn't have been charged with anything.  That's not what we're talking about here.  We're not talking about felony murder. . . . This is capital murder. . . .

(Doc. 19-12 at 34–35) (emphasis added).  By so arguing, the prosecutor intentionally misstated the law, telling the jury that it had two choices: (a) faultless, non-negligent felony murder; or (b) capital murder.  According to the prosecutor's description, an accidental or negligent shooting during a robbery would be classified as capital murder.  In fact, under Alabama law, there is no offense approximating faultless, non-negligent felony murder.  Here, based on the State's charges, the jury had three choices: to find Mr. Burgess guilty of capital murder,

281

guilty of a lesser offense of murder, or not guilty of murder.  Ala. Code §§ 13A-5-40, 13A-6-2.

565.   Trial counsel's failure to object to the above prosecutorial misconduct prejudiced Mr. Burgess.  Had trial counsel made adequate objections to the prosecution's misstatement of the law, there is a reasonable probability that Mr. Burgess would not have been convicted of capital murder.

566.   The Alabama Court of Criminal Appeals denied this aspect of Mr. Burgess's ineffectiveness claim on the merits.  *See Burgess*, 2023 WL 4146021, at *39.  The state court's ruling was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d); *Strickland*, 466 U.S. at 668.  In the alternative, this Court should decide the merits of petitioner's claim *de novo* for the reasons articulated in paragraphs 136–38 above, which are incorporated by reference herein.  *See Loper Bright*, 144 S. Ct. at 2244.

### 3.   Trial Counsel Failed to Challenge Impermissible Victim Impact Evidence.

567.   Trial counsel failed to challenge the prosecutor's impermissible introduction of victim impact evidence at the guilt phase of the trial.

568.   The prosecutor presented victim impact evidence and "expert" opinions that lacked proper foundation at the guilt phase of the trial through the

testimony of the State's witnesses such as Sergeant John Boyd and Dr. Joseph Embry.

569.    Sergeant Boyd's narrative testimony concerning State's Exhibits 1 through 39 made multiple references to personal items and effects in the area of the sales counter where Mrs. Crow worked, such as "a picture of Garth Brooks on the refrigerator," (Doc. 19-8 at 83), pictures of children, pictures of people with fish, eyeglasses, sunglasses, her sweater on a chair, her purse, and a handmade fly swatter with cross-stitching "Grandma's paddle."  (Doc. 19-8 at 83, 89–92.)

570.    Sergeant Boyd's testimony regarding the photographs of Mrs. Crow in the commode area again meticulously elaborated personal and humanizing details, such as the color of her pants and shoes, the ring on one of her fingers, the watch on her blood-spattered arm, and the cleaning supplies such as Lysol and Comet under her leg.  (Doc. 19-8 at 105–107.)

571.    State's Exhibit 41 was introduced to give the jury a "close-up" of Mrs. Crow's lower extremities.  The photograph did not advance the State's capital murder theory, but gave Sergeant Boyd the opportunity to testify, "You can see, in fact, she does have on beige shoes, blue pants.  You can see a bottle of some sort of cleaning solution that's under her leg."  (Doc. 19-8 at 105, Doc. 19-13 at 119–20.)

572.    The prosecutor utilized the photographs taken of the commode area to elicit incompetent and erroneous opinions concerning the quantity of blood on the

victim's clothing, the walls and the floor.  (Doc. 19-8 at 105–07.)  He employed the same impermissible tactic in obtaining, without proper foundation, Sergeant Boyd's opinions concerning the blood, *e.g.*, there was "a lot of blood" coming from the entry wound, all of which the prosecutor elicited to mislead the jury to conclude that Mrs. Crow was seated when she was shot and suffered after being shot and before she died.  (Doc. 19-8 at 104–07.)

573.   That the prosecutor wanted the jury to be affected by the horror, rather than educated by the evidentiary value of the photographs, was unmistakable from his examination of the State's forensic experts and law enforcement officers, such as Sergeant Boyd.

574.   The prosecutor employed the photographs of the victim to question Dr. Embry regarding Mrs. Crow's survival time.  (Doc. 19-11 at 41–42.)  His purpose was to mislead the jury into believing that Mrs. Crow suffered an agonizing death, furthering inflaming the emotions of the jurors, and increasing the probability that they would that they would wrongfully convict Mr. Burgess of capital murder and sentence him to death.

575.   The prosecutor also improperly utilized the photographs to question Brent Wheeler about Mrs. Crow's survival after being shot.  (Doc. 19-11 at 115–16.)  He achieved his objective by eliciting descriptions of the quantity of blood on Mrs. Crow's face, clothing, and the walls, (Doc. 19-11 at 115), to support the

284

opinion that Mrs. Crow "might have lived for a time" before she died. (Doc. 19-11 at 116.) Although counsel objected to the officer's opinion, the objection was overruled. *Id*. The objection was too late, and the prosecutor utilized the unfounded opinion, along with other evidence to which trial counsel failed to object, to increase the probability that the jury would erroneously convict Mr. Burgess of capital murder and sentence him to death.

576.    During the prosecutor's first closing argument, he relied on the photographs of Mrs. Crow in the commode area, and the misleading, improper and factually incorrect testimony presented concerning the photos. (Doc. 19-11 at 197–201.) For example, in thanking the jury for its service, the prosecutor said, "I know some of the evidence has been, and probably a lot of the evidence has been unpleasant for you to hear. We don't like to look at these things. Some of it is graphic and quite disturbing to you, I'm sure. It is to me and I've seen a lot of it. Again, we appreciate it." (Doc. 19-11 at 198.)

577.    When the prosecutor urged the jury to remember and consider the photographs just prior to their sentencing deliberations, he did so by asserting, falsely, that the photographs supported the conclusion that Mrs. Crow was seated when she was shot and evidenced the extent to which Mrs. Crow was conscious and had suffered after the bullet entered her head: "And then the shot comes. And she sits in there long enough – and you saw the pictures. What must go through

her mind there before her life finally runs out.  He didn't shoot her but one time?  If somebody is going to shoot me, I think I'd just assume [sic] they be sure about it."  (Doc. 19-12 at 188–89.)

578.   Together with the improper and misleading victim impact testimony and argument, the effect of the narrative description of the photographs on the jury at both guilt and sentencing phases was substantial and impermissible.  It served no purpose but to evoke outrage at Mr. Burgess that had no basis in fact.

579.   Trial counsel failed to object to this evidence and to move for a mistrial.  Trial counsel's failure to challenge the prosecutor's use of this impermissible victim impact evidence and argument prejudiced Mr. Burgess.  Had trial counsel objected and made the appropriate motions, it is reasonably probable that the court would have granted them.  The jury would have never heard these misleading and inflammatory arguments, and there is a reasonable probability that Mr. Burgess would not have been convicted of capital murder, or, if convicted, would not have been sentenced to death.

580.   The Alabama Court of Criminal Appeals denied this aspect of Mr. Burgess's ineffectiveness claim on the merits.  *See Burgess*, 2023 WL 4146021, at *39.  The state court's ruling was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d); *Payne v.*

286

*Tennessee*, 501 U.S. 808 (1991); *Strickland*, 466 U.S. at 668.  In the alternative, this Court should decide the merits of petitioner's claim *de novo* for the reasons articulated in paragraphs 136–38 above, which are incorporated by reference herein.  *See Loper Bright*, 144 S. Ct. at 2244.

> **4.   Trial Counsel Unreasonably Failed to Submit Guilt Phase Instructions, Which Were Necessary to Ensure that Mr. Burgess Received a Fair Trial.**

581.   Counsel unreasonably failed to submit jury instructions at the guilt phase, which were necessary to ensure that Mr. Burgess received a fair trial.  The only disputed legal issue at the guilt phase of the trial was whether Mr. Burgess intended to kill Mrs. Crow.  The instructions on this element of capital murder were the most critical in the case.

582.   The trial judge properly instructed the jury that to convict Mr. Burgess of capital murder, "you must believe beyond a reasonable doubt that he intended to not only rob Mrs. Crow but also kill her."  (Doc. 19-12 at 50.)  However, the next instruction was erroneous, hopelessly confusing and misleading.  The jury was instructed:

> The intent to commit murder may be presumed from the defendant's act of using a deadly weapon.  However, that presumption alone will not support the conviction of capital murder of Willie Burgess, Jr. While intent to kill may be inferred by the use of a deadly weapon by Willie Burgess, Jr., to convict him of murder that intent to kill necessary

to convict him of capital murder cannot be inferred merely from his use
of the deadly weapon.

(Doc. 19-12 at 52.)

583.   Trial counsel not only failed to object to this instruction, but actually
offered both the "presumption" and the "inference" instructions.  (Doc. 19-1 at 6–
7.)  Counsel submitted two proposed instructions, Defendant's Requested Charges
6 and 7.  Charge 6 stated that intent to kill could be "inferred" by the use of a
deadly weapon.  (Doc 19-1 at 6.)  Charge 7 stated that intent to kill could be
"presumed" by the use of a deadly weapon.  (Doc. 19-1 at 7.)  As the Alabama
Supreme Court later held, the "presumption" instruction would unconstitutionally
shift the burden of proof to Mr. Burgess.  *Ex parte Burgess*, 827 So. 2d at 199.
The Alabama Supreme Court noted only that the instruction was given without
objection; although, in fact, it was offered by the defense.  *Id.*

584.   Counsel did seek a theory of defense instruction, but their proposed
instructions were confusing and inaccurate.  Counsel failed to redraft and resubmit
the instructions.  Had the instructions been rewritten and resubmitted, it is
reasonably probable that they would have been given, as an accused has a right to a
theory of defense instruction.

585.   Mr. Burgess was prejudiced.  Had trial counsel submitted a proper
theory of defense instruction, it is reasonably probable that it would have been
given.  Had counsel refrained from submitting a "presumption" instruction, the

burden of proof would have remained on the State, instead of shifting to

Mr. Burgess on the central issue in his case.  Had the jury heard proper

instructions, there is a reasonable probability that Mr. Burgess would not have

been convicted of capital murder.

586.    The Alabama Court of Criminal Appeals denied this aspect of

Mr. Burgess's ineffectiveness claim on the merits.  *See Burgess*, 2023 WL

4146021, at *39–40.  The state court's ruling was contrary to, and an unreasonable

application of, clearly established federal law, and was based on an unreasonable

determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d);

*Strickland*, 466 U.S. at 668.  In the alternative, this Court should decide the merits

of petitioner's claim *de novo* for the reasons articulated in paragraphs 136–38

above, which are incorporated by reference herein.  *See Loper Bright*, 144 S. Ct. at

2244.

### E.   TRIAL COUNSEL WERE INEFFECTIVE AT THE PENALTY PHASE OF THE TRIAL.

#### 1.   Trial Counsel Unreasonably Failed to Object to Prosecutorial Misconduct in the Penalty Phase Argument.

587.   Trial counsel unreasonably failed to object when the prosecutor knowingly, and in bad faith, argued facts not in evidence, gave his personal opinions, and appealed to emotion.

588.   During the arguments in the penalty phase, the prosecutor intentionally engaged in numerous acts of misconduct, including the following:

589.   The prosecutor asked the jury not to hold anything against the Crow family, (Doc. 19-12 at 177); argued the comparative worth of Mr. Burgess and Mrs. Crow, (Doc. 19-12 at 180–85); speculated about what Mrs. Crow must have been thinking before and after she was shot, (Doc. 19-12 at 188–89); and speculated about the impact of the offense on Mr. Crow.  (Doc. 19-12 at 183–85.) He argued that Mrs. Crow "is turned into evidence.  The person who was a wife and a relative and a friend has now got sealed up, put in a cooler, and is evidence in this case with a tag on it."  (Doc. 19-12 at 186.)

590.   The prosecutor improperly injected his own experiences in capital cases, vouching for the State's evidence and against the defense case.  In an attempt to persuade the jury not to consider Mr. Burgess's young age, he argued that "any time I try one of these the age is always used one way or the other as a

mitigating circumstance.  The fellows ninety years old and he killed somebody.  You know, I guess that's in some [sic] mitigation."  (Doc. 19-12 at 181.)  He also compared Mr. Burgess's case to other capital cases he tried that involved robberies of not entirely innocent victims, such as drug dealers.  (Doc. 19-12 at 183.)

591.   Trial counsel failed to object to any of the above instances of prosecutorial misconduct.  Mr. Burgess was prejudiced.  Had trial counsel objected appropriately, it is reasonably probable that the court would have sustained the objection and struck the prosecutor's vouching from the record.  If the jury had never considered the prosecutor's inaccurate, emotional, and inflammatory arguments, there is a reasonable probability that the jury would not have recommended a sentence of death and that Mr. Burgess would not have been sentenced to death.

592.   Trial counsel also unreasonably failed to object to the prosecutor's efforts to mislead the jury about the law:

593.   The prosecutor repeatedly misstated the law during his penalty phase closing arguments.  For example, the prosecutor argued at the penalty phase that Mr. Burgess's age was not a mitigating factor, saying that defendants always make that claim.  (Doc. 19-12 at 181.)  "[I]t will be up to you to decide about his age . . . [A]ny time I try one of these the age is always used one way or the other as a mitigating circumstance . . . That's up to you."  (Doc. 19-12 at 181.)  But under

Ala. Code § 13A-5-51(7) (1975), age at the time of the offense is always a

mitigating factor.  The prosecutor improperly argued that it was not.

594.   The prosecutor also misstated the law by essentially telling the jury

that mitigation had to "excuse" the crime.  He denigrated the statutory mitigating

circumstance of no significant criminal history, stating that "the law doesn't say

you get one free bite."  (Doc. 19-12 at 180.)  He suggested that true mitigation was

evidence of physical and sexual abuse, asking, "Did you hear anything like that in

this case?"  (Doc. 19-12 at 182.)  All of this was a misstatement of the law of

mitigation.  *See* Ala. Code § 13A-5-52 (1981); *Lockett v. Ohio*, 438 U.S. 586, 604

(1978) (holding that the Eighth and Fourteenth Amendments require that the

"sentencer . . . not be precluded from considering, *as a mitigating factor*, any

aspect of a defendant's character or record and any of the circumstances of the

offense that the defendant proffers as a basis for a sentence less than death").  The

prosecutor also erroneously implied that Mr. Burgess had to overcome a

presumption that death was the appropriate sentence, arguing that nothing the jury

heard would suggest that death was not the most appropriate verdict.  (Doc. 19-12

at 166.)

595.   The prosecutor further argued several factors in aggravation that had

not been alleged.  For example, he argued that the fact that Mrs. Crow had been

shot only one time was aggravating, (Doc. 19-12 at 188–89), and that she had

endured psychological torment before and after she was shot. (Doc. 19-12 at 188–89.)

596.  Trial counsel failed to object to any of the above instances of prosecutorial misconduct.  Mr. Burgess was prejudiced.  Had trial counsel objected, it is reasonably probable that the court would have sustained the objections, and that the jury would not have recommended a sentence of death.

597.  The Alabama Court of Criminal Appeals denied this aspect of Mr. Burgess's ineffectiveness claim on the merits.  *See Burgess*, 2023 WL 4146021, at *40–41.  The state court's ruling was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d); *Strickland*, 466 U.S. at 668.  In the alternative, this Court should decide the merits of petitioner's claim *de novo* for the reasons articulated in paragraphs 136–38 above, which are incorporated by reference herein.  *See Loper Bright*, 144 S. Ct. at 2244.

### 2.    Trial Counsel Unreasonably Failed to Challenge Impermissible Victim Impact Argument.

598.  No victim impact evidence was introduced at the penalty phase, although the prosecutor improperly argued it anyway.  The prosecutor played upon the sympathies of the jury and argued victim impact that was either made up or simply not supported by the testimony.  The prosecutor invited the jury to

speculate about the impact of the offense and the way in which Mrs. Crow was killed, and then compared the value of Mrs. Crow's life to that of Mr. Burgess. *See Payne*, 510 U.S. at 809 (authorizing the introduction of some victim impact evidence in the penalty phase of a capital trial, but not sanctioning the use of such evidence "to encourage comparative judgments" of the worth of the defendant and that of the victim).

599.   The prosecutor started this theme by summarizing the mitigating evidence and asking, "Now what does that weigh up against a human life?  What does that way [sic] up against somebody whose life – who was killed in the course of a robbery?"  (Doc. 19-12 at 180.)

600.   After characterizing Mrs. Crow's death as a total waste, akin to but even greater than those of lives "wasted in war," the prosecutor impermissibly suggested that the jury could give her death some degree of meaning by taking Mr. Burgess's life.  (Doc. 19-12 at 184.)  "But if you take his life . . . maybe Louise Crow won't have died for nothing.  Maybe somebody who doesn't like his clothes will decide that he can do something about improving his situation without killing somebody in some convenience store or bait shop or somebody on the street.  And Mr. Burgess, by his actions, has forfeited the right to ask for anything better than that."  (Doc. 19-12 at 187.)  In characterizing Mr. Burgess as someone who was not even entitled to ask that his life be spared, the prosecutor went

beyond asking the jury to weigh Mrs. Crow's life against Mr. Burgess's life.  He

implied that Mr. Burgess's life was so worthless, it would be outweighed by the

benefit that would be gained by executing him.  Such comparison is prejudicial and

improper, for it necessarily detracts from the jurors' reasoned weighing of

constitutionally legitimate factors.

601.   The prosecutor returned to the theme with an extended argument,

speculating about the impact of the offense:

> I cannot imagine what it's like to lose a loved one in your immediate
> family under any circumstances.  It's got to be a horrible tragedy if it's
> a car wreck or killed in the military service, a police officer shot in the
> line of duty.  But I double can't imagine what it must be like to lose a
> loved one in a senseless killing such as this.
>
> * * *
>
> Can you imagine what it must be like to go to that business up there?
> What must it be like every day?  Every time somebody in the family
> accomplishes something or there's a reunion or just some family event,
> what is the first thing you think is on their mind?  Sure wish Louise
> could have been here.  She sure would have gotten a kick out of this.
>
> What's it worth to a family to have – and I'm not talking about the
> individual details of this family because that wouldn't be admissible in
> this case.  But any time you snuff out somebody's life and they've got
> relatives and family and friends.  What's it worth to a family when a
> grandparent gets to see a kid go – or a parent goes to a ball game and
> sees his kid hit a home run?  Or make a big play?  What do you think
> it's like for the rest of them when they know wouldn't Louise like to
> have seen this.

(Doc. 19-12 at 183–85.)  This argument was pure speculation because there was no

testimony about Mrs. Crow's family or the impact of the offense upon them.

295

602.    Trial counsel unreasonably failed to challenge the prosecutor's impermissible victim impact argument and failed to move for a mistrial.  Counsel's failures prejudiced Mr. Burgess.  Had trial counsel objected, there is a reasonable probability that the jury would not have recommended a sentence of death.

603.    The Alabama Court of Criminal Appeals denied this aspect of Mr. Burgess's ineffectiveness claim on the merits.  *See Burgess*, 2023 WL 4146021, at *41.  The state court's ruling was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d); *Payne*, 501 U.S. at 808; *Strickland*, 466 U.S. at 668.  In the alternative, this Court should decide the merits of petitioner's claim *de novo* for the reasons articulated in paragraphs 136–38 above, which are incorporated by reference herein.  *See Loper Bright*, 144 S. Ct. at 2244.

### 3.    Trial Counsel Unreasonably Failed to Object to the Court's Erroneous and Unconstitutional Penalty Phase Instructions.

604.    Trial counsel unreasonably failed to object to the court's charge to the jury, which misstated Alabama law regarding the weighing process that the jury must engage in when considering a death sentence.  (Doc. 19-12 at 193; Doc. 19-13 at 4–5.)

605.    The Alabama Supreme Court, in *Ex Parte Trawick*, 698 So. 2d 162 (Ala. 1997), a decision reaffirmed in *Ex Parte Bryant*, 951 So. 2d 724 (Ala. 2002), established that § 13A-5-46 of the Alabama Code requires a trial court to affirmatively instruct the jury that it can return a verdict recommending a death sentence only if it finds that the aggravating circumstances outweigh the mitigating circumstances.  The trial court's instructions in this case were the result of the same erroneous understanding of Alabama law that the Alabama Supreme Court found in *Bryant* to constitute "plain error" in a capital case, and therefore required a reversal of the death sentence in that case.  *Bryant*, 951 So. 2d at 730.

606.    Because trial counsel never objected to the court's erroneous instruction, the trial court never told the jury that Alabama law permits a death sentence recommendation only when it finds that the aggravating circumstances outweigh the mitigating circumstances.  Thus, as was the case in *Bryant*, there can be no assurance that, in this case, "the jury did not, within the parameters of the

297

erroneous instructions, base the death penalty recommendation on a finding that the mitigating circumstances did not outweigh the aggravating circumstances even though the mitigating circumstances did equal the aggravating circumstances. Such a recommendation would be contrary to [Alabama Code] §13A-5-46(e)." *Ex Parte Bryant*, 951 So. 2d at 730 (emphasis omitted).

607.   Trial counsel's failure to object to the court's instruction prejudiced Mr. Burgess.  Had counsel objected, it is reasonably probable that the court would have sustained the objection and made clear to the jury that Alabama law permits a death sentence recommendation only in the situation where the aggravating circumstances outweigh the mitigating circumstances.  In light of these circumstances and in a case in which there was only one aggravating factor, had the jury been instructed correctly, there is a reasonable probability that the jury would not have recommended a sentence of death, and that Mr. Burgess would not have been sentenced to death.

608.   Trial counsel also unreasonably failed to request that the court instruct the jury to consider Mr. Burgess's age at the time of the shooting as a mitigating circumstance.

609.   Mr. Burgess was eighteen years old at the time of the shooting. (Doc. 19-1 at 17.)  Alabama law provides that mitigating circumstances "shall include . . . [t]he age of the defendant at the time of the crime."  Ala. Code § 13A-

5-51(7).  Although defense counsel argued for the jury to consider Mr. Burgess's age as a mitigating circumstance, (Doc. 19-12 at 167–68), counsel failed to request that the trial court tell the jury that it must consider age as a mitigating circumstance.  The prosecutor exploited this unreasonable omission by encouraging the jury to discount age as a mitigating circumstance, arguing that Mr. Burgess was twenty years old at the time of trial, and thus should be held responsible for his actions.  (Doc. 19-12 at 181.)  Counsel failed to object to this argument, which was false with regard to the relevant mitigating circumstance and was intended to mislead the jury.  Without guidance from the trial court, the jury was left to rely upon the prosecutor's misstatement of the law and voted 11–1 in favor of death.

610.  The trial court's failure to instruct the jury that Mr. Burgess's age at the time of the crime constituted a mitigating circumstance was clearly contrary to the statute.  The statute speaks in mandatory language: age "shall" be a mitigating circumstance.  A legislature uses the word "shall" to denote a mandatory duty. *See, e.g., Lopez v. Davis*, 531 U.S. 230, 241 (2001) (contrasting the use of "may" and "shall" in a statute and noting that "Congress used 'shall' to impose discretionless obligations").

611.  Trial counsel's failure to request an instruction on age as a mitigating circumstance prejudiced Mr. Burgess.  Had trial counsel requested such an

instruction, it is reasonably probable that the court would have granted their request.  The prosecutor would have been unable to encourage the jury to discount age as a mitigating circumstance by arguing that Mr. Burgess was twenty years old, *at the time of trial*, and thus should be held responsible for his actions.  (Doc. 19-12 at 181.)  The jury would have heard that Mr. Burgess's youth at the time of the shooting was mitigating.  In light of these circumstances, had the jury been told to consider age as a mitigating factor, there is a reasonable probability that the jury would not have recommended a sentence of death, and that Mr. Burgess would not have been sentenced to death.

612.    The Alabama Court of Criminal Appeals denied this aspect of Mr. Burgess's ineffectiveness claim on the merits.  *See Burgess*, 2023 WL 4146021, at *41–42.  The state court's ruling was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d); *Strickland*, 466 U.S. at 668.  In the alternative, this Court should decide the merits of petitioner's claim *de novo* for the reasons articulated in paragraphs 136–38 above, which are incorporated by reference herein.  *See Loper Bright*, 144 S. Ct. at 2244.

### F.    TRIAL COUNSEL WERE INEFFECTIVE AT THE SENTENCING HEARING.

613.    Mr. Burgess's sentencing took place on August 24, 1994, almost two months after the jury made its non-unanimous sentencing recommendation.

614.    The probation office prepared a presentence report before the hearing and provided it to counsel in advance of the hearing.  (Doc. 19-13 at 18–19.)  The report contains sections on the details of the offense, Mr. Burgess's minimal prior record, his personal background, and the probation officer's evaluation.  (Doc. 19-1 at 24–30.)  Mr. Burgess's counsel unreasonably failed to prepare for the sentencing hearing and did not provide any information to the probation officer.

615.    The officer obtained information from court files, Mr. Burgess's brother's probation and court records, and from Mr. Burgess's mother, Maggie Burgess.  (Doc. 19-1 at 28.)  The report also referred to the court-ordered psychological evaluation conducted by Dr. Lawrence Maier.  (Doc. 19-1 at 30.)

616.    At sentencing, the court asked the prosecution and defense if they had any testimony or evidence to offer.  (Doc. 19-13 at 19–20.)  The prosecution declined.  (Doc. 19-13 at 19.)  Trial counsel stated:

> Judge, Mr. Burgess has informed me last week or so and again today that he doesn't have any witnesses to call other than those that previously testified, and that he has no statements to make to this court today.

(Doc. 19-13 at 20.)

617.   Counsel argued that Mr. Burgess had a minor criminal record, (Doc. 19-13 at 21–22), that the part of the report noting that he did not get along with his teachers could be in a lot of presentence reports, (Doc. 19-13 at 22); that Mr. Burgess never hurt anyone else, (Doc. 19-13 at 25); and that compared with other capital defendants, Mr. Burgess did not deserve the death penalty.  (Doc. 19-13 at 21–26.)  The court sentenced Mr. Burgess to death by electrocution.  (Doc. 19-13 at 30.)

### 1.    Trial Counsel Unreasonably Failed to Investigate and Present Evidence in Mitigation at the Sentencing Hearing.

618.   Counsel unreasonably failed to conduct a social history investigation and introduce evidence and testimony at the August 24, 1994 hearing.  The jury returned its sentencing recommendation on June 27, 1994.  Although counsel were not prepared for the penalty phase in June, counsel had almost two months in which to prepare for the August sentencing hearing.  Counsel unreasonably failed to investigate any of the reasonably available, compelling mitigating evidence between the time of the jury's penalty recommendation and the sentencing hearing. Trial counsel's failure to investigate in preparation for the sentencing hearing prejudiced Mr. Burgess.  Had trial counsel conducted such an investigation, they would have learned of the reasonably available, compelling and overwhelming mitigation evidence, detailed above in paragraphs 180–336, which are incorporated

by reference herein.  Had trial counsel presented this mitigation evidence at the

August 24, 1994 hearing, the judge would have had a complete and accurate

picture of Mr. Burgess's life history and the mitigating circumstances concerning

the capital crime.  The prosecutor could not have argued, as he did, that the case

contained few mitigating circumstances:

> [I]f Mr. Lavender wants to talk about comparing him to what you usually see in these cases, he's got a significantly small amount of mitigating circumstances, too.  We don't see the child being abused. We don't see the terrible circumstances.  We don't see the borderline retardation.  There is a man that could have made something of himself if he wanted to.  He is not in the dire circumstances that most of the defendants that we deal with in these kind of cases come through.

(Doc. 19-13 at 28.)

619.   Had the judge heard the overwhelming and compelling mitigating

evidence in this case, it is reasonably probable that he would not have concluded

that the only statutory mitigating circumstances were the absence of a significant

history of prior criminal activity as defined in section 13A-5-51(1) and

Mr. Burgess's age at the time of the offense as defined in section 13A-5-51(7).

(Doc. 19-1 at 50–51.)  Given the overwhelming and compelling mitigating

evidence that reasonably competent counsel would have presented, it is also

reasonably probable that the judge would not have concluded that the defense

failed to present evidence of other statutory mitigating circumstances, and, in

particular, evidence under section 13A-5-51 (2), *i.e.*, evidence of extreme mental or emotional disturbance. (Doc. 19-1 at 50.)

620.   The judge's findings regarding the non-statutory mitigating circumstances demonstrate the extent to which Mr. Burgess was prejudiced by trial counsel's unreasonable failure to present the overwhelming and compelling case in mitigation. Had they done so, it is reasonably probable, for example, that the judge would not have found that "the character evidence" was "limited" to the few witnesses presented at penalty phase, (Doc. 19-1 at 51); that Mr. Burgess's "home life was not ideal, in that he lacked the presence of a father figure," (Doc. 19-1 at 51); and that his father was "neglect[ful]," (Doc. 19-1 at 51); that the only mitigating evidence concerning Mr. Burgess's mental health was Dr. Maier's diagnosis of anti-social personality disorder. (Doc. 19-1 at 51–52.)

621.   Had counsel presented the overwhelming and compelling case in mitigation, it is reasonably probable that the judge would not have found the following: the shooting was premeditated, (Doc. 19-1 at 52–53); Mr. Burgess's "actions and motives raise serious doubts about his appreciation of the value of human life," (Doc. 19-1 at 53); because of his youth and the little time in which he had to "generate any sort of criminal history, good or bad," the absence of a significant criminal history was entitled to "very slight weight," (Doc. 19-1 at 53); Mr. Burgess's lack of maturity was entitled to "very low" weight compared to the

"aggravation attendant to the offense," (Doc. 19-1 at 54); his "less than ideal" home life was entitled to "slight weight," (Doc. 19-1 at 54); the antisocial personality disorder diagnosis offered "only slight mitigation," (Doc. 19-1 at 54); and that the limited character testimony "did not rise to a level or quality that would justify a high degree of mitigation." (Doc. 19-1 at 54.) Further, it is reasonably probable that the trial court would not have concluded that it could find "little more than a young adult who has been deprived of a strong family background," which "pales by comparison with the aggravation in this case." (Doc. 19-1 at 54.) It is therefore reasonably probable that, had counsel presented evidence in support of the defense of unintentional shooting and the reasonably available, overwhelming and compelling mitigating evidence, the court would not have sentenced Mr. Burgess to death.

622. In addition, had trial counsel conducted a social history investigation, they could have provided the probation officer with the reasonably available, overwhelming and compelling mitigating evidence about Mr. Burgess. Instead, trial counsel unreasonably failed to provide the probation officer with any information. Had trial counsel provided the probation officer with the reasonably available mitigation evidence, the probation report would have contained a complete and accurate picture of Mr. Burgess's social history and mitigating facts concerning the capital crime. Had the court been presented with such a report,

305

there is a reasonable probability that the court would not have sentenced

Mr. Burgess to death.

623.   The Alabama Court of Criminal Appeals denied this aspect of Mr.

Burgess's ineffectiveness claim on the merits.  *See Burgess*, 2023 WL 4146021, at

\*42–43.  The state court's ruling was contrary to, and an unreasonable application

of, clearly established federal law, and was based on an unreasonable

determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d);

*Strickland*, 466 U.S. at 668.  In the alternative, this Court should decide the merits

of petitioner's claim *de novo* for the reasons articulated in paragraphs 136–38

above, which are incorporated by reference herein.  *See Loper Bright*, 144 S. Ct. at

2244.

> **2.    Trial Counsel Unreasonably Failed to Object to the
> Court's Consideration of Dr. Maier's Forensic Mental
> Health Evaluation.**

624.   Trial counsel unreasonably failed to object to the court's consideration

of the forensic mental health report of Lawrence Maier, Ph.D.

625.   On June 3, 1993, the trial court denied initial trial counsel's motion

for an independent mental health evaluation, (Doc. 19-1 at 73–76), and instead

appointed Dr. Maier, a psychologist under contract with the Taylor Hardin Secure

Medical Facility, to conduct a mental health evaluation of Mr. Burgess.  (Doc. 19-1

at 77–78.)  The order directed Dr. Maier to provide an opinion as to whether Mr.

Burgess was competent to stand trial and as to Mr. Burgess's mental state at the time of the charged offense.  (Doc. 19-1 at 77.)

626.   Even after the court had approved $1,000 for an independent mental health evaluation, (Doc. 19-3 at 38), trial counsel unreasonably failed to even attempt to retain a qualified mental health professional to conduct such an evaluation.

627.   Dr. Maier examined Mr. Burgess under circumstances that precluded a reliable, professional diagnosis and opinion.  The order of June 3, 1993 directed that Mr. Burgess's counsel "shall provide [Dr. Maier] such information as may be in his possession as may assist the examining psychologist/psychiatrist in the completion of the examination of the defendant's mental condition and competency to stand trial, including records of prior psychological or psychiatric treatment."  (Doc. 19-1 at 77.)  It further directed that the "District Attorney shall provide information to [Dr. Maier] concerning the nature and circumstances of the offense(s) with which the defendant is charged, as well as pertinent prior legal history."  (Doc. 19-1 at 77.)  The order specified that "all information provided to the facility . . . shall be protected from discovery according to Rule 16 [of the] Alabama Rules of Criminal Procedure."  (Doc. 19-1 at 77.)

628.   A June 8, 1993 letter from the court liaison of the Department of Mental Health and Mental Retardation, copied to trial counsel and the District

Attorney, transmitted the order to the court liaison at the Huntsville Regional

Outpatient Program and requested that counsel for Mr. Burgess provide

"information regarding any problems in their communications, any history of

psychiatric or substance abuse treatment, and any other information which they

feel important to your evaluation." (Doc. 19-1 at 79.) The letter also requested

that the prosecutor furnish information from their case files. (Doc. 19-1 at 79.)

629. During the weeks leading up to Dr. Maier's mental health

examination, Mr. Burgess had counsel in name only. He was, in every other

respect, unrepresented.

630. On June 23, 1993, Ms. Chatham filed a motion to withdraw as

Mr. Burgess's counsel. (Doc. 19-1 at 83–86.) On July 9, 1993, the court set

July 28 as the date for a hearing on Ms. Chatham's motion. (Doc. 19-1 at 31.) On

July 12, 1993, Mr. Burgess wrote to a representative of the Morgan County Jail

requesting that new counsel be appointed to represent him. (Doc. 19-1 at 81.) On

July 21, 1993, Dr. Maier met with Mr. Burgess for approximately two and a half

hours. (Doc. 19-2 at 19.) His report was submitted to the trial court on July 23,

1993. (Doc. 19-2 at 17.) In his report, Dr. Maier noted that there was "moderate

impairment" in Mr. Burgess's relationship with his attorneys, which he described

as "temporary limbo as far as legal representation is concerned." (Doc. 19-2 at 22–

23.)  On July 28, 1993, Ms. Chatham was relieved as counsel for Mr. Burgess, and

Wesley Lavender and Gregory Biggs were appointed.  (Doc. 19-1 at 32, 83–86.)

631.    Prior to the date of Dr. Maier's examination, initial counsel had

received no discovery in the case and had conducted no investigation of the

charged offense or Mr. Burgess's social history.  Counsel's motion for a mental

health examination was unreasonably premature, and there was no strategic reason

to agree to an evaluation that was not confidential.  Counsel had no knowledge that

could have served as a basis for determining what information, if any, to provide to

Dr. Maier.

632.    With the exception of information provided to Dr. Maier by a jail

supervisor, the only written material that he received was furnished by the District

Attorney's Office.  Dr. Maier described that as "extensive."  (Doc. 19-2 at 22.)  It

included Mr. Burgess's video-taped statement to the media and "Incident Reports,

Defendant Statement/Confession, Police Investigation Reports, Witness

Statements, Grand Jury Indictment, Arrest History, Subpoenas Issued to Huntsville

TV Stations, Autopsy Report, [and] Defendant Signed Understanding/Waiver of

Rights."  (Doc. 19-2 at 20.)

633.    Neither initial counsel nor trial counsel knew precisely what

documents the prosecution had provided to Dr. Maier, *e.g.*, which incident reports,

police investigation reports, and witness statements, nor did they obtain copies of

the materials provided to him. Counsel had no strategic reason for failing to obtain copies of all the documents the State had given to Dr. Maier. Nor did they have a strategic reason for failing to investigate information that Dr. Maier received from the jail supervisor. Dr. Maier's opinions were based, in part, on information that was not disclosed to Mr. Burgess or his counsel. *See Gardner v. Florida,* 430 U.S. 349, 349 (1977) (holding that a defendant "is denied due process of law when the death sentence [is] imposed, at least in part, on the basis of information which he had no opportunity to deny or explain").

634. Because Dr. Maier's conclusions were based, in part, on information that was not disclosed to Mr. Burgess or his counsel, trial counsel unreasonably failed to object to the probation officer's inclusion of portions of Dr. Maier's report in the probation report and to the court's consideration of Dr. Maier's report.

635. Dr. Maier conducted a mental health evaluation without the information about the charged offense or Mr. Burgess's social history that was necessary to reach a reliable, professional opinion about Mr. Burgess's mental status or a reliable, professional diagnosis. Consequently, reasonably competent counsel would have objected to the consideration of Dr. Maier's report, including his opinion that Mr. Burgess suffered from "Anti-Social Personality Disorder," (Doc. 19-2 at 21.)

636.    A qualified mental health professional, who had been provided by counsel with relevant social history information that counsel would have learned from an adequate mitigation investigation, as discussed above, would have concluded that Mr. Burgess had impaired psychiatric, neuropsychological, and/or psychological functioning over the long term and at the time of the offense, but would not have given the diagnosis of antisocial personality disorder.

637.    Trial counsel's failure to challenge both the probation officer's incorporation of Dr. Maier's conclusions in the pre-sentence report and the court's reliance on the report in sentencing prejudiced Mr. Burgess.  Had counsel done so, the court would not have considered Dr. Maier's erroneous and unreliable opinions, and it would have considered the fact that Mr. Burgess had impaired psychiatric, neuropsychological, and/or psychological functioning over the long term and at the time of the offense.  Had the court done so, there is a reasonable probability that the court would not have sentenced Mr. Burgess to death.

638.    The Alabama Court of Criminal Appeals denied this aspect of Mr. Burgess's ineffectiveness claim on the merits.  *See Burgess*, 2023 WL 4146021, at *43–44.  The state court's ruling was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d); *Strickland*, 466 U.S. at 668.  In the alternative, this Court should decide the merits

of petitioner's claim *de novo* for the reasons articulated in paragraphs 136–38

above, which are incorporated by reference herein.  *See Loper Bright*, 144 S. Ct. at

2244.

> **3.  Trial Counsel Unreasonably Failed to Investigate the Accuracy of the Pre-Sentence Report and Failed to Object to its Consideration by the Trial Court.**

639.  Trial counsel received the pre-sentence report, (Doc. 19-2 at 24–30),

in advance of August 24, 1994, the date that Mr. Burgess was sentenced to death,

and informed the court that they had had sufficient time to review the report.  (Doc.

19-13 at 18–19.)  They offered no objection, exceptions, or additions to the report.

(Doc. 19-13 at 20.)

640.  To obtain background information, the probation officer relied, in

part, on "his brother's [court] file and Mr. Burgess's juvenile records," (Doc. 19-2

at 28), neither of which were disclosed to counsel for Mr. Burgess, nor did counsel

make any effort to obtain those files and records.

641.  Mr. Burgess was prejudiced.  As set forth above, trial counsel

unreasonably failed to present evidence in support of an unintentional shooting

defense and to present the overwhelming, compelling case in mitigation.  Had trial

counsel conducted the necessary investigation and presented that evidence, they

would have been aware that the pre-sentence report was prejudicial to Mr. Burgess,

in significant part, because of the social history information that it omitted.

Reasonably competent counsel would have objected to the trial court's consideration of the report, and, because they would have presented the evidence of the report's gross inaccuracies and incompleteness, it is reasonably probable that the objection would have been sustained.

642.   There were numerous, highly prejudicial factual errors in the presentence report, including the omission of the history of physical and emotional abandonment, violence inflicted by both parents, and the numerous other traumatic events that marked Mr. Burgess's childhood, adolescence, and teenage years.  For example, the report lists Mr. Burgess's prior arrest record but contains no information about the circumstances of these arrests, including the fact that Mr. Burgess was homeless when almost all the arrests occurred.  (Doc. 19-2 at 28.) The presentence report identifies Mr. Burgess's parents, (Doc. 19-2 at 28), but provides no information about his father's violence toward Mr. Burgess, his mother, and his siblings, his father's abandonment of the family, or his mother's cognitive and psychological disabilities and the violence and emotional abandonment to which she subjected Mr. Burgess as a result of her own upbringing and disabilities.  The probation officer reported that one sibling, Michelle, was a student at the Center for the Developmentally Disabled, (Doc. 19-2 at 30), but provided no information about the nature of her disabilities and their effect on Mr. Burgess's family life and psychosocial development.  The presentence report noted

that another sibling, Kimberly, (Doc. 19-2 at 31), was apparently missing from home, but offered no information about the circumstances of her absence, which were related to Mr. Burgess's own traumatic life history.  The report erroneously reported that Mr. Burgess could not get along with his teachers, and implied that he had only a single head injury.  (Doc. 19-2 at 30.)  These statements were erroneous, misleading, and prejudicial, as Mr. Burgess's social history demonstrates.

643.   Had counsel conducted the necessary investigation and made the necessary and meritorious objections to the presentence report, it is reasonably probable that the court would not have relied on this erroneous, misleading and prejudicial information when sentencing Mr. Burgess, and there is a reasonable probability that Mr. Burgess would not have been sentenced to death.

644.   The Alabama Court of Criminal Appeals denied this aspect of Mr. Burgess's ineffectiveness claim on the merits.  *See Burgess*, 2023 WL 4146021, at *44–45.  The state court's ruling was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d); *Strickland*, 466 U.S. at 668.  In the alternative, this Court should decide the merits of petitioner's claim *de novo* for the reasons articulated in paragraphs 136–38

above, which are incorporated by reference herein.  *See Loper Bright*, 144 S. Ct. at 2244.

### 4.    Trial Counsel Unreasonably Failed to Present Evidence of Mr. Burgess's Remorse.

645.    Although trial counsel argued at the penalty phase that Mr. Burgess was remorseful, (Doc. 19-12 at 168), they failed to present evidence of his remorse at the penalty phase or at the sentencing hearing.  In his videotaped statements, Mr. Burgess made clear that he felt remorse for shooting Ms. Crow.  *See* State's Exhibit 101 ("And I'm sorry that I did what I did but I didn't mean to shoot the lady" . . . "I'm sorry and I didn't mean to do it like this.").

646.    Trial counsel's failure prejudiced Mr. Burgess.  The court "was not persuaded that the degree of sincerity that is attendant to the remorsefulness is present," in part because he did not make them to the probation officer.  (Doc. 19-1 at 51.)  The finding of lack of remorse was unwarranted because the finding was made without a presentation of mitigating evidence on the subject, which would have assisted the court in concluding that Mr. Burgess was truly remorseful.  Had trial counsel presented evidence of remorse, it is reasonably probable that the court would have found that this evidence constituted an additional mitigating factor that weighed against a sentence of death, and there is a reasonable probability that the court would not have sentenced Mr. Burgess to death.

647. The Alabama Court of Criminal Appeals denied this aspect of Mr. Burgess's ineffectiveness claim on the merits. *See Burgess*, 2023 WL 4146021, at *45. The state court's ruling was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d); *Strickland*, 466 U.S. at 668. In the alternative, this Court should decide the merits of petitioner's claim *de novo* for the reasons articulated in paragraphs 136–38 above, which are incorporated by reference herein. *See Loper Bright*, 144 S. Ct. at 2244.

### III. TRIAL ATTORNEY GREGORY BIGGS'S ACTUAL CONFLICT OF INTEREST VIOLATED MR. BURGESS'S RIGHT TO COUNSEL AND HIS RIGHT TO A FAIR TRIAL.

648. Gregory Biggs was counsel for Mr. Burgess from July 28, 1993 until August 24, 1994. During that entire time, he had an actual conflict of interest that was not disclosed to Mr. Burgess and that adversely effected his representation of Mr. Burgess.

649. Mr. Biggs served as a special prosecutor in the case of *People v. Timothy Lynn Cox II*, No. CC 91-0670, in the Morgan County Circuit Court. Members of the victim's family in that case retained Mr. Biggs to represent them, and the District Attorney, Bob Burrell, appointed Mr. Biggs to prosecute the case. Mr. Burrell and Mr. Biggs jointly moved the court to permit Mr. Biggs to serve as a special prosecutor. That request was granted on July 29, 1991.

650.   Mr. Biggs prosecuted the *Cox* case during the entire time that he served as counsel for Mr. Burgess.  Mr. Biggs appeared before the grand jury to obtain an indictment against Mr. Cox.  The indictment, charging Mr. Cox with first-degree rape, was returned on or about August 5, 1991.  The *Cox* prosecution continued until June 26, 1995, when Mr. Cox pleaded guilty to a reduced charge and received a twenty-month sentence.

651.   Mr. Biggs's employment as a special prosecutor was an actual conflict of interest.  Mr. Biggs was appointed by Mr. Burrell, who personally prosecuted Mr. Burgess.  In addition, some of the same Decatur police officers were involved in both cases.  Gary Walker was the lead investigator in both cases.  Both Investigator Walker and Lieutenant Richard Crowell testified before the grand jury in *Cox* and were called by Mr. Biggs as his witnesses.  In Mr. Burgess's case, these same witnesses testified for the State and were ostensibly subject to cross-examination by the defense team.  This created an actual conflict of interest.

652.   This actual conflict of interest adversely affected Mr. Biggs's representation of Mr. Burgess, including the failure to challenge the prosecution's racially discriminatory charging practices, as detailed in paragraphs 529–38, which is incorporated by reference herein; the failure to present to the jury any of the evidence that the Decatur Police Department had handled the arrest and crime scenes in an unprofessional manner, resulting in the destruction of potentially

317

exculpatory evidence, as detailed in paragraph 705, which is incorporated by reference herein; and the failure to challenge numerous instances of prosecutorial misconduct, as detailed in paragraphs 556–64 and 589–95, which are incorporated by reference herein.  Mr. Biggs's concurrent service as special prosecutor in *Cox* and as defense counsel for Mr. Burgess deprived Mr. Burgess of his rights to counsel, to the effective assistance of counsel, and to a fundamentally fair trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

653.   The Alabama Court of Criminal Appeals denied this aspect of Mr. Burgess's ineffectiveness claim on the merits.  *See Burgess*, 2023 WL 4146021, at *45–47.  The state court's ruling was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d); *Mickens v, Taylor*, 535 U.S. 162 (2002).  In the alternative, this Court should decide the merits of petitioner's claim *de novo* for the reasons articulated in paragraphs 136–38 above, which are incorporated by reference herein.  *See Loper Bright*, 144 S. Ct. at 2244.

## IV.    JURORS WERE EXPOSED TO AND CONSIDERED EXTRINSIC EVIDENCE IN VIOLATION OF THEIR DUTY TO REACH GUILT AND PENALTY VERDICTS BASED SOLELY ON THE EVIDENCE PRESENTED AT TRIAL.

654.    A jury must decide a case based solely on the evidence presented in court, and this is most critical in capital cases. *Mattox v. United States*, 146 U.S. 140, 149 (1892). As a result of an improper experiment in the jury room, Mr. Burgess's jury considered extraneous evidence that went to the heart of the defense to the capital murder charge. This introduction of outside or extrinsic information violated Mr. Burgess's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution to confrontation, to the assistance of counsel, to a reliable verdict at guilt and sentencing, to due process, and to a fair trial and sentencing by an impartial jury.

655.    The sole disputed issue at the guilt/innocence phase was intent to kill. The jurors heard Mr. Burgess's consistent statements that the shooting was unintentional. No evidence was admitted at trial with regard to the design, condition or operation of the firearm. With the exception of Mr. Burgess's statement, and notwithstanding the prosecutor's factually erroneous argument that the pathologist had testified Mrs. Crow was seated, (Doc. 19-12 at 26), no evidence was introduced concerning the position of either Mr. Burgess or Mrs. Crow at the time of the shooting. As a result of discussions during deliberations, the foreperson asked that the jury be re-instructed on the elements of murder and

capital murder. (Doc. 19-12 at 77–79.) The trial judge then reinstructed the jury.

(Doc. 19-12 at 80–91.)  An unidentified then juror asked:

> If we were to have a person in our group that has no knowledge of
> firearms whatsoever, they do not know the state of a gun ready to fire
> or not or the steps necessary to make a gun fire and et cetera, et cetera,
> et cetera, just totally, you know, confused as to whether a gun is in a
> state of fire ability or not then is there a chance we might could get a
> gun expert to come in here and tell us these – educate someone on
> firearms?

(Doc. 19-12 at 91.)

656.    The trial judge responded that there would be no additional testimony

by a firearms expert or anyone else.  (Doc. 19-12 at 92.)  The jury then returned to

deliberate.  (Doc. 19-12 at 93.)  In the presence of all twelve jurors, a discussion

took place in which individual jurors provided extrinsic knowledge and opinions

about the operation of the .25 Titan semi-automatic and pistols in general.

Juror 12[19] conducted a demonstration with the .25 Titan semi-automatic, State's

Exhibit 72, for the eleven other jurors.  He conducted the demonstration to show

how, based upon his personal knowledge, the pistol operated, including how the

safety, slide, and trigger functioned, and to show how, in his view, the pistol could

not have discharged unintentionally. Jurors 7 and 10 contributed their knowledge

and opinions about the operation of firearms, as did other unidentified jurors.  All

---

[19] Postconviction counsel provided the identity of the jurors to the state trial court
and the prosecutor in a separate letter under seal on October 19, 2004.

twelve jurors were influenced, misled, or otherwise affected by these events. Following this demonstration, the jury voted to convict.

657.   Juror 12 conducted his experiment only after the judge denied the jury's request for a "gun expert."  The judge denied this request at 3:30 p.m. on June 27, 1994.  (Doc. 19-12 at 92.)  By 3:50 p.m., the jury had already been called back into the courtroom, announced its verdict, and been polled.  (Doc. 19-12 at 100.)  In other words, no more than twenty minutes elapsed between the time the judge sent the jury back to the jury room and the jury returned with its verdict. During that short period of time, Juror 12 conducted his experiment, and the juror who had requested testimony from a "gun expert" about how the pistol operated changed her vote to "guilty."

658.   Under the Sixth Amendment, a criminal defendant has the right to confront and cross-examine those who testify against him, *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987), and a due process right to a jury verdict based solely on the evidence produced at trial.  *Turner v. Louisiana*, 379 U.S. 466, 472–73 (1965). "The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury."  *Id*. at 472 (footnote omitted).  When a juror communicates extrinsic facts regarding the accused or the alleged crimes to

other jurors, the juror becomes an unsworn witness within the meaning of the Confrontation Clause.

659.   The jury was, in effect, presented with "secret" expert testimony about the workings of the firearm that was not subject to cross-examination or even counter-argument by counsel.  Further, because many of the jurors relied upon their own knowledge of firearms—and individual jurors had different and varied experiences with firearms—they relied upon different bases of knowledge.  Jurors' personal beliefs regarding the operation of firearms were outside the scope of the evidence introduced at trial, and the jurors' beliefs were ignorant of and/or in conflict with the facts concerning design, condition and operation of State's Exhibit 72.  This misconduct requires reversal and a new trial because there is no reasonable possibility that the extrinsic evidence did not affect the jury determination.

660.   This introduction of outside or extraneous information without counsel present violated Mr. Burgess's rights to confrontation, to the assistance of counsel, to a reliable verdict at guilt and sentencing, to an individualized verdict at both phases, to due process, and to a fair trial and sentencing by an impartial jury, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

661.   The Alabama Court of Criminal Appeals denied this aspect of Mr. Burgess's ineffectiveness claim on the merits.  *See Burgess*, 2023 WL 4146021, at *50–54.  The state court's ruling was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).  In the alternative, this Court should decide the merits of petitioner's claim *de novo* for the reasons articulated in paragraphs 136–38 above, which are incorporated by reference herein.  *See Loper Bright*, 144 S. Ct. at 2244.

## V.    APPELLATE COUNSEL FOR MR. BURGESS WAS CONSTITUTIONALLY INEFFECTIVE.

662.   After Mr. Burgess was sentenced to death, the court relieved trial counsel and appointed new lawyers, Thomas DiGiulian, William Middleton, and Laura Francis, for the purpose of post-trial motions and appeal.  (Doc. 19-1 at 56.)  Ms. Francis later was relieved and Catherine Roberts was appointed.  Ms. Roberts became a prosecutor and withdrew as counsel for Mr. Burgess while the case was pending in the Court of Criminal Appeals.  Mr. DiGiulian was lead counsel.  Neither Mr. Middleton nor Ms. Roberts had handled a capital case previously.  This was Ms. Roberts's first appeal.

663.   Mr. DiGiulian agreed to represent Mr. Burgess expressly on the condition that appointed counsel would not be required to write the substantive motions and appellate briefs.  Instead, the motions and briefs would be drafted by

volunteer lawyers at the Alabama Capital Representation Resource Center, which later became the Equal Justice Initiative of Alabama.  Joseph Flood had primary responsibility for writing the motions and briefs.  He was employed at the Resource Center from approximately September 1994 to September 1995.  He had only been admitted to practice in 1994, and this was his first appeal.  Mr. Flood drafted the post-trial motions in the circuit court and the briefs in the Alabama Court of Criminal Appeals, which appointed counsel filed with few, if any, changes.  After Mr. Flood left Alabama, Ruth Friedman of the Equal Justice Initiative assisted with the appeal.  She prepared petitions and briefs, including the briefs for the Alabama Supreme Court, which appointed counsel filed with few, if any, changes.

664.   New counsel filed motions to supplement and reconstruct the record and post-trial motions for new trial, in arrest of judgment, and for a judgment of acquittal.  (Doc. 19-15 at 13–22, 24–45, 51–53.)  The circuit court denied the post-trial motions and granted and denied portions of the motions to reconstruct and supplement the record.  (Doc. 19-15 at 7.)

A.    APPELLATE COUNSEL UNREASONABLY FAILED TO OBTAIN AND REVIEW STATE'S EXHIBITS 100 AND 101, THE TAPES OF MR. BURGESS'S STATEMENTS, AND FAILED TO RAISE MERITORIOUS ISSUES ON APPEAL.

665.    Appellate counsel sought to obtain copies of State's Exhibits 100 and 101, the videotapes of Mr. Burgess's statements while he was paraded before the media.  The Court of Criminal Appeals refused to order that counsel be afforded copies but ordered that the trial court make "every effort to accommodate reasonable requests by the appellant to view" the evidence.  (Doc. 19-16 at 12.)

666.    Viewing the videotapes in the court could not be an adequate substitute for obtaining copies of the tapes and transcribing them.  Nevertheless, Mr. Burgess's appointed appellate counsel unreasonably failed to go to the Morgan County Circuit Court to view the exhibits.  Further, counsel unreasonably failed to provide any information about the exhibits to the lawyers at the Alabama Capital Representation Resource Center, who were actually drafting the briefs on appeal.

667.    State's Exhibit 100 is a complete recording of Mr. Burgess's statements, obtained by Channel 19, along with the news anchor's commentary on the story.  It was admitted into evidence but was not played for the jury.  (Doc. 19-11 at 137–38.)  State's Exhibit 101 contains the news anchor's commentary, a full version of Mr. Burgess's statement, followed by a second recording of the anchor's commentary and an edited version of Mr. Burgess's statement.  The prosecution

played portions of State's Exhibit 101 for the jury, but none of what was played was transcribed. (Doc. 19-11 at 138, 143–44.) The tape was the last evidence heard in the guilt phase of the trial. (Doc. 19-11 at 144.) As a result of their failure to view these exhibits, counsel unreasonably failed to raise on appeal that portions of State's Exhibit 101 should have been excluded from evidence because it was unduly prejudicial and violated Mr. Burgess's rights to due process, equal protection, a fair trial and a fair determination of his sentence under the Fifth, Sixth, Eighth and Fourteenth Amendments and parallel provisions of the Alabama Constitution.

668.   Appellate counsel also did not argue that the videotape was improperly edited and that the jury heard portions of the statement that should have been excluded, such as Mr. Burgess asking for the death penalty and his inflammatory reference to himself as a "black n*****."

669.   Appellate counsel's unreasonable failure to view the exhibits also deprived counsel of the ability to argue that the trial court erred in denying a change of venue. As set forth in paragraphs 403–18, which are incorporated by reference herein, there was extensive coverage of Mrs. Crow's death and Mr. Burgess's arrest and trial. Mr. Burgess's statements had been broadcast throughout the region; virtually everyone in the venire had been exposed to the broadcasts. Most of the jurors who had seen the media coverage volunteered that what they

recalled was Mr. Burgess's "confession." (*See, e.g.*, Doc. 19-6 at 159.)  As jury selection proceeded, it was all the more evident that only a handful of members of the venire had not heard of the case through the news reports.  A significant percentage of those jurors had formed an opinion that Mr. Burgess was guilty of the charged capital crime.  Without seeing the content of the broadcasts, Mr. Burgess's appellate counsel could not explain to the appellate courts how the jury pool would be, and was, tainted by the broadcasts.

670.   Mr. Burgess was prejudiced.  Had counsel viewed the videotapes and raised these arguments, there is a reasonable probability that he would have prevailed on appeal and that his conviction and/or sentence would have been reversed.

671.   The Alabama Court of Criminal Appeals denied this aspect of Mr. Burgess's ineffectiveness claim on the merits.  *See Burgess*, 2023 WL 4146021, at *48.  The state court's ruling was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d); *Strickland*, 466 U.S. at 668.  In the alternative, this Court should decide the merits of petitioner's claim *de novo* for the reasons articulated in paragraphs 136–38 above, which are incorporated by reference herein.  *See Loper Bright*, 144 S. Ct. at 2244.

## B.    APPELLATE COUNSEL WERE INEFFECTIVE IN THE CIRCUIT COURT AND ON DIRECT APPEAL.

672.    Appellate counsel's performance in the Morgan County Circuit Court was constitutionally deficient for the following reasons:

673.    In litigating the post-trial motions with respect to the composition of the jury, appellate counsel unreasonably failed to investigate and present evidence that the testimony of Ms. Toy Mitchell during jury selection incorrectly represented the percentage of African Americans nineteen years or older in Morgan County.  Ms. Mitchell testified that, based upon information provided to her, African Americans made up only 7.20 percent of persons nineteen years of age or older in Morgan County.  (Doc. 19-7 at 84–85.)  According to the Census Bureau, the percentage of African Americans age nineteen or older was actually 9.15 percent, which would support a showing that the master jury list in Morgan County, and venires drawn from the master list, violate the fair cross-section requirement of the Sixth and Fourteenth Amendments.  Counsel unreasonably failed to investigate the percentage of African Americans eligible for jury service and presented that evidence to the court.  Had they done so, there is a reasonable probability that Mr. Burgess would have prevailed in this argument and been granted a new trial.

674.    In litigating post-trial motions with respect to the composition and selection of the jury, counsel moved to supplement the record with information

from the Clerk of the Jury Commission.  Counsel were eventually given access to many of the documents, but the documents were not ordered to remain permanently as part of the record in the case.  (Doc. 19-16 at 14–15.)  Counsel unreasonably failed to ensure that they would be preserved in their original condition for all future review in this case.  Had counsel not failed to ensure that the documents were preserved for review, there is a reasonable probability that Mr. Burgess would have prevailed on this claim either on appeal or in postconviction review and been granted a new trial.

675.   Counsel unreasonably failed to raise certain meritorious grounds for relief at all stages of appeal.  Counsel's performance was ineffective for failure to argue the following claims:

676.   Mr. Burgess's sentence was disproportionate, and Alabama law requires the courts on appeal to conduct a proportionality review.  *See* Ala. Code § 13A-5-53(b)(3) (1975).  Had counsel raised this issue on appeal, there is a reasonable probability that he would have prevailed on this claim and been granted a new trial.

677.   The trial court erred in denying Mr. Burgess's motion for a change of venue.  The motion for a change of venue should have been granted based upon the actual prejudice to Mr. Burgess, as demonstrated by the sample jury proceeding and the voir dire in his case, which are detailed in paragraphs 441–50, which are

specifically incorporated by reference herein.  Counsel unreasonably failed to raise this issue on appeal.  Had counsel raised this issue on appeal, there is a reasonable probability that he would have prevailed on this claim and been granted a new trial.

678.   There was racial discrimination in the selection of the grand jury foreperson, which is detailed in paragraphs 488–96.  Counsel unreasonably failed to raise this issue on appeal.  Had counsel raised this issue on appeal, there is a reasonable probability that he would have prevailed on this claim and been granted a new trial.

679.   Mr. Burgess was prejudiced by each of his appellate counsel's failures because, had the claims been raised, there is a reasonable probability that the result of the appeal would have been different.

680.   The Alabama Court of Criminal Appeals denied this aspect of Mr. Burgess's ineffectiveness claim on the merits.  *See Burgess*, 2023 WL 4146021, at *48–49.  The state court's ruling was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d); *Strickland*, 466 U.S. at 668.  In the alternative, this Court should decide the merits of petitioner's claim *de novo* for the reasons articulated in paragraphs 136–38 above, which are incorporated by reference herein.  *See Loper Bright*, 144 S. Ct. at 2244.

### C.    TO THE EXTENT APPELLATE COUNSEL UNREASONABLY FAILED TO PRESENT ALL READILY AVAILABLE EVIDENCE IN SUPPORT OF MR. BURGESS'S *J.E.B.* CLAIM, COUNSEL WAS INEFFECTIVE.

681.    On appeal to the Alabama Court of Criminal Appeals and the Alabama Supreme Court, Mr. Burgess's counsel argued that the prosecutor had purposefully discriminated against women in the selection of his jury and squarely presented the issue to the Alabama state courts. Br. of Appellant at 16–18, *Burgess*, 827 So. 2d at 134; Reply Br. of Appellant at 9–17, *Burgess*, 827 So. 2d at 134; Appellant's Appl. for Reh'g at 8–11, *Burgess*, 827 So. 2d at 134; Br. of Pet'r-Appellant at 37–38, *Ex parte Burgess*, 827 So. 2d at 193; *see J.E.B.*, 511 U.S. 129. To the extent appellate counsel unreasonably failed to present all the available record-based facts in support of the *J.E.B.* claim to the Alabama Court of Criminal Appeals and to the Alabama Supreme Court, appellate counsel performed deficiently. In that case, the deficient performance prejudiced Mr. Burgess because but for the deficient performance, the appellate courts would have remanded for an evidentiary hearing to determine whether the prosecutor can provide gender-neutral reasons for the peremptory strikes he exercised against eleven female jurors. *See Johnson v. California*, 545 U.S. at 173 (remanding the case to the state court after holding that the petitioner had established a prima facie showing).

331

682.   The Alabama Court of Criminal Appeals denied this aspect of

Mr. Burgess's ineffectiveness claim on the merits.  *See Burgess*, 2023 WL

4146021, at *49–50.  The state court's ruling was contrary to, and an unreasonable

application of, clearly established federal law, and was based on an unreasonable

determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d);

*Strickland*, 466 U.S. at 668.  In the alternative, this Court should decide the merits

of petitioner's claim *de novo* for the reasons articulated in paragraphs 136–38

above, which are incorporated by reference herein.  *See Loper Bright*, 144 S. Ct. at

2244.

### D. APPELLATE COUNSEL WERE INEFFECTIVE FOR UNREASONABLY FAILING TO ARGUE IN THE APPLICATION FOR REHEARING THAT THE COURT ERRED IN AFFIRMING THE DENIAL OF A CHANGE OF VENUE.

683.   The trial court denied trial counsel's motion for a change of venue.

On appeal, the Court of Criminal Appeals affirmed.  The court found that Mr.

Burgess had met the "saturation of the community" prong of the inherent prejudice

test.  *Burgess*, 827 So. 2d at 160.  However, the court ruled that he had failed to

show that the pretrial publicity was "prejudicial and inflammatory."  *Id.*

684.   Although appellate counsel filed an application for rehearing on

December 4, 1998, they failed to challenge the Court of Criminal Appeals's ruling

in the following four respects:

332

685.    First, the court noted that much of the publicity came about because of the public's interest in Mr. Burgess's statements, which were of his own making. *Id.*  Neither the federal nor state Constitution supports the proposition that an accused forfeits his right to a fair trial because he makes incriminating or prejudicial statements.  *See Rideau*, 373 U.S. at 723, 726–27.  Here, the televised statements were the intended result of a "perp walk" orchestrated by members of the Decatur Police Department.

686.    Second, the court found that the televised statement, which was the most prejudicial of the coverage, was admitted into evidence, and so the prejudice was negligible.  *Burgess*, 827 So. 2d at 160.  However, it is not true that the entire videotape was admitted into evidence.  In fact, only part of the videotaped statement was admitted in evidence, with portions of it redacted as set forth in paragraph 544, which is incorporated by reference herein.  Therefore, even the admission of the videotape into evidence could not cure the prejudice of the potential jurors' exposure to the televised statement.

687.    Third, the court referred to a "cooling off" period during which there had been little publicity leading up to the trial.  *Id.* at 160–61.  Yet, as detailed in paragraphs 398–418, which are incorporated by reference herein, there was substantial media coverage up to the time of the trial.

688.    Finally, appellate counsel unreasonably failed to argue the prejudicial extent and nature of the media coverage.  As set forth in paragraphs 398–418, which are incorporated by reference herein, the content of the coverage went far beyond a reporting of the facts of the charged capital crime.  Appellate counsel unreasonably failed to demonstrate from the evidence in the record that the publicity was "prejudicial and inflammatory." *Burgess*, 827 So. 2d at 160.

689.    Appellate counsel's failures prejudiced Mr. Burgess.  Had counsel made the above arguments in their application for rehearing, there is a reasonable probability that the application for rehearing would have been granted.

690.    The Alabama Court of Criminal Appeals denied this aspect of Mr. Burgess's ineffectiveness claim on the merits.  *See Burgess*, 2023 WL 4146021, at *50.  The state court's ruling was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d); *Strickland*, 466 U.S. at 668.  In the alternative, this Court should decide the merits of petitioner's claim *de novo* for the reasons articulated in paragraphs 136–38 above, which are incorporated by reference herein.  *See Loper Bright*, 144 S. Ct. at 2244.

## VI.  THE TRIAL COURT'S FAILURE TO CHANGE VENUE DENIED MR. BURGESS A FAIR TRIAL AND AN IMPARTIAL JURY IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION.

691.    The Due Process Clause of the Fourteenth Amendment guarantees a defendant's Sixth Amendment right to a trial before "a panel of impartial, 'indifferent' jurors." *Irvin*, 366 U.S. at 722. Where "inflammatory, prejudicial pretrial publicity so pervades or saturates the community as to render [it] virtually impossible" to obtain a fair trial by an impartial jury drawn from that community, due process mandates that the trial court grant a defendant's motion for change of venue. *Mayola v. Alabama*, 623 F. 2d 992, 997 (1980); *see also Rideau*, 373 U.S. at 727. Where such pervasive pretrial publicity exists, voir dire is inadequate to protect the accused's right to a fair trial by an impartial jury.

692.    A change of venue is a constitutional imperative any time there is a "reasonable likelihood" that the community sentiment or pretrial publicity will prevent a fair trial. *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966). In *Irvin*, the Supreme Court vacated a conviction and sentence of death due to pretrial publicity and community attitudes. 366 U.S. at 728. The Court found that the "current community pattern of thought as indicated by the popular news media" established a clear and convincing "build-up of prejudice." *Id*. at 725. Although each juror in *Irvin* indicated that he or she would be able to render an impartial verdict during

335

voir dire, the Court nonetheless concluded: "Where one's life is at stake – and accounting for the frailties of human nature – we can only say that in the light of the circumstances here the finding of impartiality does not meet constitutional standards." *Id*. at 720, 724, 727–28.

693.    The failure to grant a change of venue in this case deprived Mr. Burgess of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

694.    Mr. Burgess's case generated virtually unprecedented pretrial publicity, as detailed in paragraphs 398–418, which are expressly incorporated by reference herein.  Citing the pervasive adverse publicity that saturated the community and denied Mr. Burgess an opportunity for a fair trial, defense counsel filed a motion for a change of venue.  (Doc. 19-1 at 120–22.)  Trial counsel asserted that under the circumstances it would be impossible to seat a jury capable of rendering an unbiased verdict.  (Doc. 19-1 at 121.)  The trial court denied the motion after multiple deferrals and pretrial hearings.  (Doc. 19-1 at 37–41.)

695.    Mr. Burgess appealed.  *See* Brief of Appellant at 53–60, *Burgess v. State*, No. 93-2054 (Ala. Crim. App. Apr. 28, 1995).  The Alabama Court of Criminal Appeals, which was the last court to adjudicate a reasoned ruling on this claim, affirmed.  *Burgess*, 827 So. 2d at 158–61.  The state court's ruling was contrary to, and an unreasonable application of, clearly established federal law, and

was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).  In the alternative, this Court should decide the merits of petitioner's claim *de novo* for the reasons articulated in paragraphs 136–38 above, which are incorporated by reference herein.  *See Loper Bright*, 144 S. Ct. at 2244.

## VII.   THE TRIAL COURT'S REFUSAL TO EXCUSE JURORS WHO WERE UNFIT TO SERVE DENIED MR. BURGESS A FAIR TRIAL IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

696.   A defendant is guaranteed the right to a fair trial adjudicated by an impartial jury through the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.  "The failure to accord an accused" a panel of impartial and indifferent jurors "violates even the minimal standards of due process."  *Irvin*, 366 U.S. at 722.  While a juror need not be free from all preconceived notions, they must be able to set aside their impressions or opinions in order to render a verdict based on the evidence presented at trial.  *Id*. at 723.

697.   To determine a juror's potential illicit bias, a court must ask whether the "nature and strength of the opinion formed are such [that they] raise the presumption of partiality."  *Reynolds v. United States*, 98 U.S. 145, 156 (1878).  In *Irvin*, for example, a pattern of deep community resentment and prejudice towards the defendant, which was reflected in the venire, disturbed the impartiality of the jury.  366 U.S. at 728.  With a defendant's life at stake, the Court ruled, "it is not

337

requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion." *Id*.  Moreover, a juror's assurance that they can be impartial is not "dispositive."  *Murphy v. Florida*, 421 U.S. 794, 800 (1975).  A defendant can still demonstrate that a juror's opinion raises a presumption of partiality.  *Id*.

698.    Two jurors in Mr. Burgess's case should have been struck pursuant to the defense's challenges for cause, Mr. "H." and Mr. "C."

699.    During questioning by the prosecutor about prospective jurors' experiences as victims of crime, Mr. H. stated, "I had a student that was murdered less than a year ago."  (Doc. 19-6 at 16.)  The prosecutor identified the victim as Mr. Gardner, (Doc. 19-6 at 16), and defense counsel moved to strike Mr. H. for cause, pointing out that Kevin Gardner was "a victim of Roy Burgess."  (Doc. 19-6 at 86.)  The manner in which Mr. H. responded to the question about victimization strongly suggested that he had been emotionally affected by Mr. Gardner's killing, and the challenge should have been granted.

700.    Mr. H. also expressed an opinion that Mr. Burgess was guilty based on what he had seen on television.  When asked the nature of his opinion about the case, Juror H. responded, "That opinion is that he did the deed."  (Doc. 19-6 at 71.) When trial counsel inquired if Mr. H. could set aside that opinion, the prospective juror answered, "I hope I would be able to make a decision based on what I hear in

here, but I don't know that I could put it out of my mind." (Doc. 19-6 at 71.) Trial counsel gave Mr. H. as much opportunity as possible to agree that he would "ignore" the pretrial publicity. Mr. H. replied that he could not say "for sure" that he would be able to do so. (Doc. 19-6 at 72.) A challenge for cause was denied. (Doc. 19-6 at 87.) Defense counsel used their fourth peremptory challenge to remove Mr. H., as the challenge for cause was denied. (Doc. 19-1 at 195–196; Doc. 19-7 at 174.)

701.   The second juror was Mr. C. He made clear during voir dire his exposure to pretrial publicity and his inability to be fair to Mr. Burgess during deliberations. Mr. C. was a taxi driver. As he explained, "being a cab driver, you hear more than what you normally should hear and a lot of it's been exaggerated more than it should be, so I can't, you know, say—honestly I could yes or no, just because of what I've heard." (Doc. 19-6 at 63–64.) He was asked what would happen if he was a deliberating juror and realized that the evidence did not include some information that he had acquired outside of court. "Could you just forget about that?" asked counsel. "No," replied Mr. C. (Doc. 19-6 at 64.) When pressed about whether he could obey the court's instructions to disregard the extraneous information, he candidly concluded, "I couldn't say." (Doc. 19-6 at 66.) Juror C. never affirmatively stated that he would not consider the outside information in his deliberations.

702.   Trial counsel challenged Juror C. for cause, which the trial judge

denied.  (Doc. 19-6 at 84–86.)  Defense counsel used their first peremptory

challenge to remove Mr. C., as the challenge for cause was denied.  (Doc. 19-1 at

195–196; Doc. 19-7 at 173.)

703.   The trial court's refusal to excuse jurors who were unfit to serve

deprived Mr. Burgess of his rights under the Sixth, Eighth, and Fourteenth

Amendments to the United States Constitution.

704.   The Alabama Supreme Court was the last state court to adjudicate a

reasoned opinion on this claim and denied Mr. Burgess relief.  *Ex parte Burgess*,

827 So. 2d at 195–98. The state court's ruling was contrary to, and an unreasonable

application of, clearly established federal law, and was based on an unreasonable

determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).

In the alternative, this Court should decide the merits of petitioner's claim *de novo*

for the reasons articulated in paragraphs 136–38 above, which are incorporated by

reference herein.  *See Loper Bright*, 144 S. Ct. at 2244.

### VIII.  THE STATE BOTH WITHHELD AND BELATEDLY DISCLOSED EXCULPATORY EVIDENCE IN VIOLATION OF MR. BURGESS'S RIGHT TO A FAIR TRIAL AND A RELIABLE DETERMINATION OF GUILT AND SENTENCE.

705.   The State violated Mr. Burgess's due process rights by failing to

disclose exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83

(1963) and its progeny.  The suppression of exculpatory evidence continued long

340

past the time that trial or appellate counsel could have raised these claims at trial, in a motion for a new trial, or on appeal.  Among the evidence withheld or belatedly disclosed to the prejudice of Mr. Burgess was the following:

(1)    The Decatur Police Department's videotape and photographs of the crime scene, which would have revealed the condition of the scene prior to the time that Lieutenant DeButy washed down the areas, as well as contamination of the scene.  Mr. Burgess would have used this video to undermine the integrity of the State's investigation and to impeach the testimony of key law enforcement witnesses with regard to the State's theory that the shooting was intentional.

(2)    Reports, statements, or other any information pertaining to the photographic lineup shown to Laurie Marett, and any identifications she made or failed to make after viewing the photographic lineup.  Mr. Burgess would have used this information to undermine the integrity of the State's case by demonstrating that law enforcement officers engaged in improper conduct.

(3)    Affidavits collected by Decatur police officers concerning Mr. Burgess's change of venue motion and any statements, reports, or other information pertaining to the collection of those affidavits, which would have demonstrated that the affidavits were biased, inaccurate, unreliable and obtained using improper police tactics.  On February 17, 1994, the prosecutor sent two Decatur police investigators to gather affidavits from members of the community, attesting to their opinion that Mr. Burgess could receive a fair trial in Morgan County.  (Doc. 19-2 at 69–76; Doc. 19-3 at 85–86, Doc. 19-4 at 9–10.)  Although the affidavits had some sections for affiants to fill in demographic information, the critical language, i.e., the affiants' personal opinions, were printed on the form.  (Doc. 19-2 at 69–76.)  The affiants knew that the individuals soliciting their signatures were law enforcement officers.  (Doc. 19-3 at 85–86, 100–01, 107–08, 119.)  One officer did not obtain affidavits from those who believed Mr. Burgess could not get a fair trial in Morgan County,

and did not keep any list of the identities of those who declined to sign an affidavit. (Doc. 19-4 at 9–10.) Had the State provided trial counsel with this information before the change of venue motion, they could have demonstrated that the prosecution's assertion that Mr. Burgess could get a fair trial in Morgan County was groundless. It is reasonably probable that the court would have granted their motion for change of venue, as detailed in Claim VI, which is incorporated by reference herein.

706. The exculpatory evidence withheld in this case, individually and collectively, violates Mr. Burgess's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

707. The Alabama Court of Criminal Appeals denied this aspect of Mr. Burgess's ineffectiveness claim on the merits. *See Burgess*, 2023 WL 4146021, at *54–55. The state court's ruling was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). In the alternative, this Court should decide the merits of petitioner's claim *de novo* for the reasons articulated in paragraphs 136–38 above, which are incorporated by reference herein. *See Loper Bright*, 144 S. Ct. at 2244.

## IX.    THE STATE PRESENTED FALSE AND MISLEADING TESTIMONY THAT DEPRIVED MR. BURGESS OF A FAIR TRIAL AND A RELIABLE DETERMINATION OF GUILT AND PENALTY.

708. In violation of *Napue v. Illinois*, 360 U.S. 264 (1959), the prosecutor knowingly introduced false and misleading testimony in the following respects:

709.   The prosecutor knew the manner in which law enforcement officers had improperly handled the firearms evidence recovered at the arrest scene.  As detailed in paragraphs 111–24, which are incorporated by reference herein, the prosecutor intentionally presented his case to mislead the jury to believe that the conduct of the officers was proper and the integrity of the evidence had been preserved.  The prosecutor did so with the objective of obtaining a capital murder conviction and a death sentence that were unsupported by the truth of the evidence.

710.   The crime scene was contaminated, inadequately and improperly recorded, inadequately and improperly searched, and not secure.  As detailed in paragraphs 111–24, which are incorporated by reference herein, the prosecutor knowingly introduced false and misleading evidence to show that the evidence obtained at the scene was uncontaminated and the descriptions and opinion testimony of the State's witnesses were reliable.

711.   As detailed in paragraphs 111–24, which are incorporated by reference herein, the prosecutor intentionally examined the pathologist, Dr. Embry, Investigator Boyd, and other witnesses, to lead the jury to conclude erroneously that Mrs. Crow was seated when she was shot, and that she was conscious and suffered for some period of time after the shooting.

712.   The prosecutor intentionally introduced the testimony of Investigator Sheila Moore to mislead the jury to conclude erroneously that the shell casing was

found in a location consistent with its theory of an intentional shooting.  The
testimony of Investigator Moore is detailed in paragraphs 116 and 120, which are
incorporated by reference herein.

713.   As detailed in paragraph 123, which is incorporated by reference
herein, the prosecutor deliberately misled the jury to believe that the missing mace
was evidence of Mr. Burgess's dishonesty, rather than of negligent police work.

714.   The prosecutor intentionally introduced the testimony of Detective
Long to mislead the judge to conclude that Mr. Burgess had reinitiated contact
with officers during his custodial interrogation and thereby deny Mr. Burgess's
motion to suppress his statements.  The circumstances of Mr. Burgess's arrest and
the testimony of Detective Long are detailed in paragraphs 500–07, which are
incorporated by reference herein.  As a result, the motion was denied, and the
statements were presented before the jury.

715.   The prosecutor's knowing use of false and misleading testimony was
material.  It affected the judgment of the jury.  It made the trial fundamentally
unfair, violated due process, and denied Mr. Burgess a reliable determination of
guilt and penalty, all in violation of the Fifth, Sixth, Eighth, and Fourteenth
Amendments to the United States Constitution, parallel provisions of the Alabama
Constitution, and other applicable provisions of state, federal, and international
law.

716.    The Alabama Court of Criminal Appeals denied this aspect of Mr.

Burgess's ineffectiveness claim on the merits.  *See Burgess*, 2023 WL 4146021, at

*55–56.  The state court's ruling was contrary to, and an unreasonable application

of, clearly established federal law, and was based on an unreasonable

determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).

In the alternative, this Court should decide the merits of petitioner's claim *de novo*

for the reasons articulated in paragraphs 136–38 above, which are incorporated by

reference herein.  *See Loper Bright*, 144 S. Ct. at 2244.

## X.    THE TRIAL COURT'S FAILURE TO PERMIT INDIVIDUAL VOIR DIRE DENIED MR. BURGESS A FAIR TRIAL AND AN INDIVIDUALIZED SENTENCING.

717.    While the nature of voir dire is generally left to the sound discretion

of the trial judge, that discretion is limited by the requirements of due process.

*Estes v. Texas*, 381 U.S. 532, 539–40 (1965).  Mr. Burgess's case was

accompanied by an unprecedented onslaught of pretrial publicity in Morgan

County, Alabama, as detailed in paragraphs 398–418, which are expressly

incorporated by reference herein.

718.    Due to the pervasive effect of the pretrial publicity in this case, trial

counsel moved for individual voir dire of the prospective jurors, arguing that such

a procedure was necessary to discern bias and avoid contamination of the entire

panel.  (Doc. 19-1 at 123–25.)  Trial counsel argued that individual voir dire was

the only means of determining the effect of pretrial publicity without causing further prejudice. (Doc. 19-3 at 39–40.) The trial court denied the motion. (Doc. 19-3 at 41.) The failure to provide individual voir dire deprived Mr. Burgess of his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

719. Mr. Burgess appealed, arguing that the failure to allow individual voir dire deprived Mr. Burgess of a fair trial. Brief of Appellant at 35–51, *Burgess v. State*, No. 93-2054 (Ala. Crim. App. Apr. 28, 1995). The Alabama Court of Criminal Appeals, the last state court to adjudicate a reasoned opinion on this claim, affirmed. *Burgess v. State*, 827 So. 2d at 154–55. The state court's ruling was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). In the alternative, this Court should decide the merits of petitioner's claim *de novo* for the reasons articulated in paragraphs 136–38 above, which are incorporated by reference herein. *See Loper Bright*, 144 S. Ct. at 2244.

### XI.   THE TRIAL COURT'S FAILURE TO QUASH THE VENIRE AFTER PROSPECTIVE JUROR ORR VIOLATED HIS OATH BY INFORMING MEMBERS OF THE VENIRE MR. BURGESS WAS GUILTY, DENIED MR. BURGESS A FAIR TRIAL.

720.   The Supreme Court made clear in *Irvin* that the right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."  366 U.S. at 722.  Moreover, the "[e]xercise of calm and informed judgment by [the jury] is essential to proper enforcement of law."  *Sinclair v. U.S.*, 279 U.S. 749, 765 (1929).  In *Turner*, the Supreme Court applied these standards to a jury that was potentially influenced by two key witnesses who were also in charge of transporting and sequestering the very same jury.  379 U.S. at 467–68.  The Court reiterated that the evidence developed against a defendant must come from within the court room.  *Id*. at 472–73.

721.   Venire member Orr prejudiced other members of the venire in Mr. Burgess's case.  In addition to telling at least five jurors that Mr. Burgess was guilty and had confessed, Orr talked to several other jurors and was observed "running his mouth."  (Doc. 19-7 at 113–18, 132.)  After the completion of voir dire, but before the attorneys struck the jury, court employee Toy Mitchell informed the court that two venire members informed her that a third juror was telling others on the venire that Mr. Burgess was guilty.  (Doc. 19-7 at 103–05.)  The court decided to examine those two jurors, Robinson and Haga, separately to

347

assess the report. (Doc. 19-7 at 104–05.) Both Robinson and Haga informed the court that while in the smoking lounge the previous afternoon, juror Orr told them and two or three other jurors that he had watched Mr. Burgess's confession on television and knew he was guilty. (Doc. 19-7 at 107–11.) Robinson advised the court that she had not remembered a videotape until hearing Orr's comments. (Doc. 19-7 at 113–18.) In addition, Robinson observed Orr regularly talking to another male juror. (Doc. 19-7 at 113–18.) Haga also saw Orr talking to several other jurors and generally "running his mouth." (Doc. 19-7 at 132.)

722.   Based on these facts, defense counsel moved for individual voir dire to determine the effects of Mr. Orr's comments. (Doc. 19-7 at 136–38.) The trial court denied counsel's motion, insisting on a group voir dire process. (Doc. 19-7 at 136–39.) First, however, the court called venire member Orr into the courtroom. (Doc. 19-7 at 138–39.) After initially denying any discussion, Orr admitted to talking about the case with a group of two or three women and one man. (Doc. 19-7 at 141–43.) The court continued by calling the entire array into the courtroom to conduct group voir dire, pointing out Orr, and asking the jurors who had talked with Orr about the case to stand up. (Doc. 19-7 at 151.) Only one other venire member, Byrd, stood up. (Doc. 19-7 at 153.) Byrd added that she was not one of the four jurors present with Orr in the smoking lounge, but rather that Orr informed her that Mr. Burgess was guilty at lunch the day before. (Doc. 19-7 at 161.)

723.   Given Orr's misconduct and the potential prejudice it caused, defense counsel then moved to quash the venire.  (Doc. 19-7 at 165–69.)  The trial court denied the motion without determining the identity of the remaining venire members who had talked to Orr about the case or whether Orr had illicitly discussed the case with any other jurors.[20]  (Doc. 19-7 at 170–71.)

724.   The failure to quash the venire deprived Mr. Burgess of his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  Orr's misconduct was particularly damaging since it related directly to Mr. Burgess's guilt or innocence.  Because several of the prospective jurors also saw Mr. Orr talking at length with other venire members, it is reasonable to infer that he had similar discussions with other jurors who failed to identify themselves to the court.

725.   Mr. Burgess appealed.  *See* Brief of Appellant at 51–53, *Burgess v. State*, No. 93-2054 (Ala. Crim. App. Apr. 28, 1995).  The Alabama Court of Criminal Appeals, the last state court to adjudicate a reasoned opinion on this claim, affirmed on the merits.  *Burgess*, 827 So. 2d at 157–58.  The state court's ruling was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of

---

[20] The trial court stated in conclusory terms that the two unidentified jurors were from a venire in a different case. (Doc. 19-7 at 164–65.)  The record contains no facts to support that conclusion.

the evidence presented.  28 U.S.C. § 2254(d).  In the alternative, this Court should decide the merits of petitioner's claim *de novo* for the reasons articulated in paragraphs 136–38 above, which are incorporated by reference herein.  *See Loper Bright*, 144 S. Ct. at 2244.

### XII.    THE IMPOSITION OF A DEATH SENTENCE ON MR. BURGESS, WHO WAS EIGHTEEN YEARS OLD AT THE TIME OF THE CRIME, VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS.

726.    Mr. Burgess was eighteen when he was arrested in this case.  The imposition of a sentence of death in this case violated Mr. Burgess's rights under the Eighth and Fourteenth Amendments because the constitutional prohibition of the execution of juveniles announced in *Simmons* should be extended to individuals who were between the ages of eighteen and twenty-one at the time of their offenses.  543 U.S. at 573–74.  Even if this Court does not extend *Simmons*'s categorical exemption to individuals who were between eighteen and twenty-one years of age at the time of their offenses, this Court should apply the exemption to Mr. Burgess because he possessed the characteristics that led the Supreme Court in *Simmons* to conclude that "juvenile offenders cannot with reliability be classified among the worst offenders."  *Id.* at 569.

727.    ***Scientific evidence, both pre- and post-Simmons, establishes that the penological purpose of the death penalty is not fulfilled when directed at individuals between the ages of eighteen and twenty-one, since they are***

***reasonably likely to have the same neurobiological deficits as individuals under
eighteen years of age that led to the categorical exemption in Simmons.*** Recent
sociological and neuroscientific research supports the conclusion that youthful
offenders have the same vulnerabilities as juvenile offenders such that they do not
constitute the "worst offenders" for whom the death penalty is reserved. *Simmons*,
543 U.S. at 569. *See, e.g.*, Laurence Steinberg, *Does Recent Research on
Adolescent Brain Development Inform the Mature Minor Doctrine?*, 38 J. Med. &
Phil. 256, 257 (2013) ("There now is incontrovertible evidence that adolescence is
a period of significant changes in brain structure and function, and strong
consensus among developmental neuroscientists about the nature of this change.
Significantly, the most important conclusion to emerge from this research is that
important changes in brain anatomy and activity take place far longer into
development than had been previously thought—in some respects, into the early
and mid-20s."). As a consequence, execution of those who were under twenty-one
years of age at the time of their offenses does not serve the constitutionally
accepted purposes of capital punishment, which are retribution and deterrence. *See
Simmons*, 543 U.S. at 571; *see also Atkins v. Virginia*, 536 U.S. 304, 319 (2002).

728. As with juveniles, there are three broad developmental differences
between youthful offenders aged eighteen, nineteen, twenty, and adults aged
twenty-one years and over. First, individuals aged between eighteen and twenty-

one are more prone to impulsive risk-taking behavior than mature adults, in part

attributable to a "mismatch" between the limbic system and the development of the

prefrontal cortex.  Second, this age group remains vulnerable to peer pressure just

like juveniles.  Third, neither the brain nor the character of these individuals is

fully formed. They are as vulnerable to risk-taking and peer pressure as juveniles,

and they lack the ability to fully reflect upon the consequences of their actions.  As

with juveniles, individuals aged eighteen, nineteen, and twenty still have the

capacity "to attain a mature understanding of [their] own humanity."  *Simmons*,

543 U.S. at 574.

729.    The *Simmons* Court found that the "[t]hree general differences

between juveniles under eighteen and adults demonstrate that juvenile offenders

cannot with reliability be classified among the worst offenders."  *Simmons*, 543

U.S. at 569–70.  In light of the post-*Simmons* scientific and sociological evidence

demonstrating that the three general characteristics distinguishing juveniles from

adults also exist in individuals between eighteen and twenty-one years of age, it is

now evident that neither penological goal "provides adequate justification for

imposing the death penalty" on this group of offenders.  *Id*. at 572.

730.    The underdeveloped brains of individuals between eighteen and

twenty-one years of age, coupled with environmental influences that exacerbate

their vulnerabilities, leave them with the very characteristics that the Supreme

Court identified as warranting an exemption from the death penalty under

*Simmons*. Therefore, the *Simmons* categorical exemption from the death penalty

for individuals under the age of eighteen at the time of their offenses should be

extended to emerging adults up to the age of twenty-one.

731. ***A national consensus supports extending* Simmons *to individuals***

***who were under the age of twenty-one at the time of their offenses.*** In

determining whether a national consensus exists to support declaring a punishment

unconstitutional under the Eighth Amendment, the Supreme Court has looked to

both state legislation and practice, that is, whether legislatively authorized death

sentences were being carried out. *Simmons*, 543 U.S. at 563; *Atkins*, 536 U.S. at

313–15; *Hall v. Florida*, 572 U.S. 701, 714–18 (2014); *see also Miller v. Alabama*,

567 U.S. 460, 485–89 (2012) (examining question in life without parole context);

*Graham v. Florida*, 560 U.S. 48, 62–67 (2010) (same). The practice of imposing

and carrying out death sentences on individuals under the age of twenty-one, as

well as legislation regarding the treatment of individuals under the age of twenty-

one, support a finding that a national consensus has developed against the

execution of individuals who committed crimes between the ages of eighteen and

twenty-one.

732. Across the country, state sentencing practices demonstrate a trend

toward abolition of the death penalty for individuals who were between eighteen

and twenty-one at the time of the offense.  Of the fifty-two jurisdictions in the United States (the fifty states, the District of Columbia, and the federal government), there is no reasonable likelihood of executing a person who was in that age group in forty of those jurisdictions.  They include twenty-three states and the District of Columbia that have abolished capital punishment; five states in which there is a gubernatorial moratorium on executions; six states where the death penalty remains legally possible but that have effectively abandoned it; and five states that have not executed anyone in the last ten years who was under twenty-one years of age at the time of the crime (and were not included in the previous categories.  *Death Penalty Census Data*, Death Penalty Info. Ctr. ("DPIC"), https://deathpenaltyinfo.org/database/sentences (Dec. 17, 2024); *Execution Database*, DPIC, https://deathpenaltyinfo.org/database/executions (Dec. 17, 2024); *State by State*, DPIC, https://deathpenaltyinfo.org/states-landing (Dec. 17, 2024).  Over at least the past decade, these numbers demonstrate a de facto prohibition on the execution of offenders who were eighteen years of age at the time of the crime.

733.   Moreover, because individuals under the age of twenty-one remain a legally protected class for a wide range of purposes, they should be protected from the imposition of the death penalty as well.  The Court in *Simmons* considered state statutes imposing minimum age requirements to support its conclusion that the death penalty was unconstitutional for offenders under the age of 18.  543 U.S. at

569, 579–588.  In the same way that state law treatment of individuals under the age of eighteen informed *Simmons*'s "recognition of the comparative immaturity and irresponsibility of juveniles," the extent to which states prohibit individuals under age twenty-one from participating in certain activities and confer upon them the benefits of minority status reflects a wide-ranging "recognition of the comparative immaturity and irresponsibility" of these emerging adults.  *Id.* at 569. The state law age minimums of twenty-one or above tend to apply to activities— such as consuming alcohol or marijuana, fostering children, obtaining credit cards, and possessing a handgun—in which impulsive behavior and acting without reflection or responsibility would have significant consequences.  *See, e.g.*, 23 U.S.C. § 158 (national minimum drinking age is 21 years); 15 U.S.C. § 1637(c)(8), (p) (credit card restrictions for those under 21); 18 U.S.C. § 922(b)(1), (c)(1); 27 C.F.R. § 478.99(b) (prohibits the sale of handguns to those under 21 years).  Acknowledgement of the immaturity and vulnerability of young adults and the resulting need to protect them is further reflected in the fact that both state and federal laws extend protections generally reserved for juveniles—such as foster care benefits, health insurance coverage, and free public education—to young adults up to the age of twenty-one or older.  *See* 29 CFR § 2590.715-2714 (health care coverage); Ind. Collaborative Care Program (extending foster care benefits until 20 years and voluntary services until 21 years); Ala. Code §16-39-3

(guaranteeing all students, birth through twenty-one, with disabilities receive at least twelve years of free public schooling).

734.   Finally, when conducting an Eighth Amendment analysis, the Supreme Court has frequently looked to international laws, norms, and practices in determining contemporary standards of decency.  *Simmons*, 543 U.S. at 562–563 (explaining that in deciding *Stanford v. Kentucky*, 491 U.S. 361 (1989) and *Atkins*, 536 U.S. at 304, the Court inquired into society's evolving standards of decency). In holding that the Eighth Amendment precludes a sentence of life without parole for juveniles who commit non-homicide crimes, the Court observed that this is "a sentencing practice rejected the world over."  *Graham*, 560 U.S. at 80.  Thus, it is relevant here that other nations treat emerging adults under the age of twenty-one less harshly than adult offenders over the age of twenty-one.  The international community has recognized the need to treat young offenders under the age of twenty-one differently from mature adults.  For example, the United Nations Standard Minimum Rules for the Administration of Juvenile Justice require that "[e]fforts shall also be made to extend the principles embodied in the Rules to young adult offenders," and extend the protection afforded by the Rules to cover proceedings dealing with young adult offenders.  G.A. Res. 40/33, annex, United Nations Standard Minimum Rules for the Admin. of Juv. Just., U.N. Doc. A/RES/40/33 at 207 (Nov. 29, 1985).  The United Nations Committee on the

Rights of the Child has expressed appreciation for member states that "allow for the application of the rules and regulations of juvenile justice to persons aged 18 and older, usually till the age of 21, either as a general rule or by way of exception."  UN Comm. on the Rts. of the Child, Gen. Comment No. 10, Children's rights in juv. just., U.N. Doc. CRC/C/GC/10 ¶ 38 (Apr. 25, 2007).

735.    ***Even if this Court declines to extend* Simmons *to individuals who were under twenty-one years of age at the time of their offenses, the exemption applies to Mr. Burgess.***  Mr. Burgess was eighteen years old at the time of his offense, but he still possessed the characteristics of a juvenile—such as immaturity and unformed character—that the Supreme Court identified when concluding that "juvenile offenders cannot with reliability be classified among the worst offenders." *Simmons*, 543 U.S. at 569.  The imposition of a sentence of death therefore violated Mr. Burgess's rights under the Eighth and Fourteenth Amendments.

736.    At time of the offense, Mr. Burgess manifested the neurobiological deficits identified in *Simmons*, such that he had the mental capacity of a minor. Mr. Burgess had lived his eighteen years in environments that were not only physically dangerous and emotionally damaging, but also marked by grossly inadequate parental and institutional support.  Mr. Burgess's childhood was characterized by repeated traumatic experiences and environmental risk factors that

included poverty, physical abuse, abandonment, and neglect, as detailed in paragraphs 180–336, which are expressly incorporated by reference herein.  As a result, Mr. Burgess was at significant psychosocial risk to develop mental health disorders.

737.    Mr. Burgess's life experiences demonstrate that, at the time of his crime, he possessed all the characteristics identified by the Court in *Simmons* as requiring the protection of juveniles from the death penalty.  Mr. Burgess at eighteen personified the lack of maturity, susceptibility to negative influences, and unformed character of youth that led the Supreme Court to spare those under the age of eighteen from the death penalty.  Therefore, this Court should exempt Mr. Burgess from the death penalty.

738.    The Alabama Court of Criminal Appeals denied this claim on the merits.  *See Burgess*, 2023 WL 4146021, at *56.  The state court's ruling was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).  In the alternative, this Court should decide the merits of petitioner's claim *de novo* for the reasons articulated in paragraphs 136–38 above, which are incorporated by reference herein.  *See Loper Bright*, 144 S. Ct. at 2244.

XIII. **THE ALABAMA DEATH PENALTY STATUTE AND THE PROCEDURES RESULTING IN MR. BURGESS'S SENTENCE OF DEATH VIOLATE THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

739.    Alabama's capital sentencing scheme is unconstitutional under *Hurst v. Florida*, 577 U.S. 92 (2016).  In 1981, Alabama adopted a death penalty statute nearly identical to the Florida statute struck down in *Hurst.  See Harris v. Alabama*, 513 U.S. 504, 508 (1995) ("Alabama's death penalty statute is based on Florida's sentencing scheme . . .").  Alabama's death penalty sentencing scheme that was in effect at the time of Mr. Burgess's trial had the same defect that the *Hurst* Court found unconstitutional: the trial court, not the jury, made every finding necessary to impose the death penalty while the jury's sentencing verdict was, by statute, merely an "advisory" recommendation "not binding upon the court."  Ala. Code §§ 13A-5-46, -47 (1975).

740.    Mr. Burgess was sentenced pursuant to this capital sentencing scheme.  His jury returned a non-unanimous advisory verdict, not binding on the court. (Doc. 19-1 at 48, 52.)  Instead, his trial judge made all the factual findings necessary to impose a sentence of death. (Doc. 19-1 at 48–56.)  In doing so, the court also considered evidence never presented to the jury, including a pre-sentence report, (Doc. 19-1 at 48–49); Mr. Burgess's failure to provide a social history to the probation office, (Doc. 19-1 at 51); a finding that Mr. Burgess's remorse was insufficiently sincere, (Doc. 19-1 at 51); and the court psychiatrist's

diagnosis of antisocial personality disorder, (Doc. 19-1 at 52) ("[T]he Court does find, although no evidence was presented to this effect at trial, that the defendant was diagnosed as having an antisocial personality disorder by the Court's appointed psychiatrist.").

741.   The Sixth Amendment also requires that every fact necessary to impose the death penalty must be found by a jury.  *Hurst*, 577 U.S. at 98–101; *see also Ring v. Arizona,* 536 U.S. 584, 588–89 (2002).  In *Hurst*, the Supreme Court noted that, under Florida law, the "findings necessary to impose the death penalty" extended beyond the existence of an aggravating factor to findings regarding mitigating circumstances and the relative weight of each.  577 U.S. at 98–99.  After faulting Florida's statute for "the central and singular role the judge plays," the Court explained, "[T]he Florida sentencing statute does not make a defendant eligible for death until 'findings *by the court* that such person shall be punished by death.'  The trial court *alone* must *find 'the facts* . . . [t]hat sufficient aggravating circumstances exist' and '[t]hat there are *insufficient mitigating circumstances to outweigh the aggravating circumstances*.'"  *Id.* at 99–100 (internal citations omitted; third and fourth emphases added).  Because the weighing determination was a fact finding necessary to render the defendant eligible for the death penalty, *Hurst* held, it could not be made by the trial court alone.  *Id.*  Further, even though the Florida law required that the jury conduct its own weighing process, the fact

360

that the resulting verdict was "advisory" meant that it could not suffice as the "necessary factual finding that *Ring* requires." *Id.*

742. A jury returned a non-unanimous advisory death verdict of 11–1 in Mr. Burgess's case. (Doc. 19-1 at 52.) The judge made independent factual findings with respect to mitigating and aggravating circumstances, (Doc. 19-1 at 49–52), and then independently determined that the aggravating circumstances outweighed the mitigating circumstances in Mr. Burgess's case. (Doc. 19-1 at 52–55.) The judge repeatedly informed the jury that their penalty phase verdict was only a recommendation. (Doc. 19-12 at 191–93, 195, Doc. 19-13 at 3–5.)

743. Finally, after *Hurst*, a state may not "allow a sentencing judge to find an aggravating circumstance, independent of a jury's factfinding, that is necessary for imposition of the death penalty." 577 U.S. at 102. This is exactly what happens in Alabama and what occurred in Mr. Burgess's trial, however, where a defendant can only be sentenced to death if the existence of a statutory aggravating circumstance is proved beyond a reasonable doubt. Ala. Code § 13A-5-45(f) (1975); *see also* §§ 13A-5-47(d), (e) (1975).

744. The Alabama Court of Criminal Appeals denied this aspect of Mr. Burgess's ineffectiveness claim on the merits. *See Burgess*, 2023 WL 4146021, at *56. The state court's ruling was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of

the facts in light of the evidence presented.  28 U.S.C. § 2254(d); *Strickland*, 466 U.S. at 668.  In the alternative, this Court should decide the merits of petitioner's claim *de novo* for the reasons articulated in paragraphs 136–38 above, which are incorporated by reference herein.  *See Loper Bright*, 144 S. Ct. at 2244.

## XIV.  THE CUMULATIVE EFFECT OF THE ERRORS DEPRIVED MR. BURGESS OF A FUNDAMENTALLY FAIR TRIAL AND RIGHTS GUARANTEED BY THE UNITED STATES AND ALABAMA CONSTITUTIONS.

745.   Mr. Burgess has set forth the grounds that show why this petition should be granted.  In addition to these individual grounds, cumulative error has denied Mr. Burgess his right to a fundamentally fair trial and other rights guaranteed by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

746.   The Alabama Court of Criminal Appeals denied this aspect of Mr. Burgess's claim on the merits.  *See Burgess*, 2023 WL 4146021, at *58.  The state court's ruling was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).  In the alternative, this Court should decide the merits of petitioner's claim *de novo* for the reasons articulated in paragraphs 136–38 above, which are incorporated by reference herein.  *See Loper Bright*, 144 S. Ct. at 2244.

## CONCLUSION

747.   All of the claims for relief and references to violations of Mr. Burgess's federal constitutional rights are expressly intended to, and by this reference do, allege violations of Mr. Burgess's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and their individual clauses and sections, as well as all other applicable federal law.  Each of the claims pleaded herein relies on all facts pleaded throughout the petition, and the prejudice resulting from all constitutional errors must be considered cumulatively.

748.   Mr. Burgess was denied a full, fair, and adequate hearing in state court with respect to the claims raised herein.  Because Mr. Burgess was denied a hearing with respect to each of his postconviction claims, he has had no opportunity to prove their factual bases.  With respect to each of the guilt phase claims raised herein, this Court should review the claim on the merits, vacate Mr. Burgess's conviction, and order a new trial.  With respect to each of the penalty and sentencing phase claims raised herein, this Court should review the claim on the merits, vacate Mr. Burgess's death sentence, and order a new sentencing trial.

## PRAYER FOR RELIEF

For the reasons set forth above and other such reasons as may be made upon amendment to this petition and an evidentiary hearing, Mr. Burgess respectfully requests that this Court grant him the following relief:

1.      Issue a writ of habeas corpus vacating Mr. Burgess's conviction and sentence of death;

2.      Afford Mr. Burgess an opportunity to respond to any responsive pleading by the Respondent;

3.      Hold an evidentiary hearing so that Mr. Burgess may present evidence in support of his claims, including evidence that he attempted, but was not permitted, to present in state proceedings;

4.      Grant Mr. Burgess discovery under Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts and a sufficient period of time to conduct discovery;

5.      Permit Mr. Burgess, after additional factual development, an opportunity to brief and argue the issues presented in this petition;

6.      Grant such other relief as may be just and appropriate.

///

Dated:  August 15, 2025                    Respectfully submitted,

                                           /s/ *Ty Alper*
                                           Ty Alper, #ASB-3045-T68A
                                           Elisabeth Semel (*pro hac vice pending*)
                                           U.C. Berkeley School of Law
                                           346 North Addition
                                           Berkeley, CA 94720-7200
                                           Tel: (510) 643-7849
                                           talper@law.berkeley.edu
                                           esemel@law.berkeley.edu

                                           *Counsel for Petitioner Willie Burgess, Jr.*

## ATTORNEY'S VERIFICATION UNDER OATH

I affirm under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Dated this 14ᵗʰ day of August, 2025.

Ty Alper

Subscribed and sworn to before me on this 14ᵗʰ day of August 2025.

Signature: _____
Notary Public



Alexis Robart
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
02/16/2029

## CERTIFICATE OF SERVICE

I hereby certify that on this date, August 15, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

*/s/ Ty Alper*
Ty Alper